UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SIMONE T. TASSONE,

Plaintiff,

v. C. A. No. 03-481ML

PROVIDENCE SCHOOL BOARD,

Defendant.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S OBJECTION**

Defendants in the above-referenced case hereby respond to the objection filed by the Plaintiff on 1 November 2005, and received in the Law Department on 2 November 2005.

Counsel for Plaintiff misstates the chronology and mischaracterizes the Defendants' persistent efforts to gain discovery of Plaintiff's claims. Counsel for Defendants hereby avers as follows:

(1) Defendants sought to depose Plaintiff on 16 September 2004 and 1 October 2004; at the request of Plaintiff and/or counsel for Plaintiff, the Defendants agreed to reschedule such deposition.

(2) Plaintiff was deposed on 2 December 2004. The deposition commenced at 10:23 a.m. and ended at 2:30 p.m. because the Plaintiff wanted to stop. In addition, the parties had a break of approximately one and one-quarter to one and one-half hours. Thus, conservatively estimated, the Plaintiff was deposed on December 2 for under three hours.

(3) Thereafter, Defendants scheduled the continued deposition of the Plaintiff on or

about 18 March 2005. The deposition did not take place, however. Defendants' counsel learned the morning of the deposition itself, and only after the stenographer was present in the Law Department, prepared and setting up for such deposition, that Plaintiff could not attend, allegedly to attend to a medical need. Plaintiff's counsel had called late in the day before and left a telephonic message that the deposition was "off."

(4) Thereafter, Defendants sought to depose the Plaintiff on Defendants on 25 July 2005. Again, counsel for Plaintiff cancelled such deposition, this time a few days before the July 25th date. (Exhibit 1 attached hereto).

(5) The Plaintiff's deposition continued on 31 August 2005 by joint agreement of Ms. Carly Iafrate, Attorney Andrews' associate, and undersigned counsel. The date was not "unilaterally" chosen by counsel for the Defendants, but selected in part to accommodate dates for numerous witnesses whom Plaintiff sought to depose prior to 1 September, and in part to accommodate what Ms. Iafrate represented to be Attorney Andrews' vacation schedule in August.

(6) The August 31 deposition commenced at 10:00 a.m., and ended at 4:30 p.m., with approximately one hour for lunch, for a total deposition time that day of 5.5 hours.

(7) During the August 31 questioning, the Plaintiff spent a good amount of time reviewing her prior testimony, supposedly to "correct it." She also tended to digress and at times was non-responsive. When counsel for Defendants attempted to control the questioning and press Plaintiff to be more responsive, counsel for Plaintiff reprimanded counsel for Defendants, accusing her of "interrupting" the Plaintiff and demanding that she permit Plaintiff to answer in a discursive style without regard to time. (Transcript at 73-85; 126-27). In the last exchange, even

counsel for Plaintiff said: "There is no question pending. You are just rambling right now, that I am going to say, so I am going interrupt you right now because I want you to conserve your energy. (Transcript at 175).

(8) Counsel for Defendants needed to suspend on August 31 at 4:30 p.m. to attend a 5:00 p.m. appointment with the Assistant Rabbi and Cantor of Temple Beth El in Providence, to discuss the Bar Mitzvah of her son. Counsel for the Plaintiff was aware of that constraint, in general terms, but failed to disclose such awareness in her Objection and failed to include that portion of the deposition transcript in her court filing, in which Defendants' counsel explained such constraint. (Exhibit 2 attached hereto) . Plaintiff was tired by 4:30 p.m. in any event, something about which Attorney Andrews is usually solicitous.

(9) As of August 31, the Plaintiff had been deposed for 8.5 hours on two separate days. She had cancelled scheduled depositions twice, and sought continuances and new dates on at least two other occasions. Defendants had numerous additional areas to cover in questioning Plaintiff as of 31 August 2005.

(10) Counsel for Defendants twice attempted to conclude Plaintiff's deposition prior to Plaintiff's accident in October 2005.

(11) First, counsel for Defendants issued a Notice for Deposition for September 21 and 22, 2005 via mail on 23 August 2005. Sometime before those dates, counsel for Plaintiff advised of a commitment on both dates in federal court that rendered her unable to appear on either date.

(12) Second, counsel for Defendants issued a Notice for Deposition for 14 October and 18 October 2005 but Plaintiff had an injury at work in early October 2005 that has rendered her unavailable to the present.

(13) In addition, to date, Plaintiff has not served the responses to interrogatories served on her on 9 August 2005, and only partially responded to the request for production of documents also served on 9 August 2005.

