**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **SIMONNE T. TASSONE, Plaintiff** | : | |
| | : | |
| **v.** | : | **C.A. NO. 03-481ML** |
| | : | |
| **PROVIDENCE SCHOOL BOARD** | : | |
| **AND THE CITY OF PROVIDENCE,** | : | |
| **Stephen Napolitano, Defendants** | : | |

**MOTION FOR SUMMARY JUDGMENT**

Now come the Defendants Providence School Board, City of Providence and Stephen Napolitano in the above entitled matter and hereby moves this Honorable Court for a Motion for Summary Judgment. Defendants rely on their accompanying Statement of Facts and Attachments and Memorandum of Law in support thereof.

Respectfully submitted,

PROVIDENCE SCHOOL BOARD & CITY OF PROVIDENCE

By their Attorney,
JOSEPH M. FERNANDEZ
CITY SOLICITOR

Sara A. Rapport (No. 6614)
Senior Assistant City Solicitor
City of Providence Law Department
275 Westminster Street
Providence, RI 02903
(401) 421-7740 Ext. 333
Fax (401) 351-7596

**CERTIFICATION**

I hereby certify that on 10th day of March, I caused to be mailed a copy of the foregoing via first-class mail to opposing counsel: Patricia E. Andrews, Esq., 170 Westminster Street, Suite 601, Providence, RI 02903.

[signature]

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **SIMONNE T. TASSONE, Plaintiff** | : | |
| | : | |
| **v.** | : | **C.A. NO. 03-481ML** |
| | : | |
| **PROVIDENCE SCHOOL BOARD** | : | |
| **AND THE CITY OF PROVIDENCE,** | : | |
| **Stephen Napolitano, Defendants** | : | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Simonne Tassone, ("plaintiff" or "Tassone") has raised no genuine issue of material fact. She generally alleges that she was denied reasonable accommodations by the Defendant School Board ("defendant" or "the Department"), was treated disparately based on her alleged disabilities and was subjected to a hostile work environment by a former principal and a coworker.

Plaintiff's claims fail as a matter of law for numerous reasons. First, her physical impairments do not constitute disabilities under federal or state law. Although plaintiff frequently relies on a scooter or crutches to walk, there is no medical evidence that she has a neurological disorder to explain her difficulty walking. Similarly, the two instances in which she had kidney stones did not leave her permanently disabled, and there is no evidence that her diabetes condition substantially limits any of her daily functions.

Second, even if plaintiff had been disabled under the law, all of her claims dating before May 28, 1999 are barred by the statute of limitations applicable to the most generous statutes under which plaintiff seeks relief. Moreover, nearly all of plaintiff's requests for accommodation were granted. Third, plaintiff's disparate treatment claim is also untenable

because her score from an interview for a minor position she sought as a trainer in the use of a computerized program was too low. Lastly, plaintiff's account of her hostile work environment is comprised of generalized workplace complaints that, at best, reflect strained relationships with a former principal and a coworker. The acts and remarks of which she complains were neither pervasive nor related to her disability. Accordingly, this Court should grant summary judgment en toto.

## I. Summary Judgment Standard

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." See Fed. R. Civ. P. 56(c). "To determine whether these criteria have been met, a court must pierce the boilerplate of the pleadings and carefully review the parties' submissions to ascertain whether they reveal a trial worthy issue as to any material fact." Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001) (citing Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 14 (1st Cir. 2000)). Summary judgment is appropriate if the non-moving party rests "merely upon conclusory allegations, improbable inferences, and unsupported speculation." Benoit v. Technical Manufacturing Corp., 331 F.3d 166, 173 (1st Cir. 2003) (quoting Feliciano De La Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000)).

## II. Argument

**THERE IS NO GENUINE ISSUE OF MATERIAL FACT ON ANY CLAIM: DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

**A. Failure to Accommodate: Count I (Americans with Disabilities Act); Count IV (Rehabilitation Act); Count VI (Rhode Island Civil Rights Act); Count IX (Rhode Island Civil Rights of Individuals with Handicaps Act)**

In Counts I, IV, VI and IX, plaintiff alleges that defendants failed to accommodate her disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., § 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, the Rhode Island Civil Rights Act ("RICRA"), R.I. Gen. Laws § 42-112-1 et seq., and the Rhode Island Civil Rights of Individuals with Handicaps Act ("RICRIHA"), R.I. Gen. Laws § 42-87-1 et seq. Under the ADA, employers are prohibited from discriminating against or refusing to provide a reasonable accommodation for a qualified individual with a disability. See 42 U.S.C.A § 12112(a). To establish a violation of the ADA, the plaintiff must prove: 1) that she was disabled within the meaning of the Act; 2) that with or without reasonable accommodation she was able to perform the essential functions of her job; and 3) that the employer failed to make reasonable accommodations to the plaintiff's known physical or mental limitations. See Carroll v. Xerox Corp., 294 F.3d 231, 237-38 (1st Cir. 2002); Kriegel v. State of Rhode Island, Dep't of Corr., 266 F. Supp. 2d 288, 297 (D.R.I. 2003). An employee must be reasonably accommodated unless the accommodation would place an undue hardship on the employer. See Mohammadian v. CIBA Vision of Puerto Rico, Inc., 378 F. Supp. 2d 25, 30 (D.P.R. 2005).[1]

---

[1] The Rehabilitation Act and RICRIHA apply the same standard as does the ADA in failure to accommodate claims. See Tebo v. Potter, 345 F.Supp.2d 61, 65 (D. Mass. 2004) (Rehabilitation Act); Kriegel v. State of Rhode Island, Dep't of Corr., 266 F. Supp. 2d at 297 (RICRIHA). This Court recently held that "RICRA does not expressly contain any reasonable accommodation requirement and Rhode Island's courts have not, to this Court's knowledge, inferred such a requirement from its terms." Izzi v. United Parcel Service, Inc., 2005 WL 3739295, *6 (D.R.I. 2005).

1. The Plaintiff is Not Disabled.

To prevail in an action brought under the ADA, a plaintiff must establish that her condition constitutes a disability under the Act. See Tardie v. Rehabilitation Hosp. of Rhode Island, 168 F.3d 538, 541 (1st Cir. 1999). An individual may be considered disabled under the ADA if she has 1) a physical or mental impairment that substantially limits one or more of the major life activities; 2) a record of such impairment; or 3) is regarded as having such impairment. See 42 U.S.C. § 12102(2). To be substantially limited in performing a major life activity such as walking, seeing, hearing, or breathing, the plaintiff must be "unable to perform a major life activity that the average person in the general population can perform," or be "significantly restricted" in her performance of that activity. See Morales Pabon v. Morovis Cmty. Health Ctr., 310 F. Supp. 2d 411, 417 (D.P.R. 2004). Whether one is substantially limited in a major life activity entails an analysis of the nature and severity of the impairment, its duration or expected duration, and its permanent or expected permanent or long-term impact. See Nedder v. Rivier Coll., 908 F. Supp. 66, 75 (D.N.H. 1995).

Tassone contends that her disabilities stem from being "wheelchair and forearm-crutches-assisted" and from having diabetes, kidney disease and nerve damage to her right hand and left side. (Complaint at ¶¶ 10-11). Tassone's impairments, however, do not rise to the level of disabilities under the ADA.

Neurological: Tassone has failed to establish that her walking impairment is a disability or that it is consistently severe and permanent. When her neurologist, Dr. Barry Levin, examined Tassone in 1991, he did not find that her "gait abnormality" was evidence of a systemic neurological illness; rather, he attributed her difficulty walking to multiple factors, including joint abnormalities and knee problems (Statement of Undisputed Facts [hereinafter

"UF"] at ¶ 32), neither of which constitutes a disability under the ADA. In 1997, Dr. Levin concluded that Tassone's neurological examination was "unremarkable," with the exception of her gait, which he noted was "inconstant." (UF at ¶ 33). See Ramirez-Aguirre v. Ranger Am. Armored Serv., Inc., 330 F. Supp. 2d 52, 60 (D.P.R. 2002) (muscle atrophy and inability to make fist insufficient to qualify as disability under the ADA). He suggested that some of her symptoms were attributable to stress, growing out of her relationship with an abusive husband. (UF at ¶ 32).

Rheumatologist Andrew Ruthberg made the same point after finding no evidence of physical disease:

> While it may be possible that this patient does have a significant physical illness which we have yet to define, I think it also important to consider an alternative possibility that . . . she had a primary psychiatric disorder in the somatization disorder family. . . . I would strongly advise that physical therapy try to get patient to eliminate her us of crutches and go through progressive ambulation.

(UF at ¶ 40) (emphasis added).

With regard to the consistency and severity of Tassone's walking impairment, former principal Robert Lee ("Lee") testified that he saw plaintiff walking in school without the scooter or crutches "quite a bit." (UF at ¶ 17). Former assistant principal Robert DiRuzzo ("DiRuzzo") also observed the plaintiff walking without crutches at times. (UF at ¶ 17). In addition, even to the present day, the back and front entrances to the plaintiff's house do not have a ramp but only stairs. (UF at ¶ 18). Tassone herself acknowledged that she daily negotiates the stairs in her home: until only a few years before filing the charge of discrimination, in fact, she used her master bedroom on the second floor despite availability of a spare bedroom on ground level. (UF at ¶ 18). See Nedder, 908 F. Supp. at 76 (reiterating holding of various circuits that neither the inability to walk at a brisk pace for extended periods, nor having some difficulty climbing

stairs, constitutes a disability).

Kidney Stones: Tassone similarly has failed to establish that the kidney stones she had removed in 1998 and 2000 created a permanent condition that substantially limited a major life activity. Courts have held that kidney stone ailments are not disabilities under the ADA because "the mere possibility that a kidney condition may recur or that further surgery will be needed is insufficient to establish that a condition is substantially limiting." Wilson v. Buckeye Steel Castings Co., 2001 WL 1681130, *4 (S.D. Ohio). Even when a plaintiff has undergone several kidney surgeries, kidney conditions corrected by medical procedures are only temporary and therefore not a disability under the ADA. See Roush v. Weatec, Inc., 96 F.3d 840, 844 (6th Cir. 1996).

In 1998, Tassone had surgery to remove an impacted urinary stone from her left upper ureter. (UF ¶ at 34). She had another surgery to remove an impacted stone in the right ureter in 2000. (UF ¶ at 35). Since 2000, however, Tassone has not had a recurrence of kidney stones or experienced any further problems with her kidneys or urinary system. (UF ¶ at 36) . Her past difficulties with kidney stones therefore do not constitute a disability under the ADA.

Diabetes: Finally, Tassone's alleged diabetes does not amount to a disability under the ADA. In Sutton v. United Air Lines, Inc, 527 U.S. 471, 484 (1999), the United States Supreme Court held that "those whose impairments are largely corrected by medication or other devices are not 'disabled' within the meaning of the ADA." The Court found that diabetes by itself does not amount to a disability because the disease may not impair a person's daily activities, and thus does not necessarily substantially limit one or more major life activities. See id. at 483-84. Under Sutton, a disability is determined by "whether the limitations an individual with an impairment actually faces are in fact substantially limiting." Id. at 488 (emphasis in original).

Accordingly, the United States District Court for the District of Puerto Rico held that a plaintiff must produce specific evidence that her diabetes has limited an aspect of her major life activity in order for it to be considered a disability under the ADA. See Morales Pabon v. Morovis Cmty. Health Ctr., 310 F. Supp. 2d 411, 416-18 (D.P.R. 2004). Tassone here has failed to do so; in fact, by the recent admission of her physician, Tassone's diabetes has been "under excellent control." (UF at ¶ 24) (emphasis added).

2. Plaintiff's Filing Was Untimely.

In Rhode Island, a plaintiff must file her ADA claims with the Rhode Island Commission for Human Rights ("Commission"), within 300 days; and her RICRIHA claims, within one year, of the date upon which a plaintiff knows or has reason to know of the discriminatory act about which she is complaining. See Romano v. A.T. Cross Co., 39 F. Supp. 2d 143, 146 (D.R.I. 1999); Kriegel, 266 F. Supp. 2d at 295-96. She has three years from the date of the action forming the basis of the claim to file an action in court under the RICRA. See Rathbun v. Autozone, Inc., 361 F.3d 62, 70 (1st Cir. 2004). The time bar under the Rehabilitation Act is unclear: one district court within the First Circuit has held that a plaintiff must also exhaust administrative remedies prior to filing claims under the Rehabilitation Act, see Castro Ortiz v. Fajardo, 133 F. Supp. 2d 143 (D.P.R. 2001), although this Court has suggested to the contrary. See Cook v. State of Rhode Island, Dep't Mental Health, Retardation & Hosp., 783 F. Supp. 1569, 1572 (D.R.I. 1992). No case from the United States Court of Appeals for the First Circuit has addressed this apparent conflict.

The difference here is immaterial, however. Tassone filed her charge of discrimination with the Commission on May 28, 2002, and her complaint with the United States District Court for the District of Rhode Island, on October 20, 2003. Thus, even under the most generous

statute of limitations, any claim based on conduct that occurred prior to May 28, 1999 is time-barred. See Seery v. Biogen, Inc., 195 F. Supp. 2d 347, 353 (D. Mass. 2002).

The only conduct that Tassone alleges took place between May 28, 1999 and May 28, 2002 is that of former assistant principal DiRuzzo.[2] Tassone specifically claims that DiRuzzo frequently reprimanded her for leaving her students unattended and once banned her from the school library when she left the students with coworker James Winn. (Disputed Facts [hereafter "DF,"] at ¶¶ 6-7). Assuming the truth of Tassone's allegations, and the accuracy of her perceptions/speculations, Tassone's claim that this conduct by DiRuzzo created a hostile work environment fails as a matter of law. See infra at § C.

3. Plaintiff's Requests Were Granted.

The ADA requires employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless this would pose "undue hardship" on the employer. See 42 U.S.C. §12112(b)(5)(A). Employers are not required to provide every accommodation sought by an employee, even if the accommodation is not burdensome; rather, "the employer has met his statutory duty when he accommodates his disabled employee to the extent necessary for her to be able to perform her job." Mohammadian v. CIBA Vision of Puerto Rico, Inc., 378 F. Supp. 2d 25, 29 (D.P.R. 2005).

Even assuming that Tassone's "bizarre gait" or kidney stones created disabilities under the law that would require accommodations by the Department, the undisputed facts make plain that the Department granted all of plaintiff's requests, including those made prior to May 28, 1999.

[2] Tassone also complains about a remark made by Jane Shagrue in early 2003, a date well after Tassone's filing with the Commission. Even adding this remark to DiRuzzo's conduct, however, does not give rise to a hostile environment claim. See infra at § C.

Remote Control & Bathroom Doors: In the fall of 1994, Tassone requested that the Department re-hang the bathroom doors and make it more convenient for her to open the doors on the ramp connecting the first and second floors. The Department did so by November 1995, fulfilling the latter request by wiring the doors so Tassone could open them through use of a remote control. (UF at ¶ 53).[3]

Remote Control: Tassone used this remote control from the fall of 1995 through early December of 1998. (UF at ¶ 54). On or about December 8, 1998, she lost the device during an evening event at the school; the following day, she requested a new one. (UF at ¶ 54). She was told that the Department had initiated efforts to locate (or purchase) a replacement. (UF at ¶ 54). Shortly thereafter, on or about December 23, 1998, Tassone fell near on ramp while attempting to open the door, and remained out of work from 24 December 1998 until 14 March 1999. (UF at ¶ ¶ 55-56). Upon her return, she received from the Department the replacement she had requested. (UF at ¶ 57).

Free Sixth Period & Bathroom Use: In September 1998, Tassone requested that her free period be changed from fifth to sixth period, so that "teaching time is done when I am feeling my best." (UF at ¶ 58). She also advised the Department that she would be using the bathroom frequently because health problems associated with her kidney stones necessitated that she drink twelve glasses of water daily. (UF at ¶ 58). The Department granted Tassone's request that sixth period become her free one, and advised her to solicit temporary coverage for her students from neighboring teachers, or through a request to an administrator, when she needed to use the

[3] The grievance was allowed in 1994 but through oversight not implemented that year; the delay was not intentional. See Hartsfield v. Miami-Dade County, 90 F. Supp.2d 1363, 1364 (S.D.Fla. 2000); Leach v. Comm'r of the Massachusetts Rehab. Comm'n, 827 N.E.2d 745, 751 (Mass. App. Ct. 2005).

bathroom during class. (UF at ¶ 60).[4] Tassone admits that Lee himself endorsed and recommended the latter "accommodation," and had been allowing it in any event even without formal presentation to the Department. (UF at ¶ 63).

Exemption from Coverage & Personal Aid: In August 2000, plaintiff asked that she be exempt from providing coverage for absent teachers during her free period because the difficulties presented by her kidney stones grew worse by the end of the day. (UF at ¶ 66). In addition, she asked that the Department insure that a personal aid or assistant remain with her at all times, including when she was not teaching, to help her clean, make copies and assist with other tasks. (UF at ¶ 66). Again, the Department granted both requests. (UF at ¶ 67).

The only demand of Tassone's that the Department arguably denied prior to May 1999 was that she remain on the first floor, when Lee implemented the special education program called "team teaching," effective with the 1994-1995 school year.[5] Lee made Tassone a part of the new program as one of four teachers sharing forty special education students. (UF at ¶ 46). To facilitate team teaching, Tassone was required to move to a classroom on the second floor in late August 1994. (UF at ¶ 48). This decision by Lee furthered an important educational objective and did not impair Tassone's ability to perform her job; she continued to have access to her new classroom on the second floor, either directly from the street or via the main entrance and ramp. (UF at ¶¶ 44-45, 47, 51). Remaining on the first floor as Tassone now insists she preferred would not have been a reasonable accommodation: it was not necessary to enable Tassone to perform her job; and would have imposed an undue hardship on the Department'

---

[4] State law requires that all students be supervised by a certified teacher at all times. (UF at ¶ 61).
[5] It is a disputed fact that Tassone even made this request of Lee in 1994; Tassone now claims that she did, although she can produce no memorialization of such request. Lee has no recall of any such complaint, remembering instead that the teacher who was resistive to moving was coworker Wilma Johnson, who was very particular about the cleanliness of her room, and did not want to start afresh in

effort to build a program of team teaching for special education students. Plaintiff is barred in any event from complaining in 2002 about a failure to accommodate in 1994 or 1995.

4. Plaintiff's Remaining Complaints Are Not Requests for Accommodation But Generalized Workplace Complaints.

Tassone's remaining complaints reflect general dissatisfaction with her workplace and colleagues as opposed to requests for accommodation that were denied. The following are examples of the plaintiff's generalized complaints:

- inadequate room equipment and teaching supplies in September 1993;
- occasional ice in the parking lot despite requests for better maintenance;
- location of the handicapped parking spots;
- Principal Lee's refusal to exempt her from "corridor duty"; grant her early release on snow days; and permit her to use the photocopier in the library instead of the one in the teacher's room during her free period;
- Paperwork error in the Department that led to the inadvertent placement of a disruptive student in her class in September 2001.

(DF at ¶¶ 30-31).

Many of the above-mentioned complaints, such as inadequate supplies, location of the handicap parking spots, occasional ice in the school parking lot, and a paperwork/student placement error are not specific to Tassone; on the contrary, such issues affect numerous teachers and Department employees and are the lament of many in a large and urban public school system. (DF at ¶ 32). Those requests more specific to Tassone, Lee's refusal to exempt Tassone from corridor duty, grant her early release on snow days, and permit her to use the library photocopier, founder on several grounds. First, Tassone points to no date after May 1999 when Lee denied any one of these requests. One such request, to use the library photocopier, he could not have denied after May 1999 because the circumstances had changed by then and rendered the issue moot. Tassone had sixth period free as of 1999 and could comfortably walk

---

new space. (Lee Dep 11/22/04 at 52-56).

across the cafeteria to use the copier in the teacher's room. (DF at ¶ 30 at n. 21). Second, at least one such request, exemption from corridor duty, Lee had granted in part, by Tassone's admission. (DF at ¶ 30 at n.20). Finally, even if Tassone could show that: (1) she suffered from a disability; (2) made the demands as part of request to accommodate such disability, and (3) that Principal Lee (or some other administrator) denied such requests, Tassone cannot rely upon such denials to make out a failure to accommodate claim. The requests either implicated "essential functions" of the position of teacher (e.g., corridor duty, remaining for the entirety of the school day), or demanded changes that would have placed an undue hardship on the Department (e.g., disrupting student use of library with teacher use of copier). See Calef v. Gillette Co., 322 F.3d 75, 86 (1st Cir. 2003) (an employer has no duty to modify an essential function of a job, and the essential function analysis frequently overlaps with the undue hardship defense).

**B. Disparate Treatment: Count II (Americans with Disabilities Act); Count V (Rehabilitation Act); Count VII (Rhode Island Civil Rights Act); Count X (Rhode Island Civil Rights of Individuals with Handicaps Act)**

To recover under a disparate treatment theory pursuant to the ADA and related statutes, a plaintiff must demonstrate: 1) that she suffers from a disability; 2) that she was nevertheless able to perform the essential functions of her job, with reasonable accommodation; and 3) that the defendant took an adverse employment action against her because of, in whole or in part, her protected disability. See Kriegel, 266 F. Supp. 2d 288 at 299. The distinction between the elements of a failure to accommodate claim and a disparate treatment claim is that treatment claims require proof of intentional discrimination. Id.; see also Izzi v. United Parcel Service, Inc., 2005 WL 3739295, *11 (D.R.I.).

Under the burden-shifting scheme developed in McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1974), a plaintiff who suffers from a disability must make out a prima facie case of employment discrimination by demonstrating that she is a member of a protected class and has been denied an opportunity for which she was otherwise qualified. See Kriegel, 266 F. Supp. 2d at 299. The employer then has the burden of demonstrating that it had a legitimate, nondiscriminatory reason for its adverse employment decision. See id. Once a defendant has provided a legitimate, non-discriminatory reason for its action, the initial presumption of discrimination is eliminated, and the burden shifts back to the plaintiff to prove discrimination. She must then present enough evidence to permit a finding of differential treatment caused, at least in part, by discrimination. See Burton v. Town of Littleton, 426 F.3d 9, 20 (1st Cir. 2005) (applying Desert Palace, Inc., v. Costa, 539 U.S. 90, 102 (2003)); Candelario-Ramos v. Baxter Healthcare Corp., 360 F.3d 53, 56-57 (1st Cir. 2004). If the evidence does not reveal such discriminatory motivation, the claim must fail. See id.

Plaintiff's disparate treatment claim relates to her June 2001 application for a position within the Department to become part of the IEP Training Team ("Team"). (UF at ¶ 83). Team members were responsible for training other staff on the use of a computerized format in preparing Individualized Education Programs ("IEPs"). (UF at ¶ 83). The persons selected to comprise the team were to meet on ten occasions from August 2001 through May 2002 for two-hour sessions. (UF at ¶ 83). Team members would receive $25.00 per hour and could thus earn an aggregate of $500.00 over the ten-month period. (UF at ¶ 83). After the Department rejected plaintiff's application, she filed a grievance in which she alleged that a member of the interviewing team, Gail DeRoy, had inquired inappropriately about her health during the interview. (UF at ¶ 84).

The Department denied the plaintiff's grievance in a letter dated 6 November 2001, and signed by the former superintendent, Diana Lam. (UF at ¶ 85). Lam explained that the cutoff aggregate score was "40" and that the plaintiff had only scored a "37." (UF at ¶ 85). Lam also explained that DeRoy had not asked Tassone about her health during the interview itself; rather, she reported that DeRoy asked "how are you feeling" after the interview had concluded and in the spirit of friendship and genuine concern, as Tassone had undergone multiple procedures during the preceding year. (UF at ¶ 85). The grievance committee unanimously decided not to pursue Tassone's grievance and closed the matter. (UF at ¶ 86).

Application of the McDonnell Douglas burden-shifting scheme to the facts surrounding Tassone's application for the IEP trainer position makes clear that Tassone has failed to establish a viable disparate treatment claim. As discussed supra at § A, Tassone is not disabled, and therefore fails to satisfy the foundational requirement for recovery under a disparate treatment theory. See Kriegel, 266 F. Supp. 2d 288, 289 (D.R.I. 2003). Moreover, assuming that she is disabled, and further that she satisfies the second prong of the standard by demonstrating that she could have performed the duties of a Team member with reasonable accommodation, Tassone cannot satisfy the final element of the standard, that the Department rejected her for the position because of, in whole or in part, her disability. See id. The Department had a legitimate, nondiscriminatory reason for rejecting her application: Tassone had not obtained the cutoff aggregate score of "40". (UF at ¶ 85). Tassone fails to show from DeRoy's alleged inquiry about Tassone's health problems, see Candelario-Ramos v. Baxter Healthcare Corp., 360 F.3d 53, 56-57 (1st Cir. 2004), that DeRoy and the two others conducting and scoring the interview rejected her application on the basis of some unnamed disability. See Burton, 426 F.3d at 20.[6]

---

[6] Two persons conducted the interview with DeRoy, and scored Tassone in the same manner as did

**C. Hostile Work Environment: Count III (Americans with Disabilities Act); Count VI (Rehabilitation Act); Count VIII (Rhode Island Civil Rights Act); Count XI (Rhode Island Civil Rights of Individuals with Handicaps Act)**

The United States Court of Appeals for the First Circuit has assumed without deciding that hostile work environment claims may be brought pursuant to the ADA; the United States District Court for the District of Rhode Island also has assumed that hostile work environment claims are cognizable under both RICRA and RICRIHA. See Kriegel, 266 F. Supp. 2d 288, 300 (D.R.I. 2003). To establish a prima facie claim of a hostile work environment, a plaintiff must prove: 1) that she is a qualified individual with a disability; 2) that she was subjected to harassment; 3) that the harassment was based on her disability; 4) that it altered the conditions of employment; and 5) that the harassment may be imputed to the employer. See Mohammadian, 378 F. Supp. 2d at 31. When the comments and behavior alleged by the plaintiff are not pervasive or severe enough to alter the conditions employment or constitute an adverse employment action, courts must grant summary judgment. See id.

Whether an environment is hostile or abusive is determined by an examination of all of the circumstances of the situation, including the frequency of the conduct; its severity; whether it is physically threatening or humiliating, as opposed to merely offensive; and whether it unreasonably interferes with an employee's work performance. See Rodriguez v. Loctite Puerto Rico, Inc., 967 F. Supp. 653, 663 (D.P.R. 1997) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993)). In addition to proving the severity of the harassment, the plaintiff must show that the harassment was known by the employer and based on the plaintiff's disability. See id.

---

DeRoy. (Exh. 37).

1. The Allegedly Hostile Remarks Were Neither Pervasive nor Directed at the Plaintiff.

Assuming Tassone is disabled, she cannot establish a prima facie case of hostile work environment because the alleged harassment was neither pervasive/severe enough to alter the conditions of her employment nor based on her disability. See Mohammadian, 378 F. Supp. 2d at 31. In Mohammadian, the plaintiff, who contended that her depression was a disability, alleged that her direct supervisor "reprimanded her in front of colleagues; supervised her to the point of 'persecution'; did not invite her to lunches with colleagues; made insulting references to her mental health problems . . . and often commented negatively on her appearance." Id. at 28. The court granted the defendant's motion for summary judgment on the hostile work environment claim based on the standard set forth by Harris v. Forklift, 510 U.S. 17, 21 (1993) for Title VII claims, which requires that plaintiffs prove that their workplace was "permeated with insult, ridicule, and intimidation." Id. at 31. "Occasional insulting comments and behavior, no matter how hurtful are insufficient to support a claim of hostile work environment." Id. See Harris, 510 U.S. at 21.

Harris controls here. Tassone's allegations fail to establish that her workplace was permeated with insult, ridicule and intimidation. DiRuzzo allegedly admonished Tassone frequently for leaving her students unattended and/or managing them poorly; Tassone recalls in particular five distinct occasions over an approximate decade. Shagrue, on one occasion (in early 2003), mimicked Tassone's gait before a group of teachers saying something to the effect: "Maybe I should walk like this, or maybe I should say that I am handicapped, too, just so I can get out of doing my job like other people in our school." (UF at ¶ 79; DF ¶¶ 25-26). Shagrue had suffered from polio. She was wearing at the time, and continues to wear, a brace on one of her legs. (UF at ¶ 79).

Much about Tassone's workplace was positive. First, Tassone was afforded numerous adjustments and conveniences to her schedule and in the building to make her work easier: she had (and continues to have) a fulltime personal aid, a remote control to open the ramp doors and exemption from a duty that all teachers dislike. (UF at ¶¶ 53, 63, 67). Second, Principal Lee was accessible to Tassone, even if not always able to respond quickly or in the manner she had sought to various requests; he counseled her, for example, to obtain temporary coverage from other teachers or the administrators themselves when she had to use the bathroom, and never once reprimanded her, orally or in writing, for leaving her students unattended in violation of state law. (UF at ¶ 63 & at n.7). Tassone trusted Lee's evaluation of her work, soliciting him to complete her performance review before his retirement in 2001. (DF at ¶ 16).

Third, despite Shagrue's remark to others (not Tassone) over a legitimate grievance the teachers had filed about a privilege afforded Tassone, Tassone had Shagrue's support and assistance in filing numerous grievances over the years, including the 1994 one that prompted the Department to make adjustments to the bathroom door and provide Tassone with a remote control for the ramp doors. (DF at ¶ 23). Finally, Tassone had a steady group of friends with whom she had lunch daily. (DF at ¶ 2). When her daughter was killed in 1997, not just those in this lunch group, but even coworkers whom Tassone believed had been unfriendly upon her arrival at Bridgham, went out of their way to extend support, offering to teach her students and taking up a collection to raise nearly $2000.00 to defray funeral and burial costs. (DF at ¶ 3). This was hardly a workplace pervaded by hostility.[7] See Rodriguez v. Loctite Puerto Rico, 967

[7] Tassone had many problems at home. Tassone's husband, Oscar Tassone, had been physically abusive until he moved out in or about 1990. Tassone filed for divorce, but then gave up on this effort, because Oscar had "fought her." Twice Oscar violated the restraining order Tassone had obtained. Tassone's one daughter was killed in 1997, another daughter works only part-time and suffers from lupus, and the third has gambling and drug problems rooted in a severe psychological disorder. This third daughter does not earn income and has a young child. Both daughters

F. Supp. 653, 663-67 (D.P.R. 1997) (whether an environment is hostile or abusive can be determined only by looking at all of the circumstances).

2. The Remarks About Which Tassone Complains Were Not Based on her Disability.

Plaintiff Tassone's hostile work environment claims also fail because she cannot demonstrate that the alleged hostility was based on her disability. In Rodriguez, 967 F. Supp. 653, the plaintiff, who suffered from Lupus Systematic Erythematosus, alleged that she was subjected to a hostile work environment. See id. at 656. The plaintiff in Rodriguez specifically asserted that the director of human resources' actions and remarks included the following: mocking her condition by telling her "I don't feel pity for you"; unnecessarily reprimanding her in front of visitors; and telling plaintiff that she did not like the way the plaintiff smiled, and that the plaintiff could be fired for that reason. See id. at 663. "[T]he fact that the defendant and the personnel supervisor did not get along is not in and of itself evidence of harassment," noted the court. Id. at 664. "Perhaps at trial such evidence might make a jury more likely to believe the allegations of harassment, but on summary judgment, where the Court draws all inferences in the respondent's favor, the fact that the plaintiff and her alleged harasser were not friendly toward each other has essentially no value as objective proof of a hostile working environment." Id. The court further held that the personnel director's remarks toward the plaintiff including "listen to me when I talk to you," and referring to the plaintiff as "malcriada" (the Spanish term for ill-mannered) "were not they type that can necessarily be termed harassment, because no clear nexus exists between the statements and the plaintiff's alleged disability." Id.

Similarly, in Khan v. Fed. Reserve Bank of New York, 2005 WL 273027, *3 (S.D.N.Y.), the plaintiff sued her employer claiming, inter alia, that she has been subjected to a hostile work

---

continue to live with Tassone, with the grandchild. (Tassone Dep 1/4/06 at 28-39, 42-46, 144-46, 150).

environment based on her religion and national origin. The plaintiff's allegations were largely based on the fact that a coworker kept an anti-Muslim cartoon in her cubicle and the plaintiff's scheduling request for Ramadan was denied. See id. at *8. The court held that even taking the plaintiff's assertions as true, these two incidents were not enough to demonstrate an objectively hostile work environment, either separately or in combination. See id. The court also rejected the plaintiff's assertion that being yelled at, being given the silent treatment, being criticized for leaving her desk to go to the lavatory and no longer being permitted to work from home or on a flexible schedule created a hostile work environment. See id. at *9.

"First, Ms. Khan has failed to provide any evidence in support of some of these claims," held the court. See id. "Second, . . . there is no evidence that any of the events described above was motivated by discriminatory animus. To the contrary, there is evidence that the written warnings the plaintiff received were issued for legitimate reasons [as discipline for unscheduled absences and insubordination]." Id. The court granted summary judgment on the hostile work claim because no other similarly situated employees had been treated differently than the plaintiff, and there was no evidence that the employer tolerated a work environment hostile to the plaintiff's national origin or religion. See id.

The facts in Rodriguez and Khan are analogous to those alleged here. Tassone offers no proof to contradict DiRuzzo's assertion that he lacked any specific knowledge as to her so-called disability or health problems. (DF at ¶ ¶ 12-13). Most importantly, Tassone herself elicited evidence from coworker and friend James Winn that DiRuzzo's alleged animus toward her was not based on any "disability," but rather a personality difference that made them like "oil and water" in the way they interacted with each other. (DF at ¶ ¶ 17-19). Winn observed that although DiRuzzo could be "gruff" or "firm" with the Tassone, he behaved similarly with other

teachers, including himself on occasion. (DF at ¶ 17). He stated: "I'm confident it was not just Simmone." (DF at ¶ 21).

Tassone claims generally that DiRuzzo did not like her because of her "handicap"; yet she acknowledges that DiRuzzo never made fun of her limitations or stated that he found them to be problematic, rather, he criticized the way she managed her students. (DF ¶ 15). Even assuming that Tassone's perceptions and recollections are accurate, and that DiRuzzo "harassed" her for leaving her students unattended, Tassone has failed to show that DiRuzzo's so-called harassment was based on any disability. DiRuzzo may not have liked Tassone because he believed her to be a poor classroom manager; this dislike, while unfortunate, is not actionable. "[I]nchoate expressions of discontent fall far short from establishing a factual basis to support a claim of harassment on the basis of disability." Kriegel, 266 F. Supp. 2d at 301 (D.R.I. 2003).

Shagrue and Tassone may also have developed a strained relationship over Tassone's successful effort to be exempt from coverage; Shagrue does not contest that she was upset that the Department had afforded Tassone the exemption, and that she expressed her objection by filing a grievance, and by making a thoughtless remark, in 2003, to at least one other teacher while in the hallway. Yet Shagrue and the other teachers did not name Tassone in their grievance, and Shagrue did not intend for Tassone to overhear the hallway comment. In fact, after observing Shagrue in the hall, the other teachers dispersed. Tassone approached and demanded immediate clarification from friend Michael Cote, who resisted, until Tassone coaxed him to disclose what Shagrue meant. (DF at ¶ 26).

Tassone admits that Shagrue assisted her in filing a number of grievances, including the one in 1994 that prompted the Department to make adjustments to the bathroom door and provide Tassone with a remote control for the ramp doors. (DF at ¶ 23). Thus, regardless of

whether Shagrue consistently said "hi" to the plaintiff at school or made a hurtful remark that Tassone overheard, Shagrue did not interfere with Tassone's efforts to seek these adjustments. Instead, she helped Tassone. [8]

**C. Intentional Infliction of Emotional Distress**

To establish a claim of intentional infliction of emotional distress, a plaintiff must demonstrate extreme and outrageous conduct on the part of the defendant. See Jalowy v. Friendly Home, Inc., 818 A.2d 698, 707 (R.I. 2003). The Rhode Island Supreme Court has adopted the very high standard set forth in the Restatement (Second) of Torts with regard to what constitutes extreme and outrageous conduct. Id. Under this standard, "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress . . . liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possibly bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. The Department adopts and incorporates the sections discussed supra as evidence that even viewed in plaintiff's best light, her allegations of discrimination do not meet the standard for intentional infliction of emotional distress claims set forth in Jalowy. Tassone cannot demonstrate that the Department's actions were so outrageous or extreme as to go beyond the bounds of decency in a civilized society; therefore her intentional infliction of emotional distress claim must fail.

---

[8] Even if Shagrue's one remark was found to have created a hostile work environment for the plaintiff, the Department would not be liable for her behavior because "an employer can only be liable if the harassment is causally connected to some negligence on the employer's part, such as the employer knew or should have known about it and failed to take prompt remedial action. See Noviello v. City of Boston, 398 F.3d 76, 95 (1st Cir. 2005). Shagrue's only remark that arguably was related to the plaintiff's disability did not rise to the level of requiring the Department to take remedial action.

## III. Conclusion

For all of the above reasons, Defendants respectfully ask that this Court grant their Motion for Summary Judgment, and dismiss the Plaintiff's lawsuit.

Respectfully submitted,

PROVIDENCE SCHOOL BOARD & CITY OF PROVIDENCE

By their Attorney,
JOSEPH M. FERNANDEZ
CITY SOLICITOR

Sara A. Rapport (No. 6614)
Senior Assistant City Solicitor
City of Providence Law Department
275 Westminster Street
Providence, RI 02903
(401) 421-7740 Ext. 333
Fax (401) 351-7596

## CERTIFICATION

I hereby certify that on 10th day of March, I caused to be mailed a copy of the foregoing via first-class mail to opposing counsel: Patricia E. Andrews, Esq., 170 Westminster Street, Suite 601, Providence, RI 02903.