**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **SIMONNE T. TASSONE, Plaintiff** | : | |
| | : | |
| **v.** | : | **C.A. NO. 03-481 ML** |
| | : | |
| **PROVIDENCE SCHOOL BOARD** | : | |
| **& THE CITY OF PROVIDENCE,** | : | |
| **by & through Stephen Napolitano, Defendants** | : | |

**STATEMENT OF FACTS**

**I. Undisputed Facts**

**Bridgham Middle School**

1. Simonne Tassone ("Tassone") is a special education teacher employed by the Providence School Board. She began on 30 October 1992 as a substitute teacher, and effective 2 September 1993, was appointed to a full-time teaching position. (Affidavit of Donald Zimmerman [Zimmerman Affidavit"] at ¶ 3).

2. Since September 1993, Tassone has worked at the Samuel W. Bridgham Middle School ("Bridgham"), serving students with "mild-to-moderate" learning disabilities in the sixth through eighth grades. (Tassone Dep 8/31/05 at 13).

3. Bridgham was and remains a "handicap accessible" school; it is a two-level building with a ramp from the first to second floor and access from each floor to the street. (Lee Dep 11/22/04 at 30-31). The school services the more "severe handicapped" middle school students in the district, including those who are wheelchair-bound. (Lee Dep 11/22/04 at 31).

4. Pursuant to state law, Tassone's self-contained classroom has a maximum of ten

(10) students supported by one teaching assistant. (Tassone Dep 8/31/05 at 13).

5. The principal of Bridgham as of September 1993 was Robert E. Lee ("Lee"); Lee, like Tassone, began his assignment at Bridgham with the 1993-1994 school year. (Lee Dep 11/22/04 at 18-19). (Zimmerman Affidavit at ¶ 4).

6. Lee remained at Bridgham until his retirement in December 2001. He thereafter continued to assist in the administration at Bridgham as a retiree for a limited number of days in calendar year 2002, as permitted by state law. (Lee Dep 11/22/04 at 14, 15; Zimmerman Affidavit at ¶ 4).

7. Richard Cochrane ("Cochrane") served as principal at Bridgham from January 2002 through June 2003. (Zimmerman Affidavit at ¶ 5).

8. Dinah Larbi ("Larbi") became principal at Bridgham in August 2003, and remains its leader to the present date. (Zimmerman Affidavit at ¶ 6).

9. The duties and responsibilities of principal are to serve as educational leader and manager of the building; the principal does not hire staff, although he/she can make recommendations to the central administration, and sometimes may participate in interviews. (Lee Dep 11/22/04 at 16-17). The principal also evaluates the performance of teachers and assigns teachers to classrooms. (Lee Dep 11/22/04 at 16-18).

10. Robert DiRuzzo ("DiRuzzo") was an assistant principal at Bridgham from August 1991 until June 2002, when he retired. (DiRuzzo Dep 7/19/05 at 15; Zimmerman Affidavit at ¶ 7 ).

11. From 1991 until 1997, DiRuzzo was the only assistant principal at Bridgham; effective September 1997, a second assistant principal, Nidia Diez Karbonik

("Karbonik"), was assigned to Bridgham. (DiRuzzo Dep 7/19/05 at 15-16). (Zimmerman Affidavit at ¶ 8).

12. Karbonik served with DiRuzzo at Bridgham until July 2002, when she left the Providence School Department ("Department") to assume a position as administrator in another school system in Rhode Island. (Zimmerman Affidavit at ¶ 9).

13. The population at Bridgham from 1993, when Tassone began, until May 2002, when she filed the instant charge, was approximately six-hundred (600) students and fifty (50) teachers. (Zimmerman Affidavit at ¶ 12).[1]

14. The assistant principals' primary duty is to oversee the discipline of students. (DiRuzzo Dep 7/19/05 at 16).

15. With the arrival of Karbonik, DiRuzzo and Karbonik shared this duty, so that each was responsible for the discipline of approximately 300 students. (DiRuzzo Dep 7/19/05 at 16). They divided the work as follows: Karbonik was responsible for roughly three-hundred (300) students, comprised of a mix of all special education and some non-special education students (DiRuzzo Dep 10/27/05 at 16-17; Tassone Dep 8/31/05 at 52-53); DiRuzzo was responsible for roughly three-hundred (300) students, all of whom were non-special education students. (DiRuzzo Dep 7/19/05 at 34, 39; 10/27/05 at 16).

16. Neither Karbonik nor DiRuzzo had supervisory authority over teaching assistants, a task that remained with Principal Lee. (DiRuzzo Dep 10/27/05 at 17). They did

[1] DiRuzzo was replaced by Robert Perkins in July 2002, and Karbonik by Dinah Larbi in August 2002. As of July 2002, Bridgham, like other similarly situated schools in the Department, lost an administrator, so that at present, Bridgham has one principal and one assistant principal.

have limited supervisory responsibility over the teachers, and could, on occasion, be called upon to evaluate the performance of a teacher under the direction of Principal Lee. (DiRuzzo Dep 7/19/05 at 33).

**Simonne Tassone's Health Problems**

Neurological

17. Tassone is not completely dependent upon the scooter or crutches. Lee had seen her walk in the school without them "quite a bit," especially during the beginning of her tenure at Bridgham. (Lee Dep 11/22/04 at 79-81). DiRuzzo at times also had observed Tassone walking without crutches. (DiRuzzo Dep 7/19/05 at 54).

18. Moreover, Tassone was (and is) able to negotiate stairs in her own home; until approximately 1998, her bedroom was on the second floor of her three-story house, even though the first floor had a spare bedroom available. (Tassone Dep 1/4/06 at 147-48). The back and front entrances to her house do not have a ramp but only stairs and require passing through at least two doors at each entrance. (Zimmerman Affidavit at ¶ 13).

19. Tassone's apparent need for assistance in walking had (and has) no clear organic basis. The medical records report as follows:

20. In March 1987, more than five years prior to beginning work with the Department, Tassone underwent a neurological evaluation by neurosurgeon Paul W. Bernstein, M.D. She had been referred for such evaluation by neurologist Dr. Barry Levin. (Exh. 1).

---

(Zimmerman Affidavit at ¶ 11).

21. Years before, on 3 December 1984, Dr. Bernstein had performed a "cervical laminectomy" on Tassone, from which she had fully recovered and was "quite asymptomatic" until slipping and falling on ice in late 1986/early 1987. (Exh. 1).[2]

22. A few weeks or months after this fall, in early 1987, Tassone developed pain in her lower back, left lower extremity, and neck, shoulder and left upper extremity. She reported to Dr. Bernstein in her March 1987 visit that she also experienced a "tingling of the left third, fourth, and fifth fingers, in particular the fourth finger" when turning her head to the left, and "pins and needles" in her left foot. (Exh. 1).

23. In early May 1987, Tassone underwent a series of tests at St. Joseph Hospital in Providence, including a "total myelogram." The results were negative with the exception of a "some minimal interspace narrowing . . . at C5-6." (Exh. 3).

24. In November 1987, Tassone underwent an MRI (magnetic resonance imaging) of her spine at Yale New Haven Hospital; the "impression" was of "central and left sided disc herniation at C5-C6 resulting in an element of cord compression." (Exh. 4).

25. In January 1988, Tassone underwent a "discography at cervical five-six" at St.

---

[2] Tassone attested that this fall, in late 1986, resulted in a "broken neck" for which she had surgery and remain in traction n the hospital for "maybe a week." (Tassone Dep 1/4/06 at 11-14, 18). She claimed to continue to use traction at home for a prolonged period after discharge, perhaps years. (Tassone 1/4/06 at 22-23). Tassone appears to believe that this fall caused her subsequent mobility problems: "I have weakness on my left side. I fell in 1986 and broke my neck, and <u>right then and there</u>, it's like I couldn't walk and barely use my left arm." (Tassone Dep 12/2/04 at 5, emphasis added). The medical records do not support Tassone's claim. They show instead that Tassone fell outdoors near a chain link fence in late 1986, and <u>some months later</u>, went to Dr. Levin to complain of pain. (Exh. 2). She underwent at least one myelogram thereafter, and various other tests, but no surgery. The physiological basis for this subsequent left side weakness and difficulty in ambulating is far from clear. One specialist who evaluated her in 1991 encouraged further evaluation for a "somaticization disorder," a kind of psychiatric problem, and opined that Tassone engage in physical therapy with emphasis on "progressive ambulation" and removal of the crutches. <u>See</u> <u>infra</u> at ¶ 40.

Joseph Hospital. The discharge diagnosis was of a "herniated disc at cervical five-six." (Exh. 5).

26. A report by Dr. Levin dated 14 July 1989 repeated and added to Tassone's reporting of symptoms (e.g., pain in posterior neck, tingling from left side neck to shoulder, tingling in bottom of left foot, numbness on foot, weakness in left extremities, "vaguely described dizziness," bilateral low back pain). Dr. Levin referred Tassone for a neurosurgical evaluation by Neville W. Knuckey, M.D., at Rhode Island Hospital. (Exh. 6).

27. In or about August 1989, Dr. Knuckey, of the Department of Neurosurgery at Rhode Island Hospital, examined Tassone. He reported that "examination of her cervical spine reveals full range of neck movements and was non-tender to palpation. Examination of the supraclavicular region was normal. Neurologic examination for upper limbs reveals no evidence of wasting, + 1 reflexes, power was normal as was sensation. Likewise, examination of lower limbs revealed no neurological deficit." (Exh. 7).

28. Dr. Knuckey confirmed that the November 1987 MRI showed a "disc bulge at C5-6 with herniation to the left." He opined, however, that her reported symptoms could not "be explained by her MRI findings," and that if indeed her mylegram were negative (as Tassone herself reported), "no further surgical intervention" was warranted. (Exh. 7).

29. As of December 1989, Dr. Levin reported that Tassone was "much improved" compared with her presentation on the visit of September 1989. He stated that she was "walking fairly well, but with some dragging of the left toes." (Exh. 8).

30. From December 1989 through early March 1990, Tassone underwent physical therapy on an intermittent basis. She abandoned the therapy as of March 1990. (Exh. 9).

31. In May 1990, Tassone was again examined by Dr. Knuckey. She reported to him that she was "doing well" until January 1990 when she returned to work and felt pain in "left triceps and left forearm" if she worked the entire day. She added that she experienced no "specific weakness of the left upper limb." Dr. Knuckey found that Tassone had a "full range of neck movements," and that the neurological examination of her upper limbs was "normal." (Exh. 10). Dr. Knuckey ordered another MRI, which when compared with that of November 1987 (from Yale New Haven), showed no significant differences to explain her condition. (Exh. 11).

32. Dr. Levin's report of 19 July 1991 (after not seeing Tassone for nearly one year) deferred any further neurologic studies. He observed a "gait abnormality" that he believed to be related to "multiple factors, particularly joint abnormalities, especially knee problems," and upper extremity problems, "possibly related to multiple factors . . ." He did not find evidence of "systemic neurologic illness," such as multiple sclerosis. He pointed to "significant anxiety and depression," noting that Tassone "has had significant stress related to leaving her abusive husband, . . . and [was] suspicious that many complaints have component related to this stress." (Exh. 12).

33. The last time that Dr. Levin examined Tassone was in November 1997. She had not seen him for three years, since 1 November 1994. Tassone reported to Levin in this final visit that she had been stable until May 1997 when she began to

experience brief episodes (a few seconds up to 30 minutes) of pain upon turning her head to the left. Dr. Levin's neurological examination was "unremarkable" with the exception of her gait which showed "bizarre favoring and scraping of her Lt. food which was noted to be inconstant." (Exh. 13).

Urological

34. In August 1998, Tassone had surgery to remove an impacted urinary stone from her left upper ureter. (Tassone Dep 1/4/06 at 51; Exh. 14). She had a stent (tube and bag to drain the urine) for some months after this surgery. (Tassone Dep 1/4/06 at 51-52).[3]

35. In July 2000, Tassone again had surgery to remove an impacted stone in the right ureter "at the pelvic brim." (Tassone Dep. 1/4/06 at 55-56; Exh. 16). The stone was removed but again required insertion of a stent, which was replaced on 31 July 2000. (Exh. 16). In December 2000, Tassone underwent another procedure to address complications from the earlier surgery. (Tassone Dep 1/4/06 at 57-58; Exh. 17). The stent remained in place until sometime in early 2001. (Tassone Dep 1/4/06 at 57, 58, 63).

36. Tassone did not have a recurrence of kidney stones, or any further problems with her kidneys or urinary system. (Tassone Dep 1/4/06 at 58, 63). She no longer visits Dr. Maynard. (Tassone Dep 1/4/06 at 60).

Gastrointestinal

37. In January 2000, Tassone underwent a procedure called "sigmoid resection" to

[3] Tassone attested that the stent was put in well after the August 1998 surgery (Tassone Dep 1/4/06 at 53), but it appears Tassone is mistaken, as the left stent was in place as of 16 September 1998, shortly after discharge for this surgery. (Exh. 15).

correct what was believed to be diverticulosis. (Exh. 18). She remained out of work from 10 January 2000 to 3 March 2000. (Zimmerman Affidavit at ¶ 16).

38. She continued with follow-ups visits, complaining of constipation and irritable bowel throughout 2001 (Exh. 19), and more recently reflux for which she takes medication.

Rheumatoid

39. Tassone claims also to suffer from severe arthritis. (Tassone Dep 1/4/06 at 64). She attested that she has been under the care of a rheumatologist, Dr. Bernard Zimmerman, for the past three to four years (since approximately 2002). (Tassone Dep 1/4/06 at 64-65). She takes ibuprofen to alleviate discomfort. (Tassone Dep 1/4/06 at 65).

40. In January 1991, Tassone underwent an evaluation by rheumatologist Andrew Ruthberg, M.D. Dr. Ruthberg ruled out "any kind of inflammatory arthritis." (Exh. 21). He concluded: "I have tried to read through all of the progress notes in the current chart and . . . it appears that this patient has many physical complaints which have not been adequately explained by a variety of tests. While it may be possible that this patient does have a significant physical illness which we have yet to define, I think it is also important to consider an alternative possibility that . . . she has a primary psychiatric disorder in the somatization disorder family. . . . I would strongly advise that physical therapy try to get the patient to eliminate her use of crutches and go through progressive ambulation." (Exh. 21, emphasis added).[4]

[4] In June 2000, Tassone underwent tests at Roger Williams Medical Center for alleged

Bathroom Use

41. Tassone states that she never knew until the "last minute" that she would need to use the bathroom (Tassone Dep 8/31/05 at 104), and that she needed to use the bathroom five to six, and later six to seven times during the school day. (Tassone Dep 8/31/05 at 99, 107). Yet Tassone's medical records provide no evidence that Tassone experienced difficulties anticipating urination or a bowel movement as a result of her fall in 1986, or as a result of any of her neurological, urological, or gastrointestinal difficulties.

42. Tassone further claims that she needed to urinate more frequently (6-7 times each school day) after about 1997, when she became a diabetic and drank more water (Tassone Dep 8/31/05 at 107), and claims that she needed to spend time in the bathroom to attend to the stents she temporarily had implanted after the two procedures to remove kidney stones in 1998 and 2000. (Tassone Dep 8/31/05 at 117). Neither health problem accounts for Tassone's assertion that she could not anticipate needing to use the bathroom and therefore had to rush out of her classroom, sometimes without coverage. Moreover, the need to drink water appears nowhere in her medical records (Exh. 23); at most, it may have been part of an effort to keep her body hydrated, and prevent the recurrence of kidney stones, not as a result of diabetes, which until very recently was under "excellent control." (Exh. 24).

---

rheumatoid/arthritic problems; all results were negative. (Exh. 22).

**<u>Work (1993-2002)</u>**

<u>The Remote and Bathroom Door</u>

43. Tassone's classroom at Bridgham for the 1993-1994 school year was on the first floor of the building. (Tassone Dep 8/31/05 at 12). Her classroom was "self-contained," meaning then that all of her students (for a maximum of ten) remained with her for the entire day, with the exception of physical education and lunch. (Tassone Dep 8/31/05 at 12).

44. Beginning with Tassone's second year at Bridgham, from 1994-1995, Principal Lee implemented a change in the special education program, called "team teaching." (Lee Dep 11/22/04 at 44-45, 51-52). He began to formulate the change in 1993, but because the school already had been "scheduled" when he arrived in September 1993, he could not put the changes into effect until the following academic year. (Lee Dep 11/22/04 at 48, 56-57, 77).

45. Under the "team" concept, special education students with "mild to moderate" learning disabilities rotated to different classrooms for each subject, in the same way that other students did in the middle school grades. (Lee Dep 11/22/04 at 57-68; DiRuzzo Dep 10/27/05 at 31). Lee anticipated that these same special education students would become "integrated" with students having no special education needs (the "regular population"). (Lee Dep 11/22/04 at 63, 65, 66, 67; Tassone Dep 8/31/05 at 29). The goal was also to bring this cohort of special education students closer to each other physically, for logistical reasons, and so "there would be a community." (Lee Dep 11/22/04 at 66, 67, 71).[5]

---

[5] The team concept generally furthered the federal mandate that students with special learning

46. In September 1994, Lee made Tassone part of this new "team" of four teachers sharing forty special education students (all with "mild to moderate" disabilities). (Lee Dep 11/22/04 at 47; Tassone Dep 12/2/04 at 50-52; 8/31/05 at 15-16, 22).

47. Tassone taught English to these students; another teacher taught reading; a third teacher taught science; and the fourth in the group taught math. They each also taught one class of social studies. (Tassone Dep 8/31/05 at 24-25). The forty students traveled in groups of ten from class (or subject) to class. (Tassone Dep 8/31/05 at 25). Tassone and the other three teachers met as a team on occasion, in what became known as "common planning time," to discuss the shared students, or to convene with parents and review the students' individualized learning programs ("IEP's"). (Tassone Dep 8/31/05 at 29, 31-32).

48. The shift to "teaming" necessitated that Tassone move from her classroom on the first floor to a different classroom on the second floor. (Lee Dep 11/22/04 at 47, 51, 52, 69, 70, 71, 78; DiRuzzo Dep 7/19/05; Shagrue Dep 8/17/05 at 143-44). Tassone implies that she objected to the anticipated move, but that Lee told her that she had no choice in the matter. (Tassone Dep 12/2/04 at 52).

49. On 1 September 1994, at the start of the 1994-1995 school year, Tassone filed a grievance through the union requesting that the Department adjust the doors at the ends of the ramp so that they were "made accessible" or less difficult to open. (Tassone Dep 8/31/05 at 143, 155; Exh. 25).

50. Tassone specifically complained that the doors were "too heavy" and "positioned at the wrong angle." She also requested that the door to the teachers' bathroom be

---

needs be educated in the "least restrictive" setting.

adjusted so that it opened to the right instead of the left to allow Tassone to keep the scooter in the bathroom, and out of hall, while she used the bathroom. (Shagrue Dep 8/17/05; Exh. 25). Tassone worried that if she left the scooter in hall, students would vandalize it. (Tassone Dep 1/4/06 at 109-110).

51. Lee had no recollection of any awareness of either problem. (Lee Dep 11/22/04 at 85, 88-89, 90, 91). About the doors on the ramp, he attested that Tassone "opened the doors to come in the main building" on a regular basis. (Lee Dep 11/22/04 at 81-82, 84, 85, 95, 96). He expected that Tassone would either enter from Barton Street directly onto second floor, or use the main entrance and ascend to her classroom via the ramp with her scooter. (Lee Dep 11/22/04 at 78). He continued: "Whether she could use them [the forearm crutches] on the stairs, I don't know. . . . I'm not sure exactly what was wrong with her." (Lee Dep 11/22/04 at 85). He also stated that the door on the ramp "wasn't that hard to open. . . . little kids used to open the door." (Lee Dep 11/22/04 at 93, 94; DiRuzzo Dep 10/27/05 at 43).

52. The grievance was scheduled for presentation before the Superintendent on 17 October 1994 (Exh. 25), where it was favorably resolved, and before the School Board, on 6 October 1995. (Exh. 25). The Board resolved the grievance in Tassone's favor on 26 October 1995 (Exh. 25), and shortly thereafter directed that the Department make the requested changes. (Exh. 25).

53. The Department complied by November 1995. (Tassone Dep 1/4/06 at 101). It re-hung the bathroom door and provided Tassone with an electronic device ("remote control"), which had been wired to the ramp door, to facilitate her opening such door by pressing a button. (Tassone Dep 12/2/04 at 54-57; 1/4/06 at 101-02, 105).

The processing of these changes went through central administration and did not involve Lee, although he was supportive of the changes. (Lee Dep 11/22/04 at 88-89, 100).

54. Tassone used the remote control without incident from the fall of 1995 through on or about 8 December 1998. On that date, she lost the device during an evening event at the school (Tassone believed it was "stolen" or "went missing"). (Tassone Dep 12/2/04 at 57-59, 62). Tassone reported the loss, and called the Superintendent's office between December 8 and December 23 requesting a new remote. (Tassone Dep 12/2/04 at 59-60). She was told that the Department was working on obtaining such replacement. (Tassone Dep 12/2/04 at 63; Gonzalez Dep 10/31/05 at 170-72). Dr. Jose M. Gonzalez Ed.D. ("Dr. Gonzalez"), administrator in charge of "Equity and Access" (see infra at 59), spoke with Principal Lee and another central administrator in an effort to find one. (Gonzalez Dep 10/31/05 at 173, 174, 177; Lee Dep 10/21/05 at 68-71).

55. Then, on the 22nd or 23rd December 1998, just before the start of holiday break, Tassone fell while trying to open the ramp door. (Tassone Dep 12/2/04 at 60-62).

56. Tassone remained out of work from 24 December 1998 until 14 March 1999. (Zimmerman Affidavit at ¶ 14). She received full compensation for this period of unemployment, pursuant to state workers' compensation law and the teachers' contract. (Tassone Dep 12/2/04 at 66; Zimmerman Affidavit at ¶ 14).

57. Upon her return, in March 1999, the Department provided Tassone with a remote control to replace the lost one. (Tassone Dep 12/2/04 at 63; 1/4/06 at 105). She was advised prior to her return that the Department had acquired this replacement.

(Tassone Dep 12/2/04 at 63-64).

Sixth Period Free, Drinking Water

58. By letters dated 3 September 1998, and 11 September 1998, directed to the Human Resources Office of the Department and to Lee, Tassone described having to have had "surgeries" over the summer, and the onset of "Ostio Arthritis, Diabetes, High Blood Pressure, Asthma and Kidney disease." She requested that her free period be at the end of the day so that "teaching time is done when I am feeling my best." She further requested that she be allowed to use the bathroom frequently because she needed to drink twelve glasses of water daily. (Exh. 26).

59. The Department responded through Dr. Gonzalez. In 1998, Dr. Gonzalez had been appointed to a new position in the Department called "Director of Equity and Access." (Gonzalez Dep 8/2/05 at 25). He established a more formalized protocol for reviewing requests by employees seeking accommodations for disabilities under federal and state law. (Gonzalez Dep 8/2/05 at 43-44, 76-78; 10/31/05 at 167-68). The process included the periodic convening of a committee of Department employees, including central administrators, to review employee requests (the "Committee"). (Gonzalez Dep 8/2/05 at 43-44).

60. Dr. Gonzalez made notes on a handwritten memorandum dated 17 September 1998, showing that on or about that date the Committee granted Tassone's request to have sixth period as her free period, with the proviso that she not leave the school premises until the end of the day;[6] the note also addresses the issue of obtaining

[6] Beginning sometime in 1998 or 1999, Tassone's free period under the contract became sixth period, running from 1:22 to 2:15 p.m. Sixth period was the last one of the day. (Zimmerman Affidavit at ¶ 17).

classroom coverage for Tassone when she needed to use the bathroom. (Exh. 27).

61. To insure compliance with state regulatory law, the Department requires that all students, including special education students, be supervised by a teacher certified by the Rhode Island Department of Education (RIDE). (Gonzalez Dep 8/2/05 at 57-58; Lee Dep 10/21/05 at 93; DiRuzzo Dep 7/19/05 at 74-77). Emergencies such bathroom use, however, were the exception to the rule; the practice at Bridgham for a teacher needing to be out of the room for a short time was to insure that a colleague in a nearby room be made aware that he or she would be briefly absent. (Gonzalez Dep 8/2/05 at 55-57; Lee Dep 10/21/05 at 93; DiRuzzo Dep 10/27/05 at 85-86; Shagrue Dep 8/17/05 at 95-98).

62. Dr. Gonzalez explained that the Committee discussed the concern suggested, that nobody would be available to Tassone when she had to use the bathroom. He pointed out that "[I]t did come up, and we felt that it was virtually impossible, because there's typically a building principal, an assistant principal, neighboring teachers, and even teachers that are at free period" to help supervise for these short durations. (Gonzalez Dep 8/2/05 at 55).

63. The accommodation recommended was to draw upon these neighboring teachers for backup, something Tassone had been doing in any event. (Gonzalez Dep 8/2/05 at 106, 110, 111; 10/31/05 at 146-47, 149-52, 203, 204, 242, 243, 244, 245, 246; Lee Dep 10/21/05 at 111; 11/22/04 at 111-13).[7] Gonzalez recalls discussing the

[7] Tassone admits that from approximately 1994 to 1996, when she had the first of two different classrooms on the second floor, she never had a problem finding somebody to "cover" for her when she needed to use the bathroom. (Tassone Dep 8/31/05 at 103). Once she moved to another classroom on the second floor, in about 1996, she drew upon the help of the art teacher in the adjoining room (Tassone Dep 8/31/05 at 108. 112), or would use the classroom telephone and

issue with Principal Lee, who had "no problem with this." In fact, "Mr. Lee had been accommodating throughout his association with Simonne." (Gonzalez Dep 8/2/05 at 108; 10/31/05 at 137-38, 140-41, 147).

64. The only verification received by the Committee of Tassone's health problems as of this time is a note dated 10 September 1998 from Tassone's primary care physician, Cindy L. Hansen, stating that Tassone was "under [Hansen's] care for a number of medical problems." Hansen further stated that Tassone reported that she (Tassone) experienced "fatigue as day progresses . . . [and] needs to drink large amounts of water daily as part of her medical treatment." (Exh. 28).

65. The Committee did not determine what Tassone's so-called "disability" was named or how characterized; rather, it assumed she had a medical need of some nature, and allowed the solicited requests.

No Coverage Sixth Period, Personal Aid

66. In letter dated 25 August 2000, Tassone made additional requests of Dr. Gonzalez. She requested that she be exempt from having to do "coverage" during her free period (6th) because the "pain and ill feeling" resulting from kidney difficulties "get worst at the end of the day." Tassone explained in the same letter that the union representative had rejected Tassone's proposal to be exempt, stating that "there were no exceptions and that I had to do coverage."[8] Tassone also requested that her

---

call or walk to a cluster of rooms down the hall to alert a teacher there, as suggested by Principal Lee. (Tassone Dep 8/31/05 at 108-111). Finally, since approximately 2002, she has had no problem obtaining coverage for her students when she uses the bathroom because she has a teaching "partner" on the same schedule, who is "always there." (Tassone Dep 8/31/05 at 114).

[8] Coverage became necessary when the Department could not provide a substitute for an absent teacher. Under the collective bargaining agreement, when such outside substitutes were not available, the teachers in the school shared responsibility for teaching (or "covering") the absent

teacher assistant remain with her at all times, even when she had no students, to help Tassone clean, make copies and "do other tasks." Finally, she requested that the assistant remain with Tassone on the last day of the school year to help her "pack my books and clean the room." (Gonzalez Dep 8/2/05 at 118; Exh. 29).

67. The Committee met on or about 18 September 2000 to discuss, inter alia, Tassone's requests. (Gonzalez Dep 8/2/05 at 118). By memorandum dated 16 February 2001 from Dr. Gonzalez to Principal Lee, it granted both requests, determining that: (a) Tassone, because of her "medical condition" should have a personal assistant or aide who could be used for "other purposes" as Tassone deemed appropriate[9]; and that (b) Tassone's sixth period was to remain free, and that she "not be given any assignments during that time frame." (Gonzalez Dep 8/2/05 at 119-120; Gonzalez Dep 10/31/05 at 144-45, 207-08, 215, 230-31; Exh. 30).[10] Tassone was afforded a personal aid thereafter. (Gonzalez Dep 8/2/05 at 121-24; 10/31/05 at 228-29; Exh. 30).[11]

---

teacher's classes during their free periods. The teachers who "covered" were first drawn from a list of volunteers, and if none was available at the needed time, through mandatory rotation among those teachers sharing the same free period. Coverage was therefore akin to required overtime, for which teachers were paid beyond their regular salary. (Gonzalez Dep 10/31/05 at 205-06). The union position was that all teachers had to share in the duty to do coverage (Shagrue Dep 8/17/05 at 5-7), something that Principal Lee also believed. (Lee Dep 10/21/05 at 56-57, 114, 121-22; 11/22/04 at 25-27). Lee explained that he tried to accommodate all teachers, including Tassone, who asked on particular occasions to be exempt from coverage (Lee Dep 11/22/04 at 25-27); he did not have the power, however, to exempt Tassone permanently from the mandatory duty: "I couldn't do that. I'm not allowed to. Someone else would have to tell me to do that. . . . A request like that she would have to present not to me but to Central Administration." (Lee Dep 10/21/05 at 55, 57).

[9] This personal assistant or aid is different from and in addition to the teacher's assistant who must staff the classroom of special education students under RIDE regulation. The personal aide assists Tassone, not the students, although he or she may help with students, as Tassone directs.

[10] It appears that the Department made an effort right away, as of October 2000, to provide a personal assistant to Tassone. (Exh. 31).

[11] Tassone received de-facto exemption from coverage, from Lee, even before the Committee

68. The only medical document in the Department's possession associated with these requests is a letter from Tassone's primary care physician, Karen R. Smigel with date stamp of September 12, 2001, more than one year after Tassone's request, and long after the request was granted. (Gonzalez Dep 8/2/05 at 115, 121; Exh. 32). It is not clear whether the Committee and Dr. Gonzalez had received this letter prior to granting the requests by Department memorandum dated 16 February 2001, or whether, by the time the Committee had received such letter, it already had acceded to Tassone's demands.

69. Like her patient, Dr. Smigel stated that Tassone's sixth period be free of all duties, always, and Tassone must have a personal assistant for "100%" of her day, including the end of the day to "help her clean and organize her classroom." (Exh. 32).

70. Again, the Committee did not determine what Tassone's so-called "disability" was named or how characterized; rather, it assumed she had a medical need of some nature, and allowed the solicited requests.

Coverage Dispute

71. Tassone's exemption from coverage during her sixth period generated resentment, and eventually provoked a grievance by her coworkers.

72. These coworkers, a group of twenty-eight teachers, filed a grievance through the union against the Department on December 20, 2002, complaining that "in school coverage [was] being assigned in an unfair and inequitable manner." (Exh. 33).

73. The grievance arose when Jane Shagrue, mathematics teacher at Bridgham also

---

officially exempted her. (Tassone Dep 8/31/05 at 159).

active in the union, learned in December 2002 that Tassone had been exempted from having to participate in the coverage rotation. (Shagrue Dep 8/17/05 at 104-05, 114-15, 116, 120-24).

74. Shagrue explained: "Teachers generally don't like to do coverage," in part because it requires that they work during their unassigned, or free period, when they might schedule other activities or take a break from work. (Shagrue Dep 8/17/05 at 15-16).

75. Shagrue and the other teachers felt that it was unfair that Tassone had been permitted to avoid coverage. (Shagrue Dep 8/17/05 at 63). "Coverage is teaching. I'm a teacher. Whether I'm teaching my math class or teaching a class of an absent teacher, it's teaching. If I can't teach the class for one period of an absent teacher, then how do I teach my own class?" (Shagrue Dep 8/17/05 at 64). Teaching on occasion during one's unassigned period was therefore an "essential" part of being a teacher in the Department. Shagrue could not imagine a situation in which "I could carry out my regular teaching class assignment and not be able to do that on a fair and equitably [sic] manner on a rotating basis as assigned by an administrator." (Shagrue Dep 8/17/05 at 66).

76. The grievance did not mention Tassone by name, but simply described the treatment of teachers as "inequitable." (Shagrue Dep 8/17/05 at 107; Exh. 33).

77. Shagrue and the teachers signing the grievance received a response by letter dated 11 February 2003 from then Chief of Staff of the Department, Susan Lusi, Ph.D. (Shagrue Dep 8/17/05 at 109). Dr. Lusi explained that Tassone had been granted an "accommodation" that included "releasing her from the obligation to teach sixth

period" (Tassone's free period), and that one other request for such exemption, from a different employee, was still under review. (Exh. 33). She reminded the teachers that except for Tassone, and perhaps this second teacher at Bridgham, "all teachers are expected to share responsibility for teaching sixth period on a fair and equitable basis." (Exh. 33).

78. The response left Shagrue feeling "upset, angry, and frustrated," in part because she felt that the central administrators had not reached out to the teachers directly, to gain their perspective on the problem (Shagrue Dep 8/17/05 at 110), and in part because Shagrue strongly disagreed with the outcome: "My opinion is you do not accommodate one individual when that accommodation is going to adversely affect all of that individual's colleagues." (Shagrue Dep 8/17/05 at 111).

79. Shortly after receiving Dr. Lusi's letter (or a copy of it), Shagrue and a colleague were talking in the hall. Shagrue had had polio years before, and wears a leg brace. She lifted her pant leg before this colleague, and announced that she too was a handicapped person who could "get a 504 plan" too. (Shagrue Dep 8/17/05 at 128-29). Shagrue did not recall if other teachers other than this one colleague were around when she made this comment. She did not see Tassone nearby, and had "no idea" if Tassone observed the exchange. (Shagrue Dep 8/17/05 at 131, 133). Shagrue explained: "I made the comment . . . out of anger and frustration with Susan Lusi's response to a grievance concerning an issue, not a person." (Shagrue Dep 8/17/05 at 133).

<u>Hand Injury</u>

80. In September 2001, Tassone's hand was injured by a special education student.

(Tassone Dep 12/2/04 at 80-85). She was out of work as a result from 5 February 2002 through 25 August 2002; pursuant to workers' compensation law and the contract, she received reimbursement for all medical expenses and full compensation for this period of unemployment. (Tassone Dep 12/2/04 at 85; Zimmerman Affidavit at ¶ 15).

81. Prior to her return, Tassone requested (Exh. 34), and the Department purchased, a voice activation system, so that Tassone could dictate reports for her students' IEP's without using her hand. (Gonzalez Dep 10/31/05 at 180-83; Tassone Dep 12/2/04 at 85; Exhs. 35 & 36). When Tassone complained that the program did not work (Tassone Dep 1/4/06 at 126-127), the Department paid another to do the writing on Tassone's behalf. (Tassone Dep 1/4/06 at 129).

82. Tassone's hand problem partly resolved, however, so that at present, Tassone is able to input the data onto the computer without help. (Tassone Dep 1/4/06 at 85, 129-130).

<u>Computerized IEP Trainer</u>

83. In June 2001, Tassone applied for a position within the Department to become part of the "IEP Training Team" ("Team"). The Team was to train other staff on the use of a computerized format in preparing IEP's. The persons selected were to meet on ten occasions from August 2001 through May 2002 for two-hour sessions each time. Each would receive $25.00 per hour, and could thus earn an aggregate of $500.00 over the ten-month period. (Exh. 37).

84. By letter dated 2 July 2001, Tassone was rejected for such position. She filed a grievance challenging the result in which she alleged that one member of the

interviewing team for this position, Gail DeRoy, asked Tassone questions about her health. (Exh. 37).

85. The Department denied the grievance in a letter dated 6 November 2001, signed by former Superintendent Diana Lam. Lam explained that the cutoff aggregate score was "40" and that Tassone had scored only a "37." In addition, Ms. DeRoy had not asked Tassone questions about her health during the interview itself, but after it had concluded, only asked "how are you feeling" in the spirit of friendship. (Exh. 37).[12]

86. By letter dated 20 November 2001, the grievance committee of the PTU made the unanimous decision not to pursue Tassone's grievance, and closed the matter. (Exh. 37).

87. If she had been selected, Tassone would not have been able to participate in the sessions scheduled, as her hand was injured in September 2001, and she was out of work from February through August 2002. See supra at ¶ 80.

## II. The Immaterial But Disputed Facts.

1. Tassone characterized the environment at Bridgham as "hostile," from the day she arrived in 1993, to the present (in 2004). (Tassone Dep 12/2/04 at 13).

2. Yet some of what Tassone describes is at odds with this characterization. She describes developing steady colleagues/friends at Bridgham, with whom she had lunch nearly every day from the mid-1990's to the present. (Tassone Dep 8/31/05 at 141-42, 192-94; Lee Dep 10/21/05 at 117). She received support from the union, particularly from building delegate Shagrue, in filing a grievance in September

[12] The prior year, from January 2000 through the beginning of 2001, Tassone had been through

1994 (and later grievances). (Tassone Dep 8/31/05 at 143-44, 155). Moreover, although Tassone believed that many teachers were not communicative or helpful at first, by her third year (1995-1996), with the infusion of new cohorts onto her teaching team, the situation improved. (Tassone Dep 8/31/05 at 186-87).

3. Finally, when Tassone's daughter was killed in an automobile accident, during Tassone's fourth year at Bridgham (1996-97), everything changed. (Tassone Dep 8/31/05 at 188-89). Even coworkers whom Tassone had found aloof "came to [her] and offered their condolences, and they became very helpful, . . . and they said to [her], if you cannot teach, put your kids in our class, we'll give you all the time. They were just like night and day after she died." (Tassone Dep 8/31/05 at 189).

4. The teachers and staff also created a fund to collect monies to pay for the daughter's funeral, raising close to $2,000.00. (Tassone Dep 8/31/05 at 188-89). "They started giving me books and supplies and just being very friendly." (Tassone Dep 8/31/05 at 189).

5. Tassone's focus is on two persons at Bridgham: assistant principal Robert DiRuzzo, Sr., and coworker Jane Shagrue, both of whom Tassone believed did not like her. (Tassone Dep 8/31/05 at 123, 125, 141, 153).

Robert DiRuzzo

6. DiRuzzo supposedly berated Tassone a "lot" (Tassone Dep 12/2/04 at 18), once telling her to "watch [her] back" after a teacher assistant complained to DiRuzzo about Tassone's lack of control over the students, who were rude to the assistant (Tassone Dep 12/2/04 at 18-19; 8/31/05 at 97); and another time advising her

---

multiple operative procedures. See supra at §§ 34-38.

assistant (not clear if same one) that Tassone lacked ability to control students and manage her classroom. (Tassone Dep 12/2/04 at 33-34; 8/31/05 at 97). He also allegedly admonished Tassone for leaving her students unattended when she used the bathroom during class time. (Tassone Dep 12/2/04 at 20; 8/31/05 at 63-64).[13]

7. Tassone claims to remember five "distinct" occasions from 1993 to 2002 on which DiRuzzo told Tassone not to leave her students unattended. (Tassone Dep 8/31/05 at 64, 66-67, 69-70, 71-72). The fifth of these was likely in 1998 or late 2000/early 2001,[14] in which DiRuzzo allegedly reprimanded Tassone in the library in front of librarian James C. Winn, Jr. ("Winn") and her students. (Tassone Dep 12/2/04 at 21-22; 8/31/05 at 78, 88-91; Winn Dep 3/8/05 at 11-14). Tassone asserts that she was in the bathroom when Winn was forced to call upon DiRuzzo to discipline a disruptive student. After asking her why she had left the students alone with Winn, DiRuzzo allegedly told Tassone that she was "banned" from the library for the remainder of the year. (Tassone Dep 12/2/04 at 22-23; 8/31/05 at 90, 92).

8. Winn did not hear DiRuzzo say Tassone was banned. (Winn Dep 3/8/05 at 14). He says instead that "there was no further discussion . . . regarding penalties or repercussions of anything else at that time." (Winn Dep 3/8/05 at 14). It "occurred

---

[13] Tassone also claimed that DiRuzzo said something to her "on a weekly basis" about leaving students unattended. (Tassone Dep 8/31/05 at 65). Later in this same deposition, Tassone increased the number of such encounters, characterizing the situation as DiRuzzo "yelling at me for something" "two to three times a week." (Tassone Dep 8/31/05 at 138). Except for James Winn, and another teacher named Samboeun Gee (formerly Samboeun Pho) , whom Tassone claimed told her (Tassone) that she had heard DiRuzzo "yell at [Tassone] a few times," no person at Bridgham can corroborate Tassone's claims about DiRuzzo's alleged persistent harshness to Tassone. (Tassone Dep 1/4/06 at 181-82).

[14] By Tassone's account, the incident had to have taken place in late 1998 or possibly late 2000/early 2001, when she had a stent in place, because "changing the bag" was the supposed reason for Tassone's delay in the bathroom. (Tassone Dep 12/2/04 at 21).

to him," however, the night before he was deposed on 8 March 2005, that "Mr. DiRuzzo had apparently forbidden her to come back to the library for the rest of the year." (Winn Dep 3/8/05). The primary basis for his belief was that Tassone told Winn she could not return. (Winn Dep 3/8/05 at 14-15).

9. Tassone allegedly reported the library ban to DiRuzzo's superior, Principal Lee, but claims that Lee refused to intervene because "he [said he] didn't want to cause any problems between the two of them [DiRuzzo and himself]." (Tassone Dep 12/2/04 at 23; 8/31/05 at 90-91).

10. Tassone did not grieve the incident resulting in this supposed library ban or report it to the union or to anyone other than Lee. (Tassone Dep 8/31/05 at 93, 94; Shagrue Dep 8/17/05 at 99-100). She had worked through the union and filed grievances, however, for an array of perceived difficulties over the years (Tassone Dep 8/31/05 at 94), beginning in 1994, her second year at Bridgham, (Exh. 25), and more recently, in September 2001 (Exh. 37); in September 2002 (Exhs. 38 & 39, and in October 2003. (Shagrue Dep 8/17/05 at 27-28, 39-41, 43-45, 47-48, 51, 67-70, 135-37, 152). (Exh. 40).

11. Tassone explained that she did nothing to protest the library ban "because I felt everybody was against me to begin with because of my handicapped problems, and I didn't think I'd get support . . ." (Tassone Dep 12/2/04 at 25-26). She also implied that she was worried that if she protested the ban, she might be denied tenure. (Tassone Dep 12/2/04 at 26).[15]

[15] These perceptions are difficult to understand. The Department granted Tassone every accommodation she had requested, with the exception of remaining on the first floor in 1994, including being afforded a personal assistant and exempted from coverage during her free period.

12. DiRuzzo categorically denies interacting with Tassone in the manner described, banning her from the library, or having any but limited contact with her, especially after September 1997, when Ms. Karbonik was assigned to Bridgham as a second assistant principal, and assumed responsibility for disciplining all of the special education students. (DiRuzzo Dep 7/19/05 at 35, 37-38, 48-49, 50, 73, 78, 81, 82; 10/27/05 at 15, 16-17, 18-19, 54, 56, 57, 59, 77-84, 98-101). His primary recall is that Tassone's classroom was "very boisterous," "very noisy," and at times "louder" than other special education classrooms. (DiRuzzo Dep 7/19/05 at 57, 58). Tassone acknowledges that in or about 1997, Ms. Karbonik took over the task of disciplining Tassone's students, all of whom were in special education. (Tassone Dep 8/31/05 at 51, 53).

13. DiRuzzo had no knowledge of Tassone's health problems, including that she had kidney stones and a temporary stent for some periods in 1998 and 2000. (DiRuzzo Dep 7/19/05 at 55; 10/27/05 at 20, 22-23).

14. Lee has no recollection of Tassone complaining to him about problems with DiRuzzo; he thought DiRuzzo a "likeable" person who "seemed to get along with everyone." (Lee Dep 10/21/05 at 77, 136).[16] Lee himself liked Tassone and gave time to her to listen to descriptions of her health and other problems, including her need to use the bathroom often. (Lee Dep 10/21/05 at 46-47; 11/22/04 at 18-20,

---

Moreover, this alleged incident in the library had to have occurred in late 1998 or 2000/2001 (Tassone Dep 12/2/04 at 26-27), well after 1996, by which time she was securely protected with tenure under state law. See R.I. Gen. Law § 16-13-3 (teachers' tenure after probation).

[16] Lee does recall one, perhaps more than one time, that Tassone came to him with a concern about DiRuzzo's handling of a discipline matter; such an incident was not unusual among teachers – and resolving disagreements between and among teachers and assistant administrators about handling students was a commonplace event in Lee's career as principal. (Lee Dep

25-26, 108, 111, 119). He has no recall of any problems with her use of the library. (Lee Dep 11/22/04 at 111, 114). He does remember that Tassone sought to have sixth period free, and be excused from coverage when she was not feeling well, both types of requests he consistently granted. (Lee Dep 10/21/05 at 51-52, 56, 65; 11/22/04 at 119, 121-22). He also recalls that Tassone wanted him to conduct her evaluation in 2001 (Tassone Dep 8/31/05 at 134; Lee Dep 10/21/05 at 37-38, 39), but attributes that preference not to Tassone's dislike of DiRuzzo (or fear that DiRuzzo disliked her), but rather, Tassone's desire to have her evaluation conducted by one with whom she had established good rapport. (Lee Dep 10/21/05 at 39-40. 132, 134-35, 136). Other teachers made the same request of Lee. (Lee Dep 10/21/05 at 136-37).

15. Tassone claims in a general way that DiRuzzo seemed not to like her because of her "handicap." (Tassone Dep 8/31/05 at 129). Yet she acknowledges that DiRuzzo never said to her (or anyone) that he found her limitations a problem; never made fun of her; never expressed hostility over her use of the scooter; and never told her that she should "go home," or could not do the job. (Tassone Dep 8/31/05 at 129-30). The nub of the problem between the two (to the extent there was a problem), is disclosed by Tassone herself, and had nothing to do with Tassone's so-called disability: DiRuzzo did not respect Tassone's classroom management skills.

16. Tassone herself recounts persistent conflicts over how she handled difficult or disruptive students: "He would side with the kids," questioning and even

---

10/21/05 at 43-46; 11/22/04 at 107-08).

criticizing her decision to "write them up." (Tassone Dep 8/31/05 at 57-58, 60, 62). Tassone estimates that DiRuzzo would "chastise" her every month, by phone, or in person, for referring students in situations that DiRuzzo believed Tassone herself was obligated to handle. (Tassone Dep 8/31/05 at 61). According to Tassone, he said "it was my job to be able to handle kids like this, that's what I was trained for . . ." (Tassone Dep 8/31/05 at 59).

17. Friend and coworker Winn made the same point.[17] Winn believed that DiRuzzo could be "gruff" or "firm" with Tassone, as he could with certain other teachers, including on occasion Winn himself. (Winn Dep 3/8/05 at 48-49, 123).[18] Winn observed that DiRuzzo did not yell but rather, would "raise his voice" on occasion "as if prompted by anger, frustration, . . . negative emotions." (Winn Dep 3/8/05 at 79-80).

18. Tassone and DiRuzzo had very different styles, Winn observed, particularly in dealing with students: DiRuzzo was "caustic" and "quick" and would "jump" to judgment "awfully quickly about what was going on, very black and white in his decisions," whereas Tassone's approach was "more like a plea bargainer, more like an advocate for the kid, more wanting to explain situations more thoroughly than a quick description . . . ." (Winn Dep 3/8/05 at 46, 47, 98, 131, 135).

19. They were, Winn concluded, "like oil and water, not mixing." (Winn Dep 3/8/05 at

---

[17] Winn and Tassone have been good friends for more than a decade. (Winn Dep 3/8/05 at 101). They eat lunch together in Tassone's classroom or the library, sit together at meetings, and talk on the telephone outside of work. (Winn Dep 3/8/05 at 102, 105-06, 107). Tassone talked to and complained to Winn about her work troubles: "Simonne has a tendency, at least with me, to repeat herself. So I heard these stories more than once over the years." (Winn Dep 3/8/05 at 44).

[18] Winn was careful to qualify DiRuzzo's behavior as "firm" but not "rude." (Winn Dep 3/8/05 at 49).

46, 97, 125). Winn offered that there was a "personality conflict" between them (Winn Dep 3/8/05 at 97-98), yet characterized any further analysis of the basis for DiRuzzo's apparent gruffness with Tassone as mere "speculation." (Winn Dep 3/8/05 at 46, 125, 130, 131).

20. Winn also observed DiRuzzo question Tassone's "location" approximately four to six times a quarter. (Winn Dep 3/9/05 at 56, 58). Winn could give no specifics as to what he saw or heard, however. (Winn Dep 3/9/05 at 58).

21. Most important, Winn emphasized that although DiRuzzo was abrupt with Tassone, he could be very direct with others as well: "What I would want to say is that [the group toward whom he might speak "harshly"] included more than Simonne. . . I certainly saw what I saw directed at Simonne, and I saw it on occasion directed at other people, and whether it was directed repeatedly at those people, I would say probably, probably. . . . <u>I'm confident it was not just Simonne</u>." (Winn Dep 3/8/05 at 52-53, emphasis added).

<u>Jane Shagrue</u>

22. Shagrue, Tassone believed, was not friendly to her. For example, Shagrue did not say "hi" to Tassone when Tassone first arrived at Bridgham in 1993 (Tassone Dep 8/31/05 at 141), and was not inclusive of Tassone when with her "little friends, her group, groupies." (Tassone Dep 8/31/05 at 153).

23. As building delegate for the union, Shagrue did help Tassone in filing grievances, including the first in 1994 in which Tassone complained, <u>inter</u> <u>alia</u>, about the heavy doors at the ends of the ramp. (Tassone Dep 8/31/05 at 152, 155 ). She also told Tassone that some matters, particularly Tassone's request to be exempt from

coverage during her free period, were not "grievable" because the mandate to participate in coverage was "contractual." (Tassone Dep 8/31/05 at 146, 154, 160).

24. Tassone succeeded in pressing the Department to exempt her from coverage despite Shagrue's opinion. As a result, Shagrue "was very angry over [Tassone's] not having to teach the unassigned period." (Tassone Dep 8/31/05 at 156).

25. Sometime in early 2003, after being granted such exemption, Tassone was in the hall on the second floor. As she approached Shagrue's classroom, she observed Shagrue standing with a group of teachers. Shagrue was walking down the hall, dragging her left leg, in apparent imitation of Tassone's gait, and saying words to the effect: "Maybe I should walk like this, or maybe I should say that I am handicapped, too, just so I can get out of doing my job like other people in our school." (Tassone Dep 8/31/05 at 163).

26. According to Tassone, the teachers looked at Tassone and laughed, then dispersed. (Tassone Dep 8/31/05 at 163). Tassone approached one of the teachers, Michael Cote, to ask him what "was that all about." Cote refused to answer, but when Tassone persisted, Cote disclosed that some teachers had filed a grievance challenging Tassone's exemption from coverage. (Tassone Dep 8/31/05 at 164). Cote said that the teachers were very angry about the exemption, and that he agreed with the assessment of some that if Tassone could not perform all aspects of her job, including coverage, she should not be teaching. (Tassone Dep 8/31/05 at 164).

27. Tassone and Cote remained friends despite the coverage dispute, continuing, for example, to eat lunch together. (Tassone Dep 8/31/05 at 165, 173).

28. Shagrue acknowledges that she made the above comment in anger over the

Department's decision to exempt Tassone from coverage; Shagrue clarifies, however, that her intent was to call attention to her own handicap, by pulling up her pant leg, to show the others the brace she wears as a result of polio. See supra at ¶ 79.

29. On no other occasion in the more than one decade that the women worked together, did Shagrue make a remark about Tassone's gait, or in any way diminish or insult her. (Tassone Dep 8/31/05 at 165-66, 168). In fact, after this one remark, Tassone can only remember "one more time" that Shagrue and the other teachers "said something" to Tassone about being exempt from coverage. (Tassone Dep 1/4/06 at 134; 12/2/04 at 43). The teachers dropped the grievance.

Other Complaints

30. Tassone also complains of other workplace difficulties: inadequate room equipment and teaching supplies when she began in September 1993 (Tassone Dep 8/31/05 at 180; 12/2/04 at 47-49)[19]; occasional ice in the parking lot despite requests for better sanding service (Tassone Dep 12/2/04 at 67, 68-69, 71); the location of the handicapped parking spots (Tassone Dep 8/31/05 at 183-84); and Lee's refusal to exempt Tassone completely from "corridor duty" (Tassone Dep 12/2/04 at 90)[20]; grant her early release on snow days (Tassone Dep 12/2/04 at 72, 73, 74), or permit her to use the copier in the library instead of the one in the teachers' room during

[19] Tassone speculates that prior to the start of the 2003-04 school year, an unidentified group of teachers at Bridgham removed furniture and supplies from what was to become her classroom out of "bitterness" that Tassone had displaced a well-liked teacher. (Tassone Dep 12/2/04 at 49). She has absolutely no evidence of this, however. (Tassone Dep 8/31/05 at 180-81).

[20] Tassone acknowledges that Lee allowed Tassone to modify the duty, and remain in the doorway of her room, rather than in the hall, because Tassone told Lee that she was "getting hurt." (Tassone Dep 12/2/04 at 80).

her free fifth period. (Tassone Dep 8/31/05 at 148-49; 12/2/04 at 85-87).[21]

31. Tassone also complains that in September 2001, the Department made an inadvertent paperwork error in placing a disruptive student in Tassone's class, which placement arguably led to Tassone's hand injury. (Tassone Dep 12/2/04 at 76-84, 90-91).

32. These difficulties were in some instances nonspecific to Tassone and implicated concerns about which Lee and other administrators needed to attend on behalf of all using the building, including the students (e.g., books and supplies, melting ice in parking lot, caring for and properly placing and managing special education children, who could be "emotionally disturbed"). (Lee Dep 10/21/05 at 81-86, 90-92, 106-08).

33. In other instances, Lee has no recollection of Tassone complaining about any of the above matters. (Lee Dep 10/21/05 at 123-25, 127-28; 11/22/04 at 37, 38-39, 42, 51-52, 55, 61, 63, 72, 73, 75, 76, 84-85, 90-91, 98-99, 108, 118).[22] He also denies as completely inconsistent with the way he treated Tassone generally and ran the school that he would have rejected Tassone's requests under appropriate and safe circumstances (Lee Dep 10/21/05 at 39-40, 51-52, 72-73; 11/22/04 at 62, 63, 72,

---

[21] Even if this denial were true, the issue became moot once Tassone's free period changed from fifth to sixth, in 1998 or 1999. The problem, according to Tassone, was that she wanted to use the copier during her free period, and to get to the one in the teacher's room, she had to go through the cafeteria, which during fifth period, was being cleaned. The cleaning made it less convenient for Tassone, so she preferred to use the library copier. Lee had proscribed such use, because Winn was conducting classes or using the library during fifth period. (Winn Dep 3/8/05 at 25-27).

[22] It is hardly surprising that Lee, a retired administrator, who oversaw thousands of students and staff over the years, and worked nearly one decade at Bridgham, cannot remember discrete requests of Tassone allegedly made a few times more than ten years ago. The statute of limitations for discrimination claims, requiring filing at 300 days (ADA), 1 year (RICRHA), or at

73); in fact, he remembers that he did permit Tassone and Winn (and others) to leave early on occasion, provided they did not abuse the privilege (Lee Dep 10/21/05 at 109-11; 11/22/04 at 24-28; Winn Dep 3/8/05 at 29-31), and excused Tassone from coverage, as Tassone needed. (Lee Dep 11/22/04 at 25-27; 10/21/05 at 50-53).

34. Lee attempted to cultivate good morale through an open door policy. (Lee Dep 10/21/05 at 52-53; 11/22/04 at 24-25, 26-27). He finds Tassone's accusations in this lawsuit as bewildering, even "ludicrous" (Lee Dep 10/21/05 at 40), and notes that he worked diligently over the years to support her through myriad personal and professional troubles: "When I read that [the complaint], I was shocked, because I had worked with . . . and helped that woman for eight years. . . ." (Lee Dep 10/21/05 at 42, 113).

Respectfully submitted,

PROVIDENCE SCHOOL BOARD &
THE CITY OF PROVIDENCE

By their Attorney,
JOSEPH M. FERNANDEZ
CITY SOLICITOR

Sara A. Rapport (No. 6614)
Senior Assistant City Solicitor
City of Providence Law Department
275 Westminster Street
Providence, RI 02903
(401) 421-7740 Ext. 333
(401) 351-7596 (Fax)

most three years (RICRA), helps to insure that defendants will not be called upon to resurrect memories of events long past or rendered moot by intervening circumstances and resolutions.

**CERTIFICATION**

I hereby certify that on this 10th day of March, 2006, I caused to be mailed a true copy of the foregoing Statement of Facts, by regular mail, postage prepaid, to: Patricia E. Andrews, Esq., 170 Westminster Street, Suite 601, Providence, RI 02903