**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **SIMONNE T. TASSONE,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**PROVIDENCE SCHOOL BOARD AND THE CITY OF PROVIDENCE, by and through Stephen Napolitano,**<br>**Defendants.** | **C.A. No. 03-481ML** |

**PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Now comes the Plaintiff, Simonne T. Tassone ("Tassone") in the above-captioned case and pursuant to Fed. R. Civ. P. 56(c), objects to the Motion for Summary Judgment filed by Defendants Providence School Board and the City of Providence.

In support thereof, Tassone relies on the accompanying memorandum of law

Plaintiff,
By her Attorneys,

Patricia E. Andrews, #4321
Carly Beauvais Iafrate, #6343
129 Dyer Street
Providence, RI 02903
(401) 421-0966
(401) 421-0964 (fax)

**CERTIFICATION**

I hereby certify that a copy of the within document has been sent by mail to Sara Rapport, Esq., Sr. Assistant City Solicitor, City of Providence Department of Law, 275 Westminster St., Providence, RI 02903 on the 2nd day of June 2006.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **SIMONNE T. TASSONE,** | : | |
| **Plaintiff,** | : | |
| | : | **C.A. No. 03-481ML** |
| **v.** | : | |
| **PROVIDENCE SCHOOL BOARD AND THE CITY OF PROVIDENCE, by and through Stephen Napolitano,** | : | |
| **Defendants.** | : | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I. FACTS

Plaintiff, Simonne Tassone ("Tassone"), is an employee of the City of Providence School Department ("Defendants"). She has been employed since about September, 1992 as a special-education teacher. For about the first year, Tassone worked at Esek Hopkins Middle School. She does not claim that she was discriminated there. Beginning in September, 1993, Tassone was transferred to Bridgham Middle School ("Bridgham"). She continues to work at Bridgham to this day.

During much of the time that Tassone has worked at Bridgham, she has been discriminated against based upon her various disabilities. As is shown below, Tassone maintains that Defendants have failed to accommodate her and have subjected her to both disparate treatment and a hostile work environment.

II. ARGUMENT

**A. DEFENDANTS' ARGUMENT THAT PLAINTIFF DOES NOT HAVE A DISABILITY IS WITHOUT MERIT.**

1. Defendant's Argument That Plaintiff Does Not Have a Disability Under The Actual Disability Prong Is Not Supported By The Law Or The Evidence.

Law Applicable To Both The State and Federal Claims

a. Actual Disability[1]

Tassone claims that she has disabilities under the first prong of the Americans with Disabilities Act, 42 U.S.C. §12101 et seq. (the "ADA"), the Rehabilitation Act, 29 U.S.C. § 794 et seq. (the "Rehabilitation Act"), the Rhode Island Civil Rights Act, G.L. 1956 § 42-112-1 et seq.(the

[1]Defendants do not move for summary judgment on the issue whether Tassone could perform the essential functions of the job. Presumably, this is because of the overwhelming evidence that she could. For example, Principal Lee was asked whether there were any duties which Tassone could not perform. He testified that, although her health worsened as time went on, Tassone "did her best all the time to accomplish what she had to do in the classroom." He also added that he did not think there was anything that she could not do. Lee II, p. 49-50. Furthermore, the 504 committee which ultimately addressed some of Tassone's requests for accommodation reviewed the essential functions of the job and determined that she qualified for an accommodation. Gonzalez I, p. 62-65, Gonzalez II, p. 155-56.

"RICRA"), and the Civil Rights of People with Disabilities Act, G.L. 1956 § 42-87-1 et seq. (the "RIPDA"). All of these statutes define a disability as an impairment that substantially limits at least one major life activity. Gillen v. Fallon, 283 F.3d at 14 (citation omitted); see also R.I.G.L. § 28-5-6(4). Whether an impairment substantially limits one or more of an individual's major life activities is determined in a three-step analysis: (1) a determination that the condition is an impairment, (2) the identification of the major life activity, and (3) a determination that the impairment substantially limits the identified major life activity. Bragdon v. Abbott, 524 U.S. 624, 631, 141 L.Ed.2d 540, 118 S.Ct. 2196 (1998)).

Major life activities are those activities that are of central importance to daily life. Toyota Motor Manufacturing v. Williams, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). Activities such as walking and elimination of waste are major life activities. See EEOC v. Browning-Ferris, Inc., 262 F. Supp. 2d. 577, 584 (D. Md. 2002).[2]

To be substantially limited in any major life activity, an individual must be "unable to perform a major life activity that the average person in the population can perform" or "significantly restricted as to the condition, manner or duration under which she can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." Gillen, 283 F.3d at 14 (citations omitted). In determining whether an individual is substantially limited in a major life activity, a court should consider the nature and severity of the impairment, its expected duration, and its permanent or long-term impact. Id.

---

[2]See also Workman v. Frito-Lay, Inc., 165 F.3d 460, 467 (6th Cir. 1999) (jury could find that controlling bowels is major life activity); Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 871 (2d Cir. 1998) (court assumed ability to control elimination of waste is major life activity); Mazza v. Bratton, 108 F. Supp. 2d 167 (E.D.N.Y. 2000), aff'd 2001 U.S. App. LEXIS 6185 (2001)(unpublished), cert. denied, 534 U.S. 887 (2001) (plaintiff introduced sufficient evidence to create triable issue of fact that he was substantially limited in activity of controlling elimination of waste); Westinghouse Electric Supply Corp. v. MCAD, 9 Mass. L. Rep. 661 (Mass. Super. 3/5/99) (inability to control bowels is major life activity); Sacay v. The Research Foundation of the City Univ. of New York, 193 F. Supp. 2d 611 (E.D.N.Y. 2002) (court assumed inability to control elimination of waste is major life activity).

"Although short-term, temporary restrictions generally are not substantially limiting, an impairment does not necessarily have to be permanent to rise to the level of a disability. Some conditions may be long-term or potentially long-term, in that their duration is indefinite and unknowable or is expected to last at least several months. Such conditions, if severe, may constitute disabilities." Katz v. City Metal Co., Inc., 87 F.3d 26, 31 (1st Cir. 1996) (citation to EEOC regulations omitted).[3]

Similarly, chronic or episodic disorders, that are substantially limiting when active or have a high likelihood of recurrence in substantially limiting forms, may be disabilities. For example, in Lanci v. Arthur Andersen, 2000 U.S. Dist. LEXIS 3954 (S.D.N.Y. 2000), Peter Lanci, who had Tourette Syndrome, worked for Arthur Andersen. During 1991 and 1992, his symptoms were under control and he received excellent reviews. However, during February to April, 1995, his symptoms significantly worsened and he was fired when his job performance suffered. By April or May, 1995, his symptoms began to abate again and, by November, 1995, his condition was "largely under control." Id.

In addressing the defendant's motion for summary judgment, the court found that Lanci's ordinary, day-to-day symptoms did not constitute a disability. However, acknowledging that chronic or episodic disorders that are substantially limiting when active may be disabilities, the court held that Lanci was disabled during what the court called the "acute phase" in 1995 when he was substantially limited in the major life activities of thinking and concentrating.[4]

---

[3]See, e.g., Berk v. Bates Advertising, 25 F. Supp. 2d 265 (S.D.N.Y. 1998) (employee, who returned to work without symptoms after having surgery for breast cancer, was substantially limited in major life activity of reproduction because having cancer made pregnancy unduly risky and caused her to have operation which destroyed chance of reproduction).

[4]See also Mazza v. Bratton, 108 F. Supp. 2d 167 (E.D.N.Y. 2000) (court found disability where plaintiff 's ulcerative colitis caused him to be hospitalized for thirty days between May 2 and June 14 during which he was dehydrated and experienced numerous bloody bowel movements averaging about eight per day during severe periods, was placed on medication for rest of his life after hospitalizations and symptoms included, during and in months after hospitalization, diarrhea, fever, sleep deprivation, fatigue, mood changes, sexual dysfunction, severe joint pain and anemia, painful cracks to rectal area, loose and bloody stool, inflammation, cramps, nausea, gas, bowel urgency, loss of appetite and weight loss, dehydration, fatigue, pain and hemorrhoids, and where on bad day

Mitigating Measures

Under the ADA and the Rehabilitation Act, if a person is taking measures to correct for, or mitigate, a physical impairment, the effects of those measures – both positive and negative – must be taken into account when judging whether a person is "substantially limited" in a major life activity and thus "disabled" under the ADA. Sutton v. United Air Lines, Inc., 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).[5]

In contrast, the RIPDA explicitly provides that the determination whether a person has a disability "shall be determined without regard to the availability or use of mitigating measures, such as reasonable accommodations, prosthetic devices, medications or auxiliary aids." See § 42-87-1(1). Although the RICRA does not include such an expression, courts have interpreted it the same way. See, e.g., DeCamp v. Dollar Tree Stores, 875 A.2d 13, 20 (R.I. 2005) ("disability" under RICRA is defined in same way as Fair Employment Practices Act).[6]

A number of decisions decided before Sutton are instructive here. Although they obviously do not control Tassone's ADA or Rehabilitation claims, their analysis applies to her RIPDA and RICRA claims. For example, in Criado v. IBM Corporation, 145 F.3d 437 (1st Cir. 1998), Elizabeth

---

he had ten bowel movements but on good days had no symptoms all).

[5]That is not to say that a person whose impairment is controlled by medication can never have a disability after Sutton. See, e.g., Rowles v. Automated Production Systems, Inc., 92 F. Supp. 2d 424 (M.D. Pa. 2000) (court found epileptic covered by ADA even though his doctor said his seizure disorder was under excellent control with medication because, while medication significantly reduced number of seizures, employee occasionally had seizures which limited his ability to walk, talk, speak, see, hear and work, he was at risk for seizure once a year, was at risk for potential short and long term side effects from his medication, had to limit his exposure to stress and fatigue which both precipitated seizure activity, could not work excessively long hours, had to eat meals at regularly scheduled intervals, had to have eight hours of sleep each night and was less able to handle flu as vomiting could prevent him from getting enough medication which could precipitate seizure activity); Otting v. J.C. Penney Company, 223 F.3d 704 (8th Cir. 2000) (court found epileptic employee covered by ADA even though her doctor cleared her to return to work with only ladder-climbing restriction because, although she only had sporadic seizures because of medication, they were frequent enough – two or three times a month which lasted 30 seconds to two minutes -- such that she was prohibited by law from driving, could not take baths by herself for risk of drowning if seizure occurred, and was lethargic, shaky and had difficult concentrating after seizure and during seizures she could not speak, walk, see, work or control left side of her body all of which are major life activities).

[6]The Fair Employment Practices Act ("FEPA") explicitly provides that the determination whether a person has a disability is to be determined without regard to things like medication or other mitigating measures. *See* G.L. 1956 § 28-5-6(4).

Criado suffered from anxiety disorder and bouts of depression. In 1987, she began working for IBM. From that time until 1993, she had sporadic bouts of depression. However, although the bouts of depression required temporary medication, none was so severe that it required Criado to take a leave of absence. That changed in about June, 1994 when her condition worsened and she began requesting accommodations. Eventually, on the advice of her doctor, who opined that time out of work would ameliorate her condition, Criado took a medical leave of absence. IBM eventually fired Criado for not returning to work by the date it had set for her return.

On appeal of the denial of its Rule 50(b) motion, among other things, IBM argued that Criado did not have a "disability" because, prior to June, 1994, none of her major life activities had been substantially impaired by her bouts with depression. IBM also argued that, based upon her own doctor's testimony, her condition was temporary and that she would have made a complete recovery after a short leave from work. Focusing on the nature of her disability when she requested the accommodation and was fired, the First Circuit disagreed:

> "[B]y the time Criado requested the leave of absence she had become unable to perform some of the functions of her job. She was having trouble dealing with stress and relating to both co-workers and clients. Depression and anxiety were causing sleep deprivation which affected her timeliness and ability to report to work. This evidence showed that her mental impairments had substantially limited her ability to work, sleep, and relate to others. Overall, there was evidence indicating that she was unable to adequately perform her job as she had in the past. That her depression had been adequately treated through therapy in the past and was expected to be adequately treated through therapy and medication in the future does not establish that she does not have a disability . . . ." Id. See also Arnold v. United Parcel Service, Inc., 136 F.3d 854 (1st Cir. 1998) (where employee had successfully controlled his insulin-dependent diabetes for twenty-three years, court held that he was covered by ADA because, without medication, he would lapse into coma and die without insulin injections).[7]

[7]See also Harris v. H & W Contracting Co., 102 F.3d 516 (11th Cir. 1996) (court found employee with Graves disease was covered by ADA even though, except for one temporary hospitalization of eight days because of medication overdose, employee was symptom free for 20 years because untreated Graves disease caused frequent bowel movements, occasional diarrhea, and was life threatening). Washington v. HCA Health Services of Texas, Inc., 152 F.3d 464 (5th Cir. 1998), vacated/remanded, 527 U.S. 1032 (1999) (where employee suffered from Adult Stills Disease, a degenerative rheumatoid condition affecting bones and joints and a related kidney disease, court denied summary judgment and found employee was "disabled" even though he lead relatively normal life because without medication he would be bedridden and unable to work); Baert v. Euclid Beverage, 149 F.3d 626 (7th Cir. 1998) (where plaintiff was hospitalized for five days after which his doctor told him to take insulin every day for his

Applying these principles here, it is clear that Tassone has actual disabilities. For this reason, summary judgment is improper on the "actual disability" prong.

The Walking Disability

In short, Defendants argue that Tassone is not disabled because there is no medical evidence that she has a neurological disorder to explain her difficulty walking. Defendants rely on some excerpts from the notes of Dr. Barry Levin and Dr. Andrew Ruthberg.

Defendants have misinterpreted these notes. As Dr. Levin makes clear in his Affidavit, he treated Tassone for various neurological problems during the period 1981 to about November, 1997. See Ex. A. By March, 1990, he had diagnosed her as having "gait abnormality" which she still suffered from as of November, 1997 -- the last time that he examined her. "Gait abnormality" is defined as problems with walking. There are different types of gait abnormalities. Most, although not all, are due to some type of physical malfunction. Although Dr. Levin does not know the exact cause of Tassone's "gait abnormality," he is definitely of the opinion that it is caused by neurological problems including: a history of compression fractures of the lower lumbar spine, cervical and lumbosacral radiculopathy, central and left sided disc herniation at C5-C-6 resulting in an element of cord compression, cervical spondolosis, severe pain in her lower and upper back, joint pain and joint abnormalities, numbness, left foot pain, possible tarsal tunnel syndrome and knee problems. Dr. Levin confirms that Tassone's gait abnormality causes her to be substantially impaired in her ability to walk compared to the average person in the population. See Ex. A.

Dr. Levin also confirms that Defendants have misinterpreted Dr. Ruthberg's notes. In short, Dr. Levin maintains that Dr. Ruthberg did not rule out that Tassone's gait abnormality was caused

---

diabetes, court found he was "substantially limited" in all life activities, even though he admitted that he felt "perfectly healthy" once he started taking insulin, because insulin-dependent diabetic would likely lapse into coma and die without insulin); Burke v. Royal Insurance Company, 39 F.Supp. 2d 251 (E.D.N.Y. 1999) (asymptomatic, insulin-dependent diabetic was covered by ADA because, if left untreated, his diabetes would be life threatening and there was substantial limitation on his digestive system); Erjavac v. Holy Family Healthy Plus, 13 F. Supp. 2d 737 (N.D. Ill. 1998) (employee whose diabetes was controlled through medication was covered by ADA because, without medication, employee would lapse into coma or die).

by physical illness. Rather, he merely questioned that a psychiatric disorder might be the cause and that it should be explored as well. Significantly, even if it were caused by a psychiatric disorder such as somatization disorder, Tassone would still be substantially impaired in her ability to walk compared to the average person. See Ex. A.

There is other evidence to support the fact that Tassone has an actual disability. First, Dr. Jon Mukand, who has been the Medical Director for the Southern New England Rehabilitation Center, saw Tassone in April, 2005 at his Wheelchair Clinic. The purpose of this visit was to determine if Tassone was a candidate for a scooter. During this visit, Dr. Mukand performed a neurological examination of Tassone and determined that she requires a scooter because she is "permanently and substantially impaired in her strength and ability to walk as compared to the average person." See Mukand Affidavit, Ex. B. Second, Dr. Karen Smigel, an internist who treated Tassone for a number of years, is of the opinion that Tassone "needs to use crutches and/or a wheelchair to ambulate/get around." See Dr. Smigel Letter of September 12, 2001, Ex. C. Third, in her answers to interrogatories, Tassone makes clear that she meets the definition of disability under this prong. See Plaintiff's Answers ("Answers"), Ex. D. Fourth, especially based upon reports submitted by Dr. Levin, Tassone was determined to be eligible for social security benefits because, among other things, she was substantially impaired in her ability to walk beginning in March, 1987. See Ex. E, Social Security Administration Decision dated May 11, 1988.[8]

This evidence demonstrates that Tassone has a disability under the actual prong. This is, not only the case under the state statutes, but the ADA and Rehabilitation Act as well.[9]

---

[8]By the time Tassone began working for Defendants, she was no longer receiving social security benefits. See Ex. F, Tassone Affidavit.

[9]Defendants attempt to avoid this inevitable conclusion by pointing to claims that Principal Robert Lee ("Mr. Lee") and Assistant Principal Robert DiRuzzo ("Mr. DiRuzzo") saw Tassone not using her crutches or scooter and that, at one point, her bedroom was on the second floor of her house. As is demonstrated below, these claims are disputed by other testimony. Moreover, even if they were not, Tassone does not maintain that she cannot walk or climb at all. Rather, she maintains that she is substantially limited in these activities compared to the average person. This is more than enough given that the statutes make clear that an individual must either be unable to perform a major life activity or significantly restricted in doing such activities compared to the average person.

Kidney Disease

Defendants also claim that Tassone's kidney disease does not meet the definition of an actual disability. The following makes clear that Defendants are wrong. Not even considering the fact that temporary and chronic conditions can be actual disabilities, it is clear that Tassone has an actual disability under the RICRA and the RIPDA -- at least when her kidney stones are considered in their unmitigated or unmedicated state. Dr. John Maynard, Tassone's urologist, makes this abundantly clear. He describes Tassone as a stone maker. Given this, she must drink a high volume of water on a daily basis and take Magnesium Oxide to prevent her from forming stones. If Tassone did not do this, she would form more stones and this could lead to kidney failure if left untreated. See Ex. G, Dr. Maynard Affidavit. At the very least, Tassone has an actual disability under state law. Given this, summary judgment is improper on the issue whether she has an actual disability.

Hand Disability

As is discussed more fully below, Tassone was assaulted by one of her students. As a result, she sustained a severe injury to her right thumb in September, 2001. Contrary to Defendants' assertions, Tassone is still substantially limited in her ability to write. See Ex. D, No. 1 and Ex. H, Dr. Lawrence Lee's Medical Report of May 20, 2004.

Diabetes

Relying on the Supreme Court's Sutton decision, Defendants claim that Tassone's diabetes is not an actual disability. While this may be the case under the ADA and Rehabilitation Act, Tassone clearly has an actual disability under state law.

2. Although Defendants Failed To Address The Issue Whether Tassone Has A Perceived Disability, The Evidence Makes Clear That She Does.

Tassone also claims that she has a disability under the "perceived prong" of all statutes – both

---

Gillen, 283 F.3d at 14.

state and federal.[10] This is the part of the statutes which define disability as being regarded as having an impairment which substantially limits a major life activity. Under this alternative theory, Tassone claims that Defendants mistakenly believed that her medical conditions were more limiting than they actually were. See, e.g., Katz v. City Metal Co., Inc., 87 F.3d 26 (1st Cir. 1996) (plaintiff who had heart attack was perceived as having substantially limiting impairment). The "regarded as" prong turns upon the employer's state of mind. Therefore, evidence that would ordinarily be used to prove motive or discriminatory intent may also be probative of whether an employer perceived an employee as disabled. Ross v. Campbell Soup Company, 237 F.3d 701 (6th Cir. 2001).

Applying these principles here, Tassone must obviously show that Defendants had sufficient information about her disabilities or medical condition. The following demonstrates that they did.

(1) Dr. Jose Gonzalez, the Director of Equity & Access, ("Gonzalez"), testified, that Mr. Lee knew about Tassone's needs, health condition, and that she was getting certain accommodations; Gonzalez II, p. 137-143; that Tassone had an arrangement which allowed her to go to the bathroom when she needed to go and this was because she was disabled; Gonzalez II, p. 152; that both Principal Lee and Assistant Principal DiRuzzo were told about her condition that required her to go to the bathroom frequently and knew that she should be granted an accommodation; Gonzalez I, p. 106; that his 504 Committee made a determination that Tassone met the definition of disability under the ADA and the Rehabilitation Act and that his Committee would not have given her any accommodations if she did not meet these definitions; Gonzalez II, p. 155-6; that he did not know the exact medical condition that Tassone had but he knew that she had mobility issues and she was sufficiently ill such that she got tired and was weakened by it; Gonzalez II, p. 156; that Tassone was granted the right to go to the bathroom when she needed to and that she was allowed to do this because she was taking medication and drinking lots of water; Gonzalez II, p.157; and that the 504

[10]Defendants have not moved for summary judgment on this issue. Out of an abundance of causation, Tassone will address it anyway.

Committee considered Tassone's entire medical condition in making its determinations; Gonzalez II, p. 157.

(2) Mr. Lee, the Principal during much of the time, testified that: he knew that she was out a lot because of medical problems; Lee I, p. 19; he knew she was not well; Lee I, p. 19; he knew she was "handicapped" from the beginning;[11] Lee I, p. 19; he knew she some "pretty severe" operations during the period that he was there because she would talk about these issues to him, teachers and other staff when she was in the administrative offices; Lee I, p. 19, Lee II p. 47-8; "everyone" knew that she suffered a lot; Lee I, p. 19-20; he saw her using crutches "a lot"; Lee I, p.85; when Tassone first arrived at Bridgham, she had a wheelchair and used crutches; Lee I, p. 35; he assumed Tassone was sent to Bridgham because it is a handicap-accessible school; Lee I, p. 36; obviously Tassone must have had problems with the ramp otherwise they would not have given her a remote; Lee I, p. 91; DiRuzzo must have known things about Tassone's health including that she was out ill and underwent numerous operations; he believes she got the remote because her health worsened; Lee I, p. 87; he knew she used her scooter on the ramp; Lee II, p. 79; there was a question whether she could even use the stairs; Lee II, p. 79; when she first started, he did not believe she was as severely handicapped as she was later on; Lee II, p. 69; and Tassone spoke to him about her need to go to the bathroom frequently and that, as her condition got worse, Tassone had an even more difficult time with this; Lee I, p. 111. Tassone also sent a letter to Mr. Lee detailing her kidney problems among other things. See Ex. H, September 11, 1998 Letter from Tassone to Lee.

(3) Assistant Vice Principal DiRuzzo testified: he knew about Tassone's walking "handicap," that she used a scooter, assumed she was handicapped, and assumed there was something wrong with her balance and legs; DiRuzzo II, p. 23; he never saw her walking without her crutches; DiRuzzo II, p. 24.

---

[11] This is in contrast to Lee's testimony later on in the same deposition where he states that, although he knew she had a lot of medical problems," he did not know anything about her handicap when she first came to the building. Lee I, p. 85.

(4) Principal Robert Cochran testified: that he knew Tassone had a 504 Plan which included a disability accommodation and that he had a discussion with Donald Zimmerman about whether or not the accommodation should continue; Cochran, p. 38-40; that he knew she used crutches; Cochran p. 64; he had a heightened safety concern about Tassone working with special education students who had hyperactivity or behavioral problems in terms of her getting injured because she could not get out of the way fast enough; Cochran , p. 64; he believes that Tassone had a remote control to open the doors on the ramp and that, without the remote, the ramp doors would have to be opened for her by someone else; Cochran p. 90; when Tassone was without the remote, he tried to make sure that someone was around to open the ramp door for her; Cochran p. 91; he knew that she used a scooter; Cochran p. 91-2; he believed that Tassone needed someone to assist her in opening fire doors; Cochran p. 99-100; he knew that she had difficulty writing but does not know if it was because of an injury or a medical condition; Cochran p. 109-110; he believes he tried to do everything he could to accommodate Tassone; Cochran p. 132; and he believed that the ADA and Section 504, on the one hand, and the collective bargaining agreement, on the other, applied to an accommodation dispute involving Tassone and other teachers; Cochran, p. 132.

(5) Assistant Vice Principal Robert Perkins testified: he knew that she used a scooter; Perkins p. 25, 44; he believes Tassone had a disability; Perkins, p. 25; he knew that Tassone had a medical condition that required her to be out of the classroom for a period of time and that Assistant Principal DiRuzzo did not want to accommodate her; Perkins p. 52-3; he talked to employees who, like Tassone, were handicapped about evacuation routes in case of fire; Perkins p. 60-1; in talking to Principal Cochran about Tassone being excused from corridor duty, he described Tassone as being "fragile"; Perkins p. 72-3; he heard from some unidentified person that most of "Tassone's insides had been taken out," and that she had some kind of tube on the inside, and they did not know why she still came to work; he told Principal Cochran about this. Perkins p. 76-7.

(6) In their Position Paper submitted to the Rhode Island Commission for Human Rights,

Defendants admit that Tassone was transferred to Bridgham as an accommodation because the school she was first assigned to was not handicap accessible.[12]

This makes clear that Defendants perceived Tassone as having disabilities. Given this, summary judgment is improper.

3. Plaintiff Also Had A Record Of Disability.

Tassone also claims that she has a record of impairment.[13] Under this theory, a plaintiff has a record if she "has a history of, or [had] been mis-classified as having, an impairment that substantially limited a major life activity. Santiago v. Executive Airlines, Inc., 213 F.3d 25 (1st Cir. 2000) (citation omitted). To invoke this theory, a plaintiff is not limited to hospital or medical records but may use a number of other types of documents to establish a record of impairment. See, e.g., Heisler v. Metropolitan Council, 2001 U.S. Dist. LEXIS 21965 (D. Minn. 12/14/01) (disability status reports and document signed by doctor supporting a request for a medical leave of absence).[14]

The Supreme Court addressed a record of disability in School Board of Nassau County v. Arline, 480 U.S. 273, 281, 107 S. Ct. 1123, 94 L.Ed. 2d 307 (1987). In Airline, the plaintiff was hospitalized for tuberculosis in 1957. Her tuberculosis was in remission for twenty years. However, she tested positive for active tuberculosis in 1977 and 1978. Id. at 276. In 1978, she was terminated from her position as a schoolteacher because of the recurrence of her tuberculosis. Id. at 276-77. The plaintiff sued under the Rehabilitation Act. The Supreme Court held that the plaintiff's tuberculosis was a disability because "this impairment was serious enough to require hospitalization; a fact more than sufficient to establish that one or more of her major life activities were substantially

[12]As is discussed elsewhere, Defendants received a number of letters which establish that they knew about Tassone's various disabilities, medical conditions, hospitalizations, and limitations.

[13]Like the perceived prong, Defendants do not address the record prong. Again, out of an abundance of caution, Tassone is doing so.

[14]See also Bizelli v. Parker Amchem and Henkel Corp., 981 F. Supp. 1254 (E.D. Mo. 1997) (short term disability documents).

limited by her impairment. Thus, Arline's hospitalization for tuberculosis in 1957 suffices to establish that she has a 'record of . . . impairment . . .and is therefore a handicapped individual." Id. at 281.

Although Arline appears to stand for the proposition that any hospital stay is enough, most courts refuse to read Airline that broadly. See, e.g., Taylor v. United States Postal Serv., 946 F.2d 1214, 1217 (6th Cir. 1991) ("Such an interpretation would establish the 'nonsensical proposition that any hospital stay is sufficient to evidence a 'record of impairment.'"). Rather, many courts require the records to establish, not only that the plaintiff had an impairment, but that the impairment substantially limited a major life activity. See, e.g., Colwell v. Suffolk County Police Department, 158 F.3d 635 (2d Cir. 1995) (court found plaintiff, who was hospitalized for thirty days and recuperated at home for six months because of hemorrhage, did not demonstrate record of disability because only evidence of extent of impairment was record showing length of hospital stay and recuperation period and fact that he had been placed on light duty).

Courts have found a record of disability under a number of circumstances. The court's decision in McKenzie v. Dovala, 242 F.3d 967 (10th Cir. 2001) is a good example. In McKenzie, the plaintiff was a deputy sheriff with an unblemished career. However, beginning in early 1996, she began suffering from a variety of psychological afflictions including post-traumatic stress disorder. As her condition worsened, she began to miss work frequently. Then, on August 15, 1996, she fired six rounds from her revolver. The next day, she was placed on administrative leave. In the weeks that followed, she went to the hospital on several occasions. She ultimately resigned when she was told that her leave pay was exhausted. After a course of medication and therapy, she was released by her doctor. At that time, she applied for her old job again but was not hired. The lower court granted summary judgment. On appeal, the Second Circuit found that "the evidence as a whole could lead a reasonable jury to conclude that [the plaintiff] had a record of a disability for purposes of the ADA." *Id.* at 973. The court wrote:

> "McKenzie's record of absence from work on administrative leave, along with her physicians' reports, tends to show that her ability to work was substantially limited by her illness. Her complete inability to work prior to her resignation was due in part to at least one hospital admission, suggesting that the nature and severity of her impairment were grave. Physicians' reports indicate that McKenzie suffered from psychiatric problems during the year prior to her resignation. At least as early as April, 1996, she missed work because of symptoms of post-traumatic stress disorder. The duration of her illness, which kept her from working throughout much of the summer and autumn of 1996, also indicates a record of impairment. Although the permanent or long-term impact of McKenzie's illness would not tend to support a finding of disability, inasmuch as she has been released to return to work, the evidence as a whole could lead a reasonable jury to conclude that she had a record of disability for purposes of the ADA."Id. at 973.[15]

Tassone encourages this Court to read Airline narrowly. Thus, the fact that Tassone was hospitalized for an extended period of time on various occasions for work and non-work-related reasons and Defendants knew this, more than establishes that she had a "record of disability."[16]

**B. SUMMARY JUDGMENT IS IMPROPER ON THE ACCOMMODATION CLAIMS.**

Defendant argues that summary judgment is proper because "nearly all of plaintiff's requests for accommodation were granted. As is demonstrated below, this is inaccurate. To survive summary judgment on a reasonable accommodation claim, in addition to showing she is disabled and

---

[15]See also Snead v. Metropolitan Property & Casualty Insurance Company, *237 F.3d 1080 (9th Cir. 2000)* (court found genuine issue of material fact relating to whether there was "record of impairment" based on many physicians' notes and various letters in record combined with employee's short and long term disability leaves); *Lawson v. CSX Transportation, Inc.*, 245 F.3d 916 (7th Cir. 2001) (where diabetic's hospital and medical records showed numerous debilitating incidents caused by diabetes which showed he was substantially limited in major life activity of working and where plaintiff had received social security benefits, court found record of disability because during interview for job plaintiff had told defendant about his lack of work experience due to diabetic condition and that he had been totally disabled for number of years and was receiving disability benefits); *Lloyd v. East Cleveland City School District*, 232 F. Supp. 2d 806 (N.D. Ohio 2002) (court found genuine issue of material fact regarding whether plaintiff had record of disability where evidence showed disability certificate from certifying that plaintiff was totally incapacitated from January 7 to June 2, 1991, medical records showed that following surgery in January, 1991, plaintiff was unable to walk for period of time, progress notes of doctor in February and March, 1991 showed plaintiff was walking with help of crutches, and documents showed two follow-up surgeries in 1993 and 1995 when plaintiff was unable to work for three weeks following each surgery); *Kephart v. Cherokee County*, 1999 U.S. Dist. LEXIS 22819 (W.D.N.C. 3/17/99) (court found genuine issue of material fact whether there was record of disabling impairment in light of opinion letters from plaintiff's doctors concerning his rheumatoid arthritis); *Pritchard v. The Southern Company Services*, 92 F.3d 1130 (11th Cir. 1996) (where employee was diagnosed with depression in 1990 and was subsequently placed on paid and unpaid disability leave, there was genuine issue of material fact whether this constituted evidence that she had a record of being impaired).

[16]The evidence discussed under the perceived prong further establishes that Tassone has a record of disability.

qualified, a plaintiff must also prove that her employer, despite knowing of the plaintiff's disability, did not reasonably accommodate it. Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir. 2003).

Once an accommodation is requested, both employee and employer have a mutual obligation to engage in an "interactive process" to craft a solution to the work problem. See Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001) (citations omitted). At least in the First Circuit, engaging in the interactive process is not always mandatory. See Phelps v. Optima Health, Inc., 251 F.3d 21, 27 (1st Cir. 2001) (court has not taken categorical stand on interactive process preferring instead to resolve issue on case-by-case basis). Despite this, the First Circuit has held that there may be situations in which failure to engage in the process would constitute a failure to provide reasonable accommodation that amounts to a violation of the ADA. Phelps v. Optima Health, Inc., 251 F.3d 21 (1st Cir. 2001) (citations omitted). However, even where an employer fails to engage in the interactive process, an employee must still prove that, had the interactive process taken place, it would have resulted in the plaintiff being able to perform the essential functions of the job with or without accommodation. Kvorjak v. State of Maine, 259 F.3d 48 (1st Cir. 2001).

To defeat a motion for summary judgment, an employee need only show that "an accommodation seems reasonable on its face." US Airways, Inc. v. Barnett, 535 U.S. 391 (2002) (citation omitted). If an employee satisfies this burden, the defendant must show that the requested accommodation would pose an undue hardship. Id.

An employer has a mandatory duty under the ADA to implement appropriate reasonable accommodations and cannot delay the process. Humphrey v. Memorial Hospitals Association, 239 F.3d 1128, 1137 (9th Cir. 2001). Courts have concluded that an employer's delay in providing reasonable accommodations may violate the ADA. Selenke v. Medical Imaging of Colorado, 248 F.3d 1249, 1262 (10th Cir. 2001). Courts look to a number of factors to determine whether a delay is reasonable including the length of the delay, reasons for the delay, whether the employer has offered any alternative accommodations while evaluating a particular request, and whether the

employer acted in good faith. Id. at 1262-3.

In this case, summary judgment is unwarranted. As the following discussion makes clear, Tassone's requests were routinely contested, ignored, substantially delayed with significant ramifications and without justification, untenable, or only partially granted.

A few points need to be made to place Tassone's requests in proper context.[17] Mr. Gonzalez, the Director of Equity & Access and the person in charge of processing accommodations, testified that, pursuant to his directive to principals at orientation, the majority of his requests for accommodations came from principals. Gonzalez I, p. 74 (see discussion infra regarding the Department's failure's regarding its policies and procedures). In many instances, this is what Tassone did. She made most requests – if not all – to Mr. Lee. When he left, she renewed and/or made new requests requests to Mr. Cochran.

1. Requests for Accommodations Relating to Move to Second Floor.

When Tassone first arrived at Bridgham, she was given a classroom on the first floor. A short time after, another teacher (Fran Ganella) whose classroom was then on the second floor, told Tassone that she wanted her first floor classroom. Tassone was concerned because she realized that, although there was a handicap ramp going from the first to the second floor, she would have trouble because of things like not being able to open the heavy doors to get on and off the ramp. Given this, Tassone spoke to Mr. Lee. Answers No. 2. She told him that the ramp doors were heavy and that she would either be on crutches or in her scooter and she would not be able to open the doors to get on and off the ramp. Tassone I, p. 52; Winn, p. 39 (Tassone had great difficulty with the ramp doors).[18] She also wrote a letter to Human Resources describing why she needed to be on the first

[17]For purposes of this section, Tassone incorporations the information in the harassment section of this brief which deals with disability policies and procedures.

[18]Although there was an entrance on the second level, this was not an option for Tassone because there was often no available parking spots, the doors were often locked when she arrived, and she had to sign in at the office on the first floor when she first arrived. Tassone I, p. 53.

floor because of her disability.[19] Answers No.2.

Despite her requests to remain on the first floor, at the end of her first year, Mr. Lee told Tassone that she was being moved to the second floor the following year. Tassone again told Principal Lee that, because of her walking disability, she could not get onto the ramp. He told her he would see what he could do. Answers No. 2.

The beginning of the school year 1994-1995, Tassone learned that, as she had suspected from the beginning, her classroom was going to be on the second floor. The only other person who was moved from the first to the second floor was Wilma Johnson who was one of the few people who was friendly with Plaintiff. Tassone again spoke to Mr. Lee about the problem. During this school year, Tassone continued to ask Principal Lee if she could have a first-floor classroom.[20] She again told him that she could not open the heavy fire doors on the ramp because of her disability. He told her that he would see what he could do but that she would probably have to stay there for the year.[21]

Defendants claim that the reason why Tassone had to remain on the second floor is because Mr. Lee had decided that all mild-moderate teachers were going to work together on the second floor.[22] They claim that this was a way to cut down on the movement or travel of the mild-moderate

---

[19]Significantly, Tassone never received a reply from the person in Human Resources. Answers No. 2; Ex. O.

[20] "At some point before I got the remote, I remember finding a student to open the ramp doors for me so that I could get to the second floor. The student just opened the door; he did not get on the ramp with me. By the time I got to the top of the ramp, no one was around to open the door for me. I started calling but no one answered. I was stuck on the ramp for about 35 minutes. I told Mr. Lee about this." Answers No. 2.

[21]During the entire school year 1994-95 and even up until November, 1995, Tassone was forced to seek the help of another teacher, Wilma Johnson, who often helped Tassone to get on and off the ramp. However, there were times when Wilma Johnson was late or not around. On those occasions, Tassone often waited for Wilma Johnson to arrive. However, there were times when Tassone tried to open the ramp doors by herself. When she did, she often bruised herself or damaged her scooter. When she did, she told Mr. Lee. During this time, Tassone fell outside about three times while he was principal. Answers No.2.

[22]It is important to note that, in their Position Paper submitted to the Rhode Island Commission for Human Rights, defendants wrote: "In paragraphs 5 and 6 of Exhibit B, Ms. Tassone alleges she was refused an accommodation in that she was not given a classroom on the first floor. Ms. Tassone admits, however, that a ramp was provided to allow her access to her classroom and that teachers and students assisted her in accessing the ramp. Consequently, Ms. Tassone was reasonably able to access her second floor classroom."

students.

The following makes clear that Tassone's request to remain on the first floor was reasonable. First, Mr. Lee testified that he could have made that decision; it just would have made the team concept more difficult. Lee p. 62-4. Indeed, Mr. Lee admitted that if Tassone had been placed on the first floor away from her other team members, this would have been no different than what was happening at a number of other schools in Providence. Id. at 67. Second, with respect to the claim that Tassone was on second to cut down on the movement of her students, Tassone maintains that her students still had to travel downstairs for things like music, home economics, gym and non-special education classes. See Tassone Affidavit, Ex. F; Lee I, p. 67. Lee did not deny that Tassone complained about being on the second floor, he just said that he could not remember. Lee I, p. 52. Also, in addition to Fran Ganella, who was placed on the first floor in Tassone's classroom even though she was a mild-moderate teacher, other mild-moderate teachers were also placed on the first floor after Tassone was put on the second floor. Ex. F. Plaintiff remained on the second floor for a number of years.

During the school year 1994-1995 up until about November, 1995, Tassone also asked Mr. Lee if she could leave the ramp doors open. He told her no.[23] Despite this, Mr. Lee did not give any reason for the need to have the ramp doors closed. Lee p. 93. Moreover, Jane Shagrue, a union official, testified that the ramp doors were often left open especially during warm weather. Shagrue p. 93.[24]

2. <u>The Stolen Remote.</u>

---

[23]"Until I got the remote, I told Mr. Lee that, unless Wilma Johnson was around, once I was on the second floor, I could not go to places like the cafeteria, teachers' lounge, library and office because I had a hard time getting down the ramp. He told me he would see what he could do." Answers No. 2.

[24]It is important to note that defendants, in their Position Paper, write: "Ms. Tassone alleges . . . that accommodations were not provided until she filed a grievance. As stated previously, the [school department] consistently worked with Ms. Tassone to ensure her needs are accommodated. That the [school department] waited until she filed a grievance is simply not true."

Tassone had occasion to make another request relating to the ramp. On December 8, 1998, her remote was stolen. She immediately began complaining to Mr. Lee and Mr. DiRuzzo. They essentially told her that they would see what they could do about getting her another remote. Tassone I, p. 59-60; Answers No.2. After about a week -- when nothing was done -- Tassone called the Superintendent's office and spoke to Superintendent Zarella. She told him about the problem including that she was hurting herself again and damaging her scooter. He said he would look into it. As of December 23, Tassone still had heard nothing. That day, she fell off her scooter as she was trying to open the ramp doors. See Answers No. 2; Tassone I, p. 61. Because of this, Tassone was out on a medical leave of absence until about March, 1999. When she returned, she was given a remote -- one that the janitor had all along. See Answers No. 2.

3. Request to move closer to bathroom.

During the first year on the second floor, Tassone recalls that her classroom was the farthest from the bathroom. She asked Mr. Lee if she could move closer and he said that, at least for the year, he could not move her but he would see what he could do after that. Answers No. 2. She was never allowed to move closer to the bathroom until some time later.

4. Bathroom Doors.

During the first year that she was at Bridgham, Tassone told Mr. Lee that she could not get her scooter inside the bathroom because of the way the doors opened. As he often said, Mr. Lee told her things like "you have to be patient" and "things take a long time with the School Department." The bathroom doors did not get fixed until the middle of the school year 1995-1996 and only after the union filed a grievance. Answers No. 2. In addition, Tassone had to pursue her grievance all the way to the school board level, which necessarily meant that the Department opposed making this accommodation. Tassone Dep. I, p. 55-56; Shugrue, p. 31. Lee did not deny that Tassone had problems with the bathroom door, he only said he could not recall. Lee I, p. 100.

5. Requests relating to snow and ice.

Ice Issues: Because of her walking disability and her need to use forearm crutches, Tassone has difficulty getting around in snow and ice. Tassone I, p. 66-68. Among other things, the tip of her forearm crutches do not have traction when she places her weight on them. Tassone I, p. 66-67. Given this, if there was any ice when she arrived at school, she could not make it into the building if it was not sanded. Tassone I, p. 67. During the time that Lee was Principal, there were a number of times when Tassone arrived at school, opened her car door, and found that the parking lot was very icy and not sanded. Each time this happened, she went to Mr. Lee about not being able to get in because of ice and she asked if he could make sure it was sanded in the morning.[25] There were times when Mr. Lee told her that this was not part of the janitor's job but he would see what he could do about it. Other times, he told her there was nothing he could do about it. She had this problem the entire time that Lee was Principal.[26]

Snow Issues[27]: The problem with the snow was more after the school day had started. Among other things, the weight of the snow makes it difficult for her to use her crutches. Tassone I, p. 67-71. Also, if the snow accumulated on her windshield, she could not remove it while she was on her crutches and she also had no traction. Tassone I, p. 71-2. She explained this snow problem to Lee and Cochran and asked if she could leave early and they said no. Tassone I, p. 72. During

---

[25]Mr. Lee does not deny that Tassone talked to him about having difficulty getting in the parking lot because of snow or ice. Rather, at one point, he said he did not recall any such conversations but also said that she could have said something on slippery days. Lee I, p. 126. Moreover, Mr. Lee testified that it was not uncommon for people to slip in the parking lot. In fact, he had heard of people falling and even testified that Tassone could have been one of them. Lee I, p. 106-7.

[26]There were times when Wilma Johnson, another teacher, helped Tassone. However, this was very difficult for Tassone because she would have to wait – sometimes over thirty minutes – for Mrs. Johnson to arrive. Mrs. Johnson would have her husband drive Tassone's car to the sidewalk and then he would park it for her. There were other times when Tassone carried kitty litter but this did not work because she could only spread it near her car but could not spread it as she got closer to the school because she could not carry the litter and balance on her crutches at the same time. See Tassone Affidavit

[27]It is important to note that Assistant Principal Perkins said that, if he were handicapped, he would be concerned about getting across the parking lot at Bridgham. *Perkins Deposition at 62-3.* He testified that half the time it was not plowed out safely. *Id.* Occasionally, he would direct the janitors to clear ice and snow and sometimes they would do it and other times they would not. Perkins p. *64.*

the time that Lee was Principal, she went to him on a number of days when it was snowing. Tassone III, p. 101 (at least twelve times). She asked him if she could leave early because the snow was beginning to get deep and she was afraid that, because of her crutches, she would fall or would not be able to clear the snow from her windshields. Tassone does not recall Principal Lee ever allowing her to leave early even after she had the last period free. Answers No.2.

Tassone continued to have these kinds of problems after Mr. Lee left and Mr. Cochran became Principal in about September, 2001.[28] During Cochran's tenure, Tassone made the same kinds of requests to Mr. Cochran and asked if she could leave early because of the snow. He also told her that she could not leave early even if it was during the sixth period which was free with no coverage. Plaintiff remembers falling outside about three times while he was principal. Answers No.2.

For the following reasons, it is clear that Tassone's requests were reasonable. First, Mr. Lee testified that, although the school did not have responsibility for clearing and sanding the parking lot, he and Mr. DiRuzzo could – and did – tell the janitors to put sand in the parking lot whenever it was slippery or snowy. Lee II, p.106.[29] If it was the entire parking lot, they would simply call Sodexho, the company they hired to do such work. Lee II, p. 108; DiRuzzo I, p. 94. Mr. Lee also testified that there were times when a teacher asked to leave early because of bad weather and, if it was their free period or if they had coverage for their class, he would let them leave early. Lee p. 109. Second, Jane Shagrue, a union official, testified that she would have no problem with a teacher

---

[28]Assistant Principal Perkins is sure that Tassone complained to him him several times about problems with snow and ice. Perkins p. 63. Perkins told Tassone he would bring it to the attention of Mr. Cochran which he did. Perkins p. *63*. Mr. Cochran also testified that it was possible that Tassone came to him with problems about snow and ice. Cochran, p. 60.

[29]Significantly, Lee testified that it was not uncommon for someone to slip in the parking lot. Lee II, p.107.Teacher James Winn agreed that the parking lot was not plowed very well and it complicated the problem of getting to the doors safely for Tassone. Winn, p. 33. Winn was aware that Tassone had tried to get better conditions for the path leading to the door, and also the parking lot, but that her efforts were futile. Winn, p. 34. This happened on many occasions over the years. Winn, p. 34.

leaving early if it was snowing if that person had the sixth period unassigned. Shagrue p.142-3. Third, Mr. DiRuzzo states that allowing a teacher to leave early was the Principal's domain. However, he said that if Tassone had the sixth period free and she needed to leave because of her handicap, he would have let her go.[30] DiRuzzo p.96-7.[31] Fourth, Mr. Winn, the librarian, said that he was allowed to leave early during and after Mr. Lee's tenure. Winn p. 30-1. Finally, Tassone recalls a time when it began to snow; and, she asked Cochran if she could leave early. She explained that it was her free period and she was concerned about the accumulating snow because she had great difficulty walking in snow with her forearm crutches. Cochran simply told Tassone that he could not because if he let her go, he would have a problem with some gym teachers who were told they had to stop leaving early.[32] Answers No. 2. In fact, Mr. Cochran was asked if he told Tassone this and he could not deny that it happened.[33] Cochran p. 129. Director of Equity & Access Jose Gonzalez, who came in 1998, said that making sure ice and snow were not a problem for a handicapped person is the type of accommodation that was made for another disabled employee.

---

[30]It is important to note that defendants wrote, in their Position Paper: "In [her charges] Ms. Tassone complains she was not permitted to leave school early on bad snow days. This is not a reasonable request. Attendance during the full school day is an essential function of Ms. Tassone's position as a teacher . . . . Were Ms. Tassone to leave early on snow days, there would be a shortage of teachers. Morever, the PSB consistently enforces this requirement of other teachers in its middle schools. Consequently, it is an essential function of the position that PSB middle school teachers arrive at the same time and to work the same length day. Consequently, were Ms. Tassone permitted to leave before the school day ends on snow days, she would not be performing the essential functions of her postion. Furthermore, to permit Ms. Tassone to leave early on snow days would be providing her a benefit not available to other teachers."

[31]Winn recalls Tassone telling him that she requested to leave early because of bad weather. Winn p. 27. He further testified that Lee allowed him to leave early on a number of occasions. Winn p. 30-1.

[32]Mr. Cochran was asked if he recalled an incident with some gym teachers who were leaving when they were not supposed to and he said "that rings a bell."

[33]Assistant Principal Perkins testified that he recalled a time when Tassone asked to leave early. This was a time when it was snowing outside and she did not have a class. Tassone wanted to leave early to get her car while the area was still clear. She asked Cochran and he made an excuse about other teachers leaving without permission and he could not afford to do that. *Perkins Deposition at 40-1.* Perkins talked about the situation with the gym teachers. He recalled that there were times when one of them would leave early or now show up at all. He brought this to Mr. Cochran's attention but this practiced continued. *Perkins Deposition at 42.* Mr. Perkins was a teacher and assistant principal, from 2001-2004, as he put it, "if I was in a wheelchair, I would be concerned about getting across the parking lot," if it snowed. Perkins, p. 62-63. "Half of the time if it was plowed out, it wasn't plowed out, you know, safely." Perkins, p. 63

Gonzalez I, p. 103-105. Thus, it must have been reasonable.

In fact, problems with snow and ice continued even after Mr. Cochran left. On December 4 2004, Tassone fell on ice in the parking lot. She was discovered by the janitor. Answers No. 2.

3. Requests relating to non-ramp fire doors.

In about April or May, 2000, Tassone was left in the building during an actual fire. Her aide was not in the room at the time. Tassone got down the ramp but she became stuck in an area when she could not open a heavy fire door which had shut automatically. The area she was in actually began to fill up with smoke. After a while, she was found by a firefighter.[34] Answers No. 2. Especially after this happened, Tassone went to Mr. Lee and told him about non-ramp fire doors being a problem and the fact that her aide was being taken out of the room which meant she had no way of getting out. He told her he would look into it. Answers No. 2. She had previously asked Mr. Lee about this and he kept saying he would get back to her. Winn testified that Tassone had requested a remote for the fire doors in her classroom but that "Mr. DiRuzzo had refused her a number of times very emphatically." Winn, p. 35. Tassone recalls another time he told her that he would have certain teachers check on her but this happened for a while and then stopped. Answers No. 2.

Some time during the school year 2000-2001, Tassone spoke with Mr. Gonzalez and asked him if he could put automatic door openers on non-ramp fire doors. He told her he would get back to her. Tassone explained that she was concerned because there would obviously be times when, even with her own personal assistant, that she would be alone. She does not believe Mr. Gonzalez

[34] After this happened, Plaintiff began telling everyone what happened and she remembers some teachers laughing as she explained what happened. Winn "know[s] for a fact that she had a crisis on the ramp on one occasion when there was a fire in the building. * * * She found herself on the ramp alone, coming down and getting to the doors and finding the doors either shut or locked * * * and she could not get those doors opened." Winn, p. 40. As Winn recalls, that a staff person actually saw Tassone behind the door, but just waved at Tassone and went out of the building. Winn, p. 41. This was resolved somewhat when she got her personal aide but, even after that, there were times when her aide was not around. This only stopped being a problem when Mr. Cochran moved her to the first floor. Answers No. 2.

ever got back to her on this. At some point, one of the janitors told me that he did not think that the automatic door idea would work on the non-ramp fire doors. Tassone called Mr. Gonzalez and told him what the janitor said. He told me he would get back to me but she never heard from him. Answers No.2.

Under Mr. Cochran, Tassone continued to have problems with non-ramp fire doors.[35] She explained to Mr. Cochran that, even though she had a personal assistant, there were times when she was not around. Tassone believes she even told him about how she had been left behind in an actual fire. She told him that, when the fire alarm goes off, the non-ramp fire doors automatically shut and she could not open them. He told her he would look into this. Tassone does not recall anything being done. This only stopped being problem when Mr. Cochran moved Tassone to the first floor the last year he was there. Answers No. 2. It does not make sense that an automatic door opener would be reasonable for some fire doors, but not others.

4. <u>Request to have sixth period free.</u>

At some point, Tassone began to ask Mr. Lee if she could have the sixth period as her free period. Tassone believes she began asking him during the school year 1997-1998. Mr. Lee acknowledged that, over the years, Tassone came to him many times asking to be relieved of doing coverage. Lee I, p. 51. He states that she may have even asked him to be relieved permanently. Lee I, p. 53, 57. He further states that this was a union issue and he did not have the authority to make that decision. Id. at 53.[36]

---

[35]Perkins recalls Tassone coming to him about fire evacuation concerns so that she could find the best way out of the building. Perkins, p. 58, 59. Even as of the time that Perkins was at Bridgham, in 2001-2004, he states "there was nothing written down that I know of," despite the fact that generally you have on file an exit plan and that was done in other Providence schools that Perkins had worked in. Perkins, p. 58-59, 61, 135. Other teachers did not come to Perkins with concerns about fire evacuation. Perkins, p. 59. As of the time DiRuzzo was there, he was not aware of any plan with respect to Tassone's ability to get out of the building in a fire. DiRuzzo II, p. 64-65.

[36]As is noted elsewhere, at Jane Shagrue's direction, the union filed a grievance over the fact that Tassone was relieved of coverage duty. Mr. Lee recalls having a discussion with Ms. Shagrue in which she took the position that everyone had to do it. Mr. Lee's responded that he would not break the rules for Tassone. Lee I, p. 122.

On September 11, 1998, Tassone wrote a letter to Mr. Lee. She asked that the sixth period be her free period because she had just had kidney surgery and was very weak. See Tassone September, 1998 Letter to Lee, Ex. I; see also Dr. Cindy Hansen Letter dated September 10, 1998, Ex. J. Mr. Lee told her he would see what he could do. Tassone eventually got the sixth period as her unassigned period. However, it was not a totally free period because Tassone still had to do coverage during this time.[37] Answers No. 2.

Eventually, Tassone had to make another request. She asked Mr. Lee if she could have sixth period free without coverage. He told her that he believed she had to do coverage but that she should talk to a union representative. Tassone was told that there were no exceptions to coverage. On August 28, 2000, Tassone also wrote a letter to Jose Gonzalez who was then the Director of Equity and Access. See August 28, 2000 Letter, Ex. K. She again requested that she have the sixth period free including that she not have to do coverage. Significantly, she did not get this request granted until March 2001. See Gonzalez Memo to Lee dated February 16, 2001, Ex. L; Answers No. 2.

8. Request For Teaching Assistant.

In about August, 2000, Tassone requested that her teaching assistant remain with her during her free period at the end of the day. See Ex. K. Tassone explained that she needed help with things she could not do in her classroom and because she was concerned about being left alone during fire drills and actual fires. She explained that, because of the heavy doors, she was unable to get out of the building once the fire alarm went off. At some point, Tassone again spoke to Mr. Gonzalez and explained why she needed a personal assistant. He took the information down and told her he would look into it. At some point, Mr. Gonzalez told her that she would be getting her own personal assistant. After this, Tassone kept calling to find out when she was getting her own personal aide. She did not hear anything and did not get a personal aide until about March, 2001. Answers No. 2.

---

[37] Tassone would have to do coverage during the sixth period when, for example, a teacher left school because of illness and there was no one to cover his or her class.

10. Request to go to the bathroom.[38]

During the time that Mr. Lee was principal, Plaintiff continually had problems with being allowed to go to the bathroom. She developed diabetes around the end of the school year 1996-1997 or the beginning of the school year 1997-1998. Her diabetes was not under control and she was thirsty all of the time. She had to drink lots of water during the day and this made her go to the bathroom. Around this time, Mr. DiRuzzo confronted her about going to the bathroom. He told her that her teaching assistant had complained to him that she was in the bathroom. Tassone told Mr. DiRuzzo that her diabetes was causing the problem. She also told him that the problem was made worse because she is slow with her crutches and even with her scooter was sometimes slowed down if she ran into "lots of traffic." Mr. DiRuzzo told her that she could not leave her teaching assistant with her students; that she always had to have a teacher present. He also told her that she could not go as much as she was. Answers No.2.

In the beginning of September, 1998, Tassone wrote a letter to Human Resources. By this time, she had a number of medical problems including kidney disease. She wrote in pertinent part:

> "I am requesting accommodations . . . I have several medical conditions: ostioarthritis [sic], diabetes, high blood pressure, asthma and kidney disease. My condition has worsen [sic] this summer. . . Several surgeries have prevented me from going back to work . . . I will be able to work and be an effective teacher with certain accommodations. The first . . . is that my free period be at the end of the day so that my teaching time is done when I am feeling my best. I also need to drink 12 glasses of water daily . . . this will increase my need to use the bathroom..."[39] Ex. M, 9/3/98 Letter to Human Resources.

Around that same time, Tassone's internist, Dr. Cindy Hansen, also wrote:

> "Tassone is under my care for a number of medical problems. She reports increasing fatigue as the day progresses, and for that reason, we are requesting that her free

[38]It is important to note that, in their position paper, defendants write: "Ms. Tassone alleges she was not permitted to leave her teachers' aide in charge of her class in order for her to use the bathroom . . . . The Administration at Bridgham . . . does not prevent teachers from leaving their classrooms for emergency bathroom use. Consequently, Ms. Tassone's allegation that she was so prohibited is without merit."

[39]Tassone testified that she need to go to the bathroom about seven times a day. Tassone II, p. 107.

period be moved to end of day. Additionally, she needs to drink large amounts of water daily as part of her medical treatment. This will necessitate her being allowed to drink in the classroom and to leave the classroom to use the rest room as needed." Ex. J, 9/10/98 Letter from Hansen.

Finally, on September 11, 1998, Tassone wrote to Lee:

> "I plan to return to work on Monday, September 28. I will still need more surgery in the near future. . . .I have been very ill this summer and ended up having 6 surgeries. I get weak as the day progresses. My doctor says that this weakness is normal . . . It would be beneficial . . . if I had my free period at end of the day . . . . I know you are aware of my request for this change . . . last year I came down with diabetes . . . I was constantly thirsty and I needed to use the restroom frequently. My teachers assistant told Mr. DiRuzzo that I was leaving room frequently. Mr. DiRuzzo spoke to me about this and told me I could not leave classroom as frequently as I was doing. This problem resolved . . . Now I have kidney disease. In order to prevent further complications and surgery, I need to drink twelve eight ounce glasses of water a day. I will need to use restroom frequently. I know I cannot leave the students alone with the Teacher's assistant. I had trouble finding another teacher to cover my class last year. Mrs. Jackson is not always in the classroom next door to me when I need to use the restroom. I am worried about this problem now that I need to use the restroom frequently. I hope you can help me concerning this matter.." Ex. I.

Tassone does not recall ever hearing anything from Human Resources or Mr. Gonzalez about this request. Answers No. 2. The evidence is very contradictory in terms of what happened with this request behind the scenes.[40] For example, although Tassone did not know at the time, the 504 committee, including Dr. Gonzalez, appears to have met on September 17, 1998. See Ex. N, 9/17/98 504 Memo. This appears to reflect that the 504 committee discussed the issue and may have even decided that Tassone should be allowed to go to the bathroom and leave her teaching assistant with her students. This contradicts his testimony that teacher's aides cannot remain in a classroom alone. Gonzalez I, p. 54. At another point, Gonzalez states that an aide can stay in the classroom so long as a teacher is in the area. Gonzalez II, p. 146-47. He also states that as of the time that he found out about this request, that there was already a practice that had been implemented by DiRuzzo and Lee - - that her teacher's aide would stay with the students and her neighboring teachers would keep

[40] This is so confusing that despite the 504 document, Ex. M, Gonzalez said that Tassone never had filed a request regarding bathroom coverage. Gonzalez II, p. 145-46.

an eye out. Gonzalez II, p. 146. Then Gonzalez said that Lee knew that Tassone was leaving only the teacher's aide and that teachers were not coming into the classroom. Gonzalez II, p. 149-50. Finally, he says "I believe there's no legal reason not to," when asked about leaving only the teacher's aide. Gonzalez II, p. 146.

Despite the fact that there was no obvious reason preventing the accommodation, Principal Lee, on the other hand, continued to tell Tassone that she should get a teacher to cover for her. Tassone II, p. 86. Principal Lee never told her that she could leave her Teaching Assistant with her class. Tassone II, p. 87. She continued to have problems. Answers No. 2. For example, in May or June, 2001, she had a nephrostomy tube in her back because of her kidneys and a bag strapped to her leg to urinate in. As of this time, she still had to go to the bathroom frequently and it took some time because, she not only took a long time to get to and from the bathroom, but she also had to empty the bag and sometimes even sterilize it. Answers No. 2.

Because she was still under the impression she could not leave a teaching assistant with her students, she remembers asking Mr. Winn, who is a certified teacher, to watch her children in the library so she could go to the bathroom. When she came back, Assistant Principal DiRuzzo was standing there with Mr. Winn. When Assistant Principal DiRuzzo saw Tassone, he started yelling at her and asking her where she was. She told him she had to go to the bathroom. Assistant Principal DiRuzzo told her that she and her students were banned from the library for the rest of the year. She told Mr. Lee about this. Answers No. 2. She continued to have these problems after Lee, and when Cochran was principal.

11. Request to be exempted from corridor duty.[41]

The problem with corridor duty was the fact that Tassone, because of her walking disability,

---

[41]Tassone maintains that there were two types of "corridor duty." The first type is corridory duty which takes place at the beginning and end of each day. During this time, there are fewer students to deal with. The second type is corridor duty which takes place between classes when there are many more students. The former was mandatory while the latter was not.

was constantly being stampeded and bumped. In fact, there were times when she even fell down. Tassone I, p. 79. Although she does not recall when she first did, Tassone remembers explaining this to Mr. Lee. She told him that, because of her walking disability, she did not have good balance, that she could not get out of the way fast enough, and that she was getting pushed and shoved by students. She even told him that she had fallen on occasion. Given this, she asked if she could be exempted from corridor duty. Tassone I, p. 80; Answer No. 2. Mr. Lee never exempted Tassone from corridor duty. Instead, he told her things like he would see what he could do about it and, at one point, he told her that she could try standing at the door rather than in the corridor.[42] Answers No.2; Tassone I, p. 80.

When Mr. Cochran began around September, 2001, Tassone made similar requests to him.[43] She told him that, because of her disability, she was scared to stand in the hall because she was often bumped and bruised. He told her he would look into it but Tassone continued to have to do corridor duty. Answers No. 2.

The following makes clear Tassone's request was more than reasonable and could have been easily granted. For example, Mr. Lee testified that corridor duty was only encouraged but was not required.[44] Lee p. 122. He also stated that exemption from corridor duty would not have been a "big issue" for him to grant. Lee p. 127-8. Mr. Cochran testified that it was only his expectation that teachers would make a reasonable effort to keep an "eye" on the corridor during passing. Cochran

---

[42]As is explained elsewhere, standing at the doorway did not solve the problem because Tassone was injured by a student while she was standing in her doorway.

[43]Mr. Perkins confirmed that Tassone asked Mr. Cochran to be relieved of corridor duty. He knows this because Mr. Cochran told him. Perkins p. 71-72. He recalls Cochran saying that "there's enough special education teachers in that wing to be able to cover the area without Simonne. That she is fragile, and in that general area, that's where you get a lot of kids that run down the hallway." Perkins, p. 72. Among other things, Mr. Perkins remembers that Mr. Cochran was concerned about how other teachers would react if she were given this "privilege that was not allowed to other people." Perkins p. 72-73. Perkins told Cochran that he did not think exempting Simonne would prevent others from covering the area. Perkins, p. 74.

[44]Lee did not categorically deny that Tassone had asked him to be relieved of corridor duty. Rather, he merely testified that he "did not think" she had. Lee p. 127-8.

p. 72-82.

Finally, Mr. Perkins makes it even more clear that Tassone's request was reasonable. He states that, while at Bridgham, there were a number of teachers who did not do corridor duty. Perkins p. 66, Shugrue p. 73-74. In fact, at times, there were some teachers, like Mr. Wright, Mr. Polak, Ms. Shugrue, and Mr. and Mrs. Fuller, that did not do it unless Perkins went into their classroom and asked them to come out for passing. Perkins, p. 66. These teachers would not come out, for example, if they were signing a progress report, preparing for the next class, or going to the bathroom. Perkins, p. 67. Even after Perkins reminded these people about corridor duty, they would continue to stay in their rooms during passing. Perkins, p. 68. Perkins spoke with Cochran about this, and Cochran knew what he was talking about and had observed it himself - - teachers not doing corridor duty at times. Perkins, p. 68-69. Perkins said this would happen at least once or twice a week. Perkins, p. 70. Perkins also noted that he rarely saw guidance counselors doing corridor duty despite the fact that they were supposed to do it. Perkins, p. 75. Cochran did not recall Tassone asking him about corridor duty. Cochran, p. 71-72. Cochran simply directed Perkins to place a reminder in the daily bulletin. Perkins p. 68-9. Because he felt that it was the Principal's responsibility to enforce this, Perkins did not push this. Perkins p. 71.

12. <u>Requests to have dangerous students removed.</u>

Although Tassone had been afraid in the past, during the school year 1997-1998, she began to tell Mr. Lee that, because of her walking disability, she was concerned about certain aggressive and disruptive students who were being placed in her classroom. She also told Mr. DiRuzzo about this. She told them she was concerned that she would not be able to protect herself or her students because of things like being so unstable on her feet and not being able to move quickly enough. Tassone remembers Mr. Lee saying things like "I will talk to someone and get back to you." In fact, Tassone recalls talking to Mr. Lee about five times before she was injured by a student, whose first name is Nelson, on September 13, 2001. Answers No. 2.

The events leading up to her injury on September 13, 2001 are as follows. Nelson was assigned to Tassone's class in about September, 2000. In about May or June, 2001, Tassone was invited to a meeting because she was his case manager. At this meeting, a psychiatric report was read and it was determined that Nelson should be removed from Bridgham and placed in another setting. Tassone was told that Nelson would not be returning to her class the following school year. Answers No. 2. However, at orientation in August, 2001, Tassone noticed that Nelson was assigned to her class. Given this, she began placing repeated calls to Glenda Guglielmo, the Director of Special Education, and Mr. DiRuzzo. By this time, Mr. Lee had left and Tassone called his replacement, Mr. Cochran.[45] She explained to them that this was obviously a mistaken and that, because of her disability, she was afraid that she would not be able to handle Nelson if he became aggressive. She asked that Nelson be removed. Answers No. 2. Tassone was concerned, not only about her safety, but that of her students and her personal assistant. By September 13, Nelson still had not been removed from her class. On that day, while she was standing in her doorway, Nelson ran into Tassone and assaulted her. As a result, Tassone permanently injured her thumb. Answers No.2.

The following makes clear that Tassone's request to have Nelson removed from her class was more than reasonable. First, Jane Shagrue, a union steward, testified that there was a long-standing Memorandum of Understanding between the union and the school department which allowed the immediate removal of students who were, or posed, threats. Shagrue, p.145-150.[46] Second, Mr. Cochran testified that he could have implemented some temporary changes -- which involved removing the student for a few days pending a formal meeting. Cochran p.105-7. He also said that he could have assigned this student to another teacher although this would have meant that the

[45]Mr. Cochran recalls Tassone's removal request but does not recall any of the details. Cochran p. 62-3. He further testified that, when such students were assigned to teachers, there was concern on the part, not only of the teachers, but administration as well because there was always the potential for behavioral and physical problems. *Id.*

[46]In fact, Jane Shagrue recalled an incident involving DiRuzzo in which a student was immediately removed from a teacher's class. Shagrue p. 147-49.

student would have had two math classes. Cochran p.108-9. Mr. Perkins provides the most evidence that removal was a reasonable request. He testified that, under such circumstances, a student can be suspended pending a hearing. In fact, the student could be removed from the class in one day. Perkins p. 45-6. He also testified that such a student could be immediately placed in the focus room. Perkins p. 48. He also said that such a student could have received individualized instruction on an interim basis. Perkins p. 48.[47]

Plaintiff had other problems with dangerous students while Mr. Cochran was principal. She specifically recalls learning, just before or at the beginning of the school year 2002-2003, that she had a dangerous student who was assigned to her. She remembers complaining to both Mr. Perkins and Mr. Cochran. She told them how she had been injured the year before by Nelson. She told them she was afraid of this student and thought she would not be able to control him because of her disability. She eventually had to file a grievance over this on August 29, 2002. This student's first name was Thomas. Answers No.2.

13. <u>Request relating to copy machine.</u>

Although Tassone is not exactly sure, she believes this request took place some time after the school year 1997-1998. At that time, Mr. Lee decided that teachers could not use the copy machine in the library. Instead, they had to use the copy machine in the teachers' lounge. This presented a problem for Tassone because she could only get to the teachers' lounge through the cafeteria. If she did not go this way, the only other option was to use the stairs. Tassone I, p. 86. Answers No. 2. Tassone could only do her copying during the fifth period; however, during this time, the cafeteria was closed. Tassone explained this to Mr. Lee and asked if she could use the copy machine in the library. Mr. Lee refused this request. Answers No. 2.

This was obviously a reasonable request. The librarian, Mr. Winn, states that other teachers

[47]In September, 2004, Tassone had another potentially dangerous student assigned to her class. She was told by another teacher that all she had to do was write "Cannot meet students needs" on his IEP. This worked and the student was removed within three days. See Tassone Affidavit.

used his copy machine. Winn p. 22-25.

14. Request for key to storage room.[48]

Around the beginning of the school year 1998-1999, Plaintiff began to have a problem with storing her scooter. Around this time, she kept her scooter in the nurse's office. However, if she knew that she was going to be absent, Tassone kept it in a storage room. Around this time, the locks for the storage room were changed. Answers No. 2. Tassone began asking Mr. Lee and Mr. DiRuzzo for the new keys to the storage room. Mr. Lee kept telling Tassone that he was going to work on the problem.

From about the school year 1998-1999 until Mr. Lee and Mr. DiRuzzo retired, Tassone was never given a key to the storage room. This meant that Tassone always had to find a janitor to open the door any time she needed to get her scooter or she would have to wait for the janitor. Tassone remembers there were times when she was forced to look for the janitor for long periods of time. This was a problem, not only because she was wasting valuable time, but because she had to walk long distances looking for the janitor which was difficult for her to do especially given that she used forearm crutches. Answers No. 2.[49]

When Mr. Cochran arrived the beginning of the school year 2001-2002, Tassone explained to him the problem with the key as it related to her disability. Mr. Cochran told Tassone that he would see what he could do. In fact, Cochran remembers that Tassone needed access to a room because her scooter was kept there and she did not have a key. Cochran p.90-5. He recalls that Tassone asked him for a key. Id. He does not know if he ever gave her one. Id. He recalls that he

[48]In their position paper, defendants writes on the key issue: "Again, that Ms. Tassone would prefer to have her own key does not make failure to provide a key a violation of the ADA, provided the PSB provides an alternative accommodation, which it did: when Ms. Tassone needs her scooter, a janitor will open the closet for her."

[49]Lee does not deny that Tassone asked him for a key. Rather, he states he just does not recall any such conversations. Lee p. 114-16. However, he claims that he could not have given her a master key.

only had two keys to the room and would have given her one if he had an extra one. Id.[50]

It was not until after Mr. Cochran left that Tassone believes she finally got a key. This is because Mr. Perkins gave her one. Tassone Affidavit.

15. Handicap parking.

The handicap parking spot was too far from the entrance at Bridgham so Tassone parked in a non-handicap spot near the entrance of the school. After Tassone received some complaints by other teachers that she was not parking in the handicap spot, Tassone went to Mr. Lee and explained the situation. She asked if she could move the sign and he told her no. Answers No. 2.

16. Teaching Assistant.

During the time that Mr. Lee was principal, Plaintiff's aides were always being taken out of her classroom. There were times when her aides were being taken out of her room for up to three periods. She kept complaining to Mr. Lee about this and he kept saying he would do something. At some point, he told Tassone that there was nothing he could do because the teaching assistant went with the students. Answers No. 2. This accommodation obviously was reasonable because ultimately she was given her own personal aide.

## C. PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM IS NOT PROPERLY DISPOSED OF ON SUMMARY JUDGMENT.

A disability-based hostile work environment claim,[51] requires Plaintiff to present evidence

---

[50] Although his "story" is somewhat confusing, Cochran claims that, at one point, he believes he actually ordered two new keys one of which was for Tassone. *Id.* He thought the situation was solved but later found out that the janitor had actually replaced the lock. Given that his key did not work on the new lock, Cochran had to take the key that was ordered for Tassone. *Id.*

[51] The First Circuit has assumed that disability-based hostile work environment claims are viable under the ADA and the Rehabilitation Act. See Quiles-Quiles v. Henderson, 439 F.3d 1, *5, n.1 (1st Cir. 2006); Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 11, n.1 (1st Cir. 2004) (noting that ADA claims and Rehabilitation claims are generally subject to the same analysis). Thus, Plaintiff also submits that the claim is cognizable under RICRA and the RIPDA. See, e.g., Evans v. Department of Business Regulation, 2004 WL 2075132 at *4, n. 2 (R.I. Super. 2004).

that (1) she is disabled; (2) that she was subjected to a hostile work environment; and (3) that the harassment was based upon her disability or a request for an accommodation. See Quiles-Quiles v. Henderson, 439 F.3d 1, *5 (1st Cir. 2006). The Plaintiff must also establish some basis for liability. See Torres-Soto v. ARB Recycling, Inc., 2005 WL 1640872 (D.P.R. 2005) (citing O'Rourke v. Department of Providence, 235 F.3d 713, 728 (1st Cir. 2001) and Leavitt v. Wal-Mart Stores, Inc., 74 Fed Appx. 66, 71, n.3, 2003 WL 22016287 (1st Cir. 2003)).

As discussed supra, Plaintiff has already met the disability threshold. With respect to the hostile work environment, Tassone can easily demonstrate that her "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of * * * her employment and create an abusive working environment." Id. (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 267, 126 L.Ed.2d 295 (1993) and citing Mannie v. Potter, 394 F.3d 977, 982 (7th Cir. 2005)). "Among the factors relevant to this inquiry are the severity of the conduct, its frequency, and whether it unreasonably interfered with the victim's work performance." Quiles-Quiles, 439 F.3d at *7 (citing Harris, 510 U.S. at 23).

"[A] broad range of conduct [] can contribute to the creation of a hostile work environment." O'Rourke, 235 F.3d at 729. "Evidence of [discriminatory] remarks, innuendos, ridicule, and intimidation may be sufficient to support a jury verdict for a hostile work environment." Id. (citing White v. New Hampshire Dep't of Corrections, 221 F.3d 254, 260-62 (1st Cir. 2000)). Further, conduct that is not explicitly disability-based should be considered along withe more overtly discriminatory conduct in assessing the hostile work environment. Id. at 729 (quoting Landrau-Romero v. Banco Popular De Puerto Rico, 212 F.3d 607, 614 (1st Cir. 2000)). This is because conduct that is not explicit can still be charged with anti-disability animus and thus, can contribute greatly to a hostile work environment. O'Rourke, 235 F.3d at 729 (citing Lipsett v. University of Puerto Rico, 864 F.2d 881, 897 (1st Cir. 1988)). For example, silent treatment, exclusion, work

sabotage and denial of support can be considered part of a hostile work environment. See O'Rourke, 235 F.3d at 730; DeGrace v. Rumsfeld, 614 F.2d 796, 800 (1st Cir. 1980).

In addition to considering non-explicit discrimination, the Court should also "avoid disaggregating a hostile work environment claim, dividing conduct into instances of [disability]-oriented conduct and instances of unequal treatment, then discounting the latter category of conduct." O'Rourke, 235 F.3d 730; Durham Life Ins. Co. v. Evans, 166 F.3d 139, 155 (3d Cir. 1999) (noting that courts should not consider each incident of harassment in isolation). Instead, pursuant to Meritor's missive, the Court must consider "the totality of the circumstances in each case" so as not to "rob the incidents of their cumulative effect." Id. (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) and quoting Williams v. General Motors Corp., 187 F.3d 553, 561 (6th Cir. 1999)).

A hostile work environment based upon disability necessarily would include the same conduct that supports claims for failure-to-accommodate because when an employer refuses to provide an accommodation, delays the accommodation, or does not address an accommodation needed for an employee to perform a job successfully, the workplace is in effect a hostile work environment.[52] Thus, all of the Department's discriminatory conduct in response to Plaintiff's requests for accommodations is properly considered part of the hostile work environment.

---

[52]See e.g., Hurley-Bardige v. Brown, 900 F. Supp. 567, 573-75 & n. 7 (D. Mass. 1995) (totality of the circumstances in hostile work environment claim should include same conduct that underlies failure to accommodate); see also Edmonson v. Potter, 118 Fed. Appx. 726 (4th Cir. 2004) (claim that lack of accommodations fostered hostile work environment); Singletary v. District of Columbia, 351 F.3d 519, 527, n.9 (D.C. Cir. 2003) (same); Schneider v. San Diego County, 24 Fed. Appx. 744, 746 (9th Cir. 2001) (employer's failure to accommodate is part of the hostile work environment); Brown v. Snow, 2005 WL 975772, at *5 (D.D.C. 2005) (same); Roeder v. Hendricks Community Hosp., 2001 WL 1168151, at *9 (S.D. Ind. 2001) (same); Hiller v. Runyon, 95 F. Supp.2d 1016, 1024 (S.D. Iowa 2000) (same); Vendetta v. Bell Atlantic Corp., 1998 WL 575111, at *9-10 (E.D. Pa. 1998) (same); Mary Crossley, Reasonable Accommodation as Part and Parcel of the AntiDiscrimination Project, 35 Rutgers L.J. 924 (2004); Frank S. Ravitch, Beyond Reasonable Accommodation: The Availability and Structure of a Cause of Action for Workplace Harassment under the Americans with Disabilities Act, 15 Cardozo L. Rev. 1475, (1994) ("When failure to reasonably accommodate is alleged in conjunction with a hostile work environment claim, it should be incorporated as evidence relating to the severity and pervasiveness of the alleged conduct. * * * Because failure to reasonably accommodate under the appropriate circumstances can be considered intimidating, hostile, or even abusive, it can contribute to a hostile work environment.").

As the following demonstrates, Tassone's workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment from just about the time that Plaintiff began teaching at Bridgham and continuing even after charges of discrimination and this lawsuit was filed.

- Tassone had problems while Mr. Lee was principal from about September, 1993 until about June, 2001 when he finally left. Answers No. 2.
- Tassone was originally assigned to Roger Williams for the school year 1993-1994. Right before the start of school in September, Plaintiff was told she was going to Bridgham instead because Roger Williams was not handicapped accessible. When she got to Bridgham, she was assigned to a first-floor classroom but it was missing things like desks, books, and supplies. Answers No. 2. Tassone had only a few desks, about five chairs and no books or paper. Tassone Dep. I, p. 47-48. She complained to Mr. Lee. He told her that she was a Roger Williams teacher and that the problem had to be solved with them. Although he tried to help her get some supplies from Roger Williams, he refused to give Tassone supplies from Bridgham. Teacher Wilma Johnson helped her to get some things but she did without a lot of things for the entire school year. Answers No. 2. For example, about two or three months later, Roger Williams sent her only math books. Tassone Dep. I, p. 48. Lee did not deny this happened, he just said he could not remember it. Lee I, p. 38-39.
- Johnson told Tassone that a lot of teachers were angry because a "crippled" teacher was coming to the school. Tassone Dep. II, p. 178. Johnson felt that the furniture should have been there so the teachers must have removed it. Tassone Dep. I, p. 181. Tassone also stated that when you move classrooms the furniture stays in the classroom so someone must have taken the furniture out since there was a teacher that had moved out of the classroom. Tassone Dep. I, p. 48-49. Tassone also felt like this was tied to her disability because it was her disability that required her to have a first-floor classroom and the teachers were upset that she was able to do this because of her disability. Tassone Dep. I, p. 48-49.
- Plaintiff was not given a first-floor classroom (described supra in Section A), and another non-disabled teacher was. This teacher confronted her about it. Answers No. 2.
- It was around September, 1994, that Plaintiff spoke with Jane Shugrue and a grievance was filed about access to the ramp and the fact that because of the way the bathroom doors were hung she could not get into the bathroom with her scooter. Answers No. 2. With respect to the ramp doors, Tassone was "at great straits to get those doors opened on her own." Winn, p. 39. She would have to get off her scooter, get onto her crutches, try to get the door open and somehow hold it open while getting back on her scooter and driving in. Winn, p. 40. Tassone had depended on Mrs. Johnson some time to help her get into the school and onto the ramp. Tassone Dep. I, p. 54. Winn knew that Tassone had gone to the administration about it. Winn, p. 40. As he often said, Mr. Lee told her things like "you have to be patient" and "things take a long time with the School Department." The bathroom doors did not get fixed until the middle of the school year 1995-1996 and only after the union filed a grievance. Answers No. 2. As Shugrue put it, "I don't know why it took them a year to fix a door." Shugrue, p. 171.

- Tassone received the silent treatment from a number of teachers. Although there are probably more, Plaintiff specifically recalls Elaine Starks, Fran Ganella, and Jack Biancuso giving her the silent treatment. This happened from just about the day she arrived until about the time that her daughter died in 1997. However, there were still teachers who did not speak to Tassone even if she spoke first. Answers No.2.
- From just about the time Plaintiff arrived until about the time her daughter died, Jack Biancuso blamed her for things which were not her fault. If he was not blaming her, he blamed Plaintiff's students. He often confronted Plaintiff about things. Tassone also remembers him yelling at her at least once a week for things which were not her fault. Answers No. 2; Tassone Dep. II, p. 124; Tassone Dep. II, p. 139. Tassone never saw him doing this to other teachers. Tassone Dep. II, p. 125.
- The handicap parking spot was too far from the entrance at Bridgham so Plaintiff parked in a non-handicap spot near the entrance of the school. Jane Shagrue or Fran Ganella confronted Plaintiff some time after the school year 1995-1996 began but before the annex was built. Plaintiff remembers this person being very upset that she was taking a spot from someone else. Plaintiff tried to explain that the handicap spot was too far. Answers No.2; Shugrue, p. 69.
- Plaintiff had access issues with snow and ice during Lee and DiRuzzo's tenure (described above in section A).
- Before Plaintiff got the remote and after Mr. Lee told her that she had to remain on the second floor, Wilma Johnson helped her to get on and off the ramp but there were times when Wilma Johnson was late or not around and Plaintiff had to wait. There were times when Plaintiff tried to open the fire doors by herself. When she did, she often bruised herself or damaged her scooter. Plaintiff told Mr. Lee about this and he said he would see what he could do but that she probably had to stay there for the year. Until Plaintiff got the remote, she asked Mr. Lee if she could leave the ramp doors open. Mr. Lee told her no. Answers No. 2. Lee did not deny that Tassone came to him about problems with the ramp, he just said that he did not recall. Lee I, p.89-90. Lee also said that he was not aware of any fire code that required the doors to remain closed. Lee I, p. 93.
- Until Tassone got the remote, she told Mr. Lee that, unless Wilma Johnson was around, once she was on the second floor, she could not go to places like the cafeteria, teachers' lounge, library and office because she had a hard time getting down the ramp. He told her he would see what he could do. Answers No. 2.
- Plaintiff had issues with being proximate to the bathroom (described in section A).
- Plaintiff told Mr. Lee that she could not get her scooter inside the bathroom because of the way the doors opened. During the time that Mr. Lee was principal, Plaintiff's scooter was vandalized. Before the bathroom doors were fixed, she had to leave her scooter outside the bathroom. When she did, her scooter would get vandalized. Even after the bathroom doors were fixed, her scooter would get vandalized but, more often than not, it was when it was parked outside the coverage room. These are the kinds of things that happened: the battery wires were unplugged (about 25-30 times), things were stolen from the basket, the brakes would be disengaged (about 30 times), knobs were broken, and the speed was changed (about 60 times), or the alarm would go off. Plaintiff constantly told Mr. Lee about this. As he often did, he told her that she had to be patient or that things take a while in the school department. Answers No.2; Tassone III, p. 106-108. The knobs that operated the lights never got fixed. Tassone III, p. 107.

- During the time that Mr. Lee was principal but after she got the remote, Plaintiff asked him if she could use the bathroom in the office when she was on the first floor. He told her that she could. Once she did, the secretaries in the office began to give her a hard time about this. For example, they put up a sign that said things like "For office use only," and "I thought I told you!" One secretary also told her to make sure that she sprayed. Plaintiff kept explaining to them that Mr. Lee gave her permission but the problems continued. At some point, Plaintiff went to Mr. Lee about this. He told her that he would take care of it but the problems continued so she just stopped using the bathroom. Answers No.2.
- At some point before Plaintiff got the remote, she remembers finding a student to open the ramp doors for her so that she could get to the second floor. The student just opened the door; he did not get on the ramp with her. By the time she got to the top of the ramp, no one was around to open the door for her. She started calling but no one answered. She was stuck on the ramp for about 35 minutes. She told Mr. Lee about this. Answers No.2. Lee did not deny this happened, he only said he could not recall it. Lee I, p. 97-98.
- Tassone had issues with corridor duty (as explained above in section A).
- During just about the time that she began working until Mr. DiRuzzo left in about January, 2002, She continually had problems with him because of her disabilities. Although there is probably more, she can recall the following. Answers No.2.
- Mr. DiRuzzo constantly took issue with the way that Plaintiff handled things. Answers No.2.
- Mr. DiRuzzo would never speak to Tassone unless he had to. For example, Tassone would say good morning to him and he would just ignore her. Answers No. 2.
- When Plaintiff had a discussion with Mr. DiRuzzo, very often, he would not listen to what she had to say or would walk away when she was trying to explain something. Answers No. 2.
- Mr. DiRuzzo would constantly questioned her about where she had been, what she was doing or why she was doing something. Answers No. 2.
- Mr. DiRuzzo constantly yelled at Tassone. Plaintiff felt it was always related to her disabilities. She remembers him yelling at her about leaving her kids to go to the bathroom. This was especially after the summer of 1998 when she was having kidney stone problems. Tassone recalls him yelling at her about an incident involving her teaching assistant when he took her side during an incident. She remembers he yelled at her about not controlling her children better. For example, sometimes her children would go down the ramp and be noisy. Mr. DiRuzzo would yell about this. Mr. DiRuzzo yelled at her about her taking too long to get to or from some place or being too slow.
- Mr. DiRuzzo yelled at her about fire drills. At some point, he was in charge of the second floor and he had to give the time of the last person to leave. When it was her, he would tell her that she had to move faster. This became such an issue that Mr. Lee tried to give Tassone a heads up on some drills. Tassone remembers Mr. DiRuzzo yelling at her about something she did or did not do during corridor duty. Although she does not recall the date, Mr. DiRuzzo yelled at her when a child slammed another kid into a wall. She was not even around but Mr. DiRuzzo yelled at her anyway. She remembers telling him that she could not get to the spot fast enough and he was still upset. Answers No. 2; Tassone Dep. I p. 18; Tassone Dep. II, p. 69-70; Tassone Dep. II, p. 125. Winn recalled DiRuzzo yelling at Tassone, and not anybody else. Winn, p. 79.
- Mr. Perkins knew that Simonne had a medical condition that required her to be out of the classroom to go to the bathroom and that despite the condition, DiRuzzo did not want to

accommodate it. Perkins, p. 53. Significantly, Perkins recalls that even if Tassone had someone cover for her, this was still not acceptable to DiRuzzo and that as "a result of her taking care of whatever problem she had, it put a strain on the two of them, their relationship." Perkins, p. 53. In fact, Perkins noted that he had conversations with DiRuzzo about Tassone, even after DiRuzzo retired and had just come back to the building to visit. Perkins, p. 54. "[T]hose were not positive conversations that Mr. DiRuzzo had. He didn't have anything positive to say about Ms. Tassone. He felt she was a nuisance, in my opinion." Perkins, p. 54. Perkins says he was led to believe that DiRuzzo felt Tassone was a nuisance because he heard from DiRuzzo that "she always needed something, you know, may it be cleaning the snow from the walkway, may it be having to go the bathroom to attend to some medical illness." Perkins, p. 54-55. In fact, DiRuzzo specifically said "How are you getting along with Ms. Tassone. Is she bothering you. Is she a pain in the ass. Is she asking for this, asking for that. How do you tolerate her." Perkins, p. 139. Perkins noted that he could not recall DiRuzzo talking to him in a negative way about any other person. Perkins, p. 55.

- Perkins also heard about DiRuzzo yelling at Simonne from Mr. Winn and Maria DeLuca, a secretary. Perkins, p. 93. He cannot recall ever hearing that DiRuzzo yelled at others. Perkins, p. 93. Maria would tell Perkins that DiRuzzo would "get upset when he saw Simonne, when she would come to the office, that his first response was getting upset with her because she always wanted something. And to get her out of the office, he would often yell and scream at her." Perkins, p. 94.

- There were times when Tassone's students told her that Mr. DiRuzzo had questioned them about her. Plaintiff remembers this happened a good 20 times until Mr. DiRuzzo left in 2002. Answers No. 2.

- Mr. DiRuzzo often sided with Tassone's students. She only wrote kids up for serious offenses. When she did, he would call the kids to talk to them and the kids would say that the incident did not happen. Mr. DiRuzzo would speak to Tassone and left her with the distinct impression that he believed the students and not her. Answers No. 2.

- Mr. DiRuzzo blamed Plaintiff for things. She remembers an incident in which one of her students just bolted out of the room. He ended up pushing another kid into the wall and knocking some of his teeth out. Mr. DiRuzzo yelled at Tassone and blamed her for this. He told her that she should have prevented it and even threatened that she might be held liable for the child's injury. She was not even around at the time. She remembers a time when a student left Mr. Malean's room to go to Mrs. Johnson's room and he got into trouble between the two rooms. Mr. DiRuzzo yelled at Plaintiff for this. Tassone tried to explain to him that it was Mr. Malean's student as well but he just walked away. Plaintiff later asked Mr. Malean if Mr. DiRuzzo spoke to him about the incident and he told her no. Answers No.2.

- DiRuzzo would frequently chastize Tassone. This happened whenever she would write kids up, he would basically say that she should not have written them up in front of the students or to her on the phone. Tassone Dep. II, p. 60-61. He did this on a monthly basis from the time he began working with Tassone in 1993 until his retirement in 2002. Tassone Dep. II, p. 61.

- Winn witnessed some of the interactions between DiRuzzo and Tassone. Winn, p. 45. He described DiRuzzo's interaction as "a persistent, a persistent blindness or intention to engage in a kind of psychological harassment, consistently engaging in a kind of psychological harassment." Winn, p. 125. "[Q]uite consistently, I saw him dealing with her in a gruff manner, disagreeing with her approach to things, * * * reprimanding her, and from my

subjective point of view, but trying to be as objective as I can, his approach was rather caustic, quick, and if not prejudiced, jumping into a judgment awfully quickly * * *." Winn, p. 46. Winn did not see Tassone being "rebellious" or "disrespectful" with DiRuzzo. Winn, p. 47. Yet, DiRuzzo was "annoyed" with Tassone. Winn, p. 46. This was a pattern. Winn, p. 47. According to Winn, "there was a contrast in the way he treated [Tassone] or interacted with [Tassone] and the way he interacted with other people." Winn, p. 48. "On the other hand, he seemed to have a very commiserating, lenient, easygoing, fraternal relations with others, maybe even paternal relations with others." Winn, p. 48. Although he was condescending toward Tassone, he was not that way with others. Winn, p. 49-50. In relation to student-discipline issues, it was Winn's "observation on lots of occasions that issues were settled much more amicably and simply and informally in so many other cases that weren't Simonne's." Winn, p. 59. These were "calm discussions" and done "in a calmer professional atmosphere," when done with other teachers. Winn, p. 59-60.

- Winn also noticed that DiRuzzo would deal with Tassone differently in terms of monitoring her location. Winn, p. 55. He saw this first-hand. Winn, p. 55. He would see DiRuzzo looking for Simonne and questioning her location and cross-examining her perhaps 3-6 times per quarter, but it could be more. Winn, p.55- 56 Tassone recalls DiRuzzo monitoring her on a weekly basis. Tassone Dep. II, p. 65.

- Mr. DiRuzzo once told Tassone something like "you better watch your back." This happened when Plaintiff's teacher's assistant went to DiRuzzo about her and then he called her in. When she tried to explain he gave her no support. Then she left the office and as she was getting on her scooter, he said "you better watch your back." She got scared after that. Answers No. 2; Tassone Dep. I, p. 18-19.

- On another occasion, in 1999, Tassone went to DiRuzzo about a problem kid who had threatened to take her crutches, and laughed with the other students about what she would do without her crutches and he made fun of the way she walked. Tassone Dep. II, p. 59. When Tassone went to DiRuzzo he told her it was her job to handle this kid. About two and a half months later, Tassone heard that this student threatened DiRuzzo and got expelled. Tassone Dep. II, p. 59-60. This was extremely upsetting that it was okay for her to be threatened but not DiRuzzo. Tassone Dep. II, p. 60.

- Tassone had problems with DiRuzzo because she took too long to get to the bathroom. Tassone Dep. II, p. 63-64, 87. For example, in the beginning, Tassone's room was not close to a bathroom. Tassone Dep. II, p. 64. DiRuzzo thought it took Tassone too long to go to the bathroom, but she had to get there. Tassone Dep. II, p. 63-64. Tassone told DiRuzzo that because of her handicap she could not walk fast. Tassone Dep. II, p. 87. Tassone never saw DiRuzzo complain to the other teachers about bathroom use. Tassone Dep. II, p. 87. "I did tell DiRuzzo, too, that, Mr. DiRuzzo, I can't walk that fast, just the act of going to the bathroom and washing my hands is not the same speed as everybody else, and then I was getting upset because he was still upset with me." Tassone Dep. II, p. 87. Tassone could recall at least five specific occasions where DiRuzzo was upset with her for being too slow to the bathroom. Tassone Dep. II, p. 64-65. These incidents happened from the 1994-1995 school year until about the 2000-2001 school year when the library incident happened. Tassone Dep. II, p. 88.

- Although Plaintiff does not recall the date, this was after she received the remote. Someone was shutting the switch off on the ramp so she could not open the doors with her remote. Answers No. 2. This was happening about 3-5 time a week. Tassone III, p. 117. Plaintiff went to Mr. Lee but it took about ten months before this was resolved. Answers No. 2.

- Tassone had problems accessing the copy machine.(see described above Section A). Mr. Winn, the librarian, was well aware of this situation. Winn, p. 22-23. He stated that at the time, he had two copiers in the library and that teachers were allowed to use his machine. In fact, lots of teachers used it. Tassone used Winn's machine because she did her copying on her free period which was after lunch and the time during which the cafeteria was being cleaned. Because the cafeteria was located between Tassone's classroom and the teacher's lounge, Tassone could not get to the lounge safely through the cafeteria. The cafeteria was closed at the time. Winn, p. 24. "[T]he custodians would clean the room and wash the floor. So they had signs up, yellow signs up and barriers warning people that the floors were wet. And because those floors were not manageable, maneuverable for [Tassone], she was looking for an exception to come in and use the library." Winn, p. 23. Although Winn, had no objection, he later learned that this request was refused and that Tassone was "forbidden to come into the library fifth period to use the copier on a frequent basis or on any basis, I think, during a free period." Winn, p. 23. Winn recalls it being Lee at the time that banned Simonne from using the library copier. Winn, p. 23. This was significant because other teachers continued to use the library copier both before and after the new rule, and the fact that Simonne was expressly denied the ability to do this. Winn, p. 25.

- Around the beginning of the school year 1998-1999, Tassone began to have a problem with storing her scooter. Around this time, she kept her scooter in the nurse's office. If Plaintiff knew that she was going to be absent, she kept it in a storage room. Around this time, the locks were changed for the storage room. She began asking Mr. Lee and Mr. DiRuzzo for the new keys to the storage room. From about this time until the time that Mr. Lee and Mr. DiRuzzo retired, Plaintiff did not get a key to the storage room. This meant that she always had to find a janitor to open the door any time she needed to get her scooter or she would have to wait for him. Tassone remembers there were times when she was forced to look for the janitor for long periods of time and would have to walk with her crutches. Mr. Lee kept telling her that he was going to work on this problem but he never did. Plaintiff believes that she did not get a key until Mr. Perkins arrived and after Mr. Cochran left. She remembers complaining to Mr. Lee about ten times about this. Answers No. 2. Cochran remembered there being an issue with Tassone having the key to get her scooter while he was there. Cochran, p. 92. He recalls Tassone requesting a key and that she needed access to the room on a regular basis. Cochran, p. 93-94. He does not remember if she ever got a key. Cochran, p. 95.

- Tassone had problems after her remote was stolen on December 8 (as described above in Section A). As of December 23, Plaintiff still had heard nothing, despite repeated complaints. Tassone Dep. I, p. 60; Answers No. 2. Tassone had also told Zarella and Lee about why she needed this remote so bad so she did not hurt herself or do damage to her scooter like she had in the past. Tassone Dep. I, p. 62. DiRuzzo said he did nothing to deal with this problem and that it was up to Lee to deal with it. DiRuzzo I, p. 84-85.

- On December 23, Tassone fell off her scooter trying to get through the doors by herself. Answers No. 2; Tassone Dep. I, p. 60. Mrs. Johnson had helped her onto the ramp and she had got to her class. But, she could not carry everything that day, including presents for the kids so she had to leave them down the ramp. But she was afraid the kids would steal the gifts so she went back down and though that she would be able to find someone to help her back up. But when she yelled, no one came. When she tried to open the door alone, her coat hit the mechanism on the scooter that makes it go, the scooter went fast, and the door came and hit Tassone and she went flying off the scooter. She hit her head and her back hit the

floor. The rescue was called and Tassone had to be carried out on a stretcher. Winn, p. 43; Tassone Dep. I, p. 60-62. Tassone had suffered a compression fracture in her back. Tassone Dep. I, p. 65. Plaintiff eventually learned that the janitor in her school had a remote of his own all along. Answers No. 2; Tassone Dep. I, p. 64; Tassone III, p. 119. Tassone had no idea why the janitors would need a remote more than her and if Lee and Zarella knew he had one, why she wasn't allowed to use it pending getting another one. Tassone Dep. I, p. 64. Gonzalez said that Lee was aware that there was a second remote. Gonzalez I, p. 70. Lee did not deny that Tassone came to him before she fell and complained about the missing remote and her problems getting from the first floor to the second floor, he only said he could not remember, but that it was possible. Lee II, p. 74-75.

- Prior to the Spring of 2000, Plaintiff spoke to Mr. Lee about her evaluation. By this time, Plaintiff had complained to Mr. Lee about many of the problems that she had with Mr. DiRuzzo. Tassone asked Mr. Lee if he would do her evaluation instead of Mr. DiRuzzo. He told her that he would. She went back to Mr. Lee a number of times about doing her evaluation and he kept putting her off. In about June, 2001, Mr. DiRuzzo called Tassone and told her, out of the blue, that he was going to be doing her evaluation. She told him that Mr. Lee had agreed to do it and also told him that she thought it was a little late in the year to be doing the evaluation. He became upset and told her that Mr. Lee never told him about this and that, if she did not have the evaluation done right away, that he would mark it as a refusal by her. Plaintiff had to write a letter to the Director of Human Services, Robert Gormely, about this issue. He told her that he would exempt her from being evaluated. Unfortunately, she has not been evaluated since just about the beginning of her career at Bridgham when Mr. Lee first did it. Answers No. 2.
- There were times when Plaintiff's students could not go on trips because she could not get on the bus because it was too expensive to get a handicap bus. The only way she would be able to go is if a handicapped child of hers also was going. This happened from 1998 to about 2001 and maybe after. Tassone believed this happened about three times or once a year for three school years. Answers No. 2; Tassone Dep. III, p. 120.
- Plaintiff was excluded from social events. For example, Plaintiff learned that other teachers had been invited to other teachers' homes. Plaintiff was not. Answers No. 2.
- Tassone had problems with non-ramp fire doors (as described above in Section A).
- In general, students were not allowed to use the ramp. Tassone Dep. II, p. 197-98. In about September 2000, Plaintiff did a project with the students. Lee told her that she had to stop the project because the teachers had told him that they were sick and tired of her getting special treatment and that they were angry about her students using the ramp and they associated it with her being handicapped and her being able to take her kids down the ramp. Answers No. 2; Tassone Dep. II, p. 197-98.
- At a retirement party during school year 2000-2001, no one sat with Plaintiff. Answers No. 2.
- Tassone had problems with dangerous students (as described above in Section A). Answers No. 2; Tassone Dep. I, p. 76-78; Tassone Dep. I, p. 84.
- Tassone was injured so severely by Garcia that she had to have surgery in February 2002. Before she returned, she requested to be allowed to dictate some of her work because she had writing and lifting restrictions as a result of the thumb injury. She spoke to Mr. Cochran about this request in about May 2002. At the time, Mr. Cochran told Tassone that when she got cleared to return to work, they might be able to get a substitute that Tassone might be

able to dictate her IEPs to him or her. She later talked to Glenda Guglielmo about this plan. Jack Biancuso overheard this and said that teachers would file a grievance if they allowed Tassone to come to work to dictate IEPs. Biancuso said that teachers would consider this very unfair because they did not get any special treatment when they were out sick. Guglielmo then asked Biancuso if he had any suggestions and he said the school department could pay him to get them done. Tassone also spoke to someone in workers' compensation, she believes her name was Annette Stimna. Tassone told her about the plan and Stimna told Tassone that she could not come back until she was fully functioning and could do the IEPs herself. Tassone never heard back about this plan. Eventually, Tassone received a voice-activated software but it did not work. It was not the software that her doctor ordered. Answers, No. 2.

- Perkins recalls Simonne asking for help and accommodations in relation to dangerous students and not being given that help on more one occasion. Perkins, p. 43, 47. In fact, Perkins recalls Simonne coming to him several times about this and saying that she feared the student. Perkins, p. 43, 49. According to Perkins, Tassone wanted a particular education plan for this student to address the problem. This was not done and after that, he believes Simonne was hurt by the student. Perkins, p. 44. Right after Simonne was hurt, the student was removed. Perkins, p. 44. As Perkins put it, "I kind of felt if they felt, you know, that based on the fact that she's in a wheelchair, she's in a scooter, she had difficulty getting to the door, I felt there was an urgency to make sure she knew what she was doing." Perkins, p. 44. Perkins remembered Simonne coming to him about the student before he injured her and speaking with Mr. Cochran about it. Perkins, p. 51-52. Despite the fact that Simonne communicated that she felt it should be addressed right away, that she feared being injured and that there were options available, there was no discussion about these options. Perkins, p. 52.

- Cochran was aware of certain students being volatile and that there was a potential for a physical problem. Cochran, p. 63. He was also concerned for Tassone because she had a small classroom and the fact that she used a crutch made it more difficult for her to maneuver around. Cochran, p. 64, 65. Thus, there was a better chance for contact. Cochran, p. 65.

- There were a variety of options available for immediately removing a potentially dangerous student. For example, the child can be suspended, be sent to the focus room, or receive individual instruction such as home instruction or some other kind of alternative services. Perkins, p. 45-46, 48; Cochran, p. 109 (temporary moves possible, pending permanent move); DiRuzzo I, p. 16-20, 102. This can happen immediately. Perkins, p. 46; Shugrue, p. 50; 147; Guglielmo, p. 61. This can be done if the student is a threat to a teacher. DiRuzzo I, p. 21-23. Although Perkins himself tried to help Simonne by calling Glenda Guglielmo, the special education supervisor, nothing was done. Perkins, p. 46-47. Shugrue also testified that there was a memorandum of understanding regarding immediate removal of students who were a threat, and recounted an incident where another teacher had a student immediately removed by DiRuzzo and it was not a problem. Shugrue, p. 145-150.

- During the time that Mr. Lee was principal, Tassone continually had problems with being allowed to go to the bathroom. She developed diabetes during the school year 1997-1998. Her diabetes was not under control and she was thirsty all of the time. She had to drink lots of water during the day and this made her need to go to the bathroom. At some point during this school year, Mr. DiRuzzo confronted Tassone about going to the bathroom. He told her that her teaching assistant had complained to her that she was missing from the classroom a lot because she was going to the bathroom. Plaintiff told Mr. DiRuzzo that her diabetes was causing her to drink which was making her go to the bathroom a lot more. Tassone also told

him that the problem was made worse because she was slow with her crutches and even with her scooter she was sometimes slowed down if she ran into lots of traffic. Mr. DiRuzzo was very upset. He told Tassone that she could not leave her teaching assistant with her students; that she had to have a teacher present. He also told her that she could not go as much as she was. Answers No. 2.

- Tassone recalls speaking to Lee about her bathroom issues and the way DiRuzzo was yelling at her about it at least thirty times. Tassone Dep. II, p. 78. Lee told Tassone he would speak to DiRuzzo but she never heard back from him. Tassone Dep. II, p. 120. Lee did not deny that Tassone had problems using the bathroom, he only said he could not remember. Lee I, p. 100.

- Tassone had trouble with the bathroom and was yelled at by DiRuzzo in the library (as further discussed above in Section A). Plaintiff went to Mr. Lee to tell him about this and he told her to wait a short time and then approach Mr. DiRuzzo. Answers No. 2; Tassone Dep. II, p. 90. Lee said he didn't want to create a rift between himself and Mr. DiRuzzo and that Tassone should handle it herself. Tassone Dep. II, p. 90-91. Lee testified that Tassone could have left her class with her aide if she had to go to the bathroom. Lee I, p. 113-14.

- Plaintiff told Lee that she needed to go to the library because they were working on a project and the students even had some stuff on the shelves in the library. A short time later, Plaintiff told Mr. Winn, the librarian, that she was going to ask Mr. DiRuzzo if they could use the library again. Mr. Winn told her that she shouldn't because Mr. DiRuzzo had been checking with Mr. Winn to make sure she was not in the library. Mr. Winn also told her that her students – including the one who had acted up – had been coming to the library with other teachers. Although Plaintiff is not completely sure, Plaintiff believes she spoke to Mr. Lee and told him what Mr. Winn told her and he said he would look into it and get back to her but he never did. Answers No. 2; Tassone Dep. I, p. 20-23, 24. Because Tassone was banned from the library, she no longer even ate her lunch in the library. Tassone Dep. II, p. 91.

- Winn corroborated Tassone's allegations in his deposition. Winn, p. 11-15. Significantly, Winn specifically recalled that DiRuzzo came back to library after the incident about four to six times checking to make sure that Tassone had not come back. Winn also stated that although Tassone was banned from the library, the disruptive students were not banned and were allowed to come to the library with other teachers. Winn, p. 15. Winn stated that it was "very apparent" that Tassone has spoken to DiRuzzo about her health issues, "[b]ecause circumstantially her interactions with Mr. DiRuzzo would naturally have provoked discussions of her limitations imposed by her colostomy situation, bladder situation, and other health conditions that she had." Winn, p. 21. Perkins also heard that DiRuzzo banned Tassone from the library. Perkins, p. 55-56. Lee did not deny that this happened, he only said he could not remember. Lee I, p. 114.

- Tassone had problems because of the coverage accommodation (delay and harassment because of it, as described above in Section A and herein). As Winn noted, Tassone "was met with resistance by administration in varying her schedule from whatever it was." Winn, p. 66. "So if [Tassone] ended up with this year's schedule showing she had a class sixth period, and she tried to protest the fact that she really needed for health reasons to keep period six open for her to take care of medical needs, her colostomy, her pills, whatever, she met with resistance on having that freedom given to her." Winn, p. 66; Shugrue, p. 63 (Shugrue and other teachers complained that Tassone did not have to do coverage). Even if Shugrue knew it was because of her disabilities, she thought it was unfair. Shugrue, p. 64.

- During the time that Mr. Lee was principal, Tassone's aides were always being taken out of her classroom. There were times when her aides were being taken out of her room for up to three periods. Tassone kept complaining to Mr. Lee about this and he kept saying he would do something. At some point, he told her that there was nothing he could do because the teaching assistant went with the students. Answers No.2.
- During the time Mr. Cochran was principal, he overlapped with Mr. DiRuzzo. During just about the entire time that Mr. Cochran was principal, Plaintiff had problems. On or about June 6, 2001, she applied for a Computerized IEP Position. In about July, she received a letter from Kenneth Swanson, the Executive Director of Special Education, that she did not get the job. During the interview, Gail DeRoy asked her questions about her health and disabilities. Plaintiff recalls being asked things like how her health was, if she was going to need any more surgery, would she have to take time out of work, what her condition was, and what her health prognosis was for the future. Shortly after she received the July letter from Mr. Swanson, she learned that Rebecca Branca Ressinger had gotten the job. She is much less qualified than Plaintiff. Even she admitted this to Plaintiff. Plaintiff remembers talking to some teachers about her not getting the job during orientation in about August, 2001. When she told them who got the job, she remember some teachers actually chuckling and saying things like "You should not have done such a good job training Becky," "That is because Becky can get in and out of the building," "I bet your handicap is the reason you didn't get it," "They don't have to worry about making buildings accessible with Becky." These kinds of comments went on for days. Answers No. 2.
- Perkins recalled Shugrue talking about the fact that Tassone did not get the job and that she would not be able to do the job because she was too slow in terms of walking. Perkins, p. 96. Becky Branca who got the position told Perkins that "she was kind of flabbergasted that she got the position over Simonne, despite the fact that Simonne had the years that she did in that position. And that Simonne was familiar with the position and special education. And [Branca] was relatively new to put in the IEP's by computers, and stuff like that." Perkins, p. 96. Tassone also expressed her disappointment to Perkins, telling him that she had the skills, and that Becky was inexperienced. Perkins, p. 97.
- Winn also recalled Simonne not getting this position. Winn, p. 67. According to Winn, Simonne told him about the interview process and the fact that she was asked "on health issues, her health issues, would you be able to do the job, do you think you would be able to do the job, what about this problem that you have." Winn, p. 68.
- Tassone reported her feeling that she was asked inappropriate questions during the interview to Cochran. Cochran, p. 131. When asked what he said in response, he said "I think I just listened." Cochran, p. 131.
- During the time that Mr. Cochran was principal, Plaintiff talked to Mr. Cochran about a number of things that she had talked to Mr. Lee about. She remembers that she still did not have a key to the storage room where she sometimes kept her scooter. She told him about her problem having to find the janitor or having to wait for him to come to the storage room. He told her that he would look into it but she did not get a key until after he left when Mr. Perkins gave her one. Answers No. 2.
- During the time that Mr. Cochran and Mr. DiRuzzo overlapped, Tassone had the same kinds of problems with Mr. DiRuzzo that she had when he worked with Mr. Lee. Answers No. 2.
- Under Mr. Cochran, Tassone continued to have problems with non-ramp fire doors. Plaintiff explained to Mr. Cochran that, even though she had a personal assistant, there were times when she was not around. She believes she even told him about how she had been left behind

in an actual fire. She told him that, when the fire alarm goes off, the non-ramp fire doors automatically shut and she could not open them. He told her he would look into this. She doesn't recall anything being done. Answers No.2.

- During Mr. Cochran's tenure, Plaintiff asked if she could be excused from corridor duty. She told him that, because of her disabilities, she was scared to be out there and she was often bumped into and even got bruised. He told her he would look into it but Tassone continued to have to do corridor duty. Answers No.2. As noted above, at his deposition, Cochran did not even insist that corridor duty had to be done by all teachers at all times.

- During Mr. Cochran's time, Tassone told him about her bathroom needs. He told Tassone that she could not leave her classroom unless it was covered by a teacher. Answers No.2.

- Continued snow and ice problems while Perkins and Cochran were in charge. Answers No. 2 (see discussion above).

- Tassone remembers having problems with dangerous students while Mr. Cochran was principal. She specifically recalls that she learned, just before or at the beginning of the school year 2002-2003, that she had a dangerous student who was assigned to her. With Bartholomew (described above) Cochran remembered the student and admitted that "we all had concerns about this student right from the beginning of the school year." Cochran, p. 114. Cochran admitted that he had the ability, as principal, to immediately get the student out of Tassone's class. Cochran, p. 116.

- During the time that Mr. Cochran was principal, Tassone remembers times when her crutches and even her scooter was missing. She remembers that, at least five times a year, her scooter was missing. She specifically recalls a time when she had parked it in front of the main office. When she went to look for it, it was gone. Tassone specifically remembers Jane Shagrue and Maria DeLuca, the secretary, being present at the time. There was another time when it was missing and she remembers having to look for it a long time. She especially remembers this happening after the grievance was filed by Jane Shagrue and the other teachers about her not doing coverage. Answers No.2. Tassone remembered that Ms. Simon, Maria and Jane were looking at her and laughing and she could not hear what was going on, but she was looking for her scooter and could not find it. Tassone Dep. II, p. 166.

- Perkins observed many of the problems that Tassone had. Perkins Dep., p. 17, 24. For example, Perkins saw Tassone's scooter intentionally being taken and hidden from Simonne by other teachers and school secretaries in a bathroom. Perkins Dep. p. 25-6, 34. On one occasion he saw her scooter being taken and being driven down the hallway so that Tassone had no idea where it was. Perkins, p. 25-26. In the first incident, Perkins actually heard Jane Shugrue say "here she comes," "Let's get the scooter when she's not looking" and they hid the scooter in the bathroom. Perkins, p. 26. He recalls several other people being present, for example, two other teachers, Ms. Simon and Mr. Wright, as well as Maria and two other secretaries and that they laughed about it. Perkins, p. 26-27, 29. As Perkins said, "they thought it was a fun thing to do * * * they didn't discourage [Shugrue]. They didn't say that was bad or you shouldn't do that." Perkins, p. 29.

- On one of the other occasions this happened, Maria actually took the scooter for a ride up and down the hallway. Perkins, p. 35. She took the scooter as a "joke" on Simonne. Perkins, p. 36. He also saw Mr. Lazarski riding the wheelchair. Perkins, p. 87. He heard from Simonne that Lazarski had taken it from her classroom. Perkins, p. 88.

- Perkins believes that this may have happened on more than two occasions "because it was a common thing for these people to cripple Simonne's ability to get help." Perkins, p. 25, 28.

One time, about five minutes after they hid the scooter, Perkins saw Tassone looking around, trying to figure out where her scooter was, but he did not help her. Perkins, p. 33. The teachers and secretaries stuck around to watch Tassone's reaction. Perkins, p. 35. Perkins did nothing about this treatment. Perkins, p. 30. Even worse, Cochran knew about it and also did nothing. Perkins, p. 29. In fact, Cochran had "seen that kind of behavior out of those same people," and had not addressed it. Perkins, p. 29-30.

- Perkins heard that Tassone's crutches went missing and suspected that the Lazarski had taken her crutches. Perkins, p. 99.
- In general, besides DiRuzzo, Perkins noted that others held the same kind of animosity toward Simonne including, Ms. Simon, Ms. Shugrue, Maria DeLuca the secretary, and maybe Mr. Polak. Perkins, p. 56-57. For example, he recalls times when "Ms. Tassone just happened to be coming to the office and showing up, and a lot of those people would say, you know, Here she comes, don't you want to leave, kind of thing." Perkins, p. 57. In particular, "when Maria [the secretary] knew that there was something, or had an idea that there was something Tassone wanted to discuss with me, Tassone would come to my office and Maria would even call my extension and say, Don't you want me to interrupt the meeting so you can let her go." Perkins, p. 57. She would say "Do you want me to make an excuse for you to leave?" Perkins, p. 94.
- Perkins remembers a teacher named Mr. Capasso saying about Simonne, "Oh, She's lazy. She only has ten kids. She has an assistant. Why does she have to be accommodated all the time." Perkins, p. 85. Shugrue and Polak made these same kind of comments. Perkins, p. 89. Another teacher, Ms. Holloway was part of the Shugrue group and supported whatever they did. Perkins, p. 86. Mr. Lazarski was not only another person who would steal Tassone's wheelchair, but he would chase Tassone's kids all the way back to her classroom and "dog her out in the presence of all her kids." Perkins, p. 86-87. Lazarski would blame Tassone for the student being out of the classroom without finding out why the kid was out in the first place. Perkins, p. 87. Lazarski would also go into Tassone's room and confront her students without her being present, but did not do this to other teachers. Perkins, p. 88.
- On one occasion, Perkins heard a teacher say "that most of [Tassone's] insides had been taken out, and they don't know why she comes to work anyway." Perkins, p. 76. Perkins believed that "this was referring to some kind of tube, or something, that Simonne had as a result of some kind of surgery." Perkins, p. 76. He recalls hearing things like teachers saying that if Tassone could not do her job then she should just leave. Perkins, p. 76. He states that he believes this could have been "Simon, Polak, Shugrue, those people." Perkins, p. 77. He reported this to Cochran many times, but that Cochran did nothing. Perkins, p. 77. <u>According to Perkins, Cochran gave him advice on what to do with the teachers comments about Simonne. Perkins, p. 78. He said "if you see something, just let it be. Don't even talk about it. Don't even go find someone that you feel need to know about what people are doing. Just leave it alone</u>." Perkins, p. 78.
- During Mr. Cochran's time, Plaintiff recalls she did breakfast duty. Breakfast duty was both inside the cafeteria and outside. Plaintiff asked him if, because of her disabilities, she could only do cafeteria duty inside the cafeteria. He told her she could. She remembers a teacher making comments about the fact that she was always inside and the fact that this was unfair to those who had to do cafeteria duty outside. Although she is not positive, she believes the person who made these comments was Pearl Holloway. Answers No.2.
- Plaintiff also heard comments from teachers about the fact that she had it so easy because she had an assistant. Answers No.2.

- While Mr. Cochran and Mr. Perkins worked together at Bridgham, Tassone had problems because she was excused from coverage. She remembers being at school and seeing a group of teachers standing around. Although she is not exactly sure, she believes it was Mike Cote, a person whose last name is Emery, Ms. Simon, Ms. Holloway, Mr. Pollack and Mr. Wright. They were all listening to something Jane Shagrue was saying. As Tassone approached them, she heard Jane Shagrue say something like "Maybe I should walk this way" or "Maybe I should say I am handicapped so that I can get out of doing my job like other people in this school." At that point, Tassone saw them all turn around and look at me and then they all started laughing. Tassone continued to approach them and, as she got closer, they all left except for Mike Cote. At the time, Shugrue was an officer in the Providence Teachers' Union and also a Department Head. Tassone approached Mike Cote and asked him what that was all about. At first, he didn't want to tell her but he ended up telling her that the teachers had filed a grievance against her for getting out of coverage and that Jane Shagrue and just about everyone was mad about this and felt that if Tassone could not do her job like everyone else, she should not be a teacher. Tassone asked Mike Cote if he felt that way and he told her yes. When she tried to explain to him, he told her that she should not be working; she should just stay at home because she can't do her job like everyone else. Later that day, Mike Cote repeated that to her at lunch. Answers No.2.

- Winn observed this incident and "was struck with the vehemence, the sarcasm with which [Shugrue] launched her attack on Simonne." Winn, p. 70 Perkins also observed this incident. Perkins Dep., p. 25. According to him, Simonne had asked for "some kind of accommodation," and in response, Shugrue was making these comments. Perkins, p. 36. This happened on the hallway on the second floor near Ms. Simon's room. Perkins, p. 36-7. Perkins saw Ms. Simon, Ms. Holloway, Ms. Shugrue and Mr. Polak present for this conversation. Perkins, p. 37. Perkins saw Shugrue making the comments and the other teachers laughing, and no one saying "that's not right." Perkins, p. 25. As Perkins stated, "It was more an acceptance kind of thing than a dis-accepting kind of thing (sic)." Perkins p. 25. <u>Perkins did nothing about this incident</u>. Perkins, p. 37.

- Shugrue admitted doing this. Shugrue, p. 129. After Shugrue filed the grievance, she got a response from the School Department that it had allowed Tassone to be exempted from coverage because of her accommodation. Shugrue, p. 109. This response "aggravated" and "frustrated" Shugrue and made her "very angry." Shugrue, p. 108. Shugrue did not agree with the accommodation. Shugrue, p. 111. Despite the fact that she did not know how much more frequently anyone would have to do coverage because of Simonne being exempted, she was angry and upset. Shugrue, p. 113. In fact, there were at least three other teachers with the same unassigned period as Shugrue and Tassone. Shugrue, p. 113.

- Tassone formally reported the incident to Cochran in a letter dated February 4, 2003. Cochran said that Tassone told him she felt ostracized and picked on and that he "believe it presented a possibility that it could be" a form of harassment based on her disabilities. Cochran, p. 119. Cochran gave Zimmerman a copy of the letter. Cochran, p. 120. He was looking for some direction from HR and their involvement. Cochran, p. 120-21. This was not only for the coverage issues, but for the issues of "potential" harassment contained in the letter. Cochran, p. 121. <u>No investigation was conducted into the Shugrue incident, nor any of the other harassment issues contained in the letter</u>. Cochran, p. 127-28. Instead, Cochran said he spoke to Shugrue about it, but did not discipline her in any way. Cochran, p. 125. <u>Shugrue, however, testified that Cochran never spoke to her about it, or any other concern of Tassone's in the February 2003 letter. Cochran admitted that he never sought to find out</u>

who the teachers were who laughed. Cochran, p. 125-26.

- Cochran remembers teachers poking fun at Tassone. Cochran, p. 50.
- Perkins heard about the grievance about Simonne being filed from Maria. Perkins, p. 82. He believes that since the coverage was left for Maria to do, she would tell Jane, "Yes, I'm not signing Tassone's, so you should file a grievance." Perkins, p. 83. Jane would have to get the information from Maria. Perkins, p. 83.
- Cochran knew that Tassone had asked not to do coverage and called Zimmerman about it to check if in fact, Tassone had permission to have her sixth period free. Cochran, p. 38. He also recalls Shugrue coming to him about the issue. Cochran, p. 39. According to Cochran, Shugrue felt it was unfair and Cochran agreed to investigate it. Cochran, p. 40. As Cochran recalls, the issue may not have been fully resolved before he left. Cochran, p. 40.
- After the leg-imitating incident, another teacher made comments to Tassone about using the ramp. Students were not supposed to use the ramp. However, Tassone's students used the ramp because Tassone needed to use the ramp. One teacher was angry about this and came up to Tassone and said it was not fair that Tassone could use the ramp. Tassone explained that she could not use the stairs. Answers No. 2.
- Plaintiff heard comments like that at other times as well. She remembers hearing comments like that from Mike Cote, Jane Shagrue and Jack Biancuso and there were probably others. She heard things like: "If you can't do your job, you should stay home," and "You should have to do everything that we have to do. It is not fair." Although she cannot recall all of the dates she heard these comments, she knows they took place after 1998 or 1999. Answers No.2. Winn recalls Cote making a remark to him about Tassone that she should not be working in the building if she could not take on all the duties including coverage. Winn, p. 72. Cote felt that Tassone should resign or retire. Winn, p. 72.
- Tassone spoke to Perkins about the way certain people made her feel. Perkins, p. 58. For example, Perkins remembers Tassone being around the day Shugrue made the comments in front of all those teachers about her. Perkins, p. 58. As he put it, "I'm quite sure that kind of bothered her as to why my colleagues won't say anything to me." Perkins, p. 59.
- After this incident with Jane Shagrue making fun of the way Tassone walks, she had a number of other problems. She noticed that things were missing from her classroom. She remembers being absent and coming back to school and finding that lots of supplies were missing. Answers No.2.
- After this incident with Jane Shagrue, Tassone also remember getting the silent treatment from a number of teachers including Jane Shagrue. Answers No.2.
- After this incident with Jane Shagrue, Plaintiff remembers that she bought a ticket for a union fundraiser. She had gone every year and you would pay for your ticket beforehand because there was a raffle. Tassone Dep. II, p. 167. She was never given the ticket and was never told about the dinner that was held. She only learned about the dinner after the fact. Tassone spoke to Jane Shagrue about this and she gave the excuse that Tassone was out sick. Answers No. 2. However, she said it in a sarcastic way. Tassone Dep. II, p. 167. Tassone felt that they still should have called her because she bought the ticket. Answers No.2. In fact, another teacher who was out sick told Tassone that it was funny because she was out sick too and they got the ticket to her. Tassone Dep. II, p. 168.
- Tassone's classroom was broken into about three times. She believes this took place after Mr. Cochran left and while Dr. Larbi was principal. She knows the date of the first incident because she filed a grievance. She believes it was October 29, 2003. Some personal items

of hers were taken. Plaintiff found it odd because it was the night of an open house and she knows that she locked her classroom. Tassone complained to Mr. Perkins who told her that she should not file a police report. Despite requests by Tassone, she was never reimbursed for the things that were stolen. No one else's classroom was broken into that night. Perkins, p. 101. As Perkins put it, "it was one of those times that I was up to here and I just didn't want to deal with it." Perkins, p. 102. Larbi, according to Perkins, did not have much to say when he tried to address the problem with her. Perkins, p. 108. She also remembers another incident in which her classroom was broken into and apple juice and salt was spilled all over. She believes her classroom was broken into another time but she does not recall a lot of the details about this incident. Answers No.2.

- After the leg incident, Tassone's car was vandalized while parked in the lot at school. She has had things like flags taken off and scratches and black marks left. Answers No.2.
- Perkins also observed Tassone asking for help and accommodation because of her handicap and not being given the help and accommodation. Perkins, p. 25.
- In the early morning of February 4, 2004, Plaintiff fell on ice at work. She had to wait 15 minutes or so from someone to find her. Winn, p. 32. Bob Zanni, a janitor, found her lying outside. Answers No.2. Tassone had broken her wrist. Winn, p. 32. As Winn saw it, "part of the problem was that Mr. Lee and subsequent principals had not agreed to have the custodians clean a special lane for her." Winn, p. 32. Winn noted that the custodians basically shoveled one path from the main doors, even though there were three main doors, and one path out to the edge of the sidewalk where the parking lot beings. Winn, p. 32. Tassone "often parked where she could get closest to the door, but at any rate any attempts that she made with the principal to have more than just that narrow path shoveled out to the sidewalk or however wide they made it were futile." Winn, p. 32.
- During the school year 2004-05, Tassone had problems with Vice Principal Orr. She remembers an incident in which there was a food fight in the cafeteria. Tassone remembers Mr. Orr confronting her outside the cafeteria. He raised his voice and told Tassone that she had not been around to control my students. She tried to tell him that she was there but he did not listen to her. She remembers another incident which involved a student, Cassandra Walker, who was both her student and Mr. Malean's. This day, Mr. Malean had walked Cassandra Walker to the cafeteria. He also had responsibility for picking her up at the cafeteria after lunch. While she was in the cafeteria, Cassandra got into trouble. Mr. Orr was upset about this and blamed Tassone for this. Later that day, Tassone spoke to Mr. Malean to find out if Mr. Orr had talked to him about Cassandra and he told Tassone he had not. Answers No.2.
- While Dr. Larbi has been principal, Plaintiff has had access problems. Plaintiff was teaching four language arts classes and only once science. Tassone found out that all the language arts workshops were being held in a school which was not accessible. Tassone spoke to Dr. Larbi about this and she told her to contact Dr. Gallo, who was then the Director of Middle Schools in Charge of Workshops. She told her that she should just take workshops at places that were accessible. Tassone was very upset and spoke to Dr. Larbi. She agreed with Tassone that it did not make a lot of sense. After this, Tassone remembers trying to go to a workshop at another school which she believes was Gilbert Stuart. As she always did, Tassone first called to make sure it was accessible and was told it was. The day of the workshop it was raining. After banging on the door for some time, Tassone saw some teachers and told them to unlock the door for her. She waited another twenty minutes and no one came to unlock the door. She finally walked to the front of the school and knocked on a window in the basement. She was

finally let in. Answers No. 2.

- She also tried to go to a workshop at Central, she believes. Again, she called ahead and was promised that she would have no problems. She got there and banged on the door for over thirty minutes and finally a janitor came by. He told Tassone that they always lock the door after school. He tried to get her in but couldn't. At that point, Plaintiff went to the front and ran into some teachers. She believes Mr. Winn may have been one of the teachers. Tassone told them she could not get in. They said they would try to find a janitor. Tassone waited and finally was told that they could not find a janitor. Tassone had to leave. Another time, Tassone went to a workshop at Lima. She called ahead and was told she would not have a problem and that there would be an elevator and it would be unlocked. When she got there, Tassone saw the person who was doing the workshop and he said that the elevator was locked everyday at the end of the school day. Tassone had to leave. Finally, she went to a workshop at the new science school. She was told that she would not have a problem. She went to the workshop only to find out that she was going to have to change rooms every half hour or so. She told them that she could not do it because the elevator was too far from the rooms she had to go to. Tassone was told that they would get me the paperwork from the other workshops and she should just stay in the room she was in. Tassone was forced to listen to the same workshop over again. At some point, she just left. Answers No.2. Winn was aware of this situation and noted that this "happened right off the bat like three times in a row" this school year. Winn, p. 75-77.
- Plaintiff had another access problem within her own school. She recalls that she wrote an art grant and they got it. This involved creating a mural. Tassone held a raffle and sold tickets for it. There was an awards night and Tassone could not even get in because her scooter would not fit. Answers No.2.

These facts are more than sufficient from which a jury could find a hostile work environment existed for Tassone.[53] This atmosphere is both objectively and subjectively offensive, as is made clear from both Tassone's testimony which is corroborated by both Perkins and Winn. This case is more than severe where there is evidence of not only things like the scooter stealing, imitating Tassone's walk, "crippled" and "insides being taken out" comments, but also the slow[54] or no reaction from her supervisors with accommodation requests which caused her to suffer additional physical injuries, like the time she fell off her scooter and broke her back, attempting to negotiate

[53]Cf. Quiles-Quiles, 439 F.3d at *3-4, 7 (citing Arrieta-Colon, 434 F.3d at 88) (finding hostile work environment existed for postal employee); Johnson v. Lehigh County, 2000 WL 1507072, at *3 (E.D. Pa. 2000) (finding that Plaintiff's allegations of two instances of harassment, sending agents to her home to interrogate her and refusing to take remedial steps for her after a work-related injury, were sufficient for a jury to find a hostile work environment based upon disability); In re Lesley Fay Companies, Inc., 212 B.R. 747, (Bank. S.D.N.Y. 1997) and 1997 WL 555 607 (S.D.N.Y. 1997) (finding hostile work environment existed for diabetic where supervisor often screamed at her and told he she should quit if she was so sick).

[54]The delay in making accommodations can be a form of harassment. See, e.g., Hiller v. Runyon, 95 F. Supp.2d 1016, 1024 (S.D. Iowa 2000).

the ramp without the remote, or when she fell on the snow and ice breaking her wrist.[9] These things with Tassone's ability to do her job, for example, when she would be out of work after suffering an injury that could have been prevented with an accommodation or when she would be denied access to a particular place or program.

Despite the fact that there is an abundance of evidence to the contrary, the Department persists that the hostile work environment is neither pervasive nor directed at the Plaintiff. The main error the Department makes is confining the hostile work environment to "hostile remarks." Department's Summary Judgment Memorandum, p. 16 ("Memo"). The Department alleges that DiRuzzo confronted Tassone about poor student management about five times and that Shugrue made one comment. Memo, p. 16. The Department ignores the comments and conduct of the other teachers, the school secretaries, Lee, Cochran, and Perkins, among others. As noted above the comments and conduct were constant and from a number of sources. The fact that administration ultimately granted some accommodations does not mean that building-level administration and teachers could not have created and maintained a hostile work environment throughout this process.

The Department also argues that because Shugrue helped Tassone by filing grievances and was herself was disabled, she could not have harassed Tassone. This is directly contradicted by Shugrue herself who said that if a teacher came to her with a complaint regarding an accommodation she would tell them they could not file a grievance. Shugrue, p. 23, 39; Tassone II, p. 147, 154. As Tassone put it, she wondered if it was someone else asking her for help if Shugrue would have said it was a grievable issue. Tassone II, p. 152. In fact, when Tassone went to her for a number of other things besides the 1994 ramp grievance, Shugrue did not help her. Tassone II, p. 147. It is undisputed that Shugrue did not help Tassone with the coverage issue, but instead, filed a grievance against her. Tassone II, p. 154-55. Regardless of what assistance Shugrue may have gave, among other things, she made fun of Tassone's disabilities and participated in things like scooter stealing

and other comments about Tassone not being able to do her job and always having to be accommodated. Tassone II, p. 153; Perkins p. 25-27, 89.

The Department's lack of causation argument also fails. As discussed above, there is ample evidence that this hostility was because of her disabilities. Johnson said the teachers were upset because a "crippled" teacher was coming; DiRuzzo got upset and angry with her in response to her disability-related problems or requests and did not treat others the same way; teachers stole her scooter and crutches and made fun of her, including imitating the way she walked; other teachers were allowed things like leaving early in bad weather and Tassone was not; DiRuzzo told Perkins that Tassone was a "pain in the ass" because she always needed something related to her disabilities; DiRuzzo banned Tassone from the library, but did not ban the students who acted up; DiRuzzo was calmer and more professional with other teachers, but not Tassone; DiRuzzo was condescending toward Tassone but not with others; DiRuzzo yelled at Tassone but did not yell at others; DiRuzzo monitored where Tassone was and threatened her; her remote was not replaced even though a janitor had another one and she needed it for her disabilities; her scooter was vandalized; she could not access bus trips or awards nights; and so much more as is detailed above mitigates in favor of finding that this treatment was because she was disabled.

As Winn put it, "the reason that Mr. DiRuzzo interacted the way he did with her was because he found her a challenge to him that he didn't like dealing with. * * I believe he saw her as seeking special treatment. Winn, p. 25. "He didn't like dealing with her requests or exceptions for treatment." Winn, p. 130. As Perkins put it, the treatment of Tassone was purposely designed to prevent her from having her disability-related issues adequately addressed. Tassone "would come to the office for one thing and you look around and your scooter is gone, now you're more concerned about the scooter than the problem you came about." Perkins, p. 26. <u>According to Perkins, Cochran gave him advice on what to do with the teachers comments about Simonne. Perkins, p. 78. He said</u>

"if you see something, just let it be. Don't even talk about it. Don't even go find someone that you feel need to know about what people are doing. Just leave it alone." Perkins, p. 78. In addition, other similarly-situated disabled persons experienced the same kind of problems,[55] showing there was a "climate of hostility toward workers perceived to be disabled." Hiller v. Runyon, 95 F. Supp.2d 1016, 1024 (S.D. Iowa 2000).

Even more convincing is the fact that there is no evidence that Tassone had performance-related problems. Winn described her job performance as being "singular" in her dedication to the job. Winn, p. 73-74. Lee could say nothing negative about her performance. Lee, p. 20. According to Lee, DiRuzzo did not have any problems with Tassone's performance. Lee I, p. 108. DiRuzzo confirmed this. DiRuzzo, p. 35, 50. DiRuzzo never told Tassone that she had poor classroom management skills. Tassone Dep II, p. 128. Tassone has not been evaluated since 1996 and has not been disciplined. Tassone Dep. II. p. 135. This evidence directly contradicts the Department's explanation that DiRuzzo and Tassone had a personality conflict. Winn expressly made clear that the personality conflict existed as a consequence of, the fact that DiRuzzo "didn't like dealing with her requests or exceptions for treatment." Winn, p. 130. DiRuzzo himself did not say that there were any personality or performance-related problems. There is more than enough evidence from which a reasonable jury can conclude that the reason why Simonne was subject to the hostility, discriminatory treatment and lack of accommodation was because of her disabilities.

As part of the prima facie case, the Plaintiff must also establish that some basis for liability exists. See O'Rourke, 235 F.3d at 728; Faragher v. Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141

[55]There were others with disabilities that suffered similar hostility. Perkins, p. 109. Mrs. Martin was a speech therapist who walked with a cane and was looked at "as a problem by those people that I named over and over again. She went to Dr. Larbi for assistance * * * she too, was asking to be accommodated," and Larbi did not respond. Perkins, p. 110. Jane Estes was head of guidance and needed window as an accommodation and this request was consistently delayed. Winn, p. 86-87. According to Cochran, another woman who was Director of Student Leave for the school department came to the building and had snow and ice issues, because she was disabled. Cochran, p. 53. The woman could not get on to the curb safely so she left and went back to her office and then called Cochran to complain. Cochran, p. 54-55.

L.Ed. 2d 662 (1998). With respect to liability for co-worker harassment, Plaintiff need only demonstrate that the Department knew or should have known of the hostile work environment and failed to take prompt and appropriate action. O'Rourke, 235 F.3d. at 736; Arrieta-Colon v. Wal-Mart Puerto Rico, Inc., 434 F.3d 75, 85-86 (1st Cir. 2006). Here, Perkins testimony alone establishes that not only did he and other administrators (like Cochran and DiRuzzo), know about the hostile work environment perpetrated by Tassone's co-workers, but they made a conscious decision not to take any action and even participated in it.[56] Cochran admits doing nothing in response to Tassone's complaint about Shugrue except for maybe speaking with Shugrue which Shugrue denies. He never spoke with any of the other teachers or addressed any of Tassone's other complaints in the letter.

Winn confirms that, as a supervisor, DiRuzzo also participated in the harassment. Lee does not deny that many of these things happened, he only says he cannot recall. Not only did Tassone repeatedly complain orally, as is evidenced by both her deposition testimony and Answers set above, but she put some things in writing, like her memo to Mr. Cochran about the Shugrue incident to which she received no response, as well as several other notes and grievances.

"Further, when there is an actionable hostile work environment attributable to a supervisor, an employer is subject to vicarious liability to a victimized employee * * *." O'Rourke, 235 F.3d at 736 (citing Faragher, 524 U.S. at 807); Arrieta-Colon, 434 F.3d at 86. Only in the case of supervisory harassment involving no tangible job action may an employer assert an affirmative defense arguing that it should not be liable because it "exercised reasonable care to prevent and correct the harassing behavior and that the employee unreasonably failed to take advantage of available remedies." Id. (citing Faragher, 524 U.S. at 807-08). Significantly, in this case, the Department has not pled the affirmative defense, nor has it made any argument regarding the

[56]The single liability-related argument made by the Department relates only to co-worker harassment and states that even if it was aware of the Shugrue situation, and it rose to the level of a hostile work environment it did not "rise to the level of requiring the Department to take remedial action." Memo, p. 21. This makes no sense since Plaintiff is aware of no exception which requires a Plaintiff to prove not only that a hostile work environment exists but that it is of a sufficient level to require remediation.

affirmative defense in its Memo.[57] In fact, here it is apparent that the Department did nothing to prevent or correct any harassment.

The affirmative defense contains two elements: (1) "that the employer exercised reasonable care to prevent and correct promptly any * * * harassing behavior;" and (2) "that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Arrieta-Colon, 434 F.3d at 86 (noting that the employer has the burden of proof). In a normal case, the employer relies on an anti-harassment policy and the fact that the employee failed to take advantage of the procedure. Id. at 86.

Here, even if the Department had raised the defense, it is obvious that summary judgment would not be appropriate because it is apparent that policies and training were lacking. Lee does not recall any disability-related training. Lee I, p. 22. Neither Lee, nor DiRuzzo was aware of any formal procedure for handling requests for accommodations or harassment based upon disability. Lee, p. 24, 59, 64; DiRuzzo, p. 61-63. When asked initially, DiRuzzo did not know Gonzalez or what the Office of Equity and Access was. DiRuzzo I, p. 116. DiRuzzo was never told that requests for accommodations from teachers had to go to Gonzalez. DiRuzzo II, p. 63-64. Before Gonzalez came on board, DiRuzzo does not remember how things were handled. DiRuzzo I, p. 63.

Cochran did not remember undergoing or attending any kind of training or workshops while at Bridgham, relating to the ADA or disabilities. Cochran, p. 17-18. Cochran did not know about any policies or formal complaint process. Cochran, p. 22, 32-34. Cochran was not even sure where one would go if they were not satisfied with his or the administration's handling of a complaint. Cochran, p. 35. Teacher Jane Shugrue had no ADA or disability-related training while at Bridgham. Shugrue, p. 18. Shugrue had been at Bridgham since 1982. Shugrue, p. 11. Shugrue had no specific

[57] Affirmative defenses must be plead and failure to raise an affirmative defense in a timely manner constitutes a waiver of that defense. See Hanley v. State, 837 A.2d 707, 711 (R.I. 2003) (internal citations omitted). In this case, the Defendants have not plead the Faragher/Ellerth affirmative defense. Defendants have never sought to amend the answer and thus, the defense must be waived.

memory of a procedure for complaining in any policy. Shugrue, p. 18-20. She does not recall anything written about how to request an accommodation. Shugrue, p. 20.

When Gonzalez came on board in 1998, the situation did not improve much. Gonzalez said there were no harassment policies before he came on board. Gonzalez I, p. 28. He said there were no postings. Gonzalez I, p. 94. When Gonzalez was asked how teachers were supposed to know what disability-based harassment was, he said "I don't know." Gonzalez I, p. 94-95. After Gonzalez came on board in 1998, he believes he drafted harassment policies within about a year, sometime in 1999-2000. Gonzalez I, p. 34. Gonzalez, however, did not distribute these policies to teachers, but merely handed them out to principals at orientation. He did nothing to ensure that the principals made teachers aware. Gonzalez II, p. 160-61, Gonzalez I, p. 76; DiRuzzo I, p. 62. Lee does not remember posting anything about disability-related harassment and did not recall seeing any postings at all. Lee II, p. 64 . Furthermore, the "personal harassment" policy which supposedly was the disability-related harassment policy contained no complaint procedure[58] or reference to outside agencies. Gonzalez I, p. 88-89. Director of Human Resources Donald Zimmerman had no ADA training while at the school department. Zimmerman I, p. 42, 73. Although Zimmerman said that the 1998 packet was re-distributed in later years, the Department did not produce any evidence of subsequent policies.[59] This is clearly insufficient. See, e.g., Arrieta-Colon, 434 F.3d at 87 (policy is irrelevant if not put into practice, complaints are not recorded, and despite sufficient notice to employer, no corrective action was taken); Valentin-Almeyda v. Municipality of Aguadilla, 2006 WL 122963, at *10 (1st Cir. 2006) (if evidence of a policy, but none that it was distributed or that employees were aware of it, no defense available).

---

[58]The "personal harassment" policy does indicate one can complain to his or her principal or Gonzalez. In this case, it is apparent that Tassone did those things.

[59]There was an accommodations policy dated February 8, 2002 produced, as well as an August 2002 memo distributing this policy to principals. This policy was not distributed until after Tassone's charges were filed and does not relate to harassment. Gonzalez I, p. 82.

In addition, it is apparent that no investigation was conducted into any of Tassone's complaints. For example, DiRuzzo was never questioned about any allegations made by Tassone at any time, with the exception of being contacted to prepare for his deposition. DiRuzzo I, p. 27-29, 108-09. The Department did not conduct an investigation after the charges were filed. DiRuzzo I, p. 108-09, 111-12; Shugrue p. 16; Gonzalez I, p. 100-101 (only knew several months before deposition in 2005 that charges had been filed in 2002 and had never been questioned); Lee I, p. 10 Zimmerman said that in the normal case he would investigate if he heard someone had been sexually harassed or if charges of discrimination had been filed. Zimmerman I, p. 56-57, 60. But, when he saw charges in this case he did not do investigation. Zimmerman I, p. 65. He basically explained that the reason he did nothing was because by the time he saw these things they were "already over." Zimmerman I, p. 70. He never even sought to find out if any of Tassone's problems were continuing or had actually been resolved.

In addition, there is no claim by the Department that Tassone failed to complain to whomever would listen, orally and in writing. As detailed above, she complained on numerous occasions. Yet, as Perkins put it, not only was nothing done, but he was specifically instructed by Cochran that when it comes to Simonne Tassone and comments being made by teachers, "if you see something, just let it be. Don't even talk about it. Don't even go find someone that you feel need to know about what people are doing. Just leave it alone." Perkins, p. 78. As Perkins, the Vice-Principal of the building said, there was no point going to Gonzalez since "as far as I was concerned Jose Gonzalez was an air head. He had no power, and he was not going to do anything about any problems that I brought to him. I felt that I would have been a problem if I had gone to Gonzalez, so I just excluded myself from going to Gonzalez." Perkins, p. 91.

Accordingly, the Department knew or should have known of the harassment perpetrated by its teachers and with respect to supervisory liability, no affirmative defense is available for the

Department, and thus they are strictly liable.

***C. Summary Judgment is Not Proper on Plaintiff's Disparate Treatment Claims Because There are Disputes of Material Fact for a Jury to Resolve.***

The Department argues that Plaintiff's disparate treatment claim fails because she cannot prove causation. Memo, p. 14. At the outset, it is important to note that the Department's reliance only on the burden-shifting framework of McDonnell-Douglas is error. McDonnell-Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In disparate treatment cases, a Plaintiff can meet her burden on summary judgment by either the McDonnell-Douglas method of proof or under a mixed-motive theory. Plaintiffs are no longer confined to one method of proof by the presence or lack of direct evidence. See Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003); Burton v. Town of Littleton, 426 F.3d 9, 19-20 (1st Cir. 2005).

The differences in the structure of proof results in a "pronounced advantage" to the plaintiff. See Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 (1st Cir. 2000); Weston-Smith v. Cooley Dickinson Hosp., 282 F.3d 60, 64-5 (1st Cir. 2002). Under McDonnell-Douglas, the burden of persuasion remains with the plaintiff throughout the analysis. Febres, 214 F.3d at 60. By comparison, in a mixed-motive case, once the plaintiff introduces evidence that disability was a motivating factor in the employment decision, the burden of persuasion shifts to the employer who must establish that it would have made the same decision without considering plaintiff's disability. Febres, 214 F.3d at 60 (citing Price-Waterhouse v. Hopkins, 490 U.S. 228, 276-77 (1989)).

Under the mixed-motive theory, Plaintiff "must present enough evidence to permit a finding that there was differential treatment in an employment action and that the adverse employment decision was caused at least in part by a forbidden type of bias." Burton, 426 F.3d at 20 (quoting Hillstrom v. Best W. TLC Hotel, 354 F.3d 27, 30-31 (1st Cir. 2003)). Tassone was not hired for the

Computerized IEP Trainer position because of her disabilities.[60] In support of this claim, Tassone has both direct and indirect evidence of a discriminatory motive. First, during the interview, Gail DeRoy asked Tassone questions about her health and disabilities. Answers No. 2; Exhibit 37; Tassone Affidavit. Plaintiff recalls being asked things like how her health was, if she was going to need any more surgery, would she have to take time out of work, what her condition was, and what her health prognosis was for the future. Answers No. 2; Defendant's Ex. 37. This direct evidence "consists of statements made by a decision maker that directly reflect the alleged animus and bear squarely on the contested employment decision." Febres, 214 F.3d at 60. These questions were asked in front of all three interviewers. Answers No. 2; Ex. 37; Tassone Affidavit.

Second, a less-qualified non-disabled person was hired for the position. Answers No. 2. It is undisputed that Tassone had the following qualifications. She had the necessary certificate, as well as a masters plus thirty credits. Defendant's Ex. 37. She had taught special education and written IEP's for nine years. Ex. 37. She had attended many workshops and training on developing IEPs. Ex. 37. She has helped new teachers with writing IEP's. She had knowledge regarding the student regulations helpful and/or necessary for the position. Ex. 37. She also had extensive computer experience. Ex. 37. At the time, Rebecca Branca was hired, she was about to start her second year as a teacher. Ex. 37. She had no training on how to write IEPs other than what was provided by other teachers, including Tassone. Ex. 37. Tassone had helped Branca with the computer. Ex. 37. At the time, Branca even admitted to Plaintiff that she was surprised that she got the position because Tassone was more qualified. Answers No. 2, Ex. 37, Perkins, p. 96 (discussing how Branca told him "she was kind of flabbergasted that she got the position over Simonne, despite the fact that Simonne had the years that she did in that position. And that Simonne was familiar with the position and special education. And [Branca] was relatively new to put in the

[60] Plaintiff has already established supra that she is disabled, or perceived as disabled and that she could perform the essential functions of the job with or without reasonable accommodation. See also Plaintiff's Letter contained in Defendant's Ex. 37 & supra n. 2.

IEP's by computers, and stuff like that."). Branca was not asked any health questions. Ex. 37. Plaintiff remembers some teachers actually chuckling and saying things like "You should not have done such a good job training Becky," "That is because Becky can get in and out of the building," "I bet your handicap is the reason you didn't get it," "They don't have to worry about making buildings accessible with Becky." These kinds of comments went on for days. Answers No. 2; Ex. 37.

Perkins recalled Shugrue talking about the fact that Tassone did not get the job and that she would not be able to do the job because she was too slow in terms of walking. Perkins, p. 96. Winn also recalled Simonne not getting this position. Winn, p. 67. According to Winn, Simonne told him about the interview process and the fact that she was asked "on health issues, her health issues, would you be able to do the job, do you think you would be able to do the job, what about this problem that you have." Winn, p. 68. Tassone reported her feeling that she was asked inappropriate questions during the interview to Cochran. Cochran, p. 131.

In addition, this decision cannot be considered in a vacuum. As demonstrated above, the decision not to hire Tassone came at a time when she was being subjected to a hostile work environment by co-workers and supervisors, and during a time when she had made repeated requests for accommodation.

Because Tassone has introduced evidence that her disabilities was at least part of the decision why she did not get the position, the Department bears the burden of showing that it would have made the same decision in the absence of Tassone's disabilities. Febres, 214 F.3d at 60. The Department offers absolutely no evidence on this point, other than the fact that she scored only 37, and the cutoff was 40. However, the Department, could not produce any test scores and/or scoring

sheets of the persons hired for the position or for Tassone.[61] Defendant's Answers to Interrogatories, No. 18; Affidavit of Donald Zimmerman, February 7, 2005; Zimmerman I, p. 141. Apparently, no documents could be located, with the exception of some resumes, cover letters and certificates, none of which belonged to Branca. The Department has no evidence that Branca's test score exceeded 40. Significantly, Gonzalez said he was told that Tassone would get into the next class because further sessions were being held. Gonzalez I, p. 129-30. If Tassone was supposed to be allowed into a future class, then her score could not have prevented the Department from determining that she was qualified for the job.

Even if Plaintiff's disparate treatment claim were analyzed under the McDonnell-Douglas burden-shifting framework, her claim still survives summary judgment. As noted above, Plaintiff has made out her prima facie case that she is (1) disabled; (2) capable of performing the essential functions of the job with or without reasonable accommodation; and (3) suffered an adverse job action because of her disability. See Mohammadian v. CIBA Vision of Puerto Rico, 378 F. Supp.2d 25, 32 (D.P.R. 2005). The burden then shifts to the Department to demonstrate that there is a legitimate, non-discriminatory reason for failing to hire Tassone. Id. Here, the Department has alleged that Tassone lacked the score to qualify. In support of pretext, Tassone points out that the Department has no evidence of what score was given to Branca and no evidence that Branca's qualifications were superior. To the contrary, Tassone presents evidence that her qualifications were superior to Branca's. Ex. 37. In addition, Tassone has the statements of DeRoy, Perkins, Gonzalez, and Winn with regard to the fact that the real reason that Tassone did not get the job was her disability and that she was more qualified than Branca. This is more than sufficient to generate a factual dispute on the issue of pretext and permit a reasonable jury to conclude that the position was not given to Tassone because of her disabilities.

---

[61] In the Department's Answers to Interrogatories, it had alleged that the marking sheets had already been produced in its Rule 26. However, that had never been done. When the Plaintiff filed a motion to compel, the documents could not be located.

***D. Plaintiff's Claims are Timely.***

*1. Statute of Limitations*

The Department has argued that all of Tassone's pre-May 1999 claims are barred by the applicable statute of limitations.[62] At the outset it is important to note that more than sufficient facts exist to support all of Plaintiff's claims relying only on discrimination which existed from May 1999 to the present and that this directly contradicts the Department's claim that the only potential discrimination that occurred post- May 1999 is DiRuzzo's yelling and Shugrue's leg imitation.

For example, after May 1999 the following incidents occurred: (1) plaintiff remained in a second-floor classroom until after Cochran arrived; (2) problems with handicap spot; (2) access issues with snow and ice during Lee and Cochran's tenure; (3) leaving early because of weather during Lee and Cochran's tenure; (4) scooter being vandalized outside coverage room; (5) office bathroom issues; (6) corridor duty during Lee and Cochran's tenure; (7) DiRuzzo yelling, intimidating, hostile treatment, bathroom issues, fire drill issues, teaching assistant issues, monitoring, library incident, evaluation issues; (8) harassment by Maria DeLuca; (9) scooter storage incident; (10) access issues with school trips; (11) being stuck in the fire; (12) fire evacuation issues; (13) comments about using the ramp; (14) retirement party exclusion; (15) issues with agressive students, including the thumb injury; (16) problems with accommodations and returning to work after thumb injury; (17) sixth period free without coverage; (18) non-ramp fire doors; (19) computerized IEP position and comments about not getting it ; (20) teachers stealing crutches and scooter; (21) comments and silent treatment by teachers like Cote, Simon, Lazarski, Capasso, Polak and others; (22) the Shugrue leg imitating harassment; (23) union fundraiser; (24) classroom being

---

[62]Significantly, this is the first time that the Department has raised this argument. The Department did not plead statute of limitations as an affirmative defense with respect to the ADA, the Rehabilitation Act, or the RIPDA. The only somewhat related affirmative defense raised in its Answer is that RICRA has a one-year statute of limitations and to the extent there are allegations pre-dating October 20, 2002, they are time-barred. However, this is clearly not the case since the RICRA has a three-year statute of limitations. See Rathbun v. Autozone, Inc., 361 F.3d 62, 70 (1st Cir. 2004). And, the Department has since conceded as much in its Memo, p. 7. Thus, this defense should be waived.

broken into; (25) car being vandalized. (26) falling on ice; (27) problems with Ott; (28) access problems with workshops; and (29) access problems with awards night.

With respect to pre-May 1999 discrimination, the Department has completely failed to recognize the concept of accrual and the two exceptions to the limitations periods which are applicable here, the continuing violation and equitable tolling doctrines, all of which operate to render timely and viable Tassone's pre-May 1999 claims.

*a. Accrual*

To determine timeliness for any limitations period, one must first determine when the claim accrues. "Accrual is the date on which the statute of limitations begins to run. It is not the date on which the wrong that injures the plaintiff occurs, but the date - - often the same, but sometimes later - - on which the plaintiff discovers that he has been injured." Cada v. Baxter Healthcare Corp., 920 F.2d 446, 450 (7th Cir. 1990); Harris v. Department of New York, 186 F.3d 243, 247 (2d Cir. 1999). For example, in Nieves-Marques v. Puerto Rico, 353 F.3d 108, 119-20 (1st Cir. 2003), the First Circuit explained that "the time of accrual of a civil rights action is when the aggrieved party knows or has reason to know of the injury which is the basis for his action or when facts supportive of a civil rights action are or should be apparent to a reasonably prudent person similarly situation." In that case, a student had requested an accommodation and had not heard about whether the request was granted or denied. The Court found that the Plaintiffs reasonably waited until after they received a written notice that the request was denied. Id. at 120.

In this case, the Department developed no evidence with regard to Plaintiff's knowledge about her rights. To be sure, Plaintiff was not aware of her ability to pursue legal action until the time that she was denied the computerized IEP position. Tassone Affidavit. She was told by a friend that asking health questions during an interview was against the law. Tassone then went to the Union about it and they said for Tassone to get a lawyer. It was only at this point, after meeting with her attorney, that Tassone became aware that some of the past incidents may also be injuries for

which the law may provide relief.

In all events, it would be very difficult for Tassone to know whether a cause of action had accrued because with many of her requests for accommodation she was told that administration would "look into it," and for the most part, she did not hear one way or the other. For example, when an Plaintiff renews previous requests for accommodation, which have not been finally and irrevocably denied, the statute of limitations is tolled. See O'Brien v. Department of Springfield, 319 F. Supp.2d 90, 101-02 (D. Mass. 2003). In particular, "to trigger the statute of limitations, [the plaintiff] needed to have received notice, not only of the [decision not to accommodate], but also that the decision was final and that it would be followed by no further process. To alert [the plaintiff] to the accrual of his claims, this notice would need to be unequivocal, and communicated in a manner such that no reasonable person could think there might be a retreat or change in position prior to the * * * employment decision." O'Brien, 319 F.Supp.2d at 101; Nakis v. Potter, 2004 WL 2903718, at *15 (S.D.N.Y. 2004). At the same time, when some things were ultimately granted after a year or more, this lulled Tassone into believing that perhaps if she waited long enough, something would happen one way or the other. It also may take time for an employee to realize that her employer is being unreasonable. Arnold, 215 F. Supp.2d at 959-60.[63]

As further described in this brief, there was no complaint procedure or information that Plaintiff received from her employer to give her the information that perhaps, would have led to her finding out earlier about her rights. Even more important is the fact that disability-based harassment is not a well known theory of the law. It cannot be compared to sexual harassment in terms of public awareness. Thus, it cannot be said as a matter of law that all of her claims accrued before one-year prior to the charges being filed.

---

[63]As the Arnold Court put it: "That Arnold, with the full benefit of hindsight, now recognizes that she was subjected to a repeated pattern of harassment that first started in 1995 says little about when she was first put on notice of the claim. * * * The same can be said with respect to Arnold's accommodation claim. Perhaps it took some time for Arnold to realize that her employer was being unreasonable in failing to accommodate her disability." 215 F. Supp.2d at 959-60.

6. *Continuing Violation Doctrine*

"[W]here a [] violation is 'of a continuing nature, the charge of discrimination filed * * * may be timely as to all discriminatory acts encompassed by the violation so long as the charge is filed during the life of the violation or within the statutory period." O'Rourke, 235 F.3d at 730 (quoting Pilgrim v. Trustees of Tufts College, 118 F.3d 864, 868 (1st Cir. 1997)); see also National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 113, 116-117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) ("[C]onsideration of the entire scope of a hostile work environment claim, including behavior that occurred outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period."). "The continuing violation doctrine is an equitable exception that allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts and there is 'some violation within the statute of limitations period that anchors the earlier claims'" Id.[64] (quoting Provencher, 145 F.3d at 14); Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429, 438 (1997) (holding that where there is no prohibition on recovery for earlier conduct if the violation extends into the limitations period).

The continuing violation doctrine applies to Plaintiff's hostile work environment, failure-to-accommodate, and disparate treatment claims because they are all part of a single course of discriminatory conduct.[65] In order to determine the sufficiency of a serial continuing violation claim

---

[64] In addition, even where the continuing violation doctrine does not apply for purposes of damages liability, the earlier evidence "is still relevant and probative as to whether the later discrimination took place." O'Rourke v. Department of Providence, 235 F.3d 713, 726 (1st Cir. 2001) (citing United Air Lines v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) ("sometimes time-barred prior incidents become admissible as relevant background evidence") (internal citations omitted); see also Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429, 439 (1st Cir. 1997); Pleasants v. Allburgh, 285 F. Supp.2d 53 (D.D.C. 2003).

[65] See Bodiford, 854 F. Supp. at 889 (applying continuing violation theory to disparate treatment case); Sutton v. Potter, 2004 U.S. Dist. Lexis 4656 at *16-17 (N.D. Ill. 2004) (applying continuing violation theory to failure-to-accommodate case); Arnold v. Janssen Pharmaceutica, Inc., 215 F. Supp.2d 951 (N.D. Ill. 2002); Smith v. Midland Brake, Inc., 98 F. Supp. 2d 1233 (D.Kan. 2000) (same); James v. Frank, 772 F. Supp. 984 (S.D. Ohio 1991) (same); Curry v. U.S. Postal Service, 583 F. Supp. 334 (S.D. Ohio 1984) (applying continuing violation theory to failure-to-accommodate under the Rehabilitation Act because each time the Plaintiff was forced to violate her lifting restriction, which was not accommodated, a continuing violation of her request to accommodate it existed); Richards v. CH2M, Inc., 29 P.3d 175, 186 (Cal. 2001) (failure to accommodate was continual).

one must determine if:

"1) is the subject matter of the discriminatory acts sufficiently similar that there is a substantial relationship between the otherwise untimely acts and the timely acts? * * *

2) are the acts isolated and discrete or do they occur with frequency or repetitively or continuously. * * *" O'Rourke, 235 F.3d at 731 (internal citations omitted)."[66]

As noted above, there are many, many acts which are grounded squarely within the applicable limitations period and thus, can serve as the anchor for the pre- May 1999 discrimination. Looking at the subject matter of the pre-May 1999 acts, it is obvious that the subject matter of the discriminatory acts is sufficiently similar. In fact, many of the incidents are the similar refusal to accommodate or address Tassone's requests. The acts are repetitive, frequent and continuous, not isolated or discrete.[67]

"As with harassment, an instance of an employer's failure to accommodate that in isolation may seem trivial can assume greater significance and constitute a greater injury when viewed as one of a series of failures." Richards, 29 P.3d at 189. For example, when an Plaintiff renews previous requests for accommodation, which have not been finally and irrevocably denied, the statute of limitations is tolled. See O'Brien v. Department of Springfield, 319 F. Supp.2d 90, 101-02 (D. Mass. 2003); Potter, 2004 U.S. Dist. Lexis 4656 at *16-17 (finding continuing violation doctrine applied where employer failed to grant employee's request for transfer as accommodation where there "was no definitive temporal marker distinguishing for [Plaintiff] at what moment [employer's] failure to accommodate ceased to constitute the formal and expected administrative delay or red-tape

[66] Since O'Rourke, the First Circuit has said that "even if [Plaintiff] was aware of alleged hostile work environment over 300 days before she filed charge, where she filed charge within 300 days of [any incident] as such alleged incident was part of one unlawful employment practice," the charge was timely. Marrero v. Goya of Puerto Rico, 304 F.3d 7, 17 (1st Cir. 2002).

[67] Finding a continuing violation here makes sense, where courts have found one exists in even less persuasive instances. See, e.g., Bodiford v. Alabama, 854 F. Supp. 886, 889 (M.D. Ala. 1994) (finding continuing violation where Plaintiff alleged that Defendant refused him a transfer on four occasions, spanning one year, but did not file his charges until more than one year after the original denial, because it evidenced a systemic policy to deny Plaintiff transfers). In addition, Courts have allowed recovery for even longer periods of harassment than is at issue here. Morrison, 108 F.3d at 438 (finding continuing violation included conduct from the 1980s to 1991).

associated with the process of reasonably accommodating, and started characterizing disability discrimination instead."). It makes sense that Tassone would wait, especially in light of the fact that her experience was telling her that it may be several years before an accommodation might be made or the situation would change, as was done with the first-floor classroom, remote, sixth-period free and personal aide. Based on the foregoing, it cannot be said as a matter of law that the continuing violation doctrine does not apply - - the final determination must be left to the jury.

*c. Equitable Tolling*

Even if the continuing violation doctrine did not apply to, Plaintiff's claims are timely pursuant to the doctrine of equitable tolling.[68] Equitable tolling "focuses on a plaintiff's excusable ignorance and lack of prejudice to the defendant." Leong v. Potter, 347 F.3d 1117, 1123 (9th Cir. 2003). "The doctrine of equitable tolling 'has been consistently applied to excuse a claimant's failure to comply with the time limitations where she had neither actual nor constructive notice of the filing period. Id. (citing Leorna v. U.S. Dep't of State, 105 F.3d 548, 551 (9th Cir. 1997)). "If a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period, then equitable tolling will serve to extent the statute of limitations * * * until the plaintiff can gather what information he needs." Id. (quoting Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir. 2000)). "The time period for filing a complaint of discrimination begins to run when the facts that would support a charge of discrimination would have been apparent to a similarly situated person with a reasonably prudent regard for his rights." Id. (quoting Boyd v. U.S. Postal Service, 752 F.2d 410, 414 (9th Cir. 1985)). It is well settled that charges of discrimination are subject to the doctrine of equitable tolling. Zipes v. TWA, Inc., 455 U.S. 385, 393, 71 L.Ed.2d 234,

---

[68]The doctrine of equitable tolling can be applied even to discrete discriminatory acts. See Morgan, 536 U.S. at 113. Furthermore, prior discrete discriminatory acts, even if time barred and not subject to equitable tolling can be used as "background evidence in support of a timely claim." Id. The Morgan Court also made clear that it is irrelevant, for purposes of the continuing violation theory, whether the plaintiff reasonably knew that the conduct was discriminatory at the time it occurred or not. See id. at 117, n. 11 & 118. Finally, Morgan provided that a hostile act of harassment need not be independently actionable to satisfy the limitations period for a hostile environment claim. See id. at 115.

102 S.Ct. 1127 (1982)).

Any allegedly untimely claims should be forgiven because the Department failed to post statutorily mandated notices of employment rights. See Mercado v. The Ritz-Carlton San Juan Hotel Spa & Casino, 410 F.3d 41 (1st Cir. 2005). The First Circuit has determined that an "employer's violation of the EEOC posting requirement may provide a [] basis for and extended filing period 'where the employee had no other actual or constructive knowledge of [the] complaint procedures.'" Id. at 46 (citing Earnhardt v. Commonwealth of Puerto Rico, 691 F.2d 69, 72 (1st Cir. 1982)); see also Vana v. Mallinckrodt Medical Inc., 1995 U.S. App. Lexis 35488, at *7-8 (6th Cir. 1995) (citing statute); Linn v. Andover Newton Theological School, 642 F. Supp. 11, *13-14(D. Mass. 1985). This approach does not require the Plaintiff to show that the Department actively misled her. See id. at 47, n.8. Like the Plaintiffs in Mercado, there were no notices posted and Tassone had no knowledge of her legal rights until informed by her attorney in 2002. See supra & Tassone Affidavit.

There are five factors that may be considered in evaluating a claim for equitable tolling, including "(1) lack of actual notice of the filing requirement; (2) lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) a plaintiff's reasonableness in remaining ignorant of the [filing] requirement." Id. at 48 (quoting Kelley v. N.L.R.B., 79 F.3d 1238, 1248 (1st Cir. 1996)). "Actual knowledge occurs when an employee becomes generally aware that he possesses a legal right to be free from the type of discrimination he has alleged." 410 F.3d at 48. "Constructive knowledge, meanwhile, would be presumed if the employer had complied with its statutory obligation to post EEO notices in conspicuous locations, and it also is presumed when an employee has retained an attorney * * *." Id. at 48-49. No constructive notice exists where there is a policy that has no reference to the availability of legal redress. Id. at 49.

At Bridgham, there were no posters that were placed in a conspicuous place which advised Tassone of her rights under the ADA and the Rehabilitation Act, nor any that directed her where to

seek help, such as the EEOC or the Human Rights Commission, that are required by federal law. When Gonzalez came in as Director of Equity & Access in 1998, the only thing that existed is the general statement that the Department does not discriminate which was contained on the letter head. Gonzalez I, p. 27, 30. There were no postings. Gonzalez I, p. 94.The only thing that Gonzalez believed related to disability before his tenure was the letterhead statement. Gonzalez I, p. 30. Gonzalez's notices, even if distributed, did not include any information about how to contact the EEOC or the Human Rights Commission. Gonzalez I, p. 88-89. There was no accommodation procedure until 2002.

Zimmerman did not know if the school's policy was posted. Zimmerman said that besides the "civil rights in the schools" packet given out by Gonzalez on orientation day to principals he does not recall any other forum where employees can get information about the ADA or rehabilitation act. Zimmerman I, p. 75-76. See further discussion re: policies and procedures supra. If the School's own administration was unaware of these things, it makes no sense to charge Plaintiff with a failure not to have this information. She complained repeatedly, but no one informed her that there was anything could be done outside of the school department until after July 2001. Here, it cannot be said as a matter of law that Tassone was on notice that she had to file an EEOC claim before May 28, 2002. The jury should be left to determine whether, based on the disputed facts, these doctrines should be applied. See, e.g., Stalter v. Bd. of Cooperative Educational Svs. of Rockland County, 235 F.Supp.2d 323, 333 (S.D.N.Y. 2002) (allowing jury to decide applicability of equitable tolling).

*e. Exhaustion of Administrative Remedies*

The Department also implies that Plaintiff's any post-May 2002 discrimination is barred because Plaintiff allegedly failure to exhaust her administrative remedies. This argument cannot have any impact on Plaintiff's RICRA claims, since there is no administrative exhaustion requirement. See Rathbun, 361 F.3d at 68. With respect to Tassone's ADA and RIPDA claims, generally the "jurisdictional scope of the plaintiff's court action depends on the scope of the EEOC

charge and investigation." Leong v. Potter, 347 F.3d 1117, 1122 (9th Cir. 2003) (citing EEOC v. Farmer Bros. Co., 31 F.3d 891, 899 (9th Cir. 1994)). Ordinarily, the claims presented to the district court must have been before the EEOC. Id. (citing Albano v. Schering-Plough Corp., 912 F.2d 384, 385 (9th Cir. 1990)). "However, the district court has jurisdiction over any charges of discrimination that are 'like or reasonably related to' the allegations made before the EEOC, as well as charges that are within the scope of an EEOC investigation that reasonably could be expected to grow out of the allegations." Id. (quoting Sosa v. Hiraoka, 920 F.2d 1451, 1456 (9th Cir. 1990)). In this case, there has been further failures-to-accommodate and harassment since May 2002. The further facts are disturbedly similar, involve the same legal theories, the same employment relationship.

Accordingly, the Department's administrative exhaustion argument must fail.

## V. CONCLUSION.

For the foregoing reasons, Tassone respectfully requests that Defendants' Motion for Summary Judgment be denied on all claims.[69] Tassone also respectfully requests oral argument.

Plaintiff,
By her Attorneys,

Patricia E. Andrews, #4321
Carly Beauvais Iafrate, #6343
129 Dyer Street
Providence, RI 02903
(401) 421-0966
(401) 421-0964 (fax)

## CERTIFICATION

I hereby certify that a copy of the within document has been sent by mail to Sara Rapport, Esq., Sr. Assistant Department Solicitor, Department of Providence Department of Law, 275

---

[69]Plaintiff notes that Defendants have not moved for summary judgment on her access claim. See, e.g., Spector v. Norwegian Cruise Lines, Ltd., 545 U.S. 119, 125 S.Ct. 2169, 2176-77 (2005). In addition, it is clear that most, if not all, of the above-described actions support Plaintiff's claim for Intentional Infliction of Emotional Distress.

Westminster St., Providence, RI 02903 on the 2nd day of June 2006.

# EXHIBIT A

# AFFIDAVIT

I, Dr. Barry Levin, do hereby state and affirm that:

(1) Since about 1981 until November, 1997, I treated Simone Tassone for various neurological problems.

(2) During the time that I treated Simone Tassone, I was a Board Certified Neurologist.

(3) During 1981 and November, 1997, I saw Simone Tassone on a number of occasions. Each time, I performed a neurological exam on her.

(4) By March, 1990, I had diagnosed Simone Tassone as having "gait abnormality." As of the time that I last saw Simone Tassone in November, 1997, she still suffered from "gait abnormality."

(5) "Gait abnormality" is defined as problems with walking. There are different types of gait abnormalities. Most, although not all, are due to some type of physical malfunction. An abnormal gait is often due to abnormality in one of many different areas of the body. For example, it can be due to central nervous disorders such as multiple sclerosis and cerebral palsy, spinal cord abnormalities, peripheral nerve diseases, degenerative muscle diseases such as muscular dystrophy, neurodegenerative illnesses such as Parkinson's disease, arthritis, foot conditions, or conditions such as trauma.

(6) During the period before 1990 until November, 1997 -- when I last saw her – Simone Tassone's gait abnormality caused her to be substantially impaired in her ability to walk compared to the average person in the population.

(7) Simone Tassone had a number of neurological and other medical problems

which contributed to her gait abnormality including: a history of compression fractures of the lower lumbar spine, cervical and lumbosacral radiculopathy, central and left sided disc herniation at C5-C6 resulting in an element of cord compression, cervical spondolosis, severe pain in her lower and upper back, joint pain and joint abnormalities, numbness, left foot pain, possible tarsal tunnel syndrome and knee problems.

(8) In November, 1997, I noted that Simone Tassone might have been also suffering from anxiety and depression. I thought it was possible that her anxiety and depression were contributing to her gait abnormality. However, I was never of the opinion that her emotional problems were the exclusive cause of her gait abnormality.

(9) I do not believe that Simone Tassone was faking her gait abnormality.

(10) I reviewed Dr. Andrew Ruthberg's medical notes. In part, he wrote:

> "While it may be possible that this patient does have a significant physical illness which we have yet to define, I think it also important to consider an alternative possibility that . . . she had a primary psychiatric disorder in the somatization disorder family . . . . I would strongly advise that physical therapy try to get patient to eliminate her use of crutches and go through progressive ambulation."

(11) It is my opinion that Dr. Ruthberg did not rule out that Simone Tassone's gait abnormality was caused by physical illness. Rather, he merely hypothesized that a psychiatric disorder might be the cause and that it should be explored as well.

(12) Even if Simone Tassone's gait abnormality were caused exclusively by a psychiatric condition such as somatization disorder, she would still be substantially impaired in her ability to walk compared to the average person.

Subscribed and sworn to under the penalties of perjury this 1st day of June, 2006.

Dr. Barry Levin

Subscribed and sworn before me this _____ day of _____ 2006

Notary Public

My Commission Expires:__________

see attached jurat

## MASSACHUSETTS JURAT

Gov. Exec. Ord. #455 (03-13), §5(a)

Commonwealth of Massachusetts
County of Middlesex } ss.

On this the 1st (Day) day of June (Month), 2006 (Year), before me,

Carol O. Marshall (Name of Notary Public), the undersigned Notary Public,

personally appeared Barry Levin (Name(s) of Signer(s)),

proved to me through satisfactory evidence of identity, which was/were

Personal Knowledge (Description of Evidence of Identity),

to be the person(~~s~~) whose name(~~s~~) was/~~were~~ signed on the preceding or attached document in my presence, and who swore ~~or affirmed~~ to me that the contents of the document are truthful and accurate to the best of his/~~her/their~~ knowledge and belief.

CAROL O. MARSHALL
Notary Public
Commonwealth of Massachusetts
My Commission Expires Mar 21, 2008

Carol O. Marshall
Signature of Notary Public

Carol O. Marshall
Printed Name of Notary

My Commission Expires March 21, 2008

Place Notary Seal and/or Any Stamp Above

**OPTIONAL**

*Although the information in this section is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: Affidavit for Simone Tassone

Document Date: 6/1/06 Number of Pages: 3

Signer(s) Other Than Named Above: —0—

Right Thumbprint of Signer
Top of thumb here

© 2004 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org
Item No. 5952 Reorder: Call Toll-Free 1-800 US NOTARY (1-800-876-6827)

# EXHIBIT B

Affidavit

I, Jon Mukand, M.D., Ph.D., being duly sworn under oath, state as follows:

1. For about the past fifteen years, I have been the Medical Director for the Southern New England Rehabilitation Center which is located in Providence, Rhode Island.

2. I am also on the faculty at Brown University, Tufts University, and Boston University in Rehabilitation Medicine.

3. On or about April 19, 2005, Simone Tassone visited Southern New England Wheelchair Clinic. The purpose of this visit was to determine if Ms. Tassone was a candidate for a scooter.

4. During the visit on April 19, 2005, I performed a neurological examination of Ms. Tassone. Based upon that neurological examination, I determined that Ms. Tassone requires a scooter because she is permanently and substantially impaired in her strength and ability to walk as compared to the average person.

5. The attached is a true and accurate copy of my report and findings.

[signature]

Subscribed and sworn to before me 26th this day of May, 2006 in Providence, Rhode Island 02903.

[signature]
Notary Public
My commission expires

CARLY B. IAFRATE
NOTARY PUBLIC
STATE OF RHODE ISLAND
My Commission Expires January 26, 2008

# SOUTHERN NEW ENGLAND REHABILITATION CENTER

## OUTPATIENT REHABILITATION MEDICINE CLINIC NOTE

COPY

## WHEELCHAIR CLINIC SEATING AND POSITIONING EVALUATION

TASSONE, SIMONE 10246
DOB:
04/19/2005

This is the wheelchair clinic seating and positioning evaluation on Simone Tassone. Please see attached dictation for her functional mobility and functional status.

EQUIPMENT RECOMMENDATIONS: We are recommending a three-wheeled scooter as this patient cannot functional ambulate in her work environment. She is a full time special ED teacher and needs to functionally mobilize herself within the school environment and transport bags of books to and from her room. She currently uses Lofstrand crutches to walk for shorter distances and is not able to carry anything while she does this. We are recommending a three-wheeled scooter, model and brand to be determined with a front basket and rear basket to accommodate her book bags and foam filled insert to the tires as the patient is not able to manage flats.

This report serves as a letter of medical necessity. The Rehab Staff will follow up with the vendor and the patient to ensure that she is in an appropriate and effective wheelchair. This request for consultation is greatly appreciated.

Colleen Fitzsimmons MS PT

~~KO~~ COLLEEN FITZSIMMONS, MSPT

Stacy Johnson OTR/L

STACY JOHNSON, OTR/L

# 384117
KF/SJ/cts/tj
D: 04/19/2005
T: 04/19/2005

# SOUTHERN NEW ENGLAND REHABILITATION CENTER

## OUTPATIENT REHABILITATION MEDICINE CLINIC NOTE

## WHEELCHAIR CLINIC

TASSONE, SIMONE 10246
DOB:
04/19/2005

HISTORY OF PRESENT ILLNESS: This is a 57-year-old female with multiple medical problems and left hemiplegia is here for rehabilitation, medicine and wheelchair evaluation. Her contributing medical problems include C5-6 fracture with result in left hemiplegia, severe osteoarthritis, history of TIA's, diabetes and neuropathy, severe back pain related to compression fractures, and bilateral carpal tunnel surgery.

At present, she is independent with bed mobility and sitting balance. She is at the modified independent with standing balance and transfers with Lofstrand crutches. She can do transfers to the toilet, bed and shower. She is unable to do wheelchair. She is also at the modified independent level with car transfers. Ambulation with Lofstrand crutches is at the modified independent level, although with severe difficulty. She is able to drive a scooter independently. The patient is unable to propel a manual wheelchair because of left hand weakness as well as severe pain related to her poly arthritis. Pressure release and community mobility are at the modified independent level. She needs a scooter to go to her work, to her employment. The patient is at the modified independent level with her ADLs, including the shower, seat and rails. She is also at the modified independent level with her instrumental ADLs. Sitting endurance is more than 10 hours.

REVIEW OF SYSTEMS: She has a normal review of systems with constitutional symptoms, EMT, psychiatric and hemologic. She wears corrective lenses. The patient has a history of [redacted], palpations and a murmur. She is currently taking Cardizem and states that this has controlled her symptoms. The patient has asthma, but this is controlled with medications. For IBS and reflux, she is taking medications. There is severe osteoarthritis and osteopenia, being to pain and she is on medications for this. There is occasional exemia and she sees a dermatologist regularly for this. There is weakness and numbness in the left side. Her ROS, she is hypothyroid, and recently had problems with weight gain and cardiac symptoms but her medication has been adjusted. She has allergies to pons.

PAST MEDICAL HISTORY: C5-6 fracture with weakness and she has had a C5-6 laminectomy. There is weakness on the left side. Osteoarthritis at bilateral knees, ankles and hips. She has a history of three TIA's. In addition, she has a history of diabetes, hypertension, hypothyroidism, osteopenia, asthma, kidney stones, compression fracture at L2,

TASSONE



_____________3:56 fracture, bilateral carpal tunnel syndrome, surgery and left hand surgery for tendon contractures. She has also had bladder surgery and has a history of nephrostomies.

MEDICATIONS: Her current medications include Synthroid, Zyrtec, HCTZ, Kader, Cardizem, Flonase, aspirin, Flovent, albuterol, magnesium, oxide, singular, Patna, eye drops, ASA fax, hydrazine, Benadryl, Fosamax, Zelnorm, metformin, glyburide, Avapro, B complex, vitamins, ENC, fish oil, multivitamins, a stool softener, calcium with vitamin D and zinc.

ALLERGIES: SULFA, CIPRO, IODINE, Clonidine ~~4:42~~, KEFLEX and question of MORPHINE.

SOCIAL HISTORY: The patient lives in a two-level home that has 12 steps with the railing. She negotiates this on all fours. There is a three-step entry. She does not smoke or drink. The patient has two daughters, one of whom is disabled. She also has a granddaughter and her mother. She is a special ED teacher in Providence and has a personal care assistant who helps during the day. She is able to drive herself.

PHYSICAL EXAMINATION: The patient is a pleasant, alert, over-weight, middle-aged woman in no distress. Cranial nerve examination nerves II through XII is intact. Manual muscle testing reveals that she has 4/5 at the right deltoids and 3 at the left, 4+ right biceps, triceps and wrist extensors and 3+ on the left, 4 right grasp and 4- on the left. In the lower extremities, she has 4- right hip flexion, 4+ quadriceps and dorsiflexors on the left. She has 2+ hip flexion, 3 quads and 2+ dorsiflexors. Sensory exam reveals that she has decreased sensation at the left lower extremity and to a lessor degree at the left upper extremity. She has evidence of bilateral carpal tunnel syndrome surgeries and there is reduced sensation in the distribution of the median nerves. Reflexes are hypoactive at both lower extremities. There is no ankle clonus. The musculoskeletal examination reveals that she has normal range of motion in the upper extremities and lower extremities. There is mild pain to palpation at the lumbosacral region.

EQUIPMENT RECOMMENDATIONS: This patient with left-sided weakness related to cervical spine injury as well as multiple other problems related to body arthritis is a candidate for the scooter described in detail the therapy attachment. The rehabilitation and medicine recommendations are as follows:

1. I discussed weight management with the patient.
2. I advised that she enroll in an exercise program in view of her current status, low impact exercises such as swimming would be the best.
3. I discussed the implications of her cervical spine injury and the need to seek immediate attention if she should have any progression of her symptoms.
4. She has some bladder dysfunction and I advised her to check on this with urology. She may have some retention in relation to Benadryl. She has a history of bladder dysfunction and it would be important to monitor her bladder status. She may benefit from a low dose of vitamin C twice a day to prevent UTIs.
5. She should have a very good fluid intake in order to avoid getting into trouble with her GU system.

TASSONE



6. She has occasional dizziness and I suggested that she discuss her blood pressure medications. Recently, she was placed on Avapro and it would be important to monitor her orthostatics.

This report serves as a letter of medical necessity. The Rehab Staff will follow up with the vendor and the patient to ensure that she is in an appropriate and effective mobility device. This request for consultation is greatly appreciated.

JON MUKAND, M.D., PhD.

# 384115
JM/cts/tj
D: 04/19/2005
T: 04/19/2005

cc: 1. Dr. Margaret Koehm
Fax: 722-2292
174 Armasist Boulevard
Pawtucket, Rhode Island 02860

# EXHIBIT C

PARTNERS IN FAMILY HEALTH CARE, INC.
DONYA A. POWERS, M.D.
GREGORY SADOVNIKOFF, M.D.
KAREN R. SMIGEL, M.D.

SEP 12 2001

Dr. Jose Gonzalez
Director of Equity and Access
Department of Human Resources
Providence School Department
797 Westminster St.
Providence, RI 02903

Dear Dr. Gonzalez,

I have been Simmone Tassone's physician for three years. Ms. Tassone needs to use crutches and/or a wheelchair to ambulate/get around. As a disabled person, she qualifies for certain considerations under the Americans with Disabilities Act. This act requires employers to make reasonable accommodations for qualified disabled individuals.

For medical reasons and so that Ms. Tassone can continue to offer good quality teaching, I am requesting she have sixth period free under all circumstances and to have a teaching assistant with her 100% of her day. This teaching assistant also needs to help her clean and organize her classroom at the end of the day.

Ms. Tassone is also a diabetic and needs to snack/eat at regular intervals. Adequate time needs to be given to her to do this.

Please contact me for any further questions or information.

Sincerely,

Karen R. Smigel, M.D.

Karen R.Smigel, M.D.
cc: Simmone Tassone

000894

50 OFFICE PARKWAY EAST PROVIDENCE, RHODE ISLAND 02914 TELEPHONE (401) 435-4466
FAX (401) 431-2689

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **SIMMONE T. TASSONE, Plaintiff** | : | |
| | : | |
| **v.** | : | **C.A. NO. 03-481ML** |
| | : | |
| **PROVIDENCE SCHOOL BOARD AND THE CITY OF PROVIDENCE, Stephen Napolitano, Defendants** | : | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES**

**Question #1**

Please describe each "impairment", and each particular "major life activity" such "impairment" affects, and in what particular way(s) it does so.

**Response**

**Plaintiff objects to this interrogatory because it calls for a legal conclusion, is overly broad and may call for information protected by the work-product privilege. Without waiving these objections, plaintiff incorporates by reference the information contained in the medical records produced to defendant in this case, and her deposition testimony. Plaintiff further states as follows.**

**I am not absolutely sure I know what you mean by the words "impairment" and "major life activity." I assume you are talking about major health issues I have had. I will try to explain.**

**In 1986, I fractured my neck. Although I am affected in a number of ways, my ability to walk is especially affected. Assuming there is nothing like ice or water on the floor or ground, I can only walk a very short distance (maybe 20 feet) without my forearm crutches but I have to have something to hold onto. If I don't have something to hold onto, I can only walk about 6 to 10 feet without forearm crutches but I am unsteady and nervous. Again assuming there is nothing like ice or water on the floor or ground, with my forearm crutches, I can walk a few city blocks but, by the end, my shoulders and wrists hurt and I am very tired. I often have to stop and rest. I also walk very slowly compared to most people. For anything more, I**

**have to use my scooter. This can change depending on things like how tired I am. If I use my crutches too much, I also get pain in my shoulders and have trouble sleeping. I have arthritis in my major joints (knees, hips, and shoulders) and this makes things even worse when my arthritis is flaring.**

**I also suffer from kidney stones. In addition to taking medication, I have to drink 12 to 14 glasses of water in order to keep the stones small so they can pass on their own. This causes me to urinate anywhere from 10 to 20 times a day. I suffer from diabetes and this makes matters even worse.**

**I also had most of my colon removed. Since then, the time between when I first get the urge to go and the time when I actually have a bowel movement has been shortened quite a bit. There have been many times when I have had an accident in my pants because I could not make it to a bathroom in time. My walking problems make getting to the bathroom that much more difficult. I can probably hold it for five minutes but, by that time, I am in excruciating pain.**

**I also have a thyroid problem for which I have to take medication. When my levels fluctuate, I get extremely tired and weak.**

**I injured my right thumb following a hyperextension injury at school when a student assaulted me. I am very limited in terms of what I can do with my thumb. For example, if I use my thumb for even a short amount of time, I feel extreme pain. Because of the pain, I am very limited in terms of the length of time I can do things like write.**

**I have diabetes which makes me very thirsty at times which makes me drink lots of water.**

**Recently, I fell at school. This has affected my walking disability even more.**

**Question #2**

Please set forth the dates, or approximate dates, upon which Plaintiff was allegedly subjected to a "hostile environment", and the nature of the hostility alleged on each occasion.

**Response**

**Plaintiff objects to this interrogatory because it calls for a legal conclusion, is overly broad and may call for information protected by the work-product privilege. Without waiving these objections, plaintiff states as follows.**

**I am not absolutely sure I know what you mean by the words "hostile environment." I assume you are talking about problems that I may have had because of my disability. I will try to explain.**

**From just about the time that I began teaching at Bridgham until the present time, I have continually had problems because of my disability. I will take Mr. Lee first.**

**I had problems while Mr. Lee was principal from about September, 1993 until about June, 2001 when I believe he finally left. Although it is difficult to remember everything which happened to me because there is so much, I do remember the following things happening.**

**I was originally assigned to Roger Williams for the school year 1993-1994. Right before the start of school in September, I was told I was going to Bridgham instead because Roger Williams was not handicapped accessible. When I got to Bridgham, I was assigned to a first-floor classroom but it was missing things like desks, books, and supplies. I complained to Mr. Lee. He told me that I was a Roger Williams teacher and that the problem had to be solved with them. Although he tried to help me get some supplies from Roger Williams, he refused to give me supplies from Bridgham. Wilma Johnson helped me to get some things but I did without a lot of things for the entire school year.**

**When I first got to Bridgham, Wilma Johnson told me that a number of teachers talked about the fact that a teacher who was a cripple was coming to Bridgham. She told me that were upset about my getting the first floor classroom.**

**When I was given the first floor classroom, Fran Ganella, another teacher, told me that she wanted the classroom I was assigned to. I believe she was on the second floor at the time. I told her that I needed to be on the first floor because of my disability. She told me that she was still entitled to it based on seniority and that she was going to file a grievance. I spoke to Mr. Lee about this. Although I remained on the first floor that year, I was forced to go to the second floor the following year. I believe Fran Ganella got my room on the first floor. I wrote a letter to a person whose first name is "Jan" explaining this and describing why I needed to be on the first floor because of my disability. I believe she may have been in Human Resources at the time. I don't recall receiving any reply.**

**I received the silent treatment from a number of teachers. With at least some of these teachers, they became more friendly after my daughter died. However, there were still teachers who did not speak to me even if I spoke first or only spoke to me if they had to.**

**From just about the time I arrived until about the time my daughter died, Jack Biancuso blamed me for things which were not my fault. If he was not blaming me, he blamed my students. He often confronted me about things. I also remember him yelling at me at least once a week for things which were not my fault.**

The handicap parking spot was too far from the entrance at Bridgham so I parked in a non-handicap spot near the entrance of the school. Jane Shagrue or Fran Ganella confronted me some time after the school year 1995-1996 began but before the annex was built. I remember this person being very upset that I was taking a spot from someone else. I tried to explain to that the handicap spot was too far. I was told that all I had to do was move the handicap sign to the spot near the entrance. I went to Mr. Lee about this and asked if I could move the sign. He told me no.

Although I cannot recall the exact dates, during the time that Mr. Lee was principal, there were a number of times when I arrived at school, opened my car door, and found that the parking lot was very icy and not sanded. Each time this happened, I went to Mr. Lee about not being able to get in because of ice. I remember times when Mr. Lee told me that this was not part of the janitor's job but he would see what he could do about it. I also remember times when he told me that there was nothing he could do about it. I remember having this problem the entire time that Mr. Lee was principal.

During the time that Mr. Lee was principal, I remember going to him on a number of days when it was snowing. I cannot recall the dates. I asked him if I could leave early because the snow was beginning to get deep and I was afraid that, because of my crutches, I would fall or would not be able to clear the snow from my windshields. I do not recall Mr. Lee ever allowing me to leave early even after I got the sixth period free.

At the end of my first year, Mr. Lee told me that I was being moved to the second floor the following year. (The only other person who was moved from the first to the second floor was Wilma Johnson who was one of the few people who was friendly with me.) I told Mr. Lee that, because of my disability, I could not get onto the ramp. He told me that he would see what he could do. The beginning of the school year 1994-1995, I learned that my classroom was still on the second floor. I went to Mr. Lee to talk about the problem again.

It was around this time (September, 1994) that I spoke with a union person (I believe it was Jane Shagrue) and a grievance was filed about access to the ramp and the fact that the bathroom doors I used did not allow me access with my scooter. Even after the grievance was filed, I did not get a remote and the bathroom doors were not fixed until over a year later in about November, 1995.

Until I got the remote to open the ramp doors, I asked Mr. Lee if I could have a first-floor classroom. I told him that I could not open the heavy fire doors on the ramp because of my disability. He told me that he would see what he could do but I probably had to stay there for the year.

Before I got the remote and after Mr. Lee told me that I had to remain on the second floor, Wilma Johnson helped me to get on and off the ramp but there were

times when Wilma Johnson was late or not around and I had to wait for her. There were times when I tried to open the fire doors by myself. When I did, I often bruised myself or damaged my scooter. I told Mr. Lee about this and he said he would see what he could do but I probably had to stay there for the year.

Until I got the remote, I asked Mr. Lee if I could leave the ramp doors open. Mr. Lee told me no.

Until I got the remote, I told Mr. Lee that, unless Wilma Johnson was around, once I was on the second floor, I could not go to places like the cafeteria, teachers' lounge, library and office because I had a hard time getting down the ramp. He told me he would see what he could do.

During the first year on the second floor, I recall that my classroom was the farthest from the bathroom. I asked Mr. Lee if I could move closer and he said that, at least for the year, he could not move me but he would see what he could do after that.

I told Mr. Lee that I could not get my scooter inside the bathroom because of the way the doors opened. As he often said, Mr. Lee told me things like "you have to be patient" and "things take a long time with the School Department." The bathroom doors did not get fixed until the middle of the school year 1995-1996 and only after the union filed a grievance.

During the time that Mr. Lee was principal, my scooter was vandalized. Before the bathroom doors were fixed, I had to leave my scooter outside the bathroom. When I did, my scooter would get vandalized. Even after the bathroom doors were fixed, my scooter would get vandalized but, more often than not, it was when it was parked outside the coverage room. These are the kinds of things that happened: the battery wires were unplugged, things were stolen from the basket, the brakes would be disengaged, knobs were broken, and the speed was changed, or the alarm would go off. I constantly told Mr. Lee about this. As he often did, he told me that I had to be patient or that things take a while in the school department.

During the time that Mr. Lee was principal but after I got the remote, I asked him if I could use the bathroom in the office when I was on the first floor. He told me that I could. Once I did, the secretaries in the office began to give me a hard time about this. For example, they put up a sign that said things like "For office use only," and "I thought I told you!" One secretary also told me to make sure that I sprayed. I kept explaining to them that Mr. Lee gave me permission but the problems continued. At some point, I went to Mr. Lee about this. He told me that he would take care of it but the problems continued so I just stopped using the bathroom.

At some point before I got the remote, I remember finding a student to open the ramp doors for me so that I could get to the second floor. The student just

opened the door; he did not get on the ramp with me. By the time I got to the top of the ramp, no one was around to open the door for me. I started calling but no one answered. I was stuck on the ramp for about 35 minutes. I told Mr. Lee about this.

Although I cannot recall when I began to ask, at some point, I began asking Mr. Lee if I could be excused from corridor duty. I explained to them that, because of my disability, I did not have good balance, that I could not get out of the way fast enough, and that I was getting pushed and shoved by students. I even told them that I had fallen during passing. Although there may have been other comments, I remember Mr. Lee telling me that he would see what he could do but nothing was ever done.

During just about the time that I began working until Mr. DiRuzzo left in about January, 2002, I continually had problems with him because of my disability. Although there is probably more, I recall the following.

(1) Mr. DiRuzzo constantly took issue with the way that I handled things.

(2) Mr. DiRuzzo would never speak to me unless he had to. For example, I would say good morning to him and he would just ignore me.

(3) When I had a discussion with Mr. DiRuzzo, very often, he would not listen to what I had to say or would walk away when I was trying to explain something.

(4) Mr. DiRuzzo would constantly question me about where I had been, what I was doing or why I was doing something.

(5) Mr. DiRuzzo constantly yelled at me. I felt it was always related to my disability. Although there are more, these are some examples. I remember he yelled at me about leaving my kids to go to the bathroom or taking too long to go to the bathroom. I recall him yelling at me about an incident involving my teaching assistant when he took her side during an incident. I remember he yelled at me about not controlling my children better. For example, sometimes my children would go down the ramp and be noisy. Mr. DiRuzzo would yell about this. Mr. DiRuzzo yelled at me about my taking too long to get to or from some place or being too slow. Mr. DiRuzzo yelled at me about fire drills. At some point, he was in charge of the second floor and he had to give the time of the last person to leave. When it was me, he would tell me I had to move faster. This became such an issue that Mr. Lee tried to give me a heads up on some drills. I remember Mr. DiRuzzo yelling at me about something I did or did not do during corridor duty. He yelled at me when students did things but yet did not yell at other teachers who also had responsibility for the students.

(6) Mr. DiRuzzo questioned students about me. There were times when my students told me that Mr. DiRuzzo had questioned them about me. I remember this happened a good 20 times until Mr. DiRuzzo left in 2001.

(7) Mr. DiRuzzo often sided with my students. I only wrote kids up for serious offenses. When I did, he would call the kids to talk to them and the kids would say that something did not happen. Mr. DiRuzzo would confront me about this. For example, I remember seeing a fight take place where this kid punched somebody else really hard in the stomach. The kid who was hit dropped to the floor and was crying. I wrote the kid up who did the hitting. Mr. DiRuzzo spoke to the children who told him they were not fighting but just playing. Mr. DiRuzzo spoke to me about this in a harsh tone and asked why I wrote them up.

(8) Mr. DiRuzzo blamed me for things. I remember an incident in which one of my students just bolted out of the room. He ended up pushing another kid into the wall and knocking some of his teeth out. Mr. DiRuzzo yelled at me and blamed me for this. I remember another time when a student left Mr. Malean's room to go to Mrs. Johnson's room and he got into trouble between the two rooms. Mr. DiRuzzo yelled at me for this. I tried to explain to him that it was Mr. Malean's student as well but he just walked away. I later asked Mr. Malean if Mr. DiRuzzo spoke to him about the incident and he told me no.

(9) Mr. DiRuzzo once told me something like "I better watch my back." I believe I testified about this in my deposition.

(10) Dring the school year 1997-1998, my personal assistant complained to Mr. DiRuzzo that I was going to the bathroom frequently and taking a long time. Mr. DiRuzzo yelled at me about this and told me I could not leave the bathroom as frequently as I was. I was also told that I could not leave my students in class with just a personal assistant. Mr. DiRuzzo yelled at me quite a bit about my going to the bathroom just about the entire time that he worked at Bridgham.

(11) Mr. DiRuzzo minimized what I told him. In about 1999, I told him about a particular student. I believe it might have been William Reveiros. I told him he was making fun of me, threatening me, taking my crutches and laughing at me in class in front of other students. Mr. DiRuzzo did nothing about this. He told me it was my job to handle situations like this. After I complained, I learned that Mr. DiRuzzo had a problem with this student and he was quickly out of the school.

(12) Mr. DiRuzzo would chastise me when I sent students to his office for disciplinary reasons. When I sent referrals to him, he would often call me on the phone and question me about what I had done. He would sometimes even do this in my classroom in front of the children.

Although I do not recall the date, this was after I received the remote. On a number of occasions, I could not use my remote because someone was playing with

the switch. I went to Mr. DiRuzzo and Mr. Lee. The problem was not resolved for at least ten months.

Although I am not exactly sure, I believe it was some time after the school year 1997-1998 began that Mr. Lee decided that teachers could not use the copy machine in the library. Instead, they had to use the copy machine in the teachers' lounge. I could only get to the teachers' lounge through the cafeteria. This was a problem because I needed to do most of my copying during my free period (fifth) but, during this time, the cafeteria was closed because they were cleaning up from lunch periods and washing floors. I told Mr. Lee and asked if I could use the machine in the library. He told me no. This lasted an entire year.

Around the beginning of the school year 1998-1999, I began to have a problem with storing my scooter. Around this time, I kept my scooter in the nurse's office. If I knew that I was going to be absent, I kept it in a storage room. Around this time, the locks were changed for the storage room. I began asking Mr. Lee and Mr. DiRuzzo for the new keys to the storage room. From about this time until the time that Mr. Lee and Mr. DiRuzze retired, I did not get a key to the storage room. This meant that I always had to find a janitor to open the door any time I needed to get my scooter or I would have to wait for him. I remember there were times when I was forced to look for the janitor for long periods of time and would have to walk with my crutches. Mr. Lee kept telling me that he was going to work on this problem but he never did. I believe I did not get a key until Mr. Perkins arrived and after Mr. Cochran left. I remember complaining to Mr. Lee about ten times about this.

On December 8, 1998, my remote was stolen. I immediately began complaining to Mr. Lee and Mr. DiRuzzo. I started having all of the problems which I had before I got the remote. Mr. DiRuzzo blamed me for losing it. Mr. Lee told me that he would see what he could do. After about a week, I called Dr. Zarella's office and told him about the problem including that I was hurting myself again and damaging my scooter. He said he would look into it. As of December 23, I still had heard nothing. That is the day I fell when I tried to get on the ramp by myself. I eventually learned that the janitor in my school had the remote all along.

Prior to the Spring of 2000, I spoke to Mr. Lee about my evaluation. By this time, I had complained to Mr. Lee about many of the problems that I had with Mr. DiRuzzo. I asked Mr. Lee if he would do my evaluation instead of Mr. DiRuzzo. He told me that he would. I went back to Mr. Lee a number of times about doing my evaluation and he kept putting me off. In about June, 2001, Mr. DiRuzzo called me and told me, out of the blue, that he was going to be doing my evaluation. I told him that Mr. Lee had agreed to do it and also told him that I thought it was a little late in the year to be doing the evaluation. He became upset and told me that Mr. Lee never told him about this and that, if I did not have the evaluation done right away, that he would mark it as a refusal by me. I wrote a letter to the Director of Human

**Services and he gave me an exemption. Unfortunately, I have not been evaluated since just about the beginning of my career at Bridgham when Mr. Lee first did it.**

**There were times when my students could not go on trips because I could not get on the bus because it was too expensive to get a handicap bus. The only way I would be able to go is if a handicapped child of mine also was going. This happened from 1998 to about 2001 and maybe after. I believe this happened about three times or once a year.**

**I was excluded from social events. For example, I learned that other teachers had been invited to other teachers' homes. I was not.**

**In about April or May, 2000, I was left during an actual fire. My aide was not in the room at the time. I got down the ramp but I became stuck in an area when I could not open a heavy fire door which had shut automatically. The area I was in actually began to fill up with smoke. After a while, I was found by a firefighter. I scooted outside. I began telling everyone what happened and I remember some teachers laughing as I explained what happened. This was resolved somewhat when I got my personal assistant but, even after that, there were times when my aide was not around. This only stopped being a real problem when Mr. Cochran moved me to the first floor.**

**Especially after I was left in the building during an actual fire, I went to Mr. Lee and told him about non-ramp fire doors being a problem and the fact that my aide was being taken out of the room which meant I had no way of getting out. He told me he would look into it. I remember another time he told me that he would have certain teachers check on me but this happened for a while and then stopped.**

**At a retirement party during school year 2000-2001, no one sat with me.**

**Although I had been afraid in the past, during the school year 1997-1998, I began to tell Mr. Lee that, because of my disability, I was concerned about certain aggressive and disruptive students who were being placed in my classroom. I also told Mr. DiRuzzo about this. I told him them I was concerned that I would not be able to protect myself or my students because of things like being so unstable on my feet and not being able to move quickly. I remember Mr. Lee saying things like "I will talk to someone and get back to you." I recall talking to Mr. Lee about five times before I was injured by Nelson Garcia. I believe Nelson Garcia was assigned to my class in about September, 2000. In about May or June, 2001, I was invited to a meeting because I was his case manager. At this meeting, a psychiatric report was read and it was determined at this meeting that Nelson Garica should be placed in another setting. I was told he would not be coming back to Bridgham or my class. In August, 2001, I noticed that Nelson Garcia was assigned to my class. From that point until I was injured, I placed a number of calls to Glenda Guglielmo and Mr. Lauro. I believe Mr. Lee was no longer working there at the time and I placed**

**calls to his replacement, Mr. Cochran. I told them about the mistake and also said that, because of my disability, I was afraid that I would not be able to handle Nelson Garcia if he acted up. I was concerned about the safety of myself, my students and my personal assistant. By September 11, 2001, Nelson Garcia was still in my classroom. On this day, Nelson Garcia assaulted me and I permanently injured my thumb.**

**After I was injured by Nelson Garcia, I was out of school because of the injury. At some point, I talked to my doctor about returning to work. I recall speaking to Mr. Cochran in about May, 2002. I told him about my restrictions including those relating to writing and lifting. At that time, Mr. Cochran told me that, when I got cleared to return to work, they might be able to get a substitute for a couple of days and I could dictate my IEPs to him or her. I later talked to Glenda Guglielmo about this plan. Jack Biancuso overheard us talking and said that the teachers would file a grievance if they allowed me to come to work to dictate IEPs. He said that teachers would think this was very unfair because they don't get that kind of special treatment when they are out sick. Glenda Guglielmo then asked him if he had any suggestions and he said that the school department could pay him to get them done. I believe I also spoke to someone whose name is Annette Stimna who handles workman's compensation. I told her about the plan and she told me I could not come back until I was fully functioning and could do the IEPs myself. I never heard back about this plan from any administrators. Eventually, I received a voice-activated program but it did not work. It was not the one that my doctor ordered.**

**During the time that Mr. Lee was principal, I continually had problems with being allowed to go to the bathroom. I remember talking to him a number of times about this problem and also telling him about the problems I was having with Mr. DiRuzzo about this. Although I had problems before, I especially remember having a problem after I developed diabetes during the school year 1997-1998. At that time, my diabetes was not under control and I was thirsty all of the time. I had to drink lots of water during the day and this made me need to go to the bathroom. At some point during this school year, Mr. DiRuzzo confronted me about going to the bathroom. He told me that my teaching assistant had complained to him that I was missing from the classroom a lot because I was going to the bathroom. I told Mr. DiRuzzo that my diabetes was causing me to drink which was making me go to the bathroom a lot more. I also told him that the problem was made worse because I was slow with my crutches and even with my scooter I was sometimes slowed down if I ran into lots of traffic. Mr. DiRuzzo was very upset. He told me that I could not leave my teaching assistant with my students; that I had to have a teacher present. He also told me that I could not go as much as I was. During the school year 1998-1999, the situation got even worse because I developed kidney stones during the summer of 1998. I was told that I had to drink at least 12 glasses of water a day which was making me need to go to the bathroom even more. I told Mr. DiRuzzo**

about this and told him I could not always find someone to cover for me. He again told me I could only leave my class with a teacher. I eventually sent a letter to Mr. Lee and Mr. Gonzalez explaining the bathroom situation and having the sixth period as my free period. Although I recall eventually getting the sixth period as my free period, the bathroom issue was never really resolved. There were times when I actually had accidents because I could not make it to the bathroom on time. In May or June, 2001, I had a nephrostomy tube in my back because of my kidneys and a bag strapped to my leg to urinate in. As of this time, I still had to go to the bathroom frequently and it took some time because, I not only took a long time to get to and from the bathroom, but I also had to empty the bag and sometimes even irrigate it. Because I was still under the impression I could not leave a teaching assistant with my students, I remember asking Mr. Winn, who is a certified teacher, to watch my children in the library so I could go to the bathroom. When I came back, Mr. DiRuzzo was standing there with Mr. Winn. I learned that one of my students had acted up. When Mr. DiRuzzo saw me, he started yelling at me and asking me where I was. I told him I had to go to the bathroom. Mr. DiRuzzo told me that I and my students were banned from the library for the rest of the year. I went to Mr. Lee to tell him about this and he told me to wait a short time and then approach Mr. DiRuzzo. I told him we needed to go to the library because we were working on a project and the students even had some stuff on the shelves in the library. A short time later, I told Mr. Winn, the librarian, that I was going to ask Mr. DiRuzzo if we could use the library again. Mr. Winn told me that I shouldn't because Mr. DiRuzzo had been checking with Mr. Winn to make sure I was not in the library. Mr. Winn also told me that my students – including the one who had acted up – had been coming to the library with other teachers. Although I am not completely sure, I believe I spoke to Mr. Lee and told him what Mr. Winn told me and he said he would look into it and get back to me but he never did.

At some point, I began to ask Mr. Lee if I could have the sixth period as my free period. I believe I began asking him during the school year 1997-1998. I told him that I needed this because of my disability. Mr. Lee told me he would see what he could do. I eventually got the sixth period as my free period but not until about the school year 1998-1999 and only after my doctor, Dr. Cindy Hansen, sent a letter and only after I sent a letter to Dr. Gonzalez. After this, I began to ask Mr. Lee if I could be excused from coverage during my free period because of my disability. He told me he would look into in. Eventually, Mr. Lee told me that I had to do coverage and that I should talk about this with a union representative. I was told that there were no exceptions to coverage. I believe Jane Shagrue is the person who told me this. In about August, 2000, I sent a letter to Mr. Gonzalez asking that I have the sixth period free without coverage. I did not get word that I could have the sixth period free without coverage until about March, 2001.

During the time that Mr. Lee was principal, my aides were always being taken out of my classroom. There were times when my aides were being taken out of my room for up to three periods. I kept complaining to Mr. Lee about this and he

**kept saying he would do something. At some point, he told me that there was nothing he could do because the teaching assistant went with the students.**

**I recall that towards the end of the time that Mr. Lee was at Bridgham, I did a project with my students. It was a lesson to teach them about prejudice. I recall certain teachers getting so upset about this project that Mr. Lee made me cut it short. Mr. Lee told me that these teachers told him they were sick of me getting privileges and special treatment.**

**In about August, 2000, I sent a letter to Mr. Gonzalez in which I asked for no coverage during the sixth period, I also asked that my teaching assistant remain with me during my free period at the end of the day. I explained that I needed this because I needed help with things I could not do in my classroom and because I was concerned about being left alone during fire drills and actual fires. I explained that, because of the heavy doors, I am unable to get out of the building once the fire alarm goes off. I even explained how, the year before, I had been left in the building during an actual fire. I also asked that my teaching assistant remain with me on my last day of school to help me pack up. My doctor, Dr. Cindy Hansen, later sent a letter asking that I have a personal assistant assigned to me the entire time. At some point, I spoke to Mr. Gonzalez and again explained why I needed a personal assistant to do things. He took the information down and told me he would look into it. At some point, Mr. Gonzalez told me that I would be getting my own personal assistant. After this, I kept calling to find out when I was getting my personal aide. I did not hear anything and did not get a personal aide until about March, 2001.**

**Some time during the school year 2000-2001, I spoke with Mr. Gonzalez and asked him if we could put automatic door openers on non-ramp fire doors. He told me he would get back to me. I explained that I was concerned because there would obviously be times when, even with my own personal assistant, that I would be alone. I don't believe Mr. Gonzalez ever got back to me on this. I had previously asked Mr. Lee about this and he kept saying he would get back to me. At some point, one of the janitors told me that he did not think that the automatic door idea would work on the non-ramp fire doors. I called Mr. Gonzalez and told him what the janitor said. He told me he would get back to me but I never heard from him.**

**During the time Mr. Cochran was principal, he overlapped with Mr. DiRuzzo. During just about the entire time that Mr. Cochran was principal, I had problems. On or about June 6, 2001, I applied for a Computerized IEP Position. In about July, I received a letter from Kennth Swanson, the Executive Director of Special Education, that I did not get the job. During the interview, Gail DeRoy asked me questions about my health and disability. Although it is difficult to remember exactly what she said, I recall being asked things like how my health was, if I was going to need any more surgery, would I have to take time out of work, what my condition was, and what my health prognosis was for the future. Shortly after I received the July letter from Mr. Swanson, I learned that Rebecca Branca Ressinger had gotten the job. She is much less qualified than I am. Even she admitted this to**

**me. I remember talking to some teachers about my not getting the job during orientation in about August, 2001. When I told other them who got the job, I remember some teachers actually chuckling and saying things like "You should not have done such a good job training Becky," "That is because Becky can get in and out of the building," "I bet your handicap is the reason you didn't get it," "They don't have to worry about making buildings accessible with Becky." These kinds of comments went on for days.**

**During the time that Mr. Cochran was principal, I talked to Mr. Cochran about a number of things that I had talked to Mr. Lee about. I remember that I still did not have a key to the storage room where I sometimes kept my scooter. I told him about my problem having to find the janitor or having to wait for him to come to the storage room. He told me that he would look into it but I did not get a key until after he left when Mr. Perkins gave me one.**

**During the time that Mr. Cochran and Mr. DiRuzzo overlapped, I had the same kinds of problems with Mr. DiRuzzo that I had when he worked with Mr. Lee.**

**Under Mr. Cochran, I continued to have problems with non-ramp fire doors. I explained to Mr. Cochran that, even though I had a personal assistant, there were times when she was not around. I believe I even told him about how I had been left behind in an actual fire. I told him that, when the fire alarm goes off, the non-ramp fire doors automatically shut and I could not open them. He told me he would look into this. I don't recall anything being done.**

**During Mr. Cochran's tenure, I asked if I could be excused from corridor duty. I told him that, because of my disability, I was scared to be out there and I was often bumped into and even got bruised. He told me he would look into it but I continued to have to do corridor duty.**

**During Mr. Cochran's time, I told him about my bathroom needs. He told me I could not leave my classroom unless it was covered by a teacher.**

**During Mr. Cochran's time, I continued to have the same kinds of problems with snow and ice that I did with Mr. Lee. I explained to him the situation but he told me I could not leave early even if it was during the sixth period which was free with no coverage. I remember falling outside about three times while he was principal.**

**I remember having problems with dangerous students while Mr. Cochran was principal. I specifically recall that I learned, just before or at the beginning of the school year 2002-2003, that I had a dangerous student who was assigned to me. I remember complaining to both Mr. Perkins and Mr. Cochran. I told them how I had been injured the year before by Nelson Garcia. I told them I was afraid of this student and thought I would not be able to control him because of my disability. I**

**eventually had to file a grievance over this on August 29, 2002. I believe the student was Thomas Bartholomew.**

**During the time that Mr. Perkins was at Bridgham and while Mr. Cochran was principal, I remember talking to Mr. Perkins about dangerous students. I remember explaining the same safety concerns I talked about with Mr. Lee. With at least one of these, I remember him telling me that he kept calling Glenda Guglielmo but was not getting anywhere. I remember complaining to Mr. Cochran as well.**

**During the time that Mr. Cochran was principal, I remember times when my crutches and even my scooter were missing. I remember that, at least five times a year, my scooter was missing. I specifically recall a time when I had parked it in front of the main office. When I went to look for it, it was gone. I specifically remember Jane Shagrue and Maria, the secretary, being present at the time. There was another time when it was missing and I remember having to look for it a long time. I especially remember this happening after the grievance was filed by Jane Shagrue and the other teachers about my not doing coverage.**

**During Mr. Cochran's time, I recall I did breakfast duty. Breakfast duty was both inside the cafeteria and outside. I asked him if, because of my disability, I could only do cafeteria duty inside the cafeteria. He told me I could. I remember a teacher making comments about the fact that I was always inside and the fact that this was unfair to those who had to do cafeteria duty outside. Although I am not positive, I believe the person who made these comments was Pearl Holloway.**

**I also heard comments from teachers about the fact that I had it so easy because I had a T.A.**

**While Mr. Cochran and Mr. Perkins worked together at Bridgham, I had problems because I was excused from coverage. Although I don't recall the date, I remember being at school and seeing a group of teachers standing around. Although I am not exactly sure, I believe it was Mike Cote, a person whose last name is Emery, Luanne Simon, Pearl Holloway, Mr. Pollack and Mr. Wright. They were all listening to something Jane Shagrue was saying. As I approached them, I heard Jane Shagrue say something like "Maybe I should walk this way" or "Maybe I should say I am handicapped so that I can get out of doing my job like other people in this school." At that point, I saw them all turn around and look at me and then they all started laughing. I continued to approach them and, as I got closer, they all left except for Mike Cote. I approached Mike Cote and asked him what that was all about. At first, he didn't want to tell me but he ended up telling me that the teachers had filed a grievance against me for getting out of coverage and that Jane Shagrue and just about everyone was mad about this and felt that if I could not do my job like everyone else, I should not be a teacher. I asked Mike Cote if he felt that way and he told me yes. When I tried to explain to him, he told me that I should not be working; I should just stay at home because I can't do my job like everyone else.**

**Later that day, Mike Cote repeated that to me at lunch. Although I am not positive, I believe Mr. Winn and Mr. Morris were present at the time.**

**I heard comments like that at other times as well. I remember hearing comments like that from teachers including Mike Cote, Jane Shagrue and Jack Biancuso. I heard things like: "If you can't do your job, you should stay home," and "You should have to do everything that we have to do. It is not fair."**

**After this incident with Jane Shagrue making fun of the way I walk, I had a number of other problems. I noticed that things were missing from my classroom. I remember being absent and coming back to school and finding that lots of supplies were missing.**

**After this incident with Jane Shagrue, I also remember getting the silent treatment from a number of teachers including Jane Shagrue.**

**After this incident with Jane Shagrue, I remember seeing her talking in the office with Luanne Simon and Marie, the secretary. They were looking at me and laughing. I was looking for my scooter at the time.**

**After this incident with Jane Shagrue, I also remember I bought a ticket for a union fundraiser. I was never given the ticket and was never told about the dinner that was held. I only learned about the dinner after the fact. I spoke to Jane Shagrue about this and she gave the excuse that I was out sick. I felt that they still should have called me because I bought the ticket.**

**After this incident with Jane Shagrue, I recall a teacher gave me a difficult time because I took my students down the ramp. I cannot recall her name.**

**My classroom was broken into about three times. I believe this took place after Mr. Cochran left and while Dr. Larbi was principal. I know the date of the first incident because I filed a grievance. I believe it was October 29, 2003. Some personal items of mine were taken. I found it odd because it was the night of an open house and I know that I locked my classroom. I complained to Mr. Perkins who told me I should not file a police report. Despite requests by me, I was never reimbursed for the things that were stolen. I also remember another incident in which my classroom was broken into and apple juice and salt was spilled all over. I believe my classroom was broken into another time but I do not recall a lot of the details about this incident.**

**After the leg incident, my car was vandalized while parked in the lot at school. I have had things like flags taken and scratches and black marks left.**

**In the early morning of February 4, 2004, I fell on ice at work. Bob Zanni, a janitor, found me lying outside.**

During the school year 2004-05, I had problems with Vice Principal Orr. I remember an incident in which there was a food fight in the cafeteria. I remember Mr. Orr confronting me outside the cafeteria. He raised his voice and told me that I had not been around to control my students. I tried to tell him that I was there but he did not listen to me. I remember another incident which involved a student, Cassandra Walker, who was both my student and Mr. Malean's. This day, Mr. Malean had walked Cassandra Walker to the cafeteria. He also had responsibility for picking her up at the cafeteria after lunch. While she was in the cafeteria, Cassandra got into trouble. Mr. Orr was upset about this and blamed me for this. Later that day, I spoke to Mr. Malean to find out if Mr. Orr had talked to him about her and he told me he had not.

While Dr. Larbi has been principal, I have had access problems. I was teaching four language arts classes and only once science. I found out that all the language arts workshops were being held in a school which was not accessible. I spoke to Dr. Larbi about this and she told me to contact Dr. Gallo, who was then the Director of Middle Schools in Charge of Workshops. She told me that I should just take workshops at places that were accessible. I was very upset and spoke to Dr. Larbi. She agreed with me that that did not make a lot of sense. After this, I remember trying to go to a workshop at another school which I believe was Gilbert Stuart. As I always did, I first called to make sure it was accessible and was told it was. The day of the workshop it was raining. After banging for some time, I saw some teachers and told them to unlock the door for me. I waited another twenty minutes and no one came to unlock the door. I finally walked to the front of the school and knocked on a window in the basement. I was finally let in. I also tried to go to a workshop at I believe Central. Again, I called ahead and was promised that I would have no problems. I got there and banged on the door for over thirty minutes and finally a janitor came by. He told me that they always lock the door after school. He tried to get me in but couldn't. At that point, I went to the front and ran into some teachers. I believe Mr. Winn may have been one of the teachers. I told them I could not get in. They said they would try to find a janitor. I waited and finally was told that they could not find a janitor. I had to leave. Another time, I went to a workshop at Lima. I called ahead and was told I would not have a problem and that there would be an elevator and it would be unlocked. When I got there, I saw the person who was doing the workshop and he said that the elevator was locked everyday at the end of the school day. I had to leave. Finally, I went to a workshop at the new science school. I was told that I would not have a problem. I went to the workshop only to find out that I was going to have to change rooms every half hour or so. I told them that I could not do it because the elevator was too far from the rooms I had to go to. I was told that they would get me the paperwork from the other workshops and I should just stay in the room I was in. I was forced to listen to the same workshop over again. At some point, I just left.

I had another access problem within my own school. I recall there was an awards night. My students were supposed to show their work in a power point

**presentation in the cafeteria. I could not access the cafeteria because I could not get my scooter in. Someone else had to give my students their award.**

**Question #3**

Please list each occasion, by appropriate date, on which Defendants refused to provide Plaintiff with a reasonable accommodation. Please include in your answer: (a) the specific accommodation requested by Plaintiff, (b) whether such request was in writing or made orally, with approximate date, (c) the specific response by Defendants, and (d) whether such response was in writing or oral, with approximate date.

**Response**

**I incorporate my answers to interrogatory 3. I also incorporate my deposition testimony.**

**Question #4**

Please describe the occasion of the Defendant refusing the Plaintiff the so-called reasonable accommodation of "having the bathroom door hung to the left." Please include in your answer (a) when Plaintiff made such a request; (b) when and who accommodated the request; and (c) the identity of the so-called "third-party" who allegedly intervened on Plaintiff's behalf.

**Response**

**I incorporate my answers to interrogatory 3. I also incorporate my deposition testimony.**

**Question #5**

Please indicate when Plaintiff was first provided a remote control device for the doors to the ramp from the first to second floors; when Plaintiff lost the remote; and when Defendant provided her with another remote to replace the lost one.

**Response**

**I incorporate my answers to interrogatory 3. I also incorporate my deposition testimony.**

**Question #6**

Please list each occasion, by approximate date, on which Plaintiff could not "access the school" because "the sidewalks and parking lot were icy and snow covered", and where precisely the ice and snow were situated such that its presence prevented Plaintiff from accessing the school.

**Response**

**I incorporate my answer to interrogatory 3. I also incorporate my deposition testimony.**

**Question #7**

Please list each occasion, by approximate date, on which Plaintiff asked that the parking lot and sidewalk be "sanded and salted", and of whom she made such request(s).

**Response**

**I incorporate my answer to interrogatory 3. I also incorporate my deposition testimony.**

**Question #8**

Please list each occasion, by approximate date, on which Defendants refused the Plaintiff the so-called "reasonable accommodation of having an aide at all times." Please indicate in your answer when Plaintiff made such a request, and whether in writing or orally.

**Response**

**I incorporate my answer to interrogatory 3. I also incorporate my deposition testimony.**

**Question #9**

Please list each occasion in which Plaintiff allegedly had to "file grievances to obtain the reasonable accommodations she was entitled to". Please give the approximate date upon which such grievance was filed, the nature of the grievance, and the resolution, if any.

**Response**

**I incorporate my answer to interrogatory 3. I also incorporate my deposition testimony. I also refer you to the grievances which have been produced to defendant.**

**Question #10**

Please list each occasion in which Plaintiff was "often stranded, waiting for someone to come by and help her obtain access to her classroom". Please give the approximate date(s) when so "stranded", and set forth the identity of the person who arrived to help her, if any.

**Response**

**I incorporate my answer to interrogatory 3.**

**Question #11**

Please set forth the name of the student whom Plaintiff alleges injured her, when she first complained of this student, to whom she so complained, and when the student was removed from her classroom, by approximate date.

**Response**

**I incorporate my answer to interrogatory 3.**

**Question #12**

Please indicate the dates upon which the incident described in paragraphs 28-32 took place. In particular, please identify all witnesses to this incident.

**Response**

**I incorporate my answer to interrogatory 3. I also incorporate my deposition testimony.**

**Question #13**

Please describe the particular questions asked of her, and by whom, when interviewed for the position allegedly denied her in July 2001 on the basis of her disability.

**Response**

**I incorporate my answer to interrogatory 3. I also refer you to the documents produced to defendant.**

**Question #14**

Please indicate if Plaintiff did train for the position of "Computerized IEP Trainer", when she trained, and how much income she derived from such training.

**Response**

**I never trained.**

**Question #15**

Please describe the person or persons whom Plaintiff notified of her kidney disease , and specifically of the fact that she had "neuphrostomy tubes sticking into her back to drain her kidneys into a bag attached to her leg".

**Response**

**I incorporate my answer to interrogatory 3. I told Mr. Lee, Mr. DiRuzzo and the nurse. I believe I also told Mr. Gonzalez.**

**Question #16**

Please indicate the time period over which Plaintiff had "neuphrostomy tubes sticking into her back to drain her kidneys into a bag attached to her leg".

**Response**

**I incorporate my answer to interrogatory 3, the medical records produced to defendant, and my deposition testimony. I believe it was during the period 1999 to 2001.**

**Question #17**

Please describe the time period over which Plaintiff needed to use the bathroom frequently; how many times per day she needed to use the bathroom, and how long each time; and what person or persons she designated to "cover" for her while she used the bathroom.

**Response**

**I incorporate my answer to interrogatory 3. I also incorporate my deposition testimony on this issue.**

**Question #18**

Please describe each conversation Plaintiff had and with whom about the issue of providing coverage for her classroom; the date upon which such conversation took place;

and what the person with whom she spoke about such issue directed her to do to insure that the children in her classroom had "coverage" while Plaintiff used the bathroom.

**Response**

**Plaintiff objects to this interrogatory because it is ambiguous. Without waiving this objection, I incorporate my answer to interrogatory 3.**

**Question #19**

Please describe each conversation Plaintiff had and with whom about providing Plaintiff with a key to the room in which her scooter was stored; the date upon which such conversation took place; and what the person with whom she spoke about such issue indicated he/she would do, if anything, in response to Plaintiff's request.

**Response**

**I incorporate my answer to interrogatory 3.**

**Question #20**

Please indicate when Plaintiff requested that she be allowed to "dictate some of her work", and of whom she made such request. Please include in your answer whether Defendant provided Plaintiff with any tools to assist her because of this so-called injury that prevented from writing.

**Response**

**I requested this after I was injured by Nelson Garcia. I recall speaking to Mr. Cochran in about May, 2002. I told him about my restrictions including those relating to writing and lifting. At that time, Mr. Cochran told me that, when I got cleared to return to work, they might be able to get a substitute for a couple of days and I could dictate my IEPs to him or her. I later talked to Glenda Guglielmo about this plan. Jack Biancuso overheard us talking and said that the teachers would file a grievance if they allowed me to come to work to dictate IEPs. He said that teachers would think this was very unfair because they don't get that kind of special treatment when they are out sick. Glenda Guglielmo then asked him if he had any suggestions and he said that the school department could pay him to get them done. I believe I also spoke to someone whose first name is Annette Stimna who handles workman's compensation. I told her about the plan and she told me I could not come back until I was fully functioning and could do the IEPs myself. I never heard back about this plan. Eventually, I received a voice-activated program but it did not work. It was not the one that my doctor ordered.**

**Question #21**

Please set forth, in dollar amounts, any and all damages that Plaintiff allegedly suffered as a result of each and every claim set forth in her Complaint. Please include but do not limit your answer to address any damages attributable to (a) lost income; (b) emotional distress.

**Response**

Plaintiff objects to this interrogatory because it calls for information protected by the work-product privilege. Without waiving that privilege, plaintiff states that she will be seeking compensatory damages for physical and emotional pain. Plaintiff will also be seeking the money which she would have earned had she gotten the IEP computerized position.

SIMONNE T. TASSONE

Subscribed and sworn to before me this 22nd day of December, 2005 in Pawtucket, Rhode Island.

CARLY B. IAFRATE
NOTARY PUBLIC
STATE OF RHODE ISLAND
My Commission Expires January 26, 2008

Notary Public

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 22nd day of December, 2005, a copy of the foregoing was ~~e-mailed on December 21, 2005 and faxed on December 22, 2005~~ to Sara A. Rapport, Senior Assistant City Solicitor, City of Providence Law Department, 275 Westminster Street, Provicence, Rhode Island, 02903.

# EXHIBIT E

**DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES**
Social Security Administration
OFFICE OF HEARINGS AND APPEALS

**DECISION**

**IN THE CASE OF:**

Simonne Tassone

(Claimant)

**CLAIM FOR:**

Period of Disability,
Disability Insurance Benefits, and
Supplemental Security Income

[redacted]

(Social Security Number)

This case is before the Administrative Law Judge on a request for hearing. The Administrative Law Judge has carefully considered all the documents identified in the record as exhibits, the testimony at the hearing and arguments presented.

ISSUES

The general issues are whether the claimant is entitled to a period of disability and disability insurance benefits under section 216(i) and 223, respectively, of the Social Security Act, as amended; and whether the claimant is disabled under section 1614(a)(3)(A) of the Act. The Social Security Act defines "disability" as the inability to engage in any substantial gainful activity due to physical or mental impairment(s) which can be expected to either result in death or last for a continuous period of not less than 12 months.

The specific issues are whether the claimant was under a "disability" and, if so, when such disability commenced and the duration thereof; and whether the disability insured status requirements of the Act are met for the purpose of entitlement to a period of disability and disability insurance benefits.

000002

EVALUATION OF THE EVIDENCE

The claimant is a 41 year old woman, with a college education who has been employed as an art teacher which job was light in exertional level and skilled in nature, as a home health aide which was light to semi-skilled work, a nursery school teacher which was light skilled work, and as a nurses aide which was medium semi-skilled work according to the testimony of the Vocational Expert. She alleged disability since March 4, 1987 as a result severe pain associated with a cervical diskectomy, low back problems and recurrent cervical problems which will probably require additional surgery in her neck in the near future. Functionally, the claimant maintained that she is unable to do any prolonged sitting, standing or walking, or any significant lifting or climbing. Her testimony was inconsistent with an ability to perform any type of sustained work activity. The claimant specifically complained that she experienced pain in her neck extending into her left arm as well as back pain radiating into her upper leg associated with numbness in the left foot. The claimant indicated that she wanted to have surgery to try to alleviate her discomfort. Her testimony was totally credible.

Since 1981, the claimant has been treated by Dr. Levin, a Board Certified Neurologist. Dr. Levin has submitted numerous reports of record (Exhibits No. 13, 14, 15, 17, 20, 21, and 33). His notes reflect the claimant's past history of compression fractures of the lower lumbar spine in 1963 and problems with her left arm at least since 1981 (Exhibit No. 13). In November of 1984 the claimant had nerve conduction studies and an EMG which showed some abnormalities consistent with left C7-T1 radiculopathy (Exhibit No. 13). Subsequently, on December 3, 1984, the claimant underwent a cervical laminectomy at C5-C6. While her pain and numbness resolved in the left upper extremity by May 6, 1985, the claimant developed symptoms suggestive of bilateral carpal tunnel syndrome with positive Phelans maneuvers and an EMG showing mild right ulnar neuropathy with borderline slowing of the right median nerve and minor denervation of the left C8-T1 muscle (Exhibit No. 14). Later in May of 1985 Dr. Levin noted that the claimant had significant improvement (Exhibit No. 15).

The claimant returned to Dr. Levin on February 27, 1987 indicating that approximately two weeks earlier she had fallen on ice and twisted her back and that she was experiencing problems with her left lower back as well as pain in her neck and left arm. Dr. Levin was suspicious of cervical and lumbosacral radiculopathy (Exhibit No. 33).

Shortly thereafter, the claimant was examined by Dr. Bernstein, a Board-Certified Neurological Surgeon, who had performed the claimant's cervical laminectomy on December 3, 1984. He noted a positive tinel's sign at the right elbow and he felt that the claimant had sustained a cerebral concussion and that she had traumatic labyrinthitis in addition to recurrent cervical disc and a new lumbar disc problem (Exhibit No. 15).

On March 13, 1987, the claimant returned to Dr. Levin who observed improvement but continued symptomatology. An x-ray of February 27, 1987 showed a wedge compression fracture in L2 and a very slight neuroforaminal narrowing at C2-C3, C3-C4, on the left and C3-C4 on the right. An EMG was performed in March of 1987 which was considered to be normal but nerve conduction studies were consistent with left median nerve neuropathy (Exhibit No. 18). On March 24, 1987 due to the claimant's continued symptomatology, Dr. Levin averred that the claimant would require hospitalization for a myelogram (Exhibit No. 17). The claimant subsequently underwent a complete myelogram on May 4, 1987 which showed a small ventral C5-C6 extradural defect and she was diagnosed as having a cervical disc and a lumbar disc (Exhibit No. 19). The essential abnormal findings were significant limitation of cervical motion and positive tinel's sign at the right elbow. In July and August of 1987 Dr. Levin pointed out continued cervical problems and low back problems and he also described a decreased left biceps jerk (Exhibits No. 20 and 21).

In September of 1987, the claimant underwent a consultative evaluation with Dr. Miller, who described sensory abnormalities in the left arm, a limited gait with a cane, positive straight leg raising, lumbosacral tenderness, symmetrically decreased reflexes and weakness in the left arm. He felt that the claimant was limited due to pain and that she had problems with her left upper and lower extremity (Exhibit No. 22).

On November 25, 1987, the claimant underwent an MRI study which revealed a central left-sided disc herniated at C5-C6 resulting in an element of cord compression. As of January 7, 1988, Dr. Bernstein asserted that the claimant had continued pain in her left upper extremity but on physical examination she only had a suggestion of sensory abnormalities. He felt that cervical discography was necessary to further define the discrepancy between her myelogram which was unremarkable and her MRI which was remarkable at C5-C6 (Exhibit No. 30). The cervical discogram which was performed on January 26, 1988 showed apparent gross degeneration of the disc at C5-C6 which was consistent with a herniated disc causing radicular pain (Exhibit No. 32). On physical examination at that time the claimant had pain in the left arm when she moved her head and sensory abnormalites in the left arm described by Dr. Fandino.

On February 3, 1988, Dr. Levin averred that the claimant continued to be totally disabled. He described tenderness to palpation, an absent left biceps jerk and no definite right knee jerk and he maintained that the claimant had pain when she turned her head (Exhibit No. 33). In a subsequent report dated March 11, 1988, Dr. Levin commented "In summary, she has continued to do very poorly with significant pain and tingling as described and shows evidence of cervical disc disease with some spinal cord compression. She has been totally disabled for all work, including her usual work as an art teacher. Prognosis at this time is difficult to state."

After carefully reviewing all the medical evidence of record, the Administrative Law Judge believes that the claimant's complaints of pain and discomfort are totally credible. It would be expected that the claimant would have significant limitation in her ability to sit, stand, walk, lift, carry, bend or turn her head and that she would also have to lie down for prolonged periods of time to try to alleviate her severe pain. Accordingly, the Administrative Law Judge concludes that the claimant's residual functional capacity has been limited to such a great degree since the alleged onset date of disability that her occupational base has been substantially eroded and she has been unable to engage in past relevant work and all other forms of substantial gainful activity.

## FINDINGS

After careful consideration of the entire record, the Administrative Law Judge makes the following findings:

1. The claimant met the disability insured status requirements of the Act on March 4, 1987, the date the claimant stated she became unable to work, and continues to meet them through the date of this Decision.

2. The claimant has not engaged in substantial gainful activity since March 4, 1987.

3. The medical evidence establishes that the claimant has severe cervical radiculopathy and low back pain, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's subjective complaints are credible and consistent with the positive discogram and MRI scan. It appears that she may soon undergo cervical surgery once again.

5. The claimant is a 41 year old individual, who is a college graduate and has past relevant work experience as an art teacher, a home health aide, a nursery school teacher and as a nurses aide.

6. The claimant's condition results in limitation which preclude her from meeting the sitting, standing, walking, lifting, carrying, climbing, and bending requirements of even a full or wide range of sedentary work on a sustained basis and she has to lie down for prolonged periods time to try alleviate her discomfort and she is unable to use her left arm.

7. The claimant's residual functional capacity has been limited to such a great degree since the alleged onset date of disability, that her occupational base has been substantially eroded, and she has been unable to engage in her past relevant work and all other forms of substantial gainful activity.

8. The claimant has been under a "disability," as defined in the Social Security Act and Regulations, since March 4, 1987 and continuing through the date of this Decision (20 CFR 404.1520(f) and 416.920(f)).

## DECISION

It is the Decision of the Administrative Law Judge that, based on the application filed on July 9, 1987, the claimant is entitled to a period of disability commencing on March 4, 1987 and to disability insurance benefits under sections 216(i) and 223, respectively, of the Social Security Act.

It is the further Decision of the Administrative Law Judge that, as of the date of the application for Supplemental Security Income filed on July 11, 1987, the claimant was "disabled" as defined in section 1614(a)(3)(A) of the Social Security Act, and that the claimant's disability has continued at least through the date of this decision.

The component of the Social Security Administration responsible for authorizing Supplemental Security Income payments will advise the claimant regarding the nondisability requirements for these payments, and if eligible, the amount and the month(s) for which payment will be made.

V. Paul McGinn
Administrative Law Judge

May 11, 1988
Date

000006

**DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES**
Social Security Administration
OFFICE OF HEARINGS AND APPEALS

**DECISION**

**IN THE CASE OF:**

Simonne Tassone

(Claimant)

**CLAIM FOR:**

Period of Disability,
Disability Insurance [illegible] and
Supplemental Security Income

[redacted]

(Social Security Number)

This case is before the Administrative Law Judge on a request for hearing. The Administrative Law Judge has carefully considered all the documents identified in the record as exhibits, the testimony at the hearing and arguments presented.

ISSUES

The general issues are whether the claimant is entitled to a period of disability and disability insurance benefits under section 216(i) and 223, respectively, of the Social Security Act, as amended; and whether the claimant is disabled under section 1614(a)(3)(A) of the Act. The Social Security Act defines "disability" as the inability to engage in any substantial gainful activity due to physical or mental impairment(s) which can be expected to either result in death or last for a continuous period of not less than 12 months.

The specific issues are whether the claimant was under a "disability" and, if so, when such disability commenced and the duration thereof; and whether the disability insured status requirements of the Act are met for the purpose of entitlement to a period of disability and disability insurance benefits.

## EVALUATION OF THE EVIDENCE

The claimant is a 41 year old woman, with a college education who has been employed as an art teacher which job was light in exertional level and skilled in nature, as a home health aide which was light to semi-skilled work, a nursery school teacher which was light skilled work, and as a nurses aide which was medium semi-skilled work according to the testimony of the Vocational Expert. She alleged disability since March 4, 1987 as a result severe pain associated with a cervical diskectomy, low back problems and recurrent cervical problems which will probably require additional surgery in her neck in the near future. Functionally, the claimant maintained that she is unable to do any prolonged sitting, standing or walking, or any significant lifting or climbing. Her testimony was inconsistent with an ability to perform any type of sustained work activity. The claimant specifically complained that she experienced pain in her neck extending into her left arm as well as back pain radiating into her upper leg associated with numbness in the left foot. The claimant indicated that she wanted to have surgery to try to alleviate her discomfort. Her testimony was totally credible.

Since 1981, the claimant has been treated by Dr. Levin, a Board-Certified Neurologist. Dr. Levin has submitted numerous reports of record (Exhibits No. 13, 14, 15, 17, 20, 21, and 33). His notes reflect the claimant's past history of compression fractures of the lower lumbar spine in 1963 and problems with her left arm at least since 1981 (Exhibit No. 13). In November of 1984 the claimant had nerve conduction studies and an EMG which showed some abnormalities consistent with left C7-T1 radiculopathy (Exhibit No. 13). Subsequently, on December 3, 1984, the claimant underwent a cervical laminectomy at C5-C6. While her pain and numbness resolved in the left upper extremity by May 6, 1985, the claimant developed symptoms suggestive of bilateral carpal tunnel syndrome with positive Phalens maneuvers and an EMG showing mild right ulnar neuropathy with borderline slowing of the right median nerve and minor denervation of the left C8-T1 muscle (Exhibit No. 14). Later in May of 1985 Dr. Levin noted that the claimant had significant improvement (Exhibit No. 15).

The claimant returned to Dr. Levin on February 27, 1987 indicating that approximately two weeks earlier she had fallen on ice and twisted her back and that she was experiencing problems with her left lower back as well as pain in her neck and left arm. Dr. Levin was suspicious of cervical and lumbosacral radiculopathy (Exhibit No. 33).

Shortly thereafter, the claimant was examined by Dr. Bernstein, a Board-Certified Neurological Surgeon, who had performed the claimant's cervical laminectomy on December 3, 1984. He noted a positive tinel's sign at the right elbow and he felt that the claimant had sustained a cerebral concussion and that she had traumatic labyrinthitis in addition to recurrent cervical disc and a new lumbar disc problem (Exhibit No. 15).

On March 13, 1987, the claimant returned to Dr. Levin who observed improvement but continued symptomatology. An x-ray of February 27, 1987 showed a wedge compression fracture in L2 and a very slight neuroforaminal narrowing at C2-C3, C3-C4, on the left and C3-C4 on the right. An EMG was performed in March of 1987 which was considered to be normal but nerve conduction studies were consistent with left median nerve neuropathy (Exhibit No. 18). On March 24, 1987 due to the claimant's continued symptomatology, Dr. Levin averred that the claimant would require hospitalization for a myelogram (Exhibit No. 17). The claimant subsequently underwent a complete myelogram on May 4, 1987 which showed a small ventral C5-C6 extradural defect and she was diagnosed as having a cervical disc and a lumbar disc (Exhibit No. 19). The essential abnormal findings were significant limitation of cervical motion and positive tinel's sign at the right elbow. In July and August of 1987 Dr. Levin pointed out continued cervical problems and low back problems and he also described a decreased left biceps jerk (Exhibits No. 20 and 21).

In September of 1987, the claimant underwent a consultative evaluation with Dr. Miller, who described sensory abnormalities in the left arm, a limited gait with a cane, positive straight leg raising, lumbosacral tenderness, symmetrically decreased reflexes and weakness in the left arm. He felt that the claimant was limited due to pain and that she had problems with her left upper and lower extremity (Exhibit No. 22).

On November 25, 1987, the claimant underwent an MRI study which revealed a central left-sided disc herniated at C5-C6 resulting in an element of cord compression. As of January 7, 1988, Dr. Bernstein asserted that the claimant had continued pain in her left upper extremity but on physical examination she only had a suggestion of sensory abnormalities. He felt that cervical discography was necessary to further define the discrepancy between her myelogram which was unremarkable and her MRI which was remarkable at C5-C6 (Exhibit No. 30). The cervical discogram which was performed on January 26, 1988 showed apparent gross degeneration of the disc at C5-6 which was consistent with a herniated disc causing radicular pain (Exhibit No. 32). On physical examination at that time the claimant had pain in the left arm when she moved her head and sensory abnormalites in the left arm described by Dr. Fandino.

On February 3, 1988, Dr. Levin averred that the claimant continued to be totally disabled. He described tenderness to palpation, an absent left biceps jerk and no definite right knee jerk and he maintained that the claimant had pain when she turned her head (Exhibit No. 33). In a subsequent report dated March 11, 1988, Dr. Levin commented "In summary, she has continued to do very poorly with significant pain and tingling as described and shows evidence of cervical disc disease with some spinal cord compression. She has been totally disabled for all work, including her usual work as an art teacher. Prognosis at this time is difficult to state."

000004

After carefully reviewing all the medical evidence of record, the Administrative Law Judge believes that the claimant's complaints of pain and discomfort are totally credible. It would be expected that the claimant would have significant limitation in her ability to sit, stand, walk, lift, carry, bend or turn her head and that she would also have to lie down for prolonged periods of time to try to alleviate her severe pain. Accordingly, the Administrative Law Judge concludes that the claimant's residual functional capacity has been limited to such a great degree since the alleged onset date of disability that her occupational base has been substantially eroded and she has been unable to engage in past relevant work and all other forms of substantial gainful activity.

## FINDINGS

After careful consideration of the entire record, the Administrative Law Judge makes the following findings:

1. The claimant met the disability insured status requirements of the Act on March 4, 1987, the date the claimant stated she became unable to work, and continues to meet them through the date of this Decision.

2. The claimant has not engaged in substantial gainful activity since March 4, 1987.

3. The medical evidence establishes that the claimant has severe cervical radiculopathy and low back pain, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's subjective complaints are credible and consistent with the positive discogram and MRI scan. It appears that she may soon undergo cervical surgery once again.

5. The claimant is a 41 year old individual, who is a college graduate and has past relevant work experience as an art teacher, a home health aide, a nursery school teacher and as a nurses aide.

6. The claimant's condition results in limitation which preclude her from meeting the sitting, standing, walking, lifting, carrying, climbing, and bending requirements of even a full or wide range of sedentary work on a sustained basis and she has to lie down for prolonged periods time to try alleviate her discomfort and she is unable to use her left arm.

000005

7. The claimant's residual functional capacity has been limited to such a great degree since the alleged onset date of disability, that her occupational base has been substantially eroded, and she has been unable to engage in her past relevant work and all other forms of substantial gainful activity.

8. The claimant has been under a "disability," as defined in the Social Security Act and Regulations, since March 4, 1987 and continuing through the date of this Decision (20 CFR 404.1520(f) and 416.920(f)).

DECISION

It is the Decision of the Administrative Law Judge that, based on the application filed on July 9, 1987, the claimant is entitled to a period of disability commencing on March 4, 1987 and to disability insurance benefits under sections 216(i) and 223, respectively, of the Social Security Act.

It is the further Decision of the Administrative Law Judge that, as of the date of the application for Supplemental Security Income filed on July 11, 1987, the claimant was "disabled" as defined in section 1614(a)(3)(A) of the Social Security Act, and that the claimant's disability has continued at least through the date of this decision.

The component of the Social Security Administration responsible for authorizing Supplemental Security Income payments will advise the claimant regarding the nondisability requirements for these payments, and if eligible, the amount and the month(s) for which payment will be made.

V. Paul McGinn
Administrative Law Judge

May 11, 1988
Date

000006

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **SIMONNE T. TASSONE,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**PROVIDENCE SCHOOL BOARD AND THE CITY OF PROVIDENCE, by and through Stephen Napolitano,**<br>**Defendants.** | **C.A. No. 03-481ML** |

**AFFIDAVIT**

I, Simonne Tassone, the Plaintiff in the above-referenced matter, do hereby state and affirm that:

1. During the time I worked at Bridgham, I did not see any postings about laws relating to disability discrimination or harassment. I did not see any postings about the EEOC or Human Rights Commission. I was not given or shown any school policy regarding disability discrimination or disability harassment. I was not given or shown any policy about procedures for reporting harassment. I did not receive any training on harassment or disability discrimination.

2. As far as I know, after the Computerized IEP trainers were hired, they were trained. Then they began training others. To this day, some of the people who were originally hired are still Computuerized IEP trainers. I would have been able to do the job from September 2001 to February 2002 and after I returned from my injury in 2002-2003.

3. I did not consider the questions asked by DeRoy in the IEP position interview "friendly," especially when I found out that my disabilities were the reason why I did not get the job. I was never shown any scoring sheets from the interview. The questions were asked during the interview, between two "job-related" questions. All three interviewers were present. There was nothing in the job description that I could not do or any qualifications that I did not hold.

4. At the end of the school year 2001-02 when I was hurt and out of work, I believe that the City paid another teacher to write my IEPs. When I came back to work in the Fall 2002, the voice activation system did not work. After the voice-activated software did not work, the Department did

not make any further attempt to accommodate my thumb injury.

5. When my classroom was moved to the second floor, my students still had to travel up and down the stairs or ramp to go to the cafeteria, library, nurse and office. With respect to the statement about handicapped and wheelchair bound students, I believe that up until last year, all severe and profound were on the first floor. They have a severe and profound classroom on the second floor now, but I do not think there is anyone in a wheelchair who is in a severe and profound class is on the second floor. There may be students in regular education classes on the second floor that have a wheelchair but they have other students and teachers available to push them up and down the ramp which was not always the case for me.

6. After I was moved to the second floor, my students were never integrated with the regular students like Lee had planned. My students did not change classes just like the regular ed students did. The mild-moderate students moved between mild-moderate classrooms, not into regular ed classes. When some mild-moderate classes were moved to the second floor they were not close physically to each other at all. They were located in the four corners of the floor so the distance that the special ed students had to travel to the other special ed classes was farther than the regular ed students had to travel between classes.

7. In addition to Fran Ganella, I believe that there was at least one other mild-moderate class that did not move to the second floor.

8. When I had problems getting into the school because of snow and/or ice issues, I sometimes carried kitty litter but this did not work because I could only spread it near my car but could not spread it as she got closer to the school because I could not carry the litter and balance on my crutches at the same time.

9. In September, 2004, I had another potentially dangerous student assigned to my class. I was told by another teacher that all I had to do was write "Cannot meet students needs" on the IEP. This worked and the student was removed within three days.

10. I ultimately got a key to the room with my scooter but it was not until after Cochran left and when Perkins gave me one.

11. If the door on the second floor was not locked when I came into the school in the morning, I would still need to access both floors so that I could get to the office to sign-in, get my mail, go to the teachers lounge, cafeteria and library.

12. I never saw Gonzalez's note dated September 17, 1998 about my accommodation requests until after I filed this lawsuit. If in fact Gonzalez and Lee had a conversation about having an accommodation for my bathroom use, I was never made aware of it.

13. I submitted Dr. Smigel's letter to the School Department around the time I made the

request, not a year later.

14. Even after Ms. Karbonik became a vice-principal I had problems with DiRuzzo. In addition, at times they would cover for each other.

15. After I was interviewed for the Computerized IEP position, I was told by a friend that asking health questions during an interview was against the law. When I didn't get the position, I went to the Union about it and they said to get a lawyer. It was only at this point that I learned that some of the other incidents was something I could pursue as well.

17. I went to Cochran to get a key to the storage room. I explained to him what I had explained to Lee. He also said he would see what he could do but nothing was done. It was only after he left that I got the key to the storage room.

18. I recall a time when I asked Cochran if I could leave early because of snow and he told me I could not because of some gym teachers.

19. There were times when I had to wait for over thirty minutes for Wilma Johnson and her husband. This was when it was icy. Mr. Johnson would drive me to the school and then park my car.

20. Over the years, I have slipped on ice and even fallen in the parking lot.

21. I called, from September 2000 to February, 2001 to see why I had not gotten a personal aide and I was told they could not find one for me.

22. After I was left in school during an actual fire, I went to Lee about this.

23. I requested that my teaching assistant remain with me. Lee told me that the teaching assistant went with the students not me.

24. Before I moved to the first floor in my home, I would crawl up the stairs and I would go down the stairs by sitting on my backside. To get into my house or out, I only had to climb two small stairs and a tiny lip to get on the porch. I was able to do this because I had things like a railing to hang onto.

25. During Lee and Cochran's tenure, I do not recall ever walking outside my classroom without my crutches or scooter. There were times when, on occasion, I did not use my crutches inside my classroom but that was only because it was small and I had things to hold onto.

Subscribed and sworn to under the penalties of perjury this 2nd day of June 2006.

Subscribed and sworn to under the penalties of perjury this 2nd day of June 2006.

Simonne Tassone

Simonne Tassone

Subscribed and sworn before me this 2nd day of June 2006

Notary Public

My Commission Expires: 1/12/10

# EXHIBIT G

AFFIDAVIT

I, Dr. John Maynard, being sworn under oath depose and state as follows:

(1) I treat Simone Tassone for kidney stones.

(2) In 1998, Tassone had a percutaneous nephrotomy tube inserted because she had a stone on the left side which was totally blocking her left kidney. When she had this tube, she had a bag which collected her urine. She subsequently had lithotripsy which is a procedure in which shock waves are used to break up the stone. This did not work and she had to have surgery to remove the stone.

(3) The next kidney stone episode was in July of 2000. At that time, she had an impacted stone on the right side. She had to have another percutaneous nephrotomy tube because the stone could not be removed. Like before, when she had the tube, she had to have a bag to collect her urine. Eventually, she had to have surgery to remove the stone and to repair the ureter which had previously been damaged.

(4) Ms. Tassone is a stone maker. For this reason, I have prescribed, and she must take, Magnesium Oxide. She also has to drink a very high volume of water on a daily basis. Both of these are prescribed to prevent her from forming stones. If she did not do this, she would form more stones and this could lead to kidney failure if left untreated.

John F Maynard, M.D.

John Maynard, M.D.

Subscribed and sworn to before me this 1st day of June, 2006 in PROVIDENCE, Rhode Island.

[signature]

Notary Public
JENNIFER KIDDIE
My Commission Expires 04/20/2010

# EXHIBIT H

**LAWRENCE W. LEE, M.D.**

**TASSONE, SIMONE T.** **OFFICE FOLLOW-UP**

05/20/04: Simone is followed for several problems. She slipped on ice at her place of work on 2/4/04 and sustained an injury to the wrist, likely a musculotendinous strain of the distal flexors as well as an acute dorsal radiocarpal impingement. This was treated conservatively with cock-up bracing and Naprosyn and has done well. At this stage the wrist really gives her little in the way of problem. She has excellent range of motion. She does have a small spur which feels to be osteophytic which has some tenderness to direct palpation. This is on the dorsum of the distal radius. Otherwise the wrist has done well and she is at essentially regular activity as far as the wrist is concerned.

Secondly, Simone has been followed for problems in the right thumb following a hyperextension injury which occurred at school. She continues to have hyperesthesia, dysesthesias in the thumb. She was trialed on Neurontin 600 mgs. t.i.d., but found this made her fatigued and dizzy. In addition she had a sense of weakness and headaches and in some felt that the discomfort was preferable to the side effects from the medication. Her thumb is largely unchanged. She has marked dysesthetic hyperesthesias producing allodynic pain through the thumb with touch and motion. I think that this will likely be a long standing problem. There may be some gradual resolution with time and it is her preference at this point to discontinue medications rather than deal with side effects.

As far as the wrist is concerned, Simone is discharged and can return to the office on an as needed basis. If she has any further problems there is not expected to be any physical limitation associated with this injury.

As far as the thumb is concerned, I think this is likely to be a long standing sensory change and while further injury would not be expected, there will be some limitations to her ability to use the thumb, especially for extended writing and any heavy type of activity will clearly not be possible.

She's reasonably comfortable with understanding that she needs to work around certain types of situations to minimize flare ups of the thumb. She can return to the office for further evaluation on this score. Also on an as needed basis, particularly if she has any further exacerbation.

LAWRENCE W. LEE, M.D./TC-ln

# EXHIBIT I

September 11, 1998

Dear Mr. Lee,

If everything continues to go well, I plan to return to work on Monday, September 28. I will still need more surgery in the near future, however, these surgeries are not as serious as my last one. My next surgery is scheduled for October 15. I will only be out of work 2 days for this surgery.

I have been very ill this summer and I ended up having 6 surgeries. I get weak as the day progresses. My doctor says that this weakness is normal for my condition. It would be beneficial to the students and me, if I had my free period at the end of the day instead of the first period as it is now scheduled. I know you are aware of my request for this change. Miss Pho and Mrs. Johnson told me that the change has not been made yet. I need to have this change made before I come to work. If my assistance is needed, I will be willing to come to school before I start work to help with this change. I am very concerned about the change not being made before I return to work. You know that I am very conscientious about my work.

Last year I came down with diabetes. I did not know I had it at first. I was constantly thirsty and I needed to use the rest room frequently. My teacher's assistant told Mr. Diruzzo that I was leaving the room frequently. Mr. Diruzzo spoke to me about this and told me that I could not leave the classroom as frequently as I was doing. This problem resolved itself after my diabetes came under control. Now I have kidney disease. In order to prevent further complications and surgery, I need to drink 12 eight ounce glasses of water a day. Because of this I will need to use the restroom frequently. I know I cannot leave the students alone with the teacher's assistant. I had trouble finding another teacher to cover my class last year. Mrs. Jackson is not always in the classroom next door to me when I need to use the restroom. I am worried about this problem now that I need to use the restroom frequently. I hope you can help me concerning this matter.

A copy of my request, for accommodations under the 504 Disabilities Act and the doctor's note, was also sent to the Department Head of Human Resources and to Phyllis Tennian. I look forward to returning to the work I love so much. Thank you for your consideration in this matter.

Sincerely.

Simonne Pasone

PLAINTIFF'S EXHIBIT 1
R. Lee
10/21/05

# EXHIBIT J

PARTNERS IN FAMILY HEALTH CARE, INC.
CINDY L. HANSEN, M.D.
JEAN R. PLOVER, M.D.
DONYA A. POWERS, M.D.
KAREN R. SMIGEL, M.D.

September 10, 1998

To Whom it May Concern:

Simonne Tassone is under my care for a number of medical problems. She reports increasing fatigue as the day progresses, and for that reason, we are requesting that her free period be moved to the end of the day. Additionally, she needs to drink large amounts of water daily as part of her medical treatment. This will necessitate her being allowed to drink in the classroom and to leave the classroom to use the rest room as needed.

Thank you for your cooperation in making these accomodations.

Sincerely,

Cindy L. Hansen

Cindy L. Hansen

000887

50 OFFICE PARKWAY EAST PROVIDENCE, RHODE ISLAND 02914 TELEPHONE (401) 435-4466
FAX (401) 431-2689

# EXHIBIT K

AUG 28 2000

Simonne Tassone
[redacted]
Pawtucket RI 02861
(401)[redacted]
Cellular (401[redacted]
August 25, 2000

Mr. Jose Gonzalez
Human Resources
Director of Equity and Access
Providence School Dept.

Dear Mr. Jose Gonzalez,

Under the ADA, I am requesting the following three reasonable accommodations in order to perform my job.
1. Sixth period free without coverage. Mr. Lee, the principal of Bridgham, has given me the sixth period free for the last three years as requested by my physician. However, there is still a problem in this regard. I have been very ill over the last two years. Several times I had to leave school because I was so sick I needed immediate hospitalization. I was very sick the last two weeks of the 1999 – 2000 school year. I went to see Mr. Lee because I felt too ill to do coverage. I was told that I had to do the coverage and to see our union representative concerning this matter. The union representative told me that there were no exceptions and that I had to do the coverage. Several time I did not think I would be able to drive home because of how I felt. Right after school ended I had to go into the hospital for more surgery. I have been to the operating table 6 times in the last two months. In fact, I spent a good deal of my summer in the hospital. I am still not feeling that well. I am well enough to work, but I need extra help in order to perform my job. I have a tube that goes into my back through my kidney and right side of my body. My doctor and I feel that I need to have the 6th. Period off with no coverage because my pain and ill feeling get worst at the end of the day.
2. Sometimes my teacher assistant is assigned another task during my free period because I do not have any students at that time. However, I need her to clean my class, run papers off, and do other tasks that need to be done because I am physically unable to do these tasks. I use forearm crutches for short distances and an electric chair to get around. I am requesting that my teacher assistant remain with me during this period. This will also help when we have a fire drill during my unassigned period. When the fire alarm goes off and there is no one in my class to help open the doors for me, I am unable to get out of the building because the fire door are too heavy for me to handle. Once we had a fire in the girl's bathroom and I was unable to get out. I was concerned because the area I was in was filling with smoke. I kept banging on the door with my crutch and finally someone came to open the door for me.
3. The last accommodation I am requesting is that my teacher assistant remain with me on the last day of the school year to help me pack my books and clean the room. This year we have that last day with no students so we can clean our rooms and put items away. Because I will not have students on that day, I am concerned that my teacher assistant will not be able to stay and help me. I will need her to pack boxes, put books away, and clean the room.
These are the accommodations I am requesting under the ADA. My doctor, Dr. Karen Smigel, will be sending you a letter about the accommodations I need in order to perform my job. It may take about two week for the letter to be printed up. I am asking for your assistance in acquiring these accommodations. I will appreciate any help you can give me.

Sincerely,

Simonne O. Tassone

Simonne Tassone
Bridgham Middle School

000889

# EXHIBIT L

COPY

**PROVIDENCE SCHOOL DEPARTMENT**
**OFFICE OF EQUITY AND ACCESS**

**MEMORANDUM**

TO: Robert Lee

FROM: José M. González

DATE: February 16, 2001

RE: 504 Accommodation for Simonne Tassone

Please be advised that the 504 Adult Accommodations Committee met to review requests and has made a decision in reference to Simonne Tassone.

Our committee has decided that two accommodations were warranted in regards to Ms. Tassone's medical condition.

They are as follows:

- A teacher assistant will be assigned to Ms. Tassone. This person will be her personal aid. If Ms. Tassone deems appropriate, the aid can be utilized for other purposes.
- Ms. Tassone's 6th period is to remain a free period. She should not be given any assignments during that time frame.

Should you have any questions about this plan, please give me a call.

JMG/im



PLAINTIFF'S EXHIBIT

# EXHIBIT M

To: Dr Jose Gonsalves

September 3, 1998
Simonne Tassone
[redacted]
Pawtucket R.I. 02861
[redacted]

Dear Head of Human Resources:

I am requesting accommodations under the 504 disability law. I have several medical conditions: Ostio Arthritis, Diabetes, High Blood Pressure, Asthma and Kidney disease. My condition has worsen this summer. I noticed , during a summer workshop for OATS, that my physical stamina weakened as the day progressed. Several surgeries have prevented me from going back to work before the end of September. I will also need more surgery and continued medical attention. I will be able to work and be an effective teacher with certain accommodations. The first accommodation I am requesting is that my free period be at the end of the day so that my teaching time is done when I am feeling my best. I also need to drink twelve glasses of water daily, so I will need to drink while I teach. This will increase my need to use the bathroom. So far these are the accommodations I am requesting. Thank you for your consideration.

Sincerely,

Simonne Tassone

Sp.Ed Teacher at S.W. Bridgham

# EXHIBIT N

PROVIDENCE SCHOOL DEPARTMENT

EMPLOYEES

Section 504 / American Disability Act
Process Procedure and Plan

DATE: 9 / 17 / 98

Referral:

A. ORIGINATING DATA

NAME: Simonne Tassone SS# ______

ADDRESS: [redacted] D.O.B. ______

Pawt RI 02861 SCHOOL: Bridgham

TELE: (H) 724-[redacted]1 (W) 360

B. STATEMENT OF THE PRESENTING ISSUE (be specific)

See attached

SUPPORTING DATA:

See attached

504 COMMITTEE REVIEW

J Gonzalez

| NAME | POSITION/ROLE |
|---|---|
| J Vallente | |
| T Corrente | |
| M Dunham | |
| P Bionfaiddo | |

RECOMMENDATION NEEDED: YES_______ NO _______

REASON:

– ck with Principal – re schedule – SW with another teacher Roberte Lee X360

in writing – has to return if last period is off.

– use of bathroom ; room coverage – Principal / Asst Prin → not avail

teacher Assistant can/should cover bathroom leaves

problem with other teachers doing it?

EVALUATION:

TYPE: ____________

DATE OF AUTHORIZATION: ________

DATE COMPLETED: ________

504 ELIGIBILITY YES:_______ NO_______

REFERRAL____________

REASON:

504 COORDINATOR ____________

FACULTY/CLERK/CUSTODIAN ____________

# EXHIBIT O

S. cember 7, 1993

Dear Jan,

There are several things I need to speak to you about. I would appreciate you letting me know when you are free and able to speak to me. One of the things I need to speak to you about is how to begin the process of filing for a waver on the residency requirement, another is concerning my having been assigned to room 110. A teacher (I don't know her name) has approached me about changing my classroom with hers because she claims to be next in line to get a classroom with a window. At first I did not think this would be a problem because having a window is not a big issue for me. The next day I found out where her classroom was and I decided that I could not make the change for several reasons. First, my medical condition is such that I need to be able to get to a bathroom quickly. I checked the bathroom on the second floor and other bathrooms in the school. The only bathroom that my wheelchair fits into is the one near the nurses station, which is located near room 110. Second, the ramp to the second floor is long and steep. Last year, while I was teaching at Esek Hopkins, my wheelchair broke down. The part needed to fix it had to be sent away for. I was without my wheelchair for four and one half weeks. My classroom was near the elevator door and so I was able to continue teaching by using my forearm crutches.
If my wheelchair breaks down this year, there is no way I can make it up the ramp using my crutches. However, room 110 is close enough to the school entrance for me to use my crutches to get there. Because of these 2 reasons, I decided not to change classrooms. I explained this to the teacher who wanted to change rooms with me and she said that she would still file a grievance. I spoke to the principal about this and he suggested that I talk to you. So when you do have a free moment please let me know. I will be thankful for any help you can give me.

Sincerely,

[signature]

cc: for Dr Zimmerman

OFFICE OF HUMAN RESOURCES

03 FEB -6 AM 10: 02

February 4, 2003

Dear Mr. Cochran,

About 21/2 years ago my doctor wrote a note to the school department requesting certain accommodations for me under the American Disabilities Act. Later, Dr. Gonzalez, who was head of Equity and Access, came to see me at Bridgham. He told me that he would provide me with these accommodations under the 504 plan. One of the accommodations the doctor requested was that I have 6th period of the day free because of my numerous medical conditions. During the last period I would be able to take care of my medical needs when necessary and this way I would be able to perform my duties, including after school activities, without jeopardizing my health or well being. Since that time I received this accommodation without any problems. Now there is a problem. Today, I heard that several teachers from our school filed a grievance concerning coverage. I did not anticipate any problems over this, however, this morning, as I scooted pass a group of teachers I saw Jane lift her pant leg up and say that she should put on her brace so she could get a 504 plan and get out of doing coverage. When she said this the teachers laughed. I felt hurt, so I asked one of the teachers who was standing near this group what that was all about. He told me that many teachers are fed up with the other teachers who get out of coverage under the guise of a 504 plan and that no one, including me, had a 504 plan. I told him that I did have a 504 plan because of what Dr. Gonzales did for me two years ago and because of what my doctor requested. He then said that the union stated that I did not have such a plan and that I should be doing coverage like everyone else. He then proceeded to tell me that the teachers felt coverage was part of my job and if I could not do coverage then I should quit my job. He also said that the teachers felt the principal should not let anyone who does not do coverage work in any after school program. Again later in the day, I overheard other teachers say the same things. I felt like I was on trial. When I was escorting my students down the ramp for lunch, another teacher approached me and told me in front of my students that I should not let my students use the ramp. When I told her that I could not use the stairs she replied that I should have my students use the stairs and I use the ramp. She said that by having them use the ramp other students will make fun of them and besides by having them use the ramp I was teaching them to break the rule. I felt terrible all day. I was convinced that many teachers were upset with me because of my 504 plan. I never told anyone about my accommodations under the 504 plan so I do not know how they found out about it. Now I feel like many teachers are against me because of my handicap. I wish I was like them and able to work all day without a break. I don't like being sick and in pain all the time. But I love my job and the accommodations give me the opportunity to work to the best of my ability. I am very upset by what is being said about me and other teachers who have handicapping conditions. I would appreciate your help concerning this matter.

Sincerely,

Simonne D. Tassone

Simonne Tassone

PLAINTIFF'S EXHIBIT