UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **SIMONNE T. TASSONE,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**PROVIDENCE SCHOOL BOARD AND THE CITY OF PROVIDENCE, by and through Stephen Napolitano,**<br>**Defendants.** | **C.A. No. 03-481ML** |

**PLAINTIFF'S STATEMENT OF DISPUTED FACTS IN RESPONSE TO DEFENDANTS' STATEMENT OF FACTS AND IN SUPPORT OF HER OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff has set forth below the specific factual disputes in response to Defendant's Statement of Facts as well as additional facts that preclude summary judgment.

1. Plaintiff does not dispute the following paragraphs of the Defendant's Undisputed Facts, (hereinafter "UF"): ¶ 1, 2, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 20, 21, 24, 25, 26, 43, 46, 47, 49, 50, 55, 57, 58, 66, 67, 69, 71, 72, 73, 74, 76, 77, 82, 84, 86.

2. Plaintiff disputes a portion of UF ¶ 3. Bridgham has a second floor entrance but the door is typically locked. Cochran, p. 54; Tassone Dep. I, p. 52. The only real way to get in to the building was on the first floor. Cochran, p. 54. For practical purposes, even if Tassone could get into the second-floor entrance, she would still need to be able to access both floors of the building for things like access to mail, the office to sign-in, teachers lounge, and library. Lee I, p. 84, 99-100. There is limited parking. Tassone I, p. 53-54; Lee I, p.83.

With respect to the statement about handicapped and wheelchair bound students, up until last year, all severe profound were on the first floor. They have a severe and profound classroom on the second floor now, but no one in a wheelchair who is in a severe and profound class is on the second floor. There may be students in regular education classes on the second floor but they have other students and teachers available to push them up and down the ramp which was not always the case

for Tassone.

3. Plaintiff disputes UF ¶ 15 to the extent that DiRuzzo and Karbonik would cover for each other if the other was not available. Tassone Affdiavit

4. Plaintiff disputes UF Paragraph 17. Lee testified that he saw her using crutches a lot. Lee 1, p. 85; Lee testified that Tassone was "sometimes" without crutches. Lee I, p. 35. Lee testified that he knew she was handicapped right from the beginning; Lee 1, p. 19; DiRuzzo never saw her walking without her crutches. DiRuzzo II, p. 24; Tassone can only walk a very short distance (maybe 20) feet without her forearm crutches but she has to have something to hold onto. If she does not have something to hold onto, she can only walk about 6 to 10 feet without forearm crutches but she is unsteady and nervous. Tassone Answers to Interrogatory 1.

5. Tassone disputes UF paragraph 18. Disputed to the extent it implies that Tassone did not have substantial difficulty doing so. When Tassone's bedroom was on the second floor, she would sit to go down the stairs and would crawl up the stairs. Tassone Affidavit. When Tassone has to go into or out of her house, she only has to go up two little steps and a little lip to get on the porch. She is able to get up and down because there are things that she can hold onto like a railing. See Tassone Affidavit.

6. Tassone disputes UF 19. See Dr. Levin and Dr. Mukand Affidavits.

7. Tassone disputes UF 22 to the extent it purports to encompass the entire report and to the extent it implies that Tassone did not have a neurological impairment which substantially affected her ability to walk as of the time that she began working for Defendants. *See Dr. Levin Affidavit and Dr. Mukand Affidavit.*

8. Tassone disputes UF 23 to the extent it purports to encompass the entire report and to the extent it implies that Tassone did not have a neurological impairment which substantially affected her ability to walk as of the time that she was employed by Defendants. *See Dr. Levin Affidavit and Dr. Mukand Affidavit.*

9. Tassone disputes UF 27 to the extent it purports to encompass the entire report and to the extent it implies that Tassone did not have a neurological impairment which substantially affected her ability to walk as of the time that she was employed by Defendants. *See Dr. Levin Affidavit and Dr. Mukand Affidavit.*

10. Tassone disputes UF 28 to the extent it purports to encompass the entire report and to the extent it implies that Tassone did not have a neurological impairment which substantially affected her ability to walk as of the time that she was employed by Defendants. *See Dr. Levin Affidavit and Dr. Mukand Affidavit.*

11. Tassone disputes UF 29 to the extent it purports to encompass the entire report and to

the extent it implies that Tassone did not have a neurological impairment which substantially affected her ability to walk as of the time that she was employed by Defendants. *See Dr. Levin Affidavit and Dr. Mukand Affidavit.*

12. Tassone disputes UF30 to the extent it purports to encompass the entire report and to the extent it implies that Tassone did not have a neurological impairment which substantially affected her ability to walk as of the time that she was employed by Defendants. *See Dr. Levin Affidavit and Dr. Mukand Affidavit.*

13. Tassone disputes UF 31 to the extent it purports to encompass the entire report and to the extent it implies that Tassone did not have a neurological impairment which substantially affected her ability to walk during her employment with Defendants. *See Dr. Levin Affidavit and Dr. Mukand Affidavit.*

14. Tassone disputes UF 32 to the extent it purports to encompass the entire report and to the extent it implies that Tassone did not have a neurological impairment which substantially affected her ability to walk during her employment with Defendants. *See Dr. Levin Affidavit and Dr. Mukand Affidavit.*

15. Tassone disputes UF 33 to the extent it purports to encompass the entire report and to the extent it implies that Tassone did not have a neurological impairment which substantially affected her ability to walk during her employment with Defendants. *See Dr. Levin Affidavit and Dr. Mukand Affidavit.*

16. Tassone disputes UF 34-36 to the extent they purport to encompass the entire report.

17. Tassone disputes UF 36 to the extent it does not take into account the fact that Tassone has not had a recurrence of kidney stones because she takes medication and drinks huge volumes of water and that, if she did not do this, she would likely develop stones and have kidney failure. *See Dr. Maynard Affidavit.*

18. Tassone disputes UF 37-8 to the extent purport to encompass the entire report.

19. Tassone disputes UF 39 to the extent that it implies that her condition is under control without medication.

20. Tassone disputes UF 40 to the extent it implies that Tassone does not have a neurological or other impairment which substantially affects her ability to walk. *See Dr. Levin Affidavit and Dr. Mukand Affidavit.*

21. Tassone disputes UF 41. *See Dr. Maynard Affidavit; Dr. Smiegel Letter; see Dr. Hansen Letter; see Tassone Interrogatory Answer 2.*

22. Tassone disputes UF 42. *See Dr. Maynard Affidavit; See Tassone Interrogatory Answer 2.*

23. Plaintiff disputes UF ¶ 44 and 45 to the extent that it implies that the plan that Lee had was actually implemented. The plan that he had for integration was never implemented. Tassone Affidavit. The way it worked was not the same as it was for regular ed students. First, the mild-moderate students moved between mild-moderate classrooms, not into regular ed classes. When some mild-moderate classes were moved to the second floor they were not close physically to each other at all. They were located in the four corners of the floor so the distance that the special ed students had to travel to the other special ed classes was farther than the regular ed students had to travel between classes. There were some mild-moderate classes that did not move to the second floor. When Tassone's class was located on the first-floor, they were located in the "same area" of the building and worked as a "team together." Lee I, p. 32.

24. Plaintiff disputes UF ¶ 48. The plan did not "necessitate" the moving of the classrooms to the second floor. Although Lee said Tassone could not stay on the first floor because she needed to be with the other special education teachers, some special education teachers remained on the first floor. Answers No. 2. Also, when Lee was asked if Tassone could have remained on the first-floor, he said "Sure. It could have been done. Anything is possible." Lee I, p. 62. According to Lee, it was only a logistics problem, but "I would assume we would have placed her on the first floor and put the other one upstairs." Lee I, p. 65, 73.

If Tassone's class was on the first-floor her students would have to travel to the 2nd floor to see other teachers but even when her class was on the 2nd floor her students had to travel to the 1st floor for things like the cafeteria, library, nurse, etc. Lee I, p. 67, Affidavit. Lee did not deny that Tassone complained about being on the second floor, he just said that he could not remember. Lee I, p. 52.

25. Plaintiff disputes UF ¶ 51 to the extent that Lee did not deny that Tassone complained to him about the bathroom doors and the ramp doors. The main doors were not as heavy or difficult to open as the ramp doors. Tassone would not enter through Barton Street on the second floor. See No. 1 above. Tassone never saw a middle school wheelchair bound student open the ramp doors alone.

Lee knew that Plaintiff was disabled. Lee said he knew "she was handicapped in the beginning." Lee I, p. 19. He knew she was in a wheelchair and used her crutches. Lee I, p. 79. "She was not well * * * I believe she had a few operations during the period that I was there, and she would tell us about them, and they were pretty severe it seemed." Lee I, p. 19. "It was pretty remarkable, the kind of things she went through. So I think everybody has a feeling that she suffered a lot." Lee I, p. 19-20.

26. Plaintiff disputes UF ¶ 52 to the extent that it implies that the grievance was favorably resolved at the superintendent's level. According to the October 6, 1995 letter from Almagno to the

Providence School Board, the union had to appeal the decision of the superintendent and bring the issue before the School Board to have it resolved in Tassone's favor. Defendant's Ex. 25. Plaintiff also disputes UF ¶ 52 to the extent that it implies that the repairs were made "shortly." The grievance was filed in September 1994 and the repairs and remote were not made available until around November 1995. Ex. 25.

27. Plaintiff disputes UF ¶ 53 to the extent that it implies that Lee was supportive of making the changes to the bathroom door and the ramp doors. Plaintiff had made this request to Lee and he took no action. Answers No.2. She even asked that the ramp doors be left open and he had said no. Answers No.2. Yet, at his deposition he could think of no reason why they could not be propped open as they often were, according to Shugrue. Shugrue, p.92-93 , Lee I, p. 92-3. Then, when she was forced to file a grievance, it took over a year to happen. See No. 7.

28. Plaintiff disputes UF ¶ 54 because at times, she still had trouble with the doors. Answers No. 2. For example, someone was shutting the switch off on the ramp so she could not open the doors with her remote. Answers No. 2. This was happening about 3-5 time a week. Tassone III, p. 117. Plaintiff went to Mr. Lee but it took about ten months before this was resolved. Answers No. 2. Plaintiff does not dispute that she reported the stolen remote, and that she was told by Lee and Zarella that they would "look into it" or were "working on it." Answers No. 2; Tassone I, p. 63-64. Plaintiff disputes that they looked very hard since a janitor had a second remote all along, and Lee was aware of it. Answers No. 2; Tassone Dep. I, p. 64; Tassone III, p. 119; Gonzalez I, p. 70.

29. Plaintiff disputes UF ¶ 56 and 80 to the extent that the City implies that the "full compensation" includes damages for the failure-to-accommodate and the damages resulting therefrom.

30. Plaintiff disputes UF ¶ 59 to the extent that it says that Gonzalez responded to Tassone about the bathroom issues. Answers No. 2. Tassone never heard back about the bathroom coverage request. Answers No. 2. Tassone was not made aware of any written protocol regarding requests for accommodations by the School Department. Tassone I, p. 39-40. Someone had come to the school and asked her if she was having problems and this person called someone at RIDE on her behalf who then called the Providence School Department. Tassone I, p. 40. After this Gonzalez contacted her and this was the first time she heard of a 504 plan for adults. Tassone I, p. 40.

Although Gonzalez established some polices, he did not ensure that anyone other than principals were made aware of them. Gonzalez II, p. 160-61.

31. Plaintiff disputes UF ¶ 60 to the extent that it says that the requests were granted as of September 17, 1998. The memo does have some information about the sixth period and bathroom coverage issues, but does not indicate when or if they were actually granted. Defendants Ex. 27. Furthermore, this document was not provided to Tassone. Tassone had to make another request in August 2000. Answers No. 2. A memorandum from Gonzalez dated February 16, 2001 to Principal Lee reflects that sixth period free of assignments was given to Tassone, as well as a personal aide.

Answers No. 2; Plaintiff's Exhibit 1.

32. Plaintiff disputes UF ¶ 61 to the extent that the City implies that all students are supervised by a certified teacher at all times. DiRuzzo testified that if a teacher wanted to chance her class being unsupervised and needed to go to the bathroom they could go. DiRuzzo I, p. 76-77. If the teacher had gone, he would excuse that teacher and just repeat the policy. DiRuzzo I, p. 77. When a teaching assistant complained that Tassone was leaving the room to go to the bathroom, DiRuzzo told the T.A. to make sure "proper assistance" was in the room but did not say "certified teacher." DiRuzzo II, p. 19-20.

33. Plaintiff disputes UF ¶ 62 to the extent that there were times when Tassone could not find a certified teacher to cover her room when she had to use the bathroom. Answers No. 2.

34. Plaintiff disputes UF ¶ 63 to the extent that it suggest that an accommodation was made to assist her with going to the bathroom. Answers No. 2. Plaintiff also disputes that Lee was accommodating throughout his association with her. Answers No. 2. If in fact Gonzalez and Lee had this conversation, Tassone was never made aware of it. Answers No. 2; Affidavit.

35. Plaintiff disputes UF ¶ 64. Answers No. 2. The Commitee had other information about Tassone's disabilities. Gonzalez II, p. 155.

36. Plaintiff disputes UF ¶ 65 and 70. Gonzalez testified that the Committee determined that Tassone was disabled as part of the accommodations process. Gonzalez II, p. 155-56. When asked what her disabilities were and if he ever knew what it was he said "I had some medical papers * * * from some doctors who in a paragraph may have alluded to something and requested some attention to a particular condition." Gonzalez II, p. 155.

39. Plaintiff disputes UF ¶ 67 to the extent that the City implies that the personal assistant was provided promptly or that Tassone was made aware of any efforts it was making on her behalf. She requested the personal assistant in about August 2000 and did not receive word or the assistant until about March 2001. Answers No. 2.

40. Plaintiff disputes UF ¶ 68 to the extent that it implies that Smiegel's letter was not sent at the time of the request. The original letter that Tassone submitted to the Department around the time of her request was undated. Tassone Affidavit

41. Plaintiff disputes UF ¶ 75 to the extent that it says that coverage is an essential function of the job. The fact that the City ultimately exempted Tassone necessarily means it is not an essential function. Answers No. 2.

42. Plaintiff disputes UF ¶ 78 to the extent that Shugrue said that the other teachers would be adversely affected. Shugrue admitted that she had not idea how much more frequently any of the teachers would have to do coverage if Tassone was exempted. Shugrue, p. 113.

43. Plaintiff disputes UF ¶ 79 inUFar as it reflects Shugrue's version of the event and that it was not directed at her. First, there was more than one other teacher present. Perkins saw Ms. Simon, Ms. Holloway, Ms. Shugrue and Mr. Polak present for this incident. Perkins, p. 25, 37. Mr. Winn also saw it. Winn, p. 70. Tassone recalls that Shugrue not only pulled up her pants but imitated the way that Tassone walked when she said "maybe I should walk this way." Answers No. 2. As Winn put it, he"was struck with the vehemence, the sarcasm with which [Shugrue] launched her attack on Simonne." Winn, p. 70. Perkins noted that no one opposed Shugrue's conduct. Perkins, p. 25.

44. Plaintiff disputes UF ¶ 81, to the extent that the City mistates the order of events. At the end of the school year while Tassone was out, the City paid another teacher to do her IEPs. When Simonne came back to work in the Fall of 2002, the City purchased a voice activation system that did not work. Answers No. 2. No other effort was made.

45. Plaintiff disputes UF ¶ 83 because the position was not called the "IEP Training Team." The posting reflects the job was called "Computerized IEP Trainers," and that the "team" would train staff. Defendant's Exhibit 37. Although that posting covered the training for the position which was held through May 2002, there are still Computerized IEP trainers today, some of which are the ones who were originally trained in 2001-2002.

46. Plaintiff disputes UF ¶ 85 because Plaintiff disputes that the questions were asked after the interview. They were asked during the interview as stated in Tassone's original letter contained in the grievance. Defendant's Ex. 37; Answers No. 2. Plaintiff also disputes that the questions were asked "in the spirit of friendship," and that it was limited to "how are you feeling." Answers No. 2. Tassone was asked things like how her health was, if she was going to need any more surgery, would she have to take time out of work, what her condition was, and what her health prognosis was for the future. Answers No. 2. This was done in front of all three interviewers. Answers No. 2; Def's Ex. 37. Although Tassone may have considered the interviewers "friendly" at the time, once she found out who was hired she concluded that the questions were discriminatory. Ex. 37; Answers No. 2. Plaintiff also notes that there is no evidence of her score other than the Department's statement to that effect. No scoring sheets were produced. Zimmerman Affidavit, February 2005.

47. Plaintiff disputes UF ¶ 87. The sessions scheduled were to train for the position. She could have attended that training from September 2001 to February 2002. Even if that was the time of the training, Plaintiff would have been able to do the training from September 2001 to February 2002. In addition, further sessions were held after 2001-2002. Gonzalez I, p. 129; Tassone Affidavit. Gonzalez was told Tassone would get into the next class. Gonzalez I, p. 129-30; Gonzalez II, p. 246-247.

48. Plaintiff does not dispute the following paragraphs of the Defendant's Disputed Facts, (hereinafter "DF"): ¶ 1, 3, 4, 7, 9, 10, 16, 23, 24, 25, 26, 27, 28.

49. Plaintiff disputes DF ¶ 2 to the extent that it implies that Shugrue always helped Tassone.

Shugrue said that if a teacher came to her with a complaint regarding an accommodation she would tell them they could not file a grievance. Shugrue, p. 23, 39; Tassone II, p. 147, 154. Tassone believed Shugrue may have helped others more. Tassone II, p. 152. In fact, when Tassone went to her for a number of other things besides the 1994 ramp grievance, Shugrue did not help her. Tassone II, p. 147. It is undisputed that Shugrue did not help Tassone with the coverage issue, but instead, filed a grievance against her. Tassone II, p. 154-55. Shugrue harassed Tassone. Answers No. 2.

50. Plaintiff also disputes DF ¶ 5. Plaintiff was harassed and/or subjected to discrimination not only by Shugrue and DiRuzzo but also by other teachers and by administrators. Answers No. 2.

51. Plaintiff disputes DF ¶ 6, n. 13. Her claims regarding DiRuzzo were also corroborated by Perkins. In fact, Perkins noted that he had conversations with DiRuzzo about Tassone, even after DiRuzzo retired and had just come back to the building to visit. Perkins, p. 54. "[T]hose were not positive conversations that Mr. DiRuzzo had. He didn't have anything positive to say about Ms. Tassone. He felt she was a nuisance, in my opinion." Perkins, p. 54. Perkins says he was led to believe that DiRuzzo felt Tassone was a nuisance because he heard from DiRuzzo that "she always needed something, you know, may it be cleaning the snow from the walkway, may it be having to go the bathroom to attend to some medical illness." Perkins, p. 54-55. In fact, DiRuzzo specifically said "How are you getting along with Ms. Tassone. Is she bothering you. Is she a pain in the ass. Is she asking for this, asking for that. How do you tolerate her." Perkins, p. 139. Critically, Perkins noted that he could not recall DiRuzzo talking to him in a negative way about any other person. Perkins, p. 55.

52. Plaintiff disputes DF ¶ 8. Winn believed that DiRuzzo had banned Tassone from the library because Tassone told him <u>and</u> because DiRuzzo kept checking to make sure Tassone had not been to the library. Winn p. 11-15. Perkins also heard that Tassone was banned from the library. Perkins, p. 55-56.

53. Plaintiff disputes DF ¶ 11, n. 15. The Department did not grant Plaintiff every accommodation she had asked for. Answers No. 2.

54. Plaintiff disputes DF ¶ 12. Answers No. 2. DiRuzzo still had to interact with Tassone after Karbonik was assigned to Bridgham and still subjected her to hostility based upon her disability. Answers No. 2.

55. Plaintiff disputes DF ¶ 13 DiRuzzo did know about Plaintiff's health problems.

56. Plaintiff disputes DF ¶ 14. Lee did not take the time to listen to Plaintiff's problems with accommodations and harassment. Answers No. 2.

57. Plaintiff disputes DF ¶ 15. DiRuzzo said he had no problems with Tassone which necessarily includes classroom management issues. DiRuzzo, p. 35, 50. According to Lee, DiRuzzo

did not have any problems with Tassone's performance. Lee, p. 108. DiRuzzo never told Tassone that she had poor classroom management skills. Tassone Dep II, p. 128. DiRuzzo expressed the fact that his problem with Tassone was based on disability and requests for accommodation directly to Perkins. Perkins, p. 54-55, 139. Winn expressly made clear that the personality conflict existed in addition to, and perhaps as a consequence of, the fact that DiRuzzo "didn't like dealing with her requests or exceptions for treatment." Winn, p. 130.

58. Plaintiff does not dispute that Winn's testimony is reflected in DF ¶ 17-21. However, Winn also expressly made clear that DiRuzzo "didn't like dealing with her requests or exceptions for treatment." Winn, p. 130. DiRuzzo did not say that he had a personality conflict with Tassone. DiRuzzo, p. 35, 50. See also Plaintiff's response to DF ¶ 15.

59. Plaintiff disputes DF ¶ 29. Shugrue created and participated in the hostile work environment on other occasions that were not related to the coverage/leg imitation incident. For example, Shugrue was involved in the handicap spot problems, silent treatment, scooter stealing, comments about not being able to do her job, that she should not be accommodated and not helping her with certain grievances. Answers No. 2; Perkins, p. 25-6, 29, 76-78; Shugrue, p. 23, 39; Tassone II, p. 147, 154-55.

60. Plaintiff disputes DF ¶ 30 to the extent that these are characterized as "other workplace difficulties." See Answers No. 2. Plaintiff also disputes footnote 19 with respect to the fact that there is evidence that the supply problem in 1993-1994 was because of her disability. Johnson told Tassone that a lot of teachers were angry because a "crippled" teacher was coming to the school. Tassone Dep. II, p. 178. Johnson felt that the furniture should have been there so the teachers must have removed it. Tassone Dep. I, p. 48-19, 181. Plaintiff also disputes DF ¶ 30, n.19 to the extent that it implies that Winn believed Lee's rationale for barring Plaintiff from using the copier was for a legitimate reason or that Winn said that Lee explained the reason to him. Winn specifically stated that other teachers were allowed to use the library copier both before and after Tassone was not allowed, and that it was enigmatic to him that she was not allowed to use it. Winn, p. 25.

61. Plaintiff disputes DF ¶ 32. Answers No. 2.

62. Plaintiff disputes DF ¶ 33 to the extent that Lee alleges he allowed Tassone to leave early on occasion. Winn noted that he "saw a contrast between Simonne's results in asking for permission to leave early * * * and my results when asking for permission to leave * * *." Winn, p. 26-27. Winn recalls that Simonne was told that it was very consistent that she was not given permission to leave early, for example, if she was threatened by the weather conditions and needed to get out. Winn, p. 27. He believed this happened from 1993 "to the present." Winn, p. 27-28. Winn noted that in his experience, if he asked to leave early, he "was never refused by any administrator from doing that." Winn, p. 30-31. He believes he was allowed this two or three times per year. Winn, p. 31. Teacher Jane Shugrue testified that when she had sixth period free she would sometimes be allowed to leave early to attend to union business. Shugrue, p. 141-42.

This continued to be a problem when Principal Cochran was in charge after January 2002. Mr. Perkins, a supervisor, recalls this being just one of the situations where Tassone was asking for help and accommodations because of her handicap and not being given the help and accommodations. Perkins, p. 40. For example, he knows of one instance in particular that Simonne wanted to leave early. Perkins, p. 40. Tassone did not have a class and it was snowing outside. Perkins, p. 40. As he stated, "[a]nd I know we usually don't clean up that little ramp, little handicap-accessible ramp. And Simonne wanted to leave to get to her car while the area was still clear. She didn't have any classes or anything. And she wasn't allowed to do that." Perkins, p. 40. According to Perkins, he saw Cochran tell her no. Perkins, p. 40. Perkins said that Tassone came to him about snow and ice issues several times. Perkins, p. 63.

Tassone was not allowed to leave early even though gym teachers routinely would take turns leaving early. Perkins, p. 41. Perkins said that gym teachers were a problem because the three of them would rotate leaving early, or sometimes one of them would not even show up and the other two would cover for the absent teacher. Perkins, p. 41. Despite the fact that Perkins and Cochran knew the gym teachers were doing this, the gym teachers continued to do it. Perkins, p. 41. Cochran did not deny telling Tassone that she could not leave early because it would be a problem with some gym teachers. Cochran, p. 128-29.

Although Tassone was ultimately excused from coverage, it took over a year for this to be granted to her as an accommodation.

63. Plaintiff disputes ¶ 34. Answers No. 2.

Plaintiff,
By her Attorneys,

Patricia E. Andrews, #4321
Carly Beauvais Iafrate, #6343
129 Dyer Street
Providence, RI 02903
(401) 421-0966
(401) 421-0964 (fax)

**CERTIFICATION**

I hereby certify that a copy of the within document has been sent by mail to Sara Rapport, Esq., Sr. Assistant City Solicitor, City of Providence Department of Law, 275 Westminster St., Providence, RI 02903 on the 2nd day of June 2006.