(14) In contrast, Defendants have cooperated fully in producing discovery, to wit:

a. On or about 21 May 2004, Defendants provided to Plaintiff disclosures and discovery pursuant to Federal Rule of Civil Procedure 26;

b. On 9 September 2004, Defendants served their Responses and Answers to eighteen (18) document requests and twenty-one (21) interrogatories;

c. In response to Motions by Plaintiff alleging that Defendants' answers and responses were insufficiently responsive, Defendants provided Further Answers to Plaintiff's Interrogatories (on 6 October 2004), Third Answers to Plaintiff's Interrogatories (on 22 November 2004), and a Third Response to Plaintiff's Request for Production of Documents (on 22 November 2004).

d. On 29 December 2004, the Plaintiff filed a Motion for Conditional Order of Default and Attorneys' Fees. On 14 January 2005, Magistrate Judge David Martin denied such Motion, but allowed a limited supplemental response by Defendants to Plaintiff.

e. On 9 February 2005, Defendants provided that Supplemental Response.

f. On 16 February 2005, Plaintiff served on Defendants a Second Request for Documents and a Second Set of Interrogatories. There were nine (9) document requests and one interrogatory which eight (8) substantive subparts, asking three (3) separate questions about each of 8 individuals other than the

Plaintiff associated with or employed by the School Department.

g. On 4 March 2004, Defendants responded to the Second Request for Production of Documents and provided Answers to the Second Set of Interrogatories.

h. Via facsimile on 20 May 2005, Plaintiff then issued a Third Request for Production of Documents comprised of seventy-nine (79) individual requests, some with subparts.

i. Defendants objected to this Request in its entirety; the Court denied the Plaintiff's Motion to Compel responses to this Third Request, except for seven requests which counsel for Defendants volunteered to produce, and did so in September 2005.

(15) Defendants also have produced the following witnesses for deposition for the following periods of time on the following dates:

a. Mr. Robert Lee: November 22, 2004 (12:17 p.m. to 2:55 p.m.) and October 21, 2005 (11:20 p.m. to 3:35 p.m.)

b. Mr. Robert Cochran: December 16, 2004 (11:00 a.m. to 3:15 p.m.)

c. Mr. James Winn: March 8, 2005 (11:10 a.m. to 2:30 p.m.)

d. Mr. Robert DiRuzzo: July 19, 2005 (11:00 a.m. to 3:15 p.m.) and October 27, 2005 (9:10 a.m. to 11:25 a.m.).

e. Mr. Donald Zimmerman: July 21, 2005 (11:00 a.m. to 4:58 p.m.) and continued deposition scheduled for November 16, 2005 at 11:00 a.m.

f. Dr. Jose Gonzalez: August 2, 2005 (11:12 a.m. to 3:16 p.m.) and October 31,

2005 (11:00 a.m. to 2:30 p.m.)

g. Ms. Jane Shagrue: August 17, 2005 (11:00 a.m. to 4:24 p.m.)

h. Ms. Glenda Guglielmo: October 7, 2005 (11:00 a.m. to 3:15 p.m.).

(16) The purpose in seeking until 31 December 2005 for continued deposition of Plaintiff was to afford the Plaintiff time to recover, review, sign and produce the Answers to Interrogatories, outstanding since early August 2005, and thereby render the conclusion of her deposition more efficient.

(17) If Plaintiff is able to be deposed prior to 31 December 2005, Defendants have no objection to concluding discovery prior to this date; given the uncertainty of her medical condition and recovery time, however, counsel for the Defendants sought to be conservative.

(18) Defendants need a full explication by Plaintiff of her case to clarify those issues that are ripe for resolution. They therefore reassert their request for sufficient time prior to the filing of dispositive motions to: (a) Review Plaintiff's Answers to Interrogatories; and Responses to Request for Production for Documents; and (b) Conclude the Deposition of the Plaintiff. Several claims and topics remain completely unexplored.

(19) The refusal of counsel for the Plaintiff to accede to this basic request, in light of her client's conduct, both in failing to appear on scheduled deposition dates, and failing to answer questions directly in deposition, is unreasonable. Counsel for Plaintiff, in fact, already agreed to produce Plaintiff for one more day. (Exhibit 3 attached hereto).

(20) Although Plaintiff's most recent mishap is indeed unfortunate, it should not prevent Defendants from gaining information about a lawsuit that Plaintiff herself has initiated, particularly when Plaintiff's claims span such a lengthy period of time (1993 to present) and

require reconstruction of events that took place more than one decade ago.

DEFENDANTS,
PROVIDENCE SCHOOL BOARD AND CITY OF PROVIDENCE

By their Attorney,

JOSEPH M. FERNANDEZ
CITY SOLICITOR

Sara A. Rapport (No. 6614)
Senior Assistant City Solicitor
City of Providence Law Department
275 Westminster Street, Suite 200
Providence, RI 02903
((401) 421-7740 Ext. 333
Fax (401) 351-7596

**CERTIFICATION**

I hereby certify that on this 7th day of November, I caused to be mailed a copy of the foregoing Response to Plaintiff's Objection with exhibits, via first-class mail, on opposing counsel: Patricia E. Andrews, Esq., 170 Westminster Street, Suite 601, Providence, RI 02903

# EXHIBIT 1

Mayor

**Department of Law**

21 July 2005

Patricia Andrews, Esq.
Carly Beauvais Iafrate, Esq.
Law Offices of Patricia E. Andrews
170 Westminster St., Suite 601
Providence, Rhode Island 02903
*Via Facsimile (351-4802) and First-Class Mail*

Re: Simonne Tassone

Dear Pat and Carly:

I was advised by e-mail on Monday 18 July 2005 that Ms. Tassone would not be available on the date scheduled for continuation of her deposition, Monday, 25 July 2005. I have therefore cancelled that date. I am now enclosing a new notice for such deposition in the Law Department on Wednesday, 31 August 2005. If we do not finish on the 31st, I will expect that we can agree to do so after the discovery deadline of 1 September 2005.

Thank you for your attention to this matter.

Sincerely yours,

Sara A. Rapport
Senior Assistant City Solicitor
Chief Legal Counsel, PSD

Enclosure

275 Westminster Street, Suite 200 • Providence, Rhode Island 02903-1845
(401) 421-7740 (Voice) • (401) 751-0203 (TDD) • (401) 351-7596 (Facsimile)

# EXHIBIT 2

time?
A. Yes, because they had to.
Q. And they would talk about the students with you?
A. Yes.
Q. But they would not be friendly to you?
A. Right, but then the following year, everything changed.
Q. Are we still talking about the same cohort, the special --
A. Yes, the special ed teachers.
Q. Year 3, 1995/1996, is it still Wilma, Elaine, the man and you, or was there a point at which the man went down and a new person came in?
A. I think that's the point the new person came in, and the new person talked to me.
Q. Who was the new person?
A. I can't think of her name, but I do believe she teaches in Providence. Turchetta, I think, is her last name.
Q. So the third year, Elaine left or went downstairs?
A. Right.
Q. And we are talking about 1995/1996?
A. And Murray retired.
Q. Murray is the man?
A. Murray is the man. I remembered his name, Murray.



Q. And Murray retired by that third year?
A. Yes.
Q. And who replaced Murray?
A. I think, but I am not sure, because we had several teachers come and go, we had a Jennifer, and I can't remember her last name, and we had a Sloan White, and we had somebody by the name of Sam Pho.
Q. It would have been the one in charge of math; does that help refresh your memory?
A. Sloan White had math. Jennifer, it begins with a Q, her last name, but I can't remember her last name, so I am trying to remember the year that these three came. I am having a hard time remembering, but I remember them being part of the team. As a new teacher came on to the team, they would be okay with me.
Q. So the new folks coming in replacing Elaine or the man were friendlier?
A. Yes.
Q. And Wilma remained part of this cohort?
A. Right.
Q. And in the first two years, we are talking 1993/1994, 1994/1995, did any one of these teachers, other than Wilma Johnson, reporting to you say to you directly, I am angry that you came here and ousted this other teacher?



MS. ANDREWS: Objection as to form.
A. I know, but I can't remember who, telling me that they were angry because I ousted this other teacher, because she was a very nice teacher, and she had been teaching there for many years, but I don't know if it was Elaine or Fran.
Q. Did any of these teachers, other than saying that, say anything else to you that was hurtful or inappropriate?
MS. ANDREWS: During that period 1993 through 1996?
MS. RAPPORT: Yes.
A. It was hurtful and made me feel bad is that they would not -- they just totally ignored me, avoided me, like I was the plague. I felt awful. All I remember is feeling awful and not knowing what to do about it, but something happened, and they changed.
Q. What happened?
A. My daughter was killed in a car accident.
Q. What year was that?
A. 1996/1997 school year.
Q. That would have been your fourth year at school?
A. Yes, and for some reason all three of them, to my immense surprise, changed and came to my assistance.
Q. All three?
A. Elaine Starks, Fran Gonella, and Jack Biancusso,



and they just changed completely, they came to me and offered their condolences, and they became very helpful, because I went back to work a couple of weeks after she died, and they said to me, if you cannot teach, put your kids in our class, we will give you all the time. They were just like night and day after she died.
Q. When did your daughter get killed?
A. June 2, 1997.
Q. And what else did they do for you, other than that?
A. They helped, they started a fund, especially Jack, to collect monies to help for my daughter's funeral.
Q. How much did that raise?
A. That raised close to $2,000. About 1,700.
Q. Anything else?
A. They started giving me books and supplies and just being very friendly. It was like, you know, it was like a night-and-day change. It felt so good. I was so happy. But too bad it had to take my daughter's death for them to be nice to me.
(BRIEF RECESS TAKEN)
MS. ANDREWS: For the record, she is prepared to go on beyond 4:30, and so am I.
THE WITNESS: Any time you want me to go to.

Page 190

MS. RAPPORT: That's fine, but at 5, I have an appointment to tend to. I have a religious instruction for my child, so we will go for another 20 minutes, and then I will be seeking to reconvene.

THE WITNESS: I was going to say something to finish what I said earlier.

MS. ANDREWS: Okay.

A. That although these three teachers did a complete turnaround, still I felt a lot of -- not like the other teachers, Jane Shagrue and the others, they just never became friendly.

Q. Never to you?

A. Yes.

Q. Did you have a group of friends at this point that you could point to?

MS. ANDREWS: You are talking 1997?

A. Well, there was Jim.

Q. Let's go back a little bit, when you say the new teachers came in in 1995, 1994/1995, was that when the new teachers came in?

A. Well, one new teacher, I think, yes, two new teachers, they talked to me, and we worked together, but we did not have lunch together, and I did not meet with them about anything else, but the kids' stuff. They were younger, and they wanted to be with younger

Page 191

teachers.

Q. Who did you eat lunch with in 1994/1995?

A. 1994/1995, I usually ate alone in a classroom or in with Mrs. Johnson's room.

Q. How about 1993/1994, who did you eat with?

A. I ate alone with in my classroom.

Q. Not with Mrs. Johnson?

A. No.

Q. How about 1995/1996?

A. I still believe I ate alone.

Q. In your classroom?

A. Yes, or with Mrs. Johnson.

Q. So could you go to the lunchroom, if you wanted to?

A. No.

Q. Why not?

A. Well --

Q. The teachers' lunchroom, I mean.

A. Because I can't get to the lunchroom during lunchtime. The kids are in the cafeteria, and it is too crowded. I can't scoot by.

Q. Where do most of the teachers eat, is there a teachers' lunchroom?

A. There is a teachers' room that most of the teachers go to, which is off of the lunchroom, so in the beginning, I could not go there when I was on the

Page 192

second floor anyway until I got my remote because I couldn't got downstairs without Mrs. Johnson's help or somebody else's help, and she never left her room, and I did not want to bother the teachers any more than what I had already had, I felt they didn't -- they did not bother me, so even now I still can't get to the teachers' room during lunch because it is a logistic, you have to through the cafeteria to get to the teachers' room.

Q. Do other teachers eat in their room, besides you?

MS. ANDREWS: Objection as to form and foundation.

A. Yes.

Q. In 1994/1995, did other teachers eat in their room?

A. I don't know that far back. I know they do now.

Q. What about in 1996/1997, did you eat by yourself that year, or was that when the Winn lunch started?

A. I don't know if that was when the Winn lunches.

Q. That's Jim Winn?

A. Yes.

Q. So you think that the lunches with Mr. Winn might have begun in 1998 after your daughter died, 1998/1999 or before your daughter died?

A. Let me see. Let me think. It could have been about that time, if it was, it could have been the year

Page 193

before she died or the year after she died, but it was around that time that I started to have lunch outside of my room.

Q. So it could have been 1996/1997 or 1997/1998?

A. Yes.

Q. Was there anyone else, other than Mr. Winn, that you would eat lunch with?

A. Sharon Fuller.

Q. Did there come a point when it was more than Sharon, Mr. Winn, and you?

A. Mr. Morris would join us.

Q. Was that at the beginning of --

A. Yes, we were kind of like the four, if Sharon got the same free lunches. See, with Mr. Winn, it didn't make any difference, he was a librarian, and he could eat at any lunch. Mr. Morris was the technology person in the building, and it did not make any difference to him. On some years, I remember one year where Sharon Fuller did not get the same lunch as we did, but worked something out with another teacher so she could eat with us at least two days a week where she switched her lunchtime with him, because she as an elective teacher and would have cafeteria duty during the lunch period.

Q. What was Ms. Fuller's elective?

A. Computer business or business/computer because in

# EXHIBIT 3

**Sara Rapport**

---

**From:** Pat Andrews [peandrews@verizon.net]
**Sent:** Thursday, September 22, 2005 4:00 PM
**To:** Sara Rapport

Sara:

I have decided to make my client available for one more day. You should be able to finish by that time.

Pat Andrews