UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SIMONNE T. TASSONE, Plaintiff | : |
| | : |
| v. | : C.A. NO. 03-481 ML |
| | : |
| PROVIDENCE SCHOOL BOARD | : |
| AND THE CITY OF PROVIDENCE, | : |
| Stephen Napolitano, Defendants | : |

# REPLY MEMORANDUM BY DEFENDANTS

Defendants hereby submit this Reply Memorandum in response to Plaintiff's Statement of Disputed Facts and Memorandum in Support of Objection to Motion for Summary Judgment ("P DF" or P Memo").[1] Defendants assume without conceding that the Plaintiff had two disabilities of potential relevance: (a) under federal and state law, she had difficulty walking; and (b) under state law, she had kidney difficulties that if left untreated, would likely lead to the formation of kidney stones, which if left untreated, could lead to kidney failure. The treatment was for Tassone to drink a large volume of water daily and take magnesium oxide. (P Exh. G).[2]

## I. Requests for Accommodation

Move to Second Floor. Plaintiff admits that she was able to walk (P Memo at 7, n.9); that the ramp at the school facilitated her access to the building's second floor; and that she had the assistance of students and teachers in moving on the ramp. (P Memo at

[1] Plaintiff's Statement of Disputed Facts is 10 pages, single spaced. Her Memorandum runs 72 pages, 16 of which are single-spaced. Defendants cannot respond to each detail in this reply memorandum but will address only the most significant problems with Plaintiff's representations.
[2] "P Exh. __" refers to the exhibits attached to Plaintiff's Memorandum in Support of Her Objection To Defendants' Motion for Summary Judgment; "D Exh. __" refers to the exhibits attached to the Defendants' Memorandum in Support of Motion for Summary Judgment.

17, n.22).[3] Under these circumstances, Tassone's demand to remain on the first floor was unreasonable; if granted it would have significantly compromised the ability of Principal Robert Lee, the school's leader and manager, to carry out a plan driven by sound educational concerns and the interests of special education students. (D UF ¶¶ 44-47; Lee Aff.).[4] See Trovato v. City of Manchester, New Hampshire, 992 F. Supp. 493, 497 (D.N.H. 1997) (accommodation not reasonable if it requires a fundamental alteration in the nature of a program or imposes undue financial and administrative burdens on the defendant). Moreover, to assist Tassone in moving between the first and second floors, the Department installed an electronic device on the ramp doors so that Tassone could open them with a remote control – a control she was using as of November 1995. (D UF ¶ 53). Tassone's alternative proposal, to leave the doors open at all times, was illegal and unsafe. (Exh. 1, attached hereto).[5]

The Missing Remote. Tassone lost that remote in early December 1998 (she thinks it was stolen). She thereafter injured herself on the ramp, and was out of work

[3] For many years, Tassone crawled up and down the stairs from her bedroom on the second floor of her home. (P DF ¶ 5). Surely moving on a ramp, with a scooter, and eventually with a remote control to open the ramp doors, was more convenient.

[4] Tassone misstates the record when she alleges that Principal Robert Lee did not implement any aspect of the educational plan that necessitated her move to the second floor in 1994. Team teaching for students with mild to moderate learning disabilities ("mild-moderate" students) was a fundamental change at Bridgham: it enabled these special education students, like their counterparts in regular classrooms, to change classes (and teachers) instead of remaining in the same setting with one instructor for the entire day. (D UF ¶¶ 44-47; Lee Aff. at ¶ 3). Lee concededly did not implement every aspect of his overall plan, which included occasional integration (or mainstreaming) of the special education students into regular classes. (D UF ¶ 45; Lee Aff. at ¶ 8). Yet this was his intent at the time that he moved Tassone. (Lee Aff. at ¶ 7). In fact, his purpose in placing the special education students in the "four corners" of the second floor was to locate each of the four mild-moderate classes in close proximity to a cluster of regular education classes, thereby facilitating opportunities for mainstreaming. (Lee Aff. at ¶ 7). Some integration did take place, although only occasionally, among a few teachers. (Lee Aff. at ¶ 7). Tassone further alleges that some mild-moderate students remained on the first floor in and after 1994. (Tassone Aff. at ¶¶ 6-7). Tassone is mistaken. (Lee Aff. at ¶¶ 10-11); (DiRuzzo Dep 10/27/05 at 31).

[5] The state fire code requires that the ramp doors remain closed, something of which Lee, many years later, remained dimly aware. (Lee Dep. 11/22/04 at 92-93) (pages attached hereto as Exh. 1). Jane Shugrue's acknowledgement that teachers would leave the doors open in warm weather did not make such violation okay. (P Memo at 18).

from late December through March 1998. The Department replaced the remote by the time of her return.[6] Even if the request for a new remote were construed as a request for an "accommodation," the Department's inability to provide a replacement immediately was not a "failure to accommodate." See Selenke v. Medical Imaging of Colorado, 248 F.3d 1249 (10th Cir. 2001) (rejecting claim of delay in accommodation); Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 737 (5th Cir. 1999) (employer not obligated to move at "maximum speed" to complete reasonable accommodation); and cases referenced in Defendants' Memorandum in Support of Motion for Summary Judgment ("D Memo") at 9, n.3. This claim is without merit.

Bathroom Doors. Tassone could have used the teachers' bathroom on the second floor even if the Department had not re-hung the doors to that bathroom. Hence, the change was not needed to enable Tassone to perform her job. See Stewart v. County of Brown, 86 F.3d 107, 111 (7th Cir.1996) (plaintiff erroneously assumes "accommodation" means "a perfect cure for the problem"); Mohammadian v. CIBA of Puerto Rico, Inc., 378 F. Supp.2d 25, 29 (D.P.R. 2005) ("The employer has met his statutory duty when he accommodates his disabled employee to the extent necessary for her to be able to perform her job."). The Department nonetheless made the fix – and still Tassone complains. (D UF ¶ 50). She alleges that the Department initially opposed making the change and took too long to effect it. The evidence shows to the contrary that central administrators

[6] To the extent Tassone suffered a job-related injury on 23 December that may been prevented had she not lost the remote, she was compensated in full through the workers' compensation system and under the teachers' contract. Tassone's implication that Principal Lee purposefully failed to disclose the existence of this additional remote until months after she was injured is unsupported by the record. Lee was trying to determine who had the second remote, only to learn at some point that the custodian had one. (Gonzalez Dep 8/2/05 at 70; Tassone Dep 1/6/06 at 118-19; 12/2/04 at 64). Gonzalez also made efforts to acquire a new remote, attempting to identify the company that had obtained the bid to install it. His efforts came to a stop, he explained, when he learned that Tassone had a replacement. (Gonzalez Dep 10/31/05 at 173-77) (pages attached hereto as Exh. 2).

promptly reviewed the September 1994 grievance requests, in October 1994, and completed all renovations within weeks after Tassone brought the matter before the School Board, in October 1995. (D Exh. 25; D UF ¶ 53). This lag of one year by a municipal department in completing maintenance tasks, one of which involved electrical wiring, falls far short of amounting to a "failure to accommodate." See Selenke, 248 F.3d 1249; Loulseged, 178 F.3d 731 & cases referenced in D Memo at 9, n.3.

More Electronic Doors. Tassone asked the Department to rewire all the building's exits so they would operate electronically. She allegedly made this request in the 2000-01 school year of Dr. Gonzalez, and in 2002 or 2003, of Principal Cochrane. (P Memo at 23-24). Both men promised to "look into" the matter but never got back to her, she claims. Tassone wanted such wiring in case she needed to exit the building in an emergency. (P Memo at 23-24). The Department correctly rejected such request. First, the Department had provided for Tassone's safety by affording her a personal aid, tasked with remaining by Tassone's side at all times. See Selenke, 248 F.3d at 1263 (employer not obligated to provide the accommodation the employee prefers). Second, neither state nor federal antidiscrimination law requires that an employer anticipate every conceivable exigency to insure the maximum safety of employees with impairments. Such heightened protections bear no relationship to performing the essential functions of the job of teaching middle school students.

Bathroom Use. The Plaintiff has a history of producing kidney stones; to prevent recurrence, she takes medication and drinks volumes of water daily.[7] If she did not do so, according to a physician's affidavit, she "would form more stones and this could lead to

[7] Tassone admitted that she has not seen this physician, Dr. Maynard, except once after 2001, and that she has been "released" from his care. (Tassone Dep 1/4/06 at 60).

kidney failure if left untreated." (P Exh. G). Yet this "diagnosis," and Plaintiff's references in her factual recitation at paragraph 21[8] do not support her dispute of Defendants' basic contention that the Plaintiff has failed to set forth evidence that she "experienced difficulties anticipating urination or a bowel movement as a result of her fall in 1986, or as a result of any of her neurological, urological, or gastrointestinal difficulties." Thus, Plaintiff has produced no medical support for the claim that she cannot <u>anticipate</u> needing to use the bathroom or <u>controlling</u> her bowels or urination as a result of any disability or impairment,[9] and that she therefore should be exempt from the district's command that her students remain supervised in some fashion by a certified teacher when she leaves to use the bathroom. (D UF ¶ 41).

Even if Tassone's need to frequent the bathroom, allegedly without notice, as result of drinking water were to be construed as arising from or related to a legal "disability," Tassone acknowledges that the Department "accommodated" this need by permitting her – even advising her – to call upon teachers informally outside of her room to "cover" for her when left the room on short notice. She now claims that although the Department memorandum (D Exh. 27), and deposition testimony by Dr. Gonzalez and former Principal Lee (D UF ¶ 63), show that the Department believed it had resolved her request for bathroom coverage in 1998 (D Exh. 26), Plaintiff never knew about this favorable resolution because the Department failed to communicate it. Her claim is belied by her admission that Principal Lee explicitly told her that she could leave her classroom as often as needed provided she alerted a teacher in a nearby cluster. (Tassone

---

[8] Dr. Maynard's recent Affidavit (P Exh. G), and Dr. Hansen's letter of 10 September 1998 (D Exh. 28), note that Tassone should drink large amounts of water – but not that she cannot control her urination. Dr. Smigel's letter (undated) makes no reference to drinking water or frequent urination. (D Exh. 32).

[9] Plaintiff's references to cases involving an inability to control the elimination of waste are therefore of no utility to her argument. (P Memo at 2, n.2).

Dep. 8/31/05 at 108-11). In sum: Ms. Tassone knew she needed to make some certified personnel aware that she would be out of the room – and she fully understood that the administrators were permitting her to bend the rules by not requiring that such personnel be physically present in her room but only cognizant of her absence. (P DF ¶ 32).

Sixth Period/No Coverage/Personal Aid. Plaintiff also implies that requests she made in September 1998 were not granted until early 2001. (P DF ¶¶ 31 & 39; P Memo at 24-25). Again, the Plaintiff misleads dramatically. Plaintiff made two different written requests, first in 1998 and then in 2000; each time, the Department granted those requests en toto. The first appeared by letter dated 11 September 1998, in which Tassone sought: (1) a switch of her free period (the contract provides that all teachers have one free period each day) to sixth period, the last period of the day;[10] and (2) teacher or administrative support during her trips to the bathroom. (D Exhs. 25 & 26). Plaintiff was well aware that the Department "accommodated" both requests promptly. She knew that the Department changed her free period to sixth period in 1998 or 1999 (D UF ¶ 60 & n.6). Moreover, she knew that the Department was permitting her to leave the classroom to use the bathroom without conforming strictly to the rule. See supra.

In a second letter written approximately two years later and dated 25 August 2000, Tassone made three additional requests: (1) exemption from having to do "coverage" during her free sixth period;[11] (2) the support of a teacher assistant during her free period and; and (3) the support of a teacher assistant on the last day of the school year. (D Exh. 29). The Department formally granted the first request by memorandum

[10] It appears that Tassone's free period as of 11 September 1998 was period 1 (D Exh. 26), a change from the prior year, 1997-98, when it was period 5. (Zimmerman Aff. I at ¶¶ 2 & 17 and attachments).

[11] "Coverage" was (and remains) the contractual obligation of teachers to teach, or "cover," a coworker's class when he or she was absent and no substitute available. (D UF ¶¶ 66-67 & n.8).

dated 16 February 2001. (D Exh. 30). In fact, it is undisputed that Principal Lee had granted Tassone de-facto exemption from having to do coverage during her free sixth period prior to February 2001. (Tassone Dep 8/31/05 at 159; Lee Dep 11/22/04 at 25-27; 10/21/05 at 55, 57).[12]

The Department resolved her second and third requests in that same memorandum by providing her with a fulltime personal aid. The individual assigned to "assist" her was not someone obligated to help her teach, or work with students, but rather, someone obligated to assist Tassone personally in performing her job.[13] The ironic feature of this "claim" by Tassone – that she had to wait a few months for a personal aid (from August 2000 to February/March 2001), is that Tassone had not even requested a fulltime assistant; instead she had merely requested that a teaching assistant be dispatched to help her during sixth period and on the last day of school! (D Exh. 29). The Department went far beyond that request, at a cost of nearly $100,000.00 to date, yet still Tassone complains. (Zimmerman Aff. II).

Unruly Students. Tassone's classes were not comprised of the most emotionally and behaviorally volatile students. (Lee Aff. at ¶¶ 11-12; Tassone Dep 12/2/04 at 4; 8/31/05 at 11-12). Yet on occasion, even mild-moderate students (as well as students not in special education) develop behavioral problems, and sometimes, after assessment, are

[12] Coverage means that teachers are required by contract to forego their free period – and teach – on occasion. Most teachers (including Tassone) do not like having to cover because they guard their free period jealously. Yet the greater the number of teachers participating in the rotation, and sharing the responsibility of "covering," the less frequently each teacher will have to "cover." On reflection, it was not legally necessary (or wise) for the Department to exempt Tassone from performing this essential job function. Tassone could and did teach for periods 1 through 5. Her mobility issues and need to drink water did not render her incapable of also teaching approximately once every couple of months during her free sixth period. (Shugrue Dep 8/17/05 at 110-17, 119-25). Tassone was capable of extending herself after hours when she wanted, to wit: she took on tasks doing before and after school work for which she would receive some extra pay. (Tassone Dep 1/4/06 at 177-78). Tassone could and should have been performing the essential job function of participating in the coverage rotation.

[13] The personal aid provided Tassone is not the same as a teaching assistant required for students under regulations set forth by the Rhode Island Department of Education. (D UF ¶ 67, n.9).

placed elsewhere. The particular instance about which Tassone complains involves a student who all agreed in May or June 2001 would be transferred the following year because of psychiatric problems. Through oversight, however, he was returned to Tassone's class in September 2001. Tassone alleges that this oversight was a "failure to accommodate," and wonders why the Department did not immediately remove, suspend, or discipline the boy when he was incorrectly placed back in her room (P Memo at 31).[14]

Tassone is a certified special education teacher. An essential function of her job is to manage even difficult students, a basic fact acknowledged by educators familiar with the Department or any urban system. (Guglielmo Dep 10/7/05 at 91-100; Gonzalez Dep 10/31/05 at 218-20) (pages attached hereto as Exh. 4). Tassone has the advantage of a personal aid to assist her in carrying out her job. The Department need do no more; it plainly is not obligated, as Tassone implies, to monitor her students continuously to insure that none is "difficult" on the assumption that she is too "frail" or "incapacitated" to manage them should they act out.

Leaving Early/Corridor Duty. Tassone complains that Principals Lee and Cochrane would not permit her to leave early on days that it began snowing. Although it might have been Tassone's preference to avoid the snow, remaining at school on days that the weather turned inclement (and hence coping with travel under such conditions), was an essential function of her job. The teachers' contract could not have been plainer. (Exh. 5, attached hereto). See Laurin v. Providence Hosp., 150 F.3d 52, 56 (1st Cir.

---

[14] This suggestion is remarkable coming from one entrusted with the care of special education students. It would be unlawful under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. 1400 et seq., and its implementing regulations, to remove, suspend, or discipline a child for the status of having psychiatric problems, or prior to his or her doing anything wrong. (Guglielmo Dep 10/7/05 at 5-56) (discussing legal process for addressing disciplinary problems with children in special education) (pages attached hereto as Exh. 3).

1998) (employer need not accommodate a disability by foregoing an "essential function" of the employment position).[15] Corridor duty was also an essential job function. (Gonzalez Dep 8/2/05 at 66-67; Shugrue Dep 8/17/05 at 71-86; DiRuzzo Dep 7/19/05 at 61; Perkins Dep 8/23/05 at 68) (pages attached hereto as Exh. 7). It did not require that Tassone physically subdue students or put herself in harm's way, but rather, that she be present in the hall, or inside the classroom doorway, as Lee suggested. (Shugrue Dep 8/17/05 at 84-85). The purpose was for teachers with authority, who were familiar with students and able to invoke their names, to remain visible and available to issue verbal warnings or commands, and thereby keep adolescent energy in check. (Shugrue Dep 8/17/05 at 86). Tassone could and should do this work. It is a part of her teaching job.

Other Complaints. Additional so-called "failures to accommodate" – Tassone preferred a classroom closer to the bathroom, that the parking lot be free of all ice, a key to the storage room,[16] a better handicapped parking spot, and use of the library copier[17] –

---

[15] Jane Shugrue's opinion that "she would have no problem" with teachers leaving early is irrelevant. (P Memo at 21). Shugrue was a teacher – not an administrator – and had no authority to make a decision about whether teachers could leave the building. The fact that gym teachers were flouting the contract by leaving early without permission (P Memo at 22 & n.33), and that librarian-teacher Winn left early with permission on rare occasions for medical reasons (P Memo at 22; Winn Dep. 3/8/05 at 29-31) (pages attached hereto as Exh. 6), only underscores that remaining until the end of the day was an essential job duty, which administrators needed to demand of all teachers with consistency.

[16] This allegation is particularly strange, given that Tassone reports in her pleading that she used the storage room, instead of the nurse's office, to store her scooter, only when she knew she would be absent. (P Memo at 33). Even then, her lament is that she had to wait for the janitor to open the room, not that she could not access her scooter, presumably when she returned from absences. Former Principal Lee could not recall any issue with a key, but knows that he could not have given Tassone a "master key" for the building. (Lee Dep 10/21/05 at 114-16). Former Principal Cochrane tried to get extra keys for the literacy center/conference room (not clear if this means the "storage room"), but was unable to do so. (Cochrane Dep 12/16/04 at 91-96). Eventually, Tassone obtained a key. (Tassone Aff. at ¶ 10).

[17] Principal Lee directed teachers not to use the library copier, but rather the one in the teacher's room, to insure that students and staff using the library were not disturbed by the noise. (Winn Dep. 3/8/05 at 22-26) (pages attached hereto as Exh. 8). Tassone complained that it was inconvenient for her to get to the teacher's room during period five, when she preferred to do her copying, because the custodians were cleaning the cafeteria at that time. Tassone had options: she could use her scooter with care when moving through the cafeteria; she could do her copying at another time; or she could change her free period (from 5th to 1st and then to 6th), as she did in September 1998. After 1998, then, her copying problem was resolved. Thus, her complaint about the copier, coming well after 1999, which begins the three-year period

founder on the same flaw: Tassone was not entitled to the most convenient or optimal work arrangements. The Department provided her with those accommodations needed (and even some not needed) to perform her job. See Mohammadian, 378 F. Supp.2d at 29. It need do no more.

**II. Insufficient Evidence To Show A Hostile Work Environment**

Tassone's hostile work environment claim is a litany of "everything that bothered her" at work for nearly a decade. The effort comprises sixteen single-spaced pages. (P Memo at 37-52). First, she reiterates the so-called "failures to accommodate" her set forth above. E.g., moving to the second floor (37, 38)[18]; the bathroom doors (37); the delay in re-hanging those doors (37); the handicap parking spot (38); the snow and ice in the parking lot (38, 47); difficulty with the ramp doors (38, 39); vandalism to her scooter (38); proximity to the bathroom (38); having to do corridor duty (39, 47); not being allowed to use the library copier (42); replacing the remote (42); falling off her scooter (42); a difficult student who injured her thumb (43); Perkins' description of this same student (44); another student who was difficult (47); the voice-activated software purchased for her by the Department (44); students at the school who seemed potentially volatile (43, 44); not getting the coverage exemption quickly enough (45); that teaching assistants left her room to work with the students (46); storing her scooter (42, 46); all the doors to the building (47).

Second, Tassone makes reference to the same event or issue numerous times. See supra, e.g., storing her scooter, snow and ice. Third, she makes generalized and unspecific accusations and allegations. She claims, for example, that she "had problems

---

for filing under the most generous statute of limitations (RICRA), is untimely. See infra at § II.

[18] References in paragraphs are to pages from Plaintiff's Memorandum.

while Mr. Lee was principal from about September 1, 1993 until about June, 2001 when he finally left" (37); that she "heard comments from teachers about the fact that she had it so easy because she had an assistant" (48); and that Perkins "observed" Tassone asking for help and accommodation because of her handicap and not being given the help and accommodation" (51).[19] Fourth, she relies upon hearsay. For example, she claims that she could not take her students on field trips because the Department would not pay for a "handicap" bus to accommodate her (43). Not only does this allegation ring false, but it is a classic statement by an "out-of-court" declarant offered for the truth of the matter. (Tassone Dep 1/4/06 at 121-22) (pages attached hereto as Exh. 9).[20]

Finally, Tassone misstates the record. At times, the misrepresentations are an attempt to paint with a hostile brush innocent, even kind behavior, e.g., her evaluation in 2001 (43)[21]; problems with the ramp switch (41).[22] At other points, the misrepresentations are more significant, as when they suggest that coworker Winn singled out Tassone, and did so based on her disability. (40-41). Winn's deposition testimony was quite different: he was confident that DiRuzzo was "gruff" or "abrupt"

---

[19] Perkins only became assistant principal at Bridgham in early 2002. He did not overlap with DiRuzzo at all. (Perkins Dep 8/23/05 at 17). It is difficult to know exactly what "accommodations" Perkins allegedly saw Tassone seeking at this point since she had a personal aid by that time, and resolution of her kidney difficulties.

[20] That same declarant, Glenda Guglielmo, was deposed but not asked about this allegation. (Guglielmo Dep 10/7/05 at 1-121). Tassone also offers Perkins statement that he "heard about" DiRuzzo yelling at Tassone from Winn and DeLuca (40). Again, this is all hearsay. Its unreliability is made plain by the comparison of what Perkins said Winn said to him, and what Winn said under oath in deposition. See infra. DeLuca was not deposed.

[21] Lee explained that Tassone approached him in the fall of 2001 and requested that he evaluate her instead of DiRuzzo, a request not uncommon among teachers who wanted to draw upon supporters to document their performance. Lee intended to do so before his retirement in December 2001, but could not make time that fall because of pressing demands, including a site visit by outside authorities/evaluators of the school. He learned only after December 2001 that he could not perform evaluations once he retired. (Lee Dep 10/21/05 at 131-37) (pages attached hereto as Exh. 10). To insure that Tassone did not suffer from this misunderstanding, the Department exempted her from any evaluation at all. (Exh. 11). It is difficult to understand how this example of "mistreatment," among many, reflects animus toward Tassone or a "hostile environment."

[22] Tassone describes problems with the "switch" but leaves out the persistent efforts of the custodian, who tried to fix it for months. (Tassone Dep 1/4/06 at 115-20) (pages attached hereto as Exh 12).

with others – and "that it was not just Simmone." (Winn Dep 3/8/05 at 53).[23] When asked why he believed Tassone and DiRuzzo were like "oil and water," he answered:

> He was abrupt. She was ready to go at length about the situation she wanted to discuss with him or she wanted to discuss with her. She favored painting a whole picture. He favored zeroing in on one point and sticking to it. She looked for flexibility based on the particular incident. He wanted to call on the law, the procedure, the policy.

(Winn Dep 3/8/05 at 131-32). With some employees whom he liked, Winn recalled, DiRuzzo would "lapse into Italian fairly frequently," but with others, such as Winn himself, "[t]here was a certain point at which we wouldn't go beyond." (Winn Dep 3/8/05 at 132). When pressed to explain why he thought DiRuzzo did not like "dealing with" Tassone's requests for exceptions, Winn demurred: "I'm uncomfortable with all of this now. It's too much in the realm of speculation, and my speculation, and I'm going to have a hard time grounding it in any fact . . . it becomes highly speculative." (Winn Dep 3/8/05 at 130-31).

Tassone's claim of a "hostile environment" reduces to interpersonal difficulties she experienced with two people: DiRuzzo and Shugrue. First, even assuming that DiRuzzo excessively monitored and did not seem to like her, as Tassone claims (DiRuzzo "very often would not listen to what she had to say or would walk away when she was trying to explain something . . ." at 39), or expressed dislike of her, as Perkins claims (40),[24] the record provides no support for the notion that DiRuzzo's dislike was based on Tassone's <u>disability</u>. It shows in contrast that whatever tensions that might have existed

---

[23] The pages from Winn's deposition referenced herein are attached hereto as Exh. 13.

[24] Perkins' claims are a bit strained, and reflect his deep bias against the Department itself. (Perkins Dep8/23/05 at 6-13, 19-23). Perkins filed a complaint against the Department with the Rhode Island Commission for Human Rights that resolved with a finding of no probable cause. (Exh. 14). Moreover, his transfer from Esek Hopkins Middle School, where he had been principal, to Bridgham Middle School, where he became assistant principal, was a demotion.

grew out of DiRuzzo and Tassone's very different temperaments (Winn, supra), and DiRuzzo's perception that Tassone could control her students as well as other special education teachers with comparably challenging students. (DiRuzzo Dep 7/19/05 at 57-58) ("She had a very boisterous classroom, very noisy.")[25]

The tension between the two may also have grown out of fact that DiRuzzo, who was responsible for student discipline and behavior, received a complaint from Tassone's teaching assistant because Tassone was "missing from" the classroom a good deal. (44-45 & DiRuzzo Dep 10/27/05 at 18-20). Even Tassone acknowledges this problem, recounting how in one case a student was badly hurt when she was out of the room, and DiRuzzo told her she was responsible.[26] Assuming for argument that DiRuzzo "banned" Tassone from the library, in 1997 or 1998, a contention that seems unlikely given that Tassone would certainly have grieved such a "ban,"[27] the record fails to support Tassone's contention DiRuzzo did so because Tassone was disabled. Rather, the clear explanation from the evidence is that, once again, he saw students misbehaving in part because she was not present.

Second, Tassone similarly distorts the record regarding Shugrue. Even if Shugrue made an insensitive remark about Tassone (D DF ¶¶ 25-26), this one remark and the

---

[25] Tassone claims that he "often sided with [her] students and "chastised" her about her writing up of students until his retirement until his retirement in 2002. (40). That is highly unlikely, since Nidia Karbonik became assistant principal at Bridgham in September 1997, and thereafter assumed all responsibilities for overseeing the discipline of students in special education. (D UF ¶¶ 11, 15; D DF ¶ 12; Tassone Dep 8/31/05 at 51, 53).

[26] As Tassone recounts, one of her students "just bolted out of the room," and then pushed another student against the wall and knocked some of his teeth out. DiRuzzo allegedly told Tassone that she should have prevented it, and that she could be held liable for the child's injury. Tassone defends that "[s]he was not even around at the time" (40). That students often act out when authorities are not on site is precisely the reason that the Department required that a certified person remain with the students at all times.

[27] Winn did not hear DiRuzzo "ban" Tassone from the library but reprimand her for being out of the room, and leaving her students.

fallout from the coverage dispute for the next few months[28] does not amount to a hostile work environment. Neither do the two times that Perkins witnessed (in or after 2002) coworker Shugrue and the secretary Maria taking and/or hiding Tassone's scooter. (Perkins Dep at 25-29). Cochrane was upset upon learning what Shugrue had said about Tassone's exemption from coverage, and conveyed that feeling of support to Tassone. (Cochrane Dep 12/16/04 at 118). He recounted that Tassone herself wanted Cochrane to leave the situation and "let it blow over" in an effort to quell the bad feelings that the coverage dispute had engendered. (Cochrane Dep 12/16/04 at 118-28) (pages attached hereto as Exh. 15). He respected that wish but nonetheless had "several conversations" with Shugrue. (Cochrane Dep 12/16/04 at 122).[29]

In sum: Tassone fails to set forth sufficient facts to make out a hostile environment claim. The record show that Tassone's work environment was far from hostile: the teachers were supportive of her (at least until the coverage dispute), and at times extremely generous, as when they took up a collection to help pay for her daughter's funeral (D DF ¶¶ 2-4). Moreover, Principal Lee, Principal Cochrane, Dr.

---

[28] Tassone recounts the Shugrue remark and the aftermath, including the failure to be reminded of a union fundraiser, over and over, in an effort to magnify this event. (See description of same incident at 49-50). Tassone's suggestion that Shugrue thereafter orchestrated breaking into her classroom (50), the theft of items from her classroom (50), and vandalism of her car (51), is totally unsupported by the record. And the fact that teachers who filed a grievance challenging an exemption awarded to Tassone, and who lost such grievance, thereafter "gave her the silent treatment," is hardly surprising and not actionable against the Department. The Department denied the grievance and afforded Tassone a privilege to which she was arguably not entitled under the law. As may be obvious, describing the same incident two or three times and from the claimed perspective of more than one person (Perkins and Winn both claimed to see the event, although Winn describes it happening on the first floor, in the "foyer," whereas Perkins and Tassone claim it took place on the second floor), does not mean that the incident happened four or five times. Finally, the remark by Shugrue took place in early 2003, <u>after</u> she filed her charge of discrimination with the Rhode Island Commission for Human Rights, so it is questionable that such event is appropriately considered to be part of this lawsuit.

[29] This may be why Cochrane told Perkins to "leave it alone" when Perkins claimed to hear a number of teachers, including Shugrue, complain of Tassone's apparent inability to "do her job" (48). Plainly, these remarks grew out of the coverage dispute. Perkins is hardly Tassone's hero, in any event. He admits watching, but doing nothing about, Shugrue's hiding Tassone scooter. Moreover, his bias is palpable. (Perkins Dep 8/23/05 at 6-13, 19-23).

Gonzalez, and even Jane Shugrue worked with Tassone for years to make her life easier – fixing the bathroom doors, wiring the ramp, replacing her remote, exempting her from coverage, changing her free period, and providing a fulltime personal aid. That Tassone nonetheless might have had a more difficult time at work than a person without physical limitations or health problems is not the question – getting through snow and around in general with a scooter is necessarily more difficult than walking on two unimpaired legs.[30]

Tassone's claim fails. Compare Hurley-Bardige v. Brown, 900 F. Supp. 567, 574 n.7 (D. Mass.1995) (failure to accommodate by refusing to build a ramp or install an elevator for an employee, which failure provoked her to quit, in conjunction with other factors, made out hostile environment claim based on disability) with Roeder v. Hendricks Community Hospital, 2001 WL 1168151, *9 (S.D. Ind. 2001) (allegations of being assigned to an undesirable work area, not being given a personal computer, not being given certain computer training, being criticized her for not completing work quickly and being given a computer terminal with a fuzzy image were not so severe or pervasive as to raise a triable issue of fact on whether plaintiff's work environment was objectively hostile). See also cases cited in D Memo at 15-21 and Nakis v. Potter, 2004 WL 2903718, *26 (S.D. N.Y.) (listing of complaints by plaintiff amount to "garden-variety workplace occurrences in which the employee disagrees with an employer's decision."); Brown v. Snow, 407 F.Supp.2d 61, 70 (D.C. D.C. 2005); Edmondson v. Potter, 118 Fed.Appx. 726, 730 (4th Cir. 2004) (unpublished).

[30] It is highly debatable whether drinking large volumes of water during the day (the "treatment" for preventing recurrence of kidney stones) would make work life much different for Tassone than the average person. Many people do, or are advised to, drink eight or more glasses of water a day to maintain general good health.

**III. Tassone's Claims Are Untimely**

Accrual. Tassone argues that her pre-May 1999 claims are timely under the concept of accrual, which embodies a variation of the "discovery rule." Under this rule, the statute of limitations begins to run on the date that a plaintiff knows of her injury or understands herself to have been injured or wronged; this date may be different from (and necessarily later than) the date on which the event giving rise to that injury or wrong actually occurred. See Rodriguez Narvaez v. Nazario, 895 F.2d 38, 41, n.5 (1st Cir. 1990). Tassone relies principally upon Nieves-Marques v. Puerto Rico, 353 F.3d 108 (1st Cir. 2003), in which a hearing-impaired student missed the 30-day limitations period for review of an administrative order because he waited eleven days after delivering the letter to the Department of Education demanding a sign interpreter before concluding that the Department would not comply. See id. at 119. The accrual doctrine does not apply here.

First, Nieves-Marquez bears no resemblance to Tassone's case. Assuming that Tassone did not have absolute clarity right away as to whether some of her requests had been denied or delayed, Tassone knew or should have known well before May 2002 to complain about problems allegedly besetting her as early as 1994. That she claims to have requested a number of "accommodations" repeatedly (e.g., better clearing of the ice), shows that she had developed an awareness of these so-called "failures to accommodate" early on. Second, Tassone's suggestion that her claims began to accrue only after her attorney informed her that these past incidents might be actionable (P Memo at 65), is unsupported by the case law. See Madison v. St. Joseph Hosp., 949 F. Supp. 953, 959 (D.N.H. 1996) ("A plaintiff's action accrues when he discovers that he

has been injured, not when he determines that the injury was unlawful") (quoting Thelen v. Marc's Big Boy Corp., 64 F.3d 264, 267 (7th Cir.1995)).

Third and finally, Tassone's contention that the Department had little or no process by which she could learn of her legal rights does not bring her within the doctrine's ambit. (P Memo at 66). The Department had a clear process in place, and a myriad of communications, including postings in each school, through which it advised employees of their rights. (Gonzalez Dep 8/2/05 at 25-53, 73-100). Yet even assuming that the process was imperfect in the early 1990's, Tassone knew that she had rights. She filed a grievance on 1 September 1994, the very beginning of the school year when she began work on the second floor (D Exh. 25), and took it "all the way to the school board level" in 1995. (P Memo at 66). That grievance began: "I am handicapped and need to get around in a scooter or wheelchair." (D Exh. 25, emphasis added). Three years later, in September 1998, she wrote two letters, in which she requested "accommodations under the 504 Disabilities Act." (D Exh. 26).

Continuing Violations. Tassone argues that the defendants committed "serial violations" in that she suffered similar acts of discrimination over the years. (P Memo at 68). Her argument is without merit for two reasons: 1) the acts about which she complains are dissimilar, discrete, and isolated, see supra; 2) Tassone believed herself aggrieved by her workplace from the inception, and thus is not entitled to the benefit of a doctrine designed to protect those who do not realize that they are experiencing discrimination. See Seery v. Biogen, 195 F. Supp. 2d 347, 352 (D. Mass. 2002); Branco v. Massachusetts Dep't of Revenue, 2000 WL 1678076, *3 (D. Mass.).

Equitable Tolling. The doctrine of equitable tolling does not render her pre-1999

claims timely either. Equitable tolling excuses a plaintiff's untimely claims when he or she was aware of his or her rights but did not timely file due to reasonable reliance on the employer's misleading or confusing representations or conduct. See Romero-Villanueva v. Puerto Rico Elec. Power Auth., 112 Fed. Appx. 74, *3 (1st Cir. 2004). As with the plaintiff in Branco, 2000 WL 1678076, *3, Tassone's invocation of equitable tolling is inappropriate because she cannot show that either that she filed a defective pleading or that she was tricked by defendants' conduct into allowing the filing deadline to pass. Tassone cites five factors considered in evaluating a claim for equitable tolling and claims they apply to her claims: 1) lack of actual notice of the filing requirement; 2) lack of constructive notice of the filing requirement; 3) diligence in pursuing one's rights; 4) absence of prejudice to the defendant; and 5) reasonableness in remaining ignorant of the filing requirement. See Jobe v. INS, 238 F.3d 96, 100 (1st Cir. 2001). Assuming, arguendo, that Tassone satisfies the first three factors, the defendants remain prejudiced by her failure to timely file her pre-1999 claims and it was unreasonable that Tassone failed to do so. Anti-discrimination statutes have brief limitations periods to ensure that the accused receive sufficient notice of alleged violations to adequately investigate the claims while they are still capable of being investigated. See Place v. California, Webbing Indus., Inc., 249 F. Supp. 2d 157, 161 (D.R.I. 2003). The defendants in this matter are significantly prejudiced by Tassone's attempts to litigate incidents that occurred five years before the most generous statute of limitations allows. Tassone herself cannot pinpoint exact dates regarding some of the older incidents, thus defendants cannot be expected to defend the same.

Respectfully submitted,

PROVIDENCE SCHOOL BOARD & CITY OF PROVIDENCE

By their Attorney,
JOSEPH M. FERNANDEZ
CITY SOLICITOR

Sara A. Rapport (No. 6614)
Senior Assistant City Solicitor
City of Providence Law Department
275 Westminster Street
Providence, RI 02903
(401) 421-7740 Ext. 385
(401) 351-7596 (facsimile)

**CERTIFICATION**

I hereby certify that on the 28th day of July, I caused to be mailed a copy of the foregoing Reply Memorandum with attachments via first-class mail to opposing counsel: Patricia E. Andrews, Esq., 129 Dyer Street, Providence, RI 02903.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SIMMONE T. TASSONE, :
(Plaintiff) :
:
v. C.A. NO. 03-418ML
:
PROVIDENCE SCHOOL BOARD
:
(Defendant) :

**DEFENDANTS' RESPONSE TO PLAINTIFF'S THIRD REQUEST FOR PRODUCTION OF DOCUMENTS**

Request No. 7. For the period 1993 to the present time, any and all documents which reflect the duties and responsibilities of special-education teachers. Your response should include, but not be limited to, documents reflecting which duties are essential.

Response. Objection. Request is overly broad. Without waiving such objection, please see attached.

Request No. 9. For the period of 1993 to the present time, any and all documents which support the contention that corridor duty was an essential function of plaintiff's job.

Response. Objection. Request is overly broad. Teachers can and have been directed to perform corridor duty at beginning of the year orientation, but such documentation is not extant. Moreover, teachers who refuse to perform corridor duty can and have been "written up" for such refusal but documentation is similarly not extant, or would be unduly burdensome to access and produce.

Request 12. For the period 1993 to the present time, any and all documents which reflect who has, or had, responsibility for sanding, plowing, clearing, and/or de-icing, and/or de-icing the parking lot and other surrounding areas near or outside of Bridgham. Your answer should include, but not be limited to, any contracts between defendants and any other party including Sodexho or Marriott, any and all documents which set forth or explain the authority which Bridgham administrators and/or principals had over the janitors and/or custodians.

Response. Objection. Request is not reasonably calculated to lead to the discovery of admissible evidence. Without waiving such objection, please see attached.

Request 18. For the period 1993 to the present time, any and all documents relating to the fact that fire doors had to be closed at all times.

Response. See R.I. Gen. Laws § 23-28.12-30(h); R.I. Life Safety Code §§ 7.2.1.8 & 7.2.4.3.9

Request 30. For the period 1993 to the present time, any and all documents which reflect that teachers (including special education teachers) had to do coverage.

Response. Please see attached.

Request 38. For the period 1993 to the present time, any and all documents which reflect the cost of assigning plaintiff her own personal assistant.

Response. Please see attached.

Request 63. Any and all documents which reflect when plaintiff's personal assistant began working for plaintiff.

Response. Please see attached.

DEFENDANTS,
PROVIDENCE SCHOOL BOARD AND
CITY OF PROVIDENCE

By their Attorney,

JOSEPH M. FERNANDEZ
CITY SOLICITOR

Sara A. Rapport (No. 6614)
Senior Assistant City Solicitor
City of Providence Law Department
275 Westminster Street
Providence, RI 02903
(401) 421-7740 Ext. 385
Fax (401) 351-7596

## CERTIFICATION

I hereby certify that on this 21th day of September 2005, I mailed a copy of the foregoing Defendants' Response to Plaintiff's Third Request for Production of Documents on opposing counsel:

Patricia E. Andrews, Esq.,
170 Westminster Street, Suite 601
Providence, RI 02903

Sara A. Rapport

report, but I don't recall the incident. I'm not even sure if I was in the building at that time or I found out the next day. I'm not sure.

Q. What accident report?

A. That she had -- I have to read it, but I assume she fell or hurt herself, and she had to fill out an accident report. I had to sign the accident report. There was no witnesses, and we sent it Downtown.

Q. Can you tell me -- do you remember that incident happening?

A. No, I don't.

Q. Can you tell me what it is you know now sitting here today about that incident?

A. That it happened.

Q. That what happened, I'm trying to find out.

A. I would have to read the report to tell you.

Q. Do you remember it being that she fell off her scooter at work?

A. I didn't remember it, when she showed it to me.

Q. But sitting here today --

(OFF THE RECORD)

Q. Now, did you ever remember -- strike that. Can you tell me any reason why the doors on the ramp

could not have remained open?

A. No, I don't -- I always remember them being closed from when I got there until afterwards. I don't know if it's part of the fire code, if they're fire doors. I'm not sure why they would be, but they were always closed on both levels.

Q. If Simonne Tassone had come to you and asked you to keep the doors open, what would you have said?

MS. QUIGLEY: Objection.

A. I have no idea. I really don't know if -- I don't know what we could have done. I would have to investigate it. I don't know.

Q. You're not aware of any code that requires them to remain closed?

A. No, I'm not.

Q. Did you ever see her on her scooter?

A. Yes, quite a bit.

Q. The special ed students, they used the ramp as well?

A. Yes. She took her classes up and down the ramp.

Q. How would a special ed student get from the first floor to the second floor using the ramp? Could they open the door?

A. Yes. The door wasn't that hard to open. I

button on your remote, it would move the signal?
A. Yes.
Q. Did you ever fill out any paperwork to make a request to resolve this problem? Strike that. Did you ever put in writing or memorialize in any way this problem you were having with the switch?
MS. ANDREWS: Objection as to the form.
A. I don't remember putting it in writing. I know I spoke to Mr. Lee and Mr. DiRuzzo. I spoke to Peter, I don't know his last name. He works for the school department. He was the janitor. I spoke to him about it. He tried using the tape. I am not sure if it was Mr. Lee or Mr. DiRuzzo who said they would put in a work order.
Q. And at some point it got removed, the switch did?
A. Yes.
Q. Turning to Page 8 where you are talking about the remote and the loss of the remote, you say, I eventually learned the janitor in my school had the remote all



along; do you see that sentence?
A. Yes.
Q. Is it your understanding that remote the janitor had was the one that had gone missing in December of 1998 or an extra one?
A. An extra one.
Q. Did you physically get the remote from the janitor?
A. Yes, I did.
Q. He handed it to you or gave it to you?
A. I am not sure if he gave it to Mr. Lee and Mr. Lee gave it to me, but he did speak to me about it.
Q. Who is the he?
A. Peter.
Q. This is the same Peter who put tape up?
A. Yes.
Q. He is the one who said, it is my remote that you now have, or my copy of it?
A. Yes.
Q. Is he the one who said, don't lose it?
A. Yes.
Q. Because we don't have any others?
A. Yes.



Q. Did you get along with Peter?
A. Yes.
Q. Do you know his last name?
A. I know his wife works at the school. I don't know his last name offhand right now. I always called him Peter.
Q. You say on Page 9 that students could not go on trips because I could not get on the bus?
A. Yes.
Q. You are saying this happened from 1998 to about 2001?
A. Yes.
Q. How many times in that time period did that happen?
A. Sometimes once a year.
Q. We are talking about three years here, '98 to '99, '99 to 2000 and 2000 to 2001?
MS. ANDREWS: Why don't you read your answer before you, when she asks a question, read it and take your time and then answer it.
A. It happened three times or once a year for the three years.
Q. Your memory is that in each of the three



years from 1998 to 2001 your kids did not go on any field trips at all because of your inability to use the bus?
A. Yes, because I was told that it cost extra money to get a handicap because for a scooter. If they went to a museum or a place that did a lot of walking and that because of that a lot of field trips had to be cancelled.
Q. Did other people go on field trips those years?
A. Yes.
Q. Who told you that your kids could not go on a field trip because they could not get a handicap bus?
A. It was members of the special-ed team, I believe.
Q. Who? Glenda Guglielmo?
A. I am talking about teachers.
Q. Did Mr. Lee tell you that?
A. No.
Q. Did Mr. DiRuzzo tell you that?
A. No.
Q. Don't you put in a request for a bus through your principal?

remote, I'd be able to come back to work.
Q. And then he had it for you?
A. He said they located one, and that I could go to school. When I went to school, Peter, I don't know his last name, he was the janitor there, met me and gave me the remote, and he said that he wasn't too happy about it, because when they first got the remotes, they were only given two, one for me and one that he kept. So, that if he needed it for, I don't know what he would need it for, but he kept one with him, and so he had to give me his, and he wasn't happy the about that. That's how I got it.
Q. So, you did get one?
A. Yes.
Q. And you were able to use it from then on?
A. Correct.
Q. Do you still use that today?
A. Yes, but today, the last two years, I do go on the second floor if I have to go to a S.I.T. team meeting or if I have to meet with one person. They don't call them MDT teams anymore. A different name, you know what I mean?
MS. QUIGLEY: Yes, I know what you're talking about.
A. I can go up on the second floor, but two years

Page 70

remote, do you know?
A. No, I don't think so.
Q. How did you become involved?
A. Because the building principal -- it was either the -- I believe the building principal was trying to determine who had -- there was a second remote that they knew of, and they were trying to figure out who had the second remote so that she could be given that one.
Q. And that principal, do you remember his name?
A. Robert Lee.
Q. So, do you remember talks with Robert Lee about this issue?
A. Yes.
Q. And it's your recollection that Mr. Lee said that there was a second remote and they were just trying to find out who had it?
A. Yes.
Q. And was this during the time that Simmone Tassone had lost it?
A. Yes.
Q. And do you remember anything else that Mr. Lee said?
THE WITNESS: With regards to the remote?
MS. ANDREWS: Yes.

Page 71

A. No.
Q. Do you remember who ended up with the second remote?
MS. RAPPORT: Objection as to form.
A. It was given to Simmone.
Q. Yes. Who had it?
[redacted]
Q. And how did you learn that, was that from Mr. Lee?
A. Or Simmone herself told me that she had it.
Q. Do you remember the custodian's name?
A. No.
Q. What do you remember about her falling off her scooter?
MS. RAPPORT: Objection as to form.
A. Nothing, really. I just believe that there was some notation that she was -- she had fallen off and had hurt herself. I'm not sure.
Q. And do you know whether it had anything to do with not having her remote?
A. No. I don't know.
Q. Did you ever hear that Simmone Tassone had problems opening doors?
A. Only because she had a remote, I would assume that was the reason for the remote.
Q. Is that all you can remember?

Page 72

A. Yes. That predates me.
Q. Let me ask you this, when you came on board as Director of Equity and Access, did you seek to find out whether any employees were having difficulty with access issues?
A. No, I didn't.
Q. When was the first time that you met Simmone Tassone?
[redacted]
A. No. I cannot say for sure. I think she was
[redacted]
and wanted to meet me personally, and I also went
[redacted]
Q. And what did you determine?
[redacted]
Q. Did you find out whether she was having any access

Page 73

problems?
A. I don't remember.
Q. Do you know why you went to Bridgham to look at the environment?
A. I think that was part of my job, just to go to different places and see for myself.
Q. Was it because you knew Simmone Tassone was having some issues there?
A. I can't say for sure that this was specific to Simmone.
Q. Are you aware of any other individuals at Bridgham who have disablilties?
A. I can't remember.
Q. What's -- strike that. We talked about the 504 process, and in your prior testimony you said that sometimes you would get referrals from the union, correct?
A. Yes.
Q. And then sometimes you would actually receive a request on your forms?
A. Yes.
Q. Were there any other circumstances under which a request could get to the 504 Committee?
[redacted] It could be

conversation with Simonne?
A. I spoke to Mr. Lee and I call Mr. Dunham to try to get information.
Q. Anything else?
A. No.
Q. So how many talks did you have with Mr. Lee?
THE WITNESS: About this particular -- the remote issue?
MS. ANDREWS: Yes.
A. I would say one.
Q. And tell me what was said between the two of you.
A. I believe I asked him if he had any information about the doors, who made them, and if there was any information, like booklets that I could track down the actual company that made the doors, or who installed them.
Q. And what did he say?
A. He said he was already looking into finding the other remote.
Q. And what did you say?
A. I'm not sure what I said. I believe that if he wasn't -- I think that if he was unable to find the other remote, that we should find a way of replacing the one that she had.
Q. Can you remember anything else that you two talked



about in that conversation?
A. No.
Q. And what next happened with this lost remote?
A. I believe I called Mark Dunham to see if he had information about the paperwork, when did the requisition go out, who got the bid to install it.
Q. And what did you find out?
A. Mark said that he would have to research it and that he would get back to me.
Q. What happened next?
A. The whole process came to a stop because we were informed that Simonne had the second remote.
Q. So between the time that you spoke to Mark Dunham and the time that you learned that Simonne had the second remote, are you aware of anything else that was done with regard to this issue?
A. No.
Q. How did you find out that she had the remote?
A. I think either Simonne or Bob Lee told me. Someone told me, I don't remember who it was.
Q. And what did this person say it was?
A. That it was all set.
Q. Did they say anything about having found the remote?
A. I believe they got the second remote from the



maintenance person and gave it to Simonne.
Q. Did Mr. Lee ever tell you that he was aware of a second, that the janitor had the second remote?
A. I believe Mr. Lee told me that he was going to investigate whether or not the janitor had the second.
Q. Did you ask him why he thought the janitor had it?
A. No.
Q. But did he say, I believe the janitor has the second remote?
A. Yes.
Q. And you knew that at some point Simonne Tassone fell off her scooter, correct?
A. I'm not sure of your question.
Q. Did you at some point learn that Simonne Tassone fell off her scooter and injured herself at school?
A. Yes.
Q. Did you ever learn that it was because she didn't have the remote?
A. No, I don't believe -- no.
Q. You never learned that?
A. I can't remember that that was the -- I know that she did fall off her caddy?
MS. ANDREWS: Um-hum.



A. It's not clear to me, no.
Q. Did Mr. Lee ever get back to you and tell you that he had checked with the janitor?
MS. RAPPORT: Objection; asked and answered.
A. I don't remember.
Q. Well, he said that he was going to check to see if the janitor had the remote, correct?
A. Yes.
Q. And he said that when you first had that conversation with him after talking to Simonne, correct?
A. Yes.
Q. And sitting here today, you can't recall one way or the other whether he actually got back to you about whether or not the janitor had it?
A. I know I stopped looking because I was told, and I just don't know who told me, it could have been Simonne called and said that she had the remote.
Q. What did you find out about the company that had put in the doors?
A. Nothing.
Q. Never heard anything about that?
A. No.

Page 177

Q. Do you know whether that was ever pursued?
A. No. I asked Mark Dunham not to bother looking into it anymore because they had another remote.
Q. Do you know whether that company was still in existence?
A. I don't know.
Q. Did Mark Dunham ever tell you one way or the other that the company was no longer in existence?
A. No, he never told me anything about it.
(BRIEF RECESS)
Q. I just want to get clear on something. When you had this conversation with Mr. Lee, did he tell you that there was a second remote but he had to find out who had it?
A. I don't remember the exact conversation.
Q. Well, I'm just trying to find out, was it just a matter of, there is a second remote, I've just got to find how who's got it, or did he say, I've got to find out if there is a second remote?
MS. RAPPORT: Objection.
A. More like, let me check with the janitor, I think that when they installed it there was a second remote.
Q. And you said that in your prior deposition that

Page 178

you had had talks with Mr. Zimmerman about this case, correct?
A. Yes.
Q. And essentially he was asking you what you knew about this case, correct?
A. Mr. Zimmerman took over all of the cases, and I spent a brief while trying to give him the cases and information relating to all of them.
Q. Well, when you talked to Mr. Zimmerman, did he ever ask you questions about what you knew about Simonne Tassone?
A. I don't remember.
Q. You don't remember him doing that?
A. Well, in essence, I believe we covered the majority of the active cases.
Q. Well, did Mr. Zimmerman ask you anything about the lost remote?
A. I don't remember.
Q. You don't remember one way or the other?
A. I don't remember if he specifically asked me about the remote.
Q. Did anyone ever ask you if you had any information about the remote?
MS. RAPPORT: Objection; form.
A. I can't remember.

Page 179

Q. You can't remember that happening?
A. Right now I can't remember.
Q. That that happened?
MS. RAPPORT: Objection.
A. That anyone asked me.
Q. Can you tell me about any other communications that you have had with Simonne Tassone other than what you've testified to already?
MS. RAPPORT: Objection as to form. Over what time frame?
MS. ANDREWS: Go ahead.
A. Well, there have been quite a few occasions where I've run into her and said, hi, how are you. Nothing specific that I can remember other than when she had put in a request.
Q. Well, tell me about those conversations.
MS. RAPPORT: Objection; form.
THE WITNESS: Which conversations?
Q. You said other than when she put in those requests; I'm asking you what conversations did you have with her about those requests.
MS. RAPPORT: Objection; form.
Q. Or about any requests.
A. But you're asking me to give you the details, I don't remember any details about conversation.

Page 180

Q. [redacted] rms
[redacted] Tassone had
[redacted] out any request for an accommodation.
[redacted] That's a difficult question because I'm
[redacted] ying to think of every instance that I had a
[redacted] nversation with her. One time I was in her
[redacted] ssroom, we had purchased software that would
[redacted] lp her actually speak into the computer and it
w [redacted] uld actually transcribe her sentences that she
s [redacted] d verbally, it would go into, like, a document.
S [redacted] I was there with a person from the Technology
D [redacted] partment installing it from her classroom
c [redacted] nputer that she had. So we talked about that.
I' [redacted] not sure I can tell you specific
c [redacted] versations.
Q. [redacted] you remember anything that Simonne Tassone said
d [redacted] ing this time when the computer software was
b [redacted] ng installed?
A [redacted] No, I don't remember specifically.
Q. [redacted] d was this an accommodation?
A [redacted] I can't remember if it was. I would have to
lo [redacted] k at the documents.
Q. [redacted] hat documents?
A [redacted] If there was an accommodation. She requested
th [redacted]

Page 2

INDEX

| WITNESS | PAGE |
|---|---|
| GLENDA GUGLIELMO | |
| Examination by Ms. Iafrate | 4 |

EXHIBITS

| PLAINTIFF'S NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Document entitled Special Education Discipline Guidelines For Students With Disabilities Under IDEA 1997, 2 pp | 57 |
| 2 | Memorandum dated 11/19/01 to Special Education Teachers from Glenda Guglielmo, 1 p | 69 |
| 3 | Memorandum dated October 15, 2001, to Teachers from Rick Cochran, 1 p | 78 |
| 4 | Letter dated 9/2/02 to Glenda Guglielmo from Simonne Tassone, 1 p | 86 |
| 5 | Letter dated 9/23/02 to Glenda Guglielmo from Simonne Tassone, 1 p | 89 |
| 6 | Correspondence dated 9/3/02 to Melody Johnson from Joseph Almagno with Grievance No. 6716 enclosed, 2 pp | 100 |
| 7 | Correspondence dated 9/24/02 to Melody Johnson from Joseph Almagno with Grievance No. 6741 enclosed, 2 pp | 105 |
| 8 | Letter dated 6/5/02 to Glenda Guglielmo from Simonne Tassone, 1 p | 109 |
| 9 | Samuel W. Bridgham Middle School Faculty Sign-In Sheet, 2 p | 112 |
| 10 | S.W. Bridgham Middle School Special Education Roster By Case Manager/Case School Year 2002-2003, 1 p | 113 |
| 11 | Samuel W. Bridgham Faculty Phone List, 1 p | 113 |
| 12 | Letter dated 2/4/03 to Mr. Cochran from Simonne Tassone, 1 p | 116 |
| 13 | Letter dated 5/19/03 to Glenda and IEP Team from Rick Cochran, 1 p | 116 |

Page 3

(DEPOSITION COMMENCED 11:20 A.M.)

GLENDA GUGLIELMO

Being duly sworn, deposes and testifies as follows:

THE REPORTER: Could you state your full name for the record, please, and spell your last name?

THE WITNESS: Glenda June Guglielmo. G-U-G-L-I-E-L-M-O.

MS. IAFRATE: Good morning. My name is Carly Iafrate, and I represent Simonne Tassone in a lawsuit, and I'm going to be asking you some questions today, and what I need you to do is when I ask you the questions, I need you to put your answer on the record, so it's answered verbally. Nodding your head won't be enough.

Also, make sure you wait for me to fully get my question out before you respond, so that she has time to put it all down. If we talk over each other, sometimes it gets a little messy.

(OFF THE RECORD)

MS. IAFRATE: If you don't understand a question I'm asking, feel free to let me know, so I can reask it in a different way. If you don't ask me to do that, I will assume you

Page 4

understood the question, and I will ask you to answer it; okay?

THE WITNESS: Okay.

EXAMINATION BY MS. IAFRATE

Q. Have you been deposed before, ever?

A. No.

Q. And what did you do to prepare for your deposition today?

A. I met very briefly with Sara prior to the meeting. We were supposed to have met on September 26, I believe, and I had gone to her office, and very briefly we spoke.

MS. IAFRATE: Okay.

A. And then we found it was canceled, and this morning I just went to her office, and I was there maybe 15, 20 minutes.

MS. IAFRATE: Okay.

A. That's it.

Q. Did you review any documents before coming here today?

A. Today, I looked at one document, but it didn't pertain to Simonne.

Q. What was that document?

A. It was a decision about a court case in Rhode Island.

Page 5

Q. Okay. And what was the case about?

A. About a child remaining in the classroom.

Q. Okay. Can you tell me the name of the case?

A. I don't remember the name of it.

Q. Okay. Where did you get the case?

A. Sara gave it to me to look at.

Q. Just this morning, or she had given it to you on that prior --

A. This morning.

Q. So you read that decision?

A. Uh-huh.

MS. RAPPORT: You have to say yes or no.

A. I'm sorry. Yes.

Q. What did you learn from it?

A. Nothing. That's something I had already known.

Q. Okay. And what is that?

A. That when students are in a classroom, they have the right to remain there pending due process hearings or parents decide to exercise their stay-put rights.

Q. Did you say stay-put rights?

A. Yes.

Q. What do you mean by that?

A. If a child is going to be transferred out of a

classroom, a parent has the right to request that the child stay put until the due process hearing has been done.
Q. Are you distinguishing between special ed students or students with IEPs and a nonspecial ed student?
A. Yes, these are students with IEPs and special education students.
Q. Okay. So when you're talking about this whole thing that you just described about a student's right to remain in the classroom, you're talking only about students that have IEPs?
A. Yes.
(OFF THE RECORD)
Q. So you said you don't remember the name of the case?
A. The child's name wasn't listed.
MS. IAFRATE: Okay.
A. It was just initials.
Q. Do you remember the initials?
A. I think they were R.C.
Q. Okay. And you said it didn't teach you anything other than what you had already known; is that correct?
A. Yes.
Q. So prior to reading the case, you believed what



about a student's right to remain in the classroom?
A. That a student has the right to remain in a classroom, especially if a parent chooses to exercise their stay-put rights, whereas if an incident has occurred with the child, and say the principal wants the child out of the building, the child doesn't automatically leave. That child has rights, and the child can remain in that classroom pending a due process hearing.
Q. Okay. When you're talking about remaining in the classroom, you're talking about the particular classroom to which the student was originally assigned?
A. Yes.
Q. And to that teacher?
A. Yes.
Q. I'm going to get back to that, so let's move on. Other than that, are there any other documents that you reviewed in preparation for today, either when you were preparing for your first deposition or today?
A. The first time I read a grievance that Simonne had filed.
Q. And where did you get that grievance?



A. In Sara's office.
Q. So that was given to you by her as well?
A. Yes.
Q. And do you remember anything about that grievance?
A. It had to do with her wanting a child removed from the classroom.
Q. And did you have some opinion on whether that was possible or not based on what you read?
A. No, I just read it. I didn't verbalize any opinion I can recall.
Q. Have you seen in the past other grievances in which teachers asked for students to be removed from the classroom?
A. I have heard of them.
MS. IAFRATE: Okay.
A. Yes.
Q. And do you have an opinion on whether that's an effective way to have a student removed from the classroom?
MS. RAPPORT: Objection. When I object like that, you still have to answer, but I'm lodging an objection for the record. So I'm going to object on the grounds of failure to qualify her as an expert.
MS. IAFRATE: Okay.



THE WITNESS: Could you repeat that again?
Q. Sure. Do you have an opinion on whether filing grievances is a way that you can have a student removed from the classroom?
A. I know that teachers in Providence do that, but it doesn't mean that a child will be removed from the classroom.
Q. Okay. Are there some situations which you know of that children have been removed after teachers have filed grievances?
A. I was in Providence 31 years. There may have been. I really don't recall that a child was removed because of a grievance. I don't recall that.
Q. Okay. You don't recall that ever happening?
A. No, it may have. I don't remember.
Q. Okay. Why don't you tell me what your current position is?
A. I'm retired.
Q. Okay. How long have you been retired?
A. I've been retired since August of 2004, over a year.
Q. Okay. And prior to your retirement, what position did you hold?

A. I was a special education supervisor.
Q. And how long had you been a special education supervisor?
A. Oh, let's see about nine years.
Q. Do you recall the years? So would it have been --
A. I think it was from --
Q. 1995, does that make sense?
A. I think it was from September or October '96 until my retirement in 2004, but I had been acting -- I acted as a supervisor a few times when there was supervisors out ill.
Q. Prior to that September of 2000 -- 1996?
A. 1996, yes.
Q. Were you a teacher before 1996, before September 1996?
A. I was a diagnostic prescriptive teacher which means I did educational testing for special needs students.
Q. And how long were you a diagnostic prescriptive teacher? Is that what they call a DPT?
A. DPT, yes.
Q. How long had you been a DPT?
A. Let me think; 16, 17, 18 years. I've actually lost track of what positions I've held when.
Q. Okay. Before you were DPT?



A. I was a special education resource teacher.
Q. And how long were you a special education resource teacher?
A. That was two to three years, I believe.
Q. And prior to that?
A. I taught emotionally disturbed adolescents.
Q. Is this still in Providence?
A. Yes, that was all in Providence.
Q. When you say you taught emotionally disturbed adolescents, that's different from a special ed teacher?
A. No, that's a special education teacher.
Q. Okay. Is it a special kind of special ed teacher?
A. Yes. Nowadays, those students are called behaviorally disordered. In 1973, they were called emotionally disturbed.
Q. Are there other kinds of special ed students today that they call different things like other than behaviorally disordered?
A. Yes.
Q. What are the other kinds of special ed classes that you can have?
A. Well, not classes.
Q. Okay. Students?
A. There are different labels for students. A



child can be diagnosed as learning disabled, mentally retarded or cognitively delayed.
MS. IAFRATE: Uh-huh.
A. Then you have the behaviorally disordered. There could be traumatic brain injury, could be multiply handicapped children, speech and language delayed children, visually impaired students, and hearing impaired.
Q. So how do these groups of students correspond to, if they do -- like if somebody has a mild/moderate classroom, what kind of students are in like a mild/moderate classroom?
A. In a mild/moderate classroom, one would find any of those students except perhaps for multiply handicapped, and in some cases, there may be some multiply handicapped children included in a special education classroom.
Q. So is there any sort of formula for what kind of students go into what kind of special ed classroom?
A. There's not really a formula. What happens is a teacher is certified as either mild -- she's certified to teach a mild/moderate classroom or severe/profound, and within those two realms, you could have any child with those categories labeled



as those.
Q. Okay. So even though there's two different kinds of classrooms, you could still have any of those types of students?
A. Yes.
Q. Okay. So there's no students that the mild and moderate classroom teacher would not have that would be say in a severe and profound classroom?
MS. RAPPORT: Objection, asked and answered.
MS. IAFRATE: You still have to answer.
A. There are times when a child who's classified severely/profoundly handicapped can go into a mild/moderate classroom because he or she has made such gains, and by law, the district is required to put the child in the least restrictive environment. So there are times when a child who has been in a severely/profoundly handicapped classroom can go into a mild/moderate classroom.
Q. Okay. But are there certain kinds of students that you wouldn't start out in the mild/moderate classroom without them being in the severe/profound classroom, and then improving and getting moved to the mild/moderate classroom?

A. That may occur if a child is classified as severely or profoundly disabled, a child may not be in the classroom initially.
Q. Okay. Can you explain to me as special ed supervisor what your duties and responsibilities were; what was your job?
A. Okay. I was assigned to different schools in the district. I would have to conduct the team meetings, which means I usually met once a week at each school I was assigned to, and I chaired the team meetings, and in the meetings would be the school psychologist, the DPT, the nurse, the speech pathologist, guidance counselors, if the principals or assistant principals wanted to attend, classroom teachers could attend, and we discussed any new referral, any new student that needed to be evaluated, any student who needed reevaluation, and any students who may need more services other than the current services that the child was receiving.
Over the years, I supervised the speech pathologists which is a group of about 36 individuals, and would assign them to preschools, day cares, Head Starts, elementary, middle, high schools. I supervised the occupational



therapists. I was in charge of the secretaries in the office. I helped with the budget with my boss, a lot of different functions, but basically, we were to go out to the schools and assist schools.
Q. Are there any other functions that you can think of with respect to just the special ed students?
A. Oh, we had to make sure that the IEPs were implemented, and that all services were provided, and we acted as advocates for the students, special needs students. I was involved in the manifestation hearings.
Q. Anything else that you can think of?
A. Oh, God. I'm sure I'm forgetting a lot of things because we did so many things; budget; we ran workshops; we did professional development; speech.
Q. Anything else that relates to the special ed students? If you think of it later, you can let me know.
A. Okay.
Q. How many different schools would you be assigned to at one time?
A. Again, that varied, maybe five, six.
Q. And are they all different age -- you know, all



different grades or is that --
A. Yes, I usually had elementary, middle, but over the years, it varied. I sometimes had high school and middle schools. It varied over the years.
Q. And when you said that you went to the team meetings, how often did you say you had those meetings?
A. Once a week.
Q. And is there any other things that were discussed in these team meetings other than what you mentioned? You mentioned new students that needed be evaluated or whether they needed more services; is there any other function of the team?
A. Evaluation and to conduct IEP conferences would be part of the IEP team.
Q. Could you tell me what an IEP is?
A. An IEP is an individualized educational program developed for any child with special needs.
Q. And when you say that you had to make sure that they were implemented, tell me what exactly did you have to do.
A. By law it's required that the IEP is honored. It's a legal document, and if a child had speech services on his IEP, I have to make sure speech services were provided. If a child needed



occupational therapy, I had to make sure that service was being provided. I would meet with parents as part of the team -- not that I was the dictator of the IEP -- and discuss any concerns, problems, any of the needs the child may have, and they would be written into the IEP.
Q. Other than these team meetings, did you have other interaction with the teacher that was in charge of the special ed student?
A. Usually, the teacher, if there was a problem, would come to a team meeting, and I would try to visit the classrooms on occasion, but oftentimes, time didn't allow for that.
Q. Okay. What kinds of things would the teacher be coming to the team meeting to talk about?
A. Oh, let me think. If a teacher thought that a child -- like say, for instance, speech therapy wasn't indicated on the IEP, and the teacher would come and say, "Gee, I've noticed this problem with the child. I think that perhaps he should have a speech evaluation. He may be in need of some services." Those kinds of things the teacher would come to us with.
Q. Okay. Did you receive like say phone calls or letters from teachers about issues that they had

Page 18

outside of the team meeting?
A. On occasion.
Q. Okay. When you say, "on occasion," how often did that happen?
A. Not very often because usually the problems -- if a teacher was having a problem, they would go to one of the team members that were in the building, and then it would be discussed at a team meeting.
Q. The other team members in the building being the --
A. The school psychologist or the DPT.
Q. Who was your supervisor when you were special ed supervisor?
A. Ken Swanson.
Q. Was he your supervisor for that whole nine years?
A. No, Dr. Peter Durkin was there.
Q. Can you give me the time spans of when they were your supervisor?
A. I want to say Ken probably came in, I think, around the year 2000, maybe.
Q. And was he there until you retired?
A. He left just before I did.
Q. And did someone replace him while you were still there?

Page 19

A. I can't think of her name. Somebody was put in charge of special ed. Of course, I can't think of her name offhand.
Q. It was a female?
A. Female.
Q. Do you know where she came from?
A. She was in Providence. She used to be superintendent in Jamestown, Dr. Gallo, Frances Gallo.
Q. And before Ken Swanson, was it this Durkin person?
A. Yes, Peter Durkin.
Q. Okay. And was Mr. Durkin your supervisor going back to 1996?
A. I believe so.
Q. What kind of things is -- what's the title of that position; do you know? Like Ken Swanson, we'll use him as an example.
A. Ken Swanson was Assistant Superintendent of Specialized Services, and I believe --
Q. So -- I'm sorry. Go ahead.
A. I believe Peter's position was just Director of Special Education.
Q. So was Mr. Swanson basically in charge of special education --
A. Yes.

Page 20

Q. -- on behalf of the school district?
A. Yes.
Q. And was he also responsible for other things that weren't included in special ed services?
A. Yes.
Q. Like what?
A. Guidance counseling for the district. That would include students who are not special education, but the guidance counseling service. I'm trying to think what else. Oh, nurses. He, at one point, was in charge of the nurses. The duties kept changing.
Q. So what kinds of things did Swanson do on a daily basis that related to special education?
A. Well, he had supervisors whom he was in charge of, and we would go out to the schools and deal with the school problems, but if there was something very serious, I mean -- oh, he dealt with the union grievances also. You know, he dealt with parents who wanted to see him, and --
Q. How many supervisors were there, special ed supervisors?
A. Ten or eleven of us, maybe.
Q. And how often besides those team meetings -- I'm not sure if I asked you this, but how often did

Page 21

you visit the schools?
A. Usually that once a week.
Q. Okay. And you said that Mr. Swanson dealt with grievances. Did you have any involvement in grievances when you were special ed supervisor?
A. No, he handled them. He attended the grievance meetings.
Q. Do you ever have to attend a grievance meeting?
A. Actually, once.
Q. Okay. And what was that about?
A. It had to do with occupational therapists.
Q. And what was their complaint?
MS. RAPPORT: I'm going to -- all right. You can answer that question.
A. Okay. They were doing some extra work before and after school. They weren't pleased with the amount of money they were making. So it was a monetary issue.
Q. Okay. And besides this one time that you were involved in the grievance hearing, had you ever seen grievances? Were they ever shown to you in your role as special ed supervisor?
A. Sometimes, not too often.
Q. Do you remember any grievances that you had ever been shown what the complaint was?

A. No, other than the one that I saw in Sara's office.
Q. Okay. And are you saying that you remember seeing that at some point prior to the time that you saw it in Sara's office?
A. No, just in Sara's office.
Q. Okay. But you're saying that you remember the situation that was in that grievance?
A. No, I don't remember that either.
Q. Okay. So the first time that you ever learned anything about that grievance was in Sara's office?
A. Yes.
Q. And you don't remember the events that were in there, when they happened?
A. Right.
MS. IAFRATE: Okay.
A. Yes.
Q. Let's talk about removing special ed students from the classroom in greater detail. Is there some type of written procedure for that process?
A. A child really should not be removed from the classroom. That's a practice that -- we try to maintain the child in the classroom because of the IEP and the fact that a teacher is supposed to be



qualified to deal with the students, and we don't like to disrupt a student's educational program by transferring him from one school to another to another.
Q. But my question was a little bit different than that. It was, is there a written procedure for removing a student from a classroom?
A. Not that I can recall other than -- if you're talking about a very violent situation where the police can be called in to remove a child from the classroom.
Q. Okay. When you say, "a very violent situation," what are you talking about?
A. If a child were to really hurt another child by assaulting him or a gun -- a zero tolerance situation whereby a child were to bring in drugs or a weapon, and then the police would be called in.
Q. And are you saying that there's a written procedure for that type behavior?
A. Yes.
Q. Okay. And what does that procedure say specifically?
A. When a zero tolerance thing occurs, the police can be called, and the child is taken out of



school, and then a manifestation hearing needs to be conducted. Now, I'm only referring to special needs students at this time, and if it is -- if a child -- let's see. How can I explain this? Say, for instance, you've got a learning disabled child who has good reasoning skills, and he knows right from wrong. At the manifestation hearing, it may be determined he knew what he was doing at the time, and then he could be treated like any other student and be recommended for exclusion.
Q. What do you mean by "exclusion"?
A. A child could be excluded by the -- go before the school committee. A child could be excluded from school, but still Providence would be responsible for educating him.
Q. Okay. So you're saying he would be moved to a different school?
A. He may be homeschooled. He may go to an interim program.
Q. Are there any other options besides those, the home school or the interim program?
A. That's usually it from what I can recall.
Q. What's the interim program?
A. There's a school -- I don't even know if they still have it. It was located on Hartford Avenue,



and oftentimes, if a child was excluded from a program within a regular -- like a middle school setting, this child can go to this program which was located on Hartford Avenue.
Q. And when you're talking about this exclusion, you're talking -- or are you talking only about situations in which this person has had a manifestation hearing, the student?
A. Yes.
Q. And this term "exclusion," is there sort of a decision that he be excluded and sent to one of these outside programs?
A. Yes.
Q. Okay. Is another one of the options that they have after the exclusion to move them to another school or the exclusion is always outside schools?
A. If it's a zero tolerance offense, he would be just moved to that program, the interim program.
Q. Okay. And when you say, "zero tolerance offense," you said an assault on another child, having a gun or drugs, are there any other circumstances that are considered zero tolerance offenses which would warrant the procedure you just described?
A. Weapons, drugs, severe behavior, that's all I can recall.

Page 26

Q. You just said severe behavior, what do you mean by that?
A. Say, for instance, a child just really lost total control and started attacking people in the classroom --
Q. Physically attacking?
A. Physically attacking. If a child lost total control of his behavior and became extremely violent.
Q. Now, in this situation where the police remove the student, how quickly does that happen?
A. The principal could call the police, and as soon as they show up.
Q. Okay. So in that situation, do they have to involve the special ed supervisor or the special ed director before that decision is made?
A. When it's that bad, usually the principal would call the special education office to let them know they have a very serious event going on, that they're going to contact the police.
Q. And who decides whether it's reached that level of seriousness that the police can be contacted?
A. The school administrators.
Q. So you don't make that decision?
A. No, because usually, I wasn't there.

Page 27

Q. Okay. Besides this procedure that you just described, are there any -- and you said this was a written procedure?
A. Yes, there's a procedure that the Providence School Department has.
Q. Do you know where that is located, where I could get a copy of it? Is it part of a manual or anything or is it just --
A. You could just contact the central office, and they would have copies of it.
Q. Is it distributed to all the teachers?
A. To students and to parents. Everybody gets a copy of that.
Q. To the teachers as well?
A. Yes.
Q. Is there a name for this procedure?
A. No, zero tolerance policy.
Q. Okay. And does it apply to -- you said earlier, I think, it applies just to special ed students?
A. No, to all students.
Q. Okay. This one applies to all students?
A. Yes.
Q. Okay. But do all students have to have this manifestation hearing?
A. No. If they're not special needs students,

Page 28

they don't have that.
Q. So this part about whether they get excluded or not is just for special ed --
A. Yes.
Q. So besides this situation where you've got an actual assault or a gun or drugs or anything covered by the zero tolerance policy, is there any other written procedure for having a student removed from the classroom that you're aware of?
A. I don't recall. No, I don't think so.
Q. Okay. So other than this procedure that you just talked about, is it your opinion that students do not get removed from the classroom in a regular -- how do I say this?
MS. RAPPORT: Objection to the form of the question.
MS. IAFRATE: I'm going to fix it.
Q. Besides the procedure that you just described, is there any other circumstance that you believe a student could be removed from the classroom?
MS. RAPPORT: Objection to the form of the question.
MS. IAFRATE: Try to answer it if you understand it.
A. I'm not sure I understand that.

Page 29

Q. Okay. Okay. That's fair. What I'm trying to get at is whether there are any other reasons why a student could be removed when it doesn't rise to the level of this zero tolerance policy?
A. There have been situations where a child is in the special education classroom, and say this child has a diagnosis of bipolar disorder. If the child seems to go into an episode, and the needs -- the child's needs cannot be met in the classroom, then the child could be removed and put in maybe a day program at Bradley Hospital or Valley Community School, or there are other placements, out of district places.
Q. So this is a situation where you've got a psychiatric problem?
A. Yes, or behavior problem that's so severe that the child cannot be contained in a classroom in the public school setting.
Q. But it doesn't qualify under the zero tolerance policy?
A. No.
Q. Okay. So how does the student get removed in that situation?
A. Well, a teacher would make a referral to the team, and the referral would be discussed at the

team meeting, and it would be determined what should be done. If, in fact, the child needs more services in the classroom, if that would be more helpful to the child, or if, in fact, the child's situation has become so grave that he or she needs to be removed from the classroom and go into a more therapeutic setting.
Q. So for somebody that you just described there, a student you described there, there's day programs at hospitals?
A. Yes.
Q. And then any other places that you can send a student like that?
A. Oh, yes. Let's see. We have something called a clinical team, and the people on the clinical team make recommendations because they're more familiar with those therapeutic settings.
Q. Okay. So a therapeutic setting is sort of a nonschool environment; is that what you are saying?
A. Yes, it would be a school setting, but with more clinical services.
Q. Okay. So this is a decision that's made by the team?
A. By the team, and the team would refer the child



to the clinical team, and they would take the case on from there.
Q. Okay. So when you say the teacher referred, what exactly does the teacher have to do?
A. Fill out a form, and state the problems that she is experiencing with the child.
Q. And how long does that process take from the time that the teacher says they're having these problems until the time the team decides?
A. That referral has to be reviewed within five days, and like I said, the team meets weekly, so --
Q. And when you say, "reviewed," does that mean they have to make a decision on it within five days or they just have to review it?
A. They need to review it and come to a resolution on what they're going to do.
Q. Within the five days?
A. Yes.
Q. Is there any process that is any faster than the five days where you don't meet the zero tolerance policy? Say, for example, you have a student that threatened a teacher with a knife, but didn't actually have a knife or didn't actually physically assault a person.



A. The principal would probably suspend that student, and a manifestation hearing would be held.
Q. So all in events, the principal still has the ability to suspend the student even if the student is a special ed student?
A. Yes.
Q. Is there any time limit on how long the principal can suspend a student for?
A. A special education student should not be suspended more than 10 days per year.
Q. So, for example, if the student had already been suspended for 10 days, the principal would not be able to suspend them based on the scenario I just described?
A. They shouldn't; however, there are exceptions that are made to that rule.
Q. Under what circumstances would there be exceptions?
A. That situation, actually he could -- the principal could have called the police, if it was a threat with a knife, and the child would have been removed from the school, so --
Q. Okay. And if that situation occurred or there was some type of threat of harm, is there any reason



why the student couldn't be immediately removed?
THE WITNESS: If he had been suspended for the 10 days?
MS. IAFRATE: Uh-huh.
A. The child probably would be removed.
Q. Okay. So does that mean --
A. And then a meeting would be held immediately, if not the next day, to discuss the child's situation because of the fact he had been suspended.
Q. So is your answer --
A. Or sent home.
Q. I'm sorry. I don't want to interrupt you. So is your answer to the question, no, that there isn't any reason why under those circumstances that I described where a student threatened harm to a teacher that the student couldn't be immediately removed?
A. He could be removed by the police.
Q. Okay. Or the principal?
A. Yes, the principal would call the police in.
Q. Okay. Without involving the police, the principal could still suspend the student as long as you're saying it wasn't more than 10 days he had already been suspended that year?

A. Yes.
Q. You're saying if the student had been suspended for 10 days up until that point, the principal could only get the student out by calling the police?
A. Probably, but I'd like to add something.
MS. IAFRATE: Sure.
A. When you have a student who's been suspended, manifestation hearings have to be conducted by the 7th day. If a child has been suspended 7 days, then a manifestation hearing must be held, and the child has to be looked at to see if, in fact, he needs more services or different placement or if the child is inappropriately placed in the classroom and needs a more therapeutic setting. So, hopefully, it doesn't get to the 10 days because you meet prior to the 10th day suspension.
Q. How fast can these manifestation hearings be held, because you just mentioned that in the situation I described, it could happen the next day?
A. If, in fact, all parties could -- because the parent has to be a part of it. The IEP team members, meaning classroom teacher, school psychologist, the DPT, any service providers or speech pathologist, occupational therapist, and



the supervisor would attend a manifestation hearing. If, in fact, you can assemble that group on that day, that's wonderful. If not, hopefully, the next day because sometimes it occurs -- an event will occur while the supervisor is at the building. If you can get the parent in, then the manifestation hearing can be done that day.
Q. What if there hasn't been a threat yet, but the teacher believes that the student is dangerous or fears that the student is going to physically harm somebody. Is there any way to get that student removed?
THE WITNESS: There hasn't been a threat or --
MS. IAFRATE: No, not a specific threat yet, but they're exhibiting some signs that they are a dangerous student.
A. A child would not be removed.
Q. So how do you decide whether the conduct sort of gets to the point where the child can be removed or who decides?
THE WITNESS: Are you talking about a suspension or a child being removed from the classroom?
MS. IAFRATE: A child being removed



from the classroom.
A. That would be a team decision. It's not any one person would decide that the child should leave that classroom.
Q. Okay. Are there any other places that students can go if they get removed from the classroom that we haven't talked about up until this point, whether it's temporary or permanent?
A. If a child were removed from a special education classroom, it's possible he or she could be transferred to another school.
Q. To a special ed classroom in another school?
A. Yes.
Q. Even if say that child had made some kind of a threat?
A. A child would be transferred for different reasons. I'll gave you an example. I know of a situation there were three siblings in one classroom. They had different names. The school department wasn't aware that they were related, and when it happened, that we found out they were three siblings, well, the teachers and the administrators felt as though it wasn't a healthy situation. So two of the children got transferred out of the classroom. So it's not necessarily



because of a behavior problem.
Q. So in that case where it was because they were related, what was the process that was followed to remove them? Did there have to be a team meeting?
A. Yes, there would have to be a team meeting. There would have to be an IEP meeting. The parent had to be involved, and the parent happened to agree that she didn't think it was a healthy situation because they were like a little gang, so --
Q. And how long did that take for those other two students to be moved?
A. God, this was so long ago. I don't recall.
Q. Okay. Do you think it was -- I mean do you have a rough estimate? Is it more than a month or a week?
A. I would say it was probably a couple of weeks.
Q. In your experience, is that a typical amount of time it takes for students to be removed where there isn't a threatening or violent situation or violent student?
A. So many students in Providence have behavior problems, and they threaten other students all the time. We don't just routinely transfer a child because he threatens someone, because it's pretty

commonplace.
Q. So are you saying that a student would have to threaten someone, either the other student or the teacher, on more than one occasion before he would be moved?
A. Each case would be different. It's -- I mean there are some children who make threats all the time. They never act on them. And if students were transferred because they threatened, we'd be transferring students every day several times a day. It all depends on the child, his level of violence, the type of behavior he displays, because a teacher also has other things available to her. There's a school psychologist. There are guidance counselors, and in a crisis situation, a school psychologist can remove the child from the classroom and take the child out, and talk to him or her to calm the child down. There are different strategies that are used. It's not just because someone threatened someone they're going to be removed from the classroom.
(OFF THE RECORD)
Q. Okay. So I want to talk to you about -- kind of give me some general information about your experience, but I want to talk to you about



particular examples.
A. Okay.
Q. So can you think of a particular example or the last particular example that you were involved in in which a student was removed from the classroom other than the situation you just described to me about the three siblings?
MS. RAPPORT: And I'm going to instruct the witness not to disclose names or dates or anything specific.
THE WITNESS: Okay. I have to think about this one. It was a while ago.
MS. IAFRATE: Okay, yes.
(PAUSE)
A. Okay. I have one. It was an elementary school child who became extremely active and violent. She would hit other students and kick other students, and hit her teacher. The parent was called in. The meeting was held. There were things going on at home, and it was causing this child to really act out in school. She was removed from school, and put on home instruction, which means she got five hours of tutoring per week, and then she was evaluated by the clinical team and placed in a therapeutic setting.



Q. Who brought that situation to your attention? Was it the -- not the name, not the name, just was it the classroom teacher or was it someone else?
A. The classroom teacher and the school psychologist.
Q. Did they do that in the context of one of these weekly meetings?
A. Yes.
Q. And how long did it take to remove that student from the classroom after that meeting was held?
A. Okay. Prior to that meeting, we knew the child was having more and more difficulty in the classroom, so the school psychologist, who happened to be there full time, spent a lot of time with her, would see her daily, and oftentimes more than once a day. So things were tried in the classroom prior to her removal, and when it got to the point where she could not be contained within a classroom setting -- and the mother had to agree to this, and she did -- then she was removed, but we had ongoing meetings with the parent prior to her removal. It's not just something that was --
Q. So during that time, was she still hitting other students or hitting the teacher?
A. Attempting to, and the school psychologist



would be called in, and she would remove her from the classroom.
Q. On that day that it happened?
A. Yes.
Q. So where would she go on that day when it happened?
A. The school psychologist had an office, and she would go into the office with the psychologist, and it was used as a time-out, and the school psychologist would de-escalate her.
Q. Okay. And then the next day, she would go back to the classroom?
A. Yes.
Q. So how many times did the student get to the point where they had to take her out of the classroom on a daily basis before she was taken out permanently?
A. Maybe twice a day.
Q. Okay. But I mean for how long?
A. I would say a week approximately.
Q. And so can you think of any other situations that you were involved in where there was a student who exhibited this kind of behavior, the hitting over a period of one week, before they were removed from the classroom?

MS. RAPPORT: Again, I'm instructing the deponent not to use any specifics at all with respect to the name, timing, school, that would in any way reveal the identity of the child.
THE WITNESS: Okay. Offhand -- let me think.
(PAUSE)
A. I just thought of another case, very interesting case. A child 7 years old had never attended school, had never been exposed to other children. The mother just kept this child at home. He exhibited autistic-like behaviors. He did not know how to interact with other children. The mother did not discipline this child at all, so that when he came into a school setting -- and this was a regular ed child. He enrolled as a regular ed child because he had never had any evaluations for special education, and he was in the classroom with 26 other children, and he was absolutely wild, just couldn't even speak. He grunted and made sounds.
It was an extreme case, and the teacher -- he was put into kindergarten at age 7 -- just came to the team, and said, "I have this child, and I don't know what to do with him. I've never seen



anything like this," and it was the type of thing where we -- the team looked at the child and had the mother come in, and said this child definitely needs an evaluation because he could not function. He was so overwhelmed by being in the classroom with 26 other children not having been exposed to other children before. He was removed, and then evaluated and was placed in an out of district placement. That was another case.
Q. Did that student hit the teacher or the other students?
A. He did hit another student, yes.
Q. Okay. But he didn't hit the teacher?
A. No.
Q. Did he hit the other student more than once?
A. I don't recall. He was -- could not be contained. He would not sit. He literally would run wild through a classroom.
Q. So is his problem a little bit different than the other student you described --
A. Yes.
Q. -- in that he wasn't repeatedly hitting people?
A. Yes, different.
Q. Was anyone injured in the first example that you gave me? Was the teacher injured or the other



student injured before that girl was taken out of the elementary school?
A. No, not really.
Q. Can you think of any other examples when students were removed from classrooms that you were aware of when you were a special ed supervisor?
THE WITNESS: Are you talking about classrooms under my supervision?
MS. IAFRATE: Or any that you were aware of.
(PAUSE)
A. I know of a situation in the high school setting where a high school student was out of control because of drug problems, and he was removed.
Q. Okay. So what did that student do?
A. He was enrolled in a program for drug abuse, and went to an out of district placement.
Q. But I mean what did he do in the classroom that warranted him being removed?
A. Just acting out behaviors. I don't recall the specifics because I wasn't the supervisor in charge.
Q. Okay. So how do you find out about those cases where you're not the supervisor?



A. If I'm sitting in at the clinical team, I may hear of those situations.
Q. So, in general, is it that the team decides based on what the teacher is telling them about the level of seriousness of what the student is doing?
A. Yes, it's a team decision.
Q. And other than what we already talked about with respect to reasons why a student should remain in the classroom, are there any other reasons why a student should remain in the classroom even if they're exhibiting any of these serious types of conduct that we've talked about?
A. Yes, because it's the law. The child has to be maintained in the least restrictive environment. We would be violating a student's rights if, in fact, we took a child out of a classroom and put him in a more restrictive setting.
Q. But I think you've said to me -- correct me if I'm wrong -- if a student exhibits some serious problems like hitting other students or hitting the teacher, that that would warrant removal in some cases?
A. In some cases, not in all cases.
Q. And you're unable to make an across the board statement on that because you're saying every case

Page 46

is different?
A. Yes.
MS. IAFRATE: Off the record.
(OFF THE RECORD)
Q. Let me ask you about if -- or are there situations where the child's behavior is noted in the IEP, where it says things like he might hit or he might swear; is that kind of stuff in an IEP?
A. It might be in a goal like to reduce -- a goal may be to reduce his hitting situations or whatever, yes. There may be something in there, yes.
Q. Okay. So does that change anything with respect to whether that child can be removed or not if it's already in the IEP that he may have that behavior?
A. If it's in the IEP, there's usually a goal that would be worked on, that the teacher needs to work on with the child or the school psychologist or the guidance counselor.
Q. I guess what I'm getting at is if it's in the IEP, is the teacher supposed to be able to get hit? Do you know what I'm saying? Is she supposed to accept that because it's part of his IEP?
A. I mean, I don't think any administrator wants

Page 47

to see a teacher get hit. Unfortunately, it does happen. I'm just going to bring up a situation. Say, for instance, a preschool program, I know there have been some preschool children who could be very active, and teachers use restraint with them, and they may get hit in the process, but it's not a life-threatening injury, and the teachers deal with it.
Q. And when you say, "restraint," what do you mean by that?
A. Sometimes a child would need to be restrained, he's going after other children, and a teacher would hold a child in a basket hold.
Q. [illegible] about bigger kids though, I'm talking about [illegible] school, so have you ever heard of [illegible] where middle school students are [illegible] and the teacher is supposed to just [illegible] that?
MS. RAPPORT: Objection to the form of the question. Answer if you can.
A. [illegible] said, administrators don't want to see [illegible] get hit. Unfortunately, it does happen, [illegible] you have a child who has behavior [illegible], and sometimes a teacher is breaking up a [illegible] accidentally gets hit. I mean it's

Page 48

happened to me. I know the child wasn't directing that towards me, but it's just part of the process.
Q. Right. What if the child is directing it towards you though?
MS. RAPPORT: Objection as to form. Objection to the hypothetical.
A. It's difficult responding to these questions because each case is different. Things can be written into the IEP where if such and such occurs, the teacher will do this, or this needs to be done. So to just deal with the hypothetical situation, I need more details, kind of thing, or I would have to see an IEP in front of me because that's the legal document that dictates everything that occurs with a child.
Q. Can you think of an example, a real example, in which there was something in the IEP that instructed the teacher what to do in a particular situation?
(PAUSE)
A. All I can think of right now is if a child starts to escalate in a classroom, the teacher -- it may be written into the IEP, the school psychologist will be called or the guidance

Page 49

counselor or someone the child has a positive relationship with -- it could be the physical ed teacher who could be called -- and to remove the child from the classroom and to de-escalate him or her.
Q. And is that a similar process to what you described with the elementary school student who -- I think it was elementary student, who the psychologist would come and take her out --
A. Yes.
Q. -- immediately and then --
A. Yes.
Q. -- de-escalate her? I'm sorry. Go ahead.
A. I just remembered something else. There are times if you have a child who's an acting out child, a one-to-one assistant can be assigned to the child. That's been done in Providence.
Q. And what does that one-to-one assistant do?
A. That one-to-one assistant will assist the child with academics, but also will deal with behaviors. If, in fact, the child appears to be escalating or -- you can usually sense if there's going to be a problem with a child, not all the time, and that one-to-one assistant can remove the child from the classroom and go into another small classroom or

small space and work with the child one on one.
Q. And the one-on-one assistant can do that immediately?
A. Yes.
Q. But to get the one-on-one assistant, is that something that you need to go to the IEP team?
A. Yes.
Q. Okay. When you described if the child has a positive relationship with somebody in the building, and that person could come remove them from the classroom, could that be done even if it's not on the IEP?
A. It's usually written in the IEP.
Q. Do you know if it was on the IEP in the case of that elementary school girl?
A. Yes, it was on the IEP.
Q. Okay. And when you say it's usually on the IEP, are you aware of any time that that procedure was followed, and it was not in the IEP?
A. I'm trying to think. If a child were out of control, the teacher may call the principal, and the principal would remove the child, and take the child into his or her office, and then the principal may call the parent and may call the school psychologist. So it may happen that way.



Q. So that's always an option, to have the administrator remove the child?
A. Yes.
Q. Is part of the IEP team meeting to determine whether the reason why the student is exhibiting this behavior is related to his or her disability or not or status as a special ed student?
A. That would be in the manifestation hearing. That's when it's determined.
Q. Why is that important?
A. Why is that important? Well, if a child did something to get suspended from school, the IEP team would meet with the parent and the school administrator, and -- see it's difficult, like I said, with these hypothetical situations. Say, for instance, a child is labeled as learning disabled, and you look at the psychological report, and the child has good judgment and reasoning skills, but this one day he opted to do something where it demonstrated poor judgment, well, the team would meet, review the psychological, and say, "Gee, this child normally displays good judgment," and also, it may be determined that the infraction that occurred was not part of his learning -- not part of his



handicapped condition, which would be learning disabled. In that case, the child is supposed to be treated like any other regular ed child as far as being disciplined for his infraction.
If, in fact, the child -- it's determined that the manifestation is part of this child's disability, well, then the team has to decide what needs to be done to help this child. Does he need more evaluations? Does he need counseling that he's not receiving? Does he need a behavior plan? Does that help?
Q. Yes. But is that done only as part of the manifestation hearing or is that something that the IEP team meeting considers, too, in determining -- say, for example, we're talking about removing the student from the classroom, does the IEP team consider whether what the student did was related to his or her handicap as part of that removing them from the classroom scenario?
A. Yes. The IEP team would do that as part of the manifestation hearing; however, if, in fact, a teacher -- like I said before, if a teacher notices that a child's behavior is becoming more and more aggressive or increasingly more



noncompliant, then the teacher can go to the team and say we need to do something about this student. He's becoming more aggressive. What else can we add to the IEP that would help with the situation.
Q. If the IEP team has already decided that the student is not in the proper placement and should be removed, how long does it take for the student to actually be removed?
A. It depends on where the child is going. If you're talking about another classroom in the district, there's a placement person in the special education office. We have an elementary and a secondary supervisor, and they keep track of any vacancies in any of the classrooms.
So, for instance, say we have one child in a middle school. He's not making it, and it's determined that perhaps this child would perform better with a male teacher in another building. If there's an opening, the child can be transferred fairly soon, like possibly the next day, if there's an opening, but, again, it has to all go through the placement person, and it has to be agreed upon by all the team members and the parent.

Q. Who's the placement person? You're saying that it's a -- somebody who's a supervisor?
A. Yes, a supervisor.
Q. Okay. And while you were in Providence, who was responsible for placements?
A. Two different people. We had an elementary one -- I have to give the names?
MS. RAPPORT: That's fine.
A. Lisa Vargas. She just got married. It would be Lisa Sinapi now or Vargas-Sinapi. I don't know if she hyphenates it; and Karen Vessella, who did secondary placements.
Q. So you're saying these people would monitor vacancies, so they would know where a student could be placed within the system?
A. Yes.
Q. What about if they're going outside of the system or not to another classroom?
A. That student would be involved with the clinical team, and the clinical team has to make -- send applications to the different facilities. Again, say, for instance, if it was a child who may need a placement at Bradley, they could apply to the Bradley Hospital, Valley Community School, and it depends if they have



openings.
Q. So what's an average amount of time in your experience that that would take?
A. For an out of district placement, at least a month; at least a month, I would say.
Q. Have you ever -- or do you recall any time it taking less than a month?
A. Possibly.
MS. IAFRATE: Okay.
A. Possibly. The clinical team needs to meet with the parent, school representative, and then they need to discuss the needs of the child, and then make applications to these out of district placements, and it all depends on the response time, and also, if they have openings, so --
Q. What about in a situation where you have had that assault or threat to assault, does it still go through the placement office, and there's some time period where that student may still be in the original classroom?
A. Yes.
Q. Okay. Is there a reason why if that student has assaulted the teacher that they couldn't be put somewhere else while that placement decision is pending?



A. If the parent agreed to it, the child could stay home, and the child could get home instruction, but usually parents don't agree to that, and when I was working under Ken Swanson, he really did not like putting students on home instruction because he felt as though they belong in school like every other child, which I have to agree with him.
Q. So can any student -- is what you're saying that any student can be placed on home instruction as long as the parents agreed with it?
A. If the parent agrees to it, and the Director of Special Ed feels as though it's warranted, and all the team members, yes, it's possible.
Q. Are all the team members and Director Swanson always involved in that decision as to whether a student gets home instruction?
A. Yes.
MS. IAFRATE: Okay.
A. The director always has to know.
Q. Okay. But I mean, and all the team members --
A. Yes.
Q. -- they always have to convene in some manner to make that decision before it happens?
A. Yes.



Q. So are there ever any circumstances where somebody goes from, you know, in the classroom one day to home instruction the next day without having that meeting convened?
A. No.
(PLAINTIFF'S EXHIBIT 1 MARKED FOR IDENTIFICATION)
Q. I'm going to show you that document which I marked as Exhibit 1, which is called Special Education Discipline Guidelines For Students With Disabilities under the IDEA 1997. If you could just review that.
(PAUSE)
Q. Are you finished?
A. Yes.
Q. Okay. Have you ever seen this document before?
A. Not this particular one, but one similar to it.
Q. Okay. What about the one similar to it, what does the similar one involve?
A. It's something that the special education office has for the supervisors and/or teachers.
Q. And is that the procedure you described to me earlier with the zero tolerance or is that something different?
A. Something different.

Q. Did you have an opportunity to read that one?
A. Yes, I did.
Q. Does this refresh your recollection? Have you ever seen this one before?
A. I don't recall, but I'm sure I did. I really don't remember this one.
Q. Okay. Do you remember if you took any action after receiving this?
A. I don't remember.
Q. Do you remember speaking to any other people including the placement person or any administrators about this?
A. I don't remember.
Q. Okay. The situation that's described here would that warrant moving the student in your mind?
A. Depending upon the results of an IEP team meeting with the other members -- I mean I don't know what the IEP says as far as what steps should have been taken for his assaulted behavior, whatever. I don't recall.
Q. Okay. So if the IEP didn't say anything about his assaulted behavior, and you were participating in this IEP meeting, what would your opinion be based on what you're reading here?
MS. RAPPORT: Objection, lack of



foundation, hypothetical.
A. Well, if he hasn't had a psychiatric eval., I would have suggested that he perhaps be evaluated psychiatrically, maybe a functional behavior assessment, and then depending upon those results, possibly write some goals into the IEP regarding his behavior and what would -- hopefully something that would work in modifying his behaviors.
Q. And in the meantime, would you expect that student to stay in the classroom?
A. Yes.
Q. Did you receive many memos from teachers about moving students while you were a special ed supervisor?
A. No, not many.
Q. Do you know why Ms. Tassone may have had more problems than say another teacher with violent students?
THE WITNESS: Why she would have had more problems?
MS. IAFRATE: Uh-huh.
A. Maybe dealing with children with behavior challenges is not her strength, not one of her strengths.
Q. When you say that though are you saying that you



have some information that she's not good at dealing with special ed students?
A. I'm not saying that because I never evaluated her. I'm just saying that may not be one of her strengths. I do not know.
Q. Do you have any knowledge of her complaining about students in the past before say these two complaints in September of 2002?
A. I believe that she complains about students on a regular basis.
Q. Okay. And what is that based on?
A. Reading these letters, I think that she -- prior to my becoming supervisor there, I think I had heard that she complains about students who are a little behaviorally challenged.
Q. Are you saying you think she complains more often than other teachers?
A. In my experience, yes.
Q. And besides what you just said about her maybe not being good at dealing with those students, is there any other reason that you can think of why she would be complaining about students?
A. No.
Q. Are you aware that she's disabled or that she uses crutches and a scooter?



A. Yes.
Q. Okay. Do you think that factors in at all when she's complaining about these students that maybe have some kind of violent tendency?
MS. RAPPORT: Objection, form and foundation.
A. I understand there is a physical challenge there; however, she opted for this profession, and when you're dealing with children with disabilities, it's not that a teacher has the right to select those students who are going to be in her class, all quiet learning disabled children, who aren't going to act out. Providence doesn't have that; okay? Providence students, many, many, many of them -- I would say the majority of them have behavior difficulties.
Q. Are you -- at any time while you were employed by the Providence School Department, had you ever received any training on the Americans With Disabilities Act?
A. Yes, the State Department of Ed would come in, yes.
Q. How often did the State Department of Ed come in -- are you talking about they did some training?

A. Yes, they did some training. Also, the supervisors, we would read up on material.
Q. Okay. And when I'm talking about the Americans With Disabilities Act, I want to put your focus on not the students, but the employees.
A. Uh-huh.
Q. Okay. And are you saying that the Department of Ed for the State came in and did some training?
A. I believe they did some training, and I did some reading on my own, and also, we have a 504 procedure for any employee or student with a disability, so I was familiar with that.
Q. How often did the State Department of Ed do that training?
A. I don't recall, not yearly. I don't recall.
Q. Okay. But you recall attending it at least once?
A. Yes.
Q. And do you remember what you learned in that training?
A. No.
Q. Okay. Do you remember learning about what a request for an accommodation is?
A. Yes, I know about that. I can't say that I learned it from the State, but yes, if an individual, be it an adult or employee of the



school department or a child needs an accommodation, a plan is written and needs to be reviewed, and I know Simonne had a one-to-one assistant for herself so that person could write on the blackboard and help her with her duties in addition to the teacher assistant that she had in the classroom.
Q. How did you know that she had a one-to-one assistant?
A. Somebody in the administrative office had told me she had a 504 plan, so she had a one-to-one assistant for herself.
Q. Do you remember who that was?
A. No.
Q. Do you remember how that conversation came up?
A. No.
Q. You don't remember anything about what you were discussing that would have triggered Simonne Tassone's 504 plan?
A. No.
Q. So what is your understanding of how one would get an accommodation?
A. As an employee of the school department, you would have to go to the Human Resource Office, and I'm sure she had to provide documentation or



whatever -- I don't know what she provided in order to get her plan, but that's between her and whoever was in charge at the time.
Q. All right. So you mentioned that she opted for this job, and so handling these kinds of students, is that part of the job in your mind?
A. In my opinion, yes.
Q. Okay. It's a mandatory part of the job?
A. I would say it's definitely part of the job when you're dealing with children with disabilities.
Q. But are you saying you have to be able to do that?
A. In my opinion, to deal with children with behavior problems, learning problems, yes.
Q. Okay. Let's not talk about it so generally though in terms of learning problems or behavior problems because probably all the students have some type of problem. But what I'm speaking about is say a student who would assault a teacher, is that a mandatory part of the job to deal with that student or to keep that student in your class?
A. Mandatory? My opinion is it's part of the job. I'm not saying it's mandatory that a child, you know, hit a teacher, and the teacher -- they are just difficult children, and teachers are supposed



to be trained to deal with these difficulties, and some are better at it than others.
Q. Okay. So do you think -- if some are better than others, do you think all teachers -- all special ed teachers have to have the ability to deal with students who assault them?
MS. RAPPORT: Objection to the form of the question.
A. I'm going to speak from my personal experience. I, too, was in the classroom. I've been assaulted by a student and never asked to have them removed. It's like you get passed that. You move on. You try to deal with any behaviors the child has. I'm not saying a teacher has to have them, that it should be that way. It's just the reality of the job.
Q. If the teacher is not physically capable -- or should I say, do you think having the physical ability to deal with students who assault is a requirement of the special ed job -- special ed teaching job?
THE WITNESS: Can you say that again?
Q. Is the physical ability to deal with students who assault teachers part of the special ed teacher

job?
MS. RAPPORT: Objection to the form of the question.
A. That's difficult for me to answer when it's worded that way.
Q. Okay. Because you don't want to commit one way or the other or just the way that I asked the question?
A. No, it's -- again, it depends -- I mean you can have a perfectly docile child who just happens to flip one day, and if his arms are flailing, he's going to hit you.
Q. I'm not talking about that situation. I'm talking about someone who intentionally hits a teacher. I'm asking you, do you think all teachers should be physically able to handle kids that intentionally hit?
THE WITNESS: Should they be physically able to handle them, meaning what? To fight back, to ward off, to defend themselves?
MS. IAFRATE: To keep them in the class.
MS. RAPPORT: Objection to the form of the question, and just repeatedly objecting to the form of this question on numerous grounds,



hypothetical, lack of foundation, form, mischaracterizes the deposition testimony. If you can understand it, you can try to answer it.
A. I feel like I'm being asked if someone has a physical disability, they have to be able to defend themselves. I mean --
Q. Let me ask it a different way. Do you think it's a reasonable accommodation for Simonne Tassone to ask that students that she cannot physically handle not be in her classroom?
MS. RAPPORT: Objection.
A. No.
MS. RAPPORT: Objection to the form of the question; also, calls for a legal conclusion in that this witness is being asked to opine on what is a reasonable accommodation which is a legal question for a judge.
MS. IAFRATE: Which is not really a legal question because they're both regular words, just used in conjunction, and I think she understands what it meant.
MS. RAPPORT: In a legal proceeding, under the ADA, and my objection stands.
MS. IAFRATE: Okay. Okay.
I believe she said no, and now I want to ask her,



what is it that's unreasonable about that request in your mind?
MS. RAPPORT: Objection to the form of the question. Objection that the question calls for a legal conclusion.
A. Because someone has a disability, I don't think that gives that person the right to refuse any behaviorally challenged child who comes into his or her classroom, my opinion.
Q. And if it's not any behaviorally challenged child, but just say a child who had hit the person on occasion, would that change your opinion or not?
MS. RAPPORT: Objection.
A. It depends on what services were in place. I mean if this child has a history of doing this, and depending upon if the child is getting counseling in school, out of school, if he's got a behavior program, there are -- it's difficult for me to answer that.
MS. IAFRATE: Okay. 6?
THE REPORTER: Yes.
(PLAINTIFF'S EXHIBIT 6 MARKED FOR IDENTIFICATION)
(PAUSE)
Q. Are you finished?



A. Yes.
Q. Do you recall ever seeing this grievance?
A. No.
Q. Does this refresh your recollection about any situation that you had notice of involving Simonne Tassone?
A. No.
Q. Okay. Do you recall ever being called by Simonne Tassone's principal or vice principal about the placement of a student?
A. No.
Q. Any principal or vice principal?
A. No. Going back to 2002, no.
Q. If someone filed a grievance over the placement of the student, would that have any effect on how fast the removal process was?
A. Not necessarily.
MS. IAFRATE: Okay.
A. Because this would go to the teachers' union. The teachers' union has to get it on the agenda, get this on the agenda for grievances, and I think grievances were heard once a week with the union and the building administrators.
Q. I think you said this earlier, but I just want to confirm, would Ken Swanson be the one who would

Q. Were there any job descriptions for teachers of special ed. students?
A. I don't know.
Q. Well, as part of the 504 Committee, did you ever determine whether there were job descriptions?
A. No.
Q. How did you determine what was an essential function and what wasn't when deciding whether to give requests for accommodations?
A. I believe that we just had to go to the different resources, like Human Resources would have the job description, and also the essential functions.
Q. Did you ever see the document yourself, sir, a job description?
THE WITNESS: For Simonne?
MS. ANDREWS: For anyone.
A. Yes.
Q. For teachers?
A. Yes.
Q. Did you see one for Simonne Tassone?
A. I don't remember.
Q. Did you see any for special education teachers?
A. I have.
Q. And what were the essential functions of a



teacher's job who taught special ed. students that were listed on this document you saw?
A. Well, I would say there's quite a few duties and responsibilities. I don't think I can name them all.
Q. Can you name any?
A. Well, to provide instruction, to provide supervision, follow a curriculum, do assessments, work with parents and the administration in the schools. There's probably a whole lot more that I don't remember.
Q. You never looked at the essential functions of Simonne Tassone's job, I take it?
MS. RAPPORT: Objection.
A. I don't remember seeing them.
Q. Tell me, is it an essential function of Simonne Tassone's job to work with students who are making threats?
MS. RAPPORT: Objection. This has been asked and answered in the prior deposition.
A. I don't know.
Q. Did you see that when you looked at that document?
A. In general, job descriptions don't include that, although special education teachers are trained to handle more difficult students. I just



can't say that her job description -- I don't have any recollection of seeing it.
Q. Did you ever see that working with all types of students was an essential function of Simonne Tassone's job?
[redacted]
Q. Did you see that in any of the documents that you looked at?
A. No.
Q. Why do you say that, is that just based on your experience?
[redacted]
Q. Did you ever have occasion to deal with a request by someone with a disability to have a student removed from his or her classroom?
A. No.
Q. And if you had, what would you have done?
MS. RAPPORT: Objection; form, speculation, totally hypothetical.
A. It's never been under my jurisdiction to do something like that.
Q. I understand. Can you think of what you would



have done if that request had come to you from, let's say, Simonne Tassone?
A. I'm not sure. I'm not prepared to handle something like that. I would probably ask the principal or the special ed. supervisor who has an idea of who the students are, what their IEPs call for, what their educational psychological profiles are like, I'm speculating here, and whether or not there's any chance of moving that student.
Q. You said that earlier there were times when you made a decision about an accommodation, and then you were told that the accommodations were not reasonable; do you remember testifying to that?
A. Yes.
Q. And you said that there were times when accommodations were nullified, correct?
A. Yes.
Q. And they were accommodations that the committee had decided?
A. More informally.
Q. Tell me the circumstances under which that would happen.
A. I'm trying to think of any examples. In one occasion we wrote a plan and it included teachers not wearing almond-based perfume because of a

# 1992 – 1995

# AGREEMENT

between the

**Providence Teachers Union AFT Local 958**

and the

**Providence School Board**



to do so in writing; and a record shall be kept showing same; and

4. The teaching assignment during a teacher's unassigned period shall continue for the duration of the need subject to Item 3 above only for the remainder of the school year; and

5. A teacher assigned to teach during his/her unassigned period shall be paid additional monies at the rate of one-ninth (1/9) of one hundred eighty-one (181) of his/her annual gross salary for each period he/she is programmed to teach during his/her unassigned period and shall receive said additional monies when he/she is on paid leave, except for sabbatical leave under Article 5, Section 4, which occurs only on those days he/she is programmed to teach during his/her unassigned period; and

6. No teacher teaching during his/her unassigned period shall receive more than one (1) year of system-wide area of certification seniority (SWACS) in any school year pursuant to Article 14; and

7. Teaching during an unassigned period shall not be subject to 1the provisions of Articles 4-14.1.3, 14-14.1.4 and 14-14.1.5.

8-5. Length of the School Year and Day

8-5.1 The School Year shall be 180 days.
In addition there shall be one day of orientation which shall be the day preceding the opening of schools in September.

8-5.2. Teachers will be required to be in attendance in their respective schools during the school day only in accordance with the following time schedule:

SCHOOL DAY DEFINED

Elementary Schools - 9:15 A.M. to 2:45 P.M.
- Asa Messer
- Asa Messer Annex
- Broad Street
- Camden Avenue
- Carl G. Lauro
- Edmund W. Flynn
- Fox Point
- George J. West
- Gilbert Stuart
- Laurel Hill Avenue
- Dr. Martin Luther King
- Mary E. Fogarty
- Pleasant View - 8:45 A.M. to 2:15 P.M.
- Reservoir Avenue
- Robert F. Kennedy
- Sackett Street
- Veazie Street/Veazie Street Annex
- Webster Avenue
- William D'Abate
- Windmill Street
- Windmill Street Annex

Junior High and Middle Schools - 8:15 A.M. to 2:15 P.M.
- Nathan Bishop
- Nathanael Greene
- Esek Hopkins
- Oliver Hazard Perry
- Roger Williams
- Samuel W. Bridgham

Senior High Schools - 8:30 A.M. to 2:30 P.M.
and Birch Vocational Program

The school day as defined herein shall not exceed five (5) hours in the elementary schools and shall not exceed five and one-half (5-1/2) hours in the junior high schools, middle schools and senior high schools.

Teachers shall be present at least 15 minutes before the school day begins and shall remain at least 15 minutes after the school day ends unless they are excused by the principal.

8-5.3. The School calendars for the 1992-1995 school years are set forth in Appendix D and made a part of this Agreement.

8-6. Hiring of teachers
The Board agrees that it shall employ only those applicants who have earned a minimum of a Bachelor's Degree and have met certification requirements for at least a Provisional Certificate to the extent available and possible. The School Department shall furnish to the Union the names of all personnel holding an emergency certificate and this listing shall remain current.

8-7. Hiring and Payment of Substitute Coverage
The Board shall hire per-diem substitute teachers to cover assignments of teachers when they are absent. The Board's first priority in every instance of a teacher absence shall be to employ a per-diem substitute teacher.

Elementary Schools
If the Board has made every effort to hire a per-diem substitute teacher, and no per-diem substitute teacher is available, the absent teacher's class shall be distributed among other teachers in the school. The Board shall pay the teachers who cover the absent teacher's class at the rate of $55 per day divided by the fractional part of the absent teacher's class covered.

Middle Schools, Junior High Schools,
and Senior High Schools
If the Board has made every effort to hire a per-diem substitute teacher, and no per-diem substitute teacher is available, the principal shall utilize teachers in his school according to the following procedure:

The principal of each school shall establish during the first week of school in September, a roster of substitute teachers who volunteer their unassigned time to cover the assignments of absent teachers. Rosters of volunteer substitute teachers shall be established by area of certification. Additionally, a school-wide roster of volunteer substitute teachers shall be established.

All rosters of volunteer substitute teachers shall list, unassigned time, the names of volunteer substitute teachers alphabetical order. Teachers who volunteer to have their name added to the rosters of volunteer substitute teachers after the fi[rst] week of school in September shall have their names plac[ed] alphabetically on the rosters.

All teachers listed on the rosters of volunteer substitu[te] teachers shall be obligated to accept assignments of the princip[al] during the school year.

When a principal assigns teachers from the rosters volunteer substitute teachers, he shall make assignments first fro[m] the roster of volunteer substitute teachers with the same area certification as the absent teacher. If there are insufficient name[s] on the roster of volunteer substitute teachers in the area certification, the principal shall then assign teachers from th[e] school-wide roster of volunteer substitute teachers.

All assignments from the rosters of volunteer substitut[e] teachers shall be on a rotating basis by alphabetical order. Roster[s] of volunteer substitute teachers shall be made available to teache[rs] and the Union for inspection upon request.

If for any reason there is an insufficient number of teacher[s] on the rosters of volunteer substitute teachers to cover th[e] assignments of absent teachers, the principal shall utilize teacher[s] in his school during their unassigned time for emergency coverag[e] on a rotating basis by alphabetical order.

The number of coverages assigned to each teacher includin[g] those who have been absent for five (5) consecutive school days o[r] less shall be equal to, or nearly so, to other teachers provided tha[t] said make-up coverage necessary to attain said equalization i[s] fairly, reasonably, and equitably assigned by the principal.

Teachers who are absent in excess of five (5) consecutiv[e] school days shall be exempted from said make-up coverage fo[r] said days of absence and shall be given credit for coverage equal t[o] that which they would have been a assigned had they not been absent.

The Board shall not be liable for payment to any teacher wh[o] has fewer paid coverages as a result of the application of thi[s] section.

When a teacher covers an assignment of an absent teacher, the teacher covering the assignment shall be paid in accordance with the following schedule:

$5.00 per daily Home-Room Assignment(s)

$10.00 per Classroom or Period Assignment

# Providence Teachers Union
# Negotiating Committee

and

# Providence School Board
# Negotiating Committee

# JOINT PROPOSAL

for a

TWENTY-SIX MONTH

COLLECTIVE BARGAINING AGREEMENT

July 1, 1999 - August 31, 2001

May 12, 1999

**Article 8 Working Conditions**

**DELETE: Article 8-5.1**

**ADD NEW: 8-5.1 Length of the School Year and Day**

The 1999/2000 school year shall be 182 days.

The 1999/2000 school year is contained in Appendix D.

The 1999/2000 teacher work year shall be 186 days. Students shall be in attendance for 182 days. There shall be one (1) day of teacher orientation which shall be the day preceding the opening of schools. There shall be two and one-half days (2.5) to be used for staff development and the equivalent of one-half day (.5) to be used for one (1) evening meeting devoted to parent/teacher conferences. The 186 day schedule is contained in Appendix D.

Effective the 1999/2000 school year, teachers shall be paid at a daily rate of 1/181 of their salary as set forth in Appendix A. For purposes of retirement, the school year shall be one hundred eighty-six (186) days and a teacher's annual gross salary shall include all pay received for said one hundred eighty-six days.

For 230 day teachers, attendance at the two and one-half (2.5) days of staff development is voluntary while attendance is mandatory for the equivalent of one-half (.5) day to be used for parent/teacher conferences.

The intent and application of this section as to the 1999/2000 school year shall be such that teachers shall be paid their salaries as set forth in Appendix A and, in addition thereto, 5/181 of their said salary schedule as set forth in Appendix A.

**ADD NEW:** **8-5.1** **Length of the School Year and Day**

**Continued:**

The 2000/2001 school year shall be 182 days.

The 2000/2001 school year is contained in Appendix D.

The 2000/2001 teacher work year shall be 187 days. Students shall be in attendance for 182 days. There shall be one (1) day of teacher orientation which shall be the day preceding the opening of schools. There shall be three and one-half days (3.5) to be used for staff development and the equivalent of one-half day (.5) to be used for one (1) evening meeting devoted to parent/teacher conferences. The 187 day schedule is contained in Appendix D.

The 2000/2001 school year teacher shall be paid at a daily rate of 1/183 of their salary as set forth in Appendix A. For purposes of retirement, the school year shall be one hundred eight-seven (187) days and a teacher's annual gross salary shall include all pay received for said one hundred eighty-seven (187) days.

For 230 day teachers, attendance at the three and one-half (3.5) days of staff development is voluntary while attendance is mandatory for the equivalent of one-half (.5) day to be used for parent/teacher conferences.

The intent and application of this section as to the 2000/2001 school year shall be such that teachers shall be paid their salaries as set forth in Appendix A and, in addition thereto, 4/183 of their said salary schedule as set forth in Appendix A.

**Article 8 Working Conditions**

**REVISE: 8-5.2 School Day Defined**

| | | |
|---|---|---|
| ADD TO: | Elementary Schools | 9:15 a.m. - 2:45 p.m. |
| | Springfield Street | |
| ADD TO: | Middle Schools | 8:15 a.m. - 2:15 p.m. |
| | Springfield Street I<br>Springfield Street II | |

**September 1, 2001 - August 31, 2004**

# AGREEMENT

**Between the**

**Providence Teachers Union, AFT Local 958**

**and the**

**Providence School Board**

ptu PROVIDENCE TEACHERS UNION AFT

AFL • CIO

for the next school year. Teachers shall indicate on their programming preference sheets that are returned by March 15 of each year whether they wish to teach during their unassigned period during the subsequent school year; and

2. On a rotating basis beginning with the most senior teacher in the system-wide area of certification seniority in the department certification area in the school who has indicated on his/her preference sheet that he/she wishes to teach during his/her unassigned period shall be given the teaching assignment; and

3. No teacher assigned a teaching period during his/her unassigned period shall again be assigned to teach during his/her unassigned period until all of the teachers in the department certification area have taught at least one (1) full semester of a school year during their unassigned periods unless a teacher(s) refuses the opportunity to do so in writing; and a record shall be kept showing same; and

4. A teacher assigned to teach during his/her unassigned period shall be paid additional monies at the rate of one-fifth (1/5) of his/her daily rate for each day he/she is programmed to teach during his/her unassigned period and shall receive said additional monies when he/she is on paid leave, except for sabbatical leave under Article 5, Section 4, which occurs only on those days he/she is programmed to teach during his/her unassigned period; and

5. No teacher teaching during his/her unassigned period shall receive more than one (1) year of system-wide area of certification seniority (SWACS) in any school year pursuant to Article 2; and

6. No part-time teacher is available.

7. The Union is notified of each 6th period assignment prior to the start of each assignment.

**8-5 Length of the School Year and Day**

**8-5.1 The 2001/2002, 2002/2003 and 2003/2004 school years shall be 182 days.**

The 2001/2002, 2002/2003 and 2003/2004 teacher work years shall be 187 days. Students shall be in attendance for 182 days. There shall be one (1) day of teacher orientation which shall be the day preceding the opening of schools. There shall be three and one-half days (3.5) to be used for staff development and the equivalent of one-half day (.5) to be used for one (1) evening meeting devoted to parent/teacher conferences.

Effective the 2002/2003 and 2003/2004 school years, teachers shall be paid at a daily rate of 1/187 of their salary as set forth in Appendix A.

For 230 day teachers, attendance at the three and one-half (3.5) days of professional development is voluntary while attendance is mandatory for the equivalent of one-half (.5) day to be used for the one (1) parent/teacher conference.

The intent and application of this section as to the 2001/2002, 2002/2003 and 2003/2004 school years shall be such that teachers shall be paid their salaries as set forth in Appendix A.

8-5.2 The 2001-2002 and 2002-2003 school day defined shall remain as described in Article 8-5.2 of the July 1, 1999 – August 31, 2001 Agreement.

Effective with the first work day of the 2003/2004 school year teachers will be required to be in attendance in their respective schools during the school day in accordance with the following time schedule:

## WORK DAY DEFINED (TEACHERS)

**Elementary Schools - 9:00 a.m. to 3:00 p.m.**

Asa Messer
Broad Street
Carl G. Lauro (8:00 - 2:00)
Edmund W. Flynn Annex
Cornel Young Jr.
Fortes (8:00 - 2:00)
George J. West
Laurel Hill Annex
Martin Luther King
Mary E. Fogarty
Reservoir Avenue
Sackett Street
Veazie Street
Webster Avenue
Windmill Street
Asa Messer Annex
Harry Kizirian
Edmund W. Flynn
Charlotte Woods
Robert Bailey
Vartan Gregorian
Laurel Hill Avenue
Lima (8:00 - 2:00)
Windmill Street Annex
Pleasant View (8:30 – 2:30)
Robert F. Kennedy
Carnevale
West Broadway
William D'Abate
Fortes/Lima Annex (8:00 - 2:00)

**Middle Schools - 8:00 a.m. to 2:30 p.m.**

Esek Hopkins
Roger Williams
Springfield I
Times[2]
Nathanael Greene
Oliver Hazard Perry
Samuel W. Bridgham
Gilbert Stuart
Nathan Bishop
DelSesto

**Senior High Schools - 8:15 a.m. - 2:45 p.m.**

Mt. Pleasant
Classical
Occupational Ed Program
Birch Vocational Program
Providence Mall Academy
PAIS
Health & Science Technology Academy
Central/Hanley
Hope
Chamber
ALP
Feinstein

## SCHOOL DAY DEFINED (STUDENTS)

**Elementary Schools - 9:05 a.m. to 2:50 p.m.**

Asa Messer
Broad Street
Carl G. Lauro (8:05 - 1:50)
Edmund W. Flynn Annex
Cornel Young Jr.
Fortes (8:05 - 1:50)
George J. West
Laurel Hill Annex
Martin Luther King
Mary E. Fogarty
Reservoir Avenue
Sackett Street
Veazie Street
Webster Avenue
Windmill Street
Asa Messer Annex
Harry Kizirian
Edmund W. Flynn
Charlotte Woods
Robert Bailey
Vartan Gregorian
Laurel Hill Avenue
Lima (8:05 - 1:50)
Windmill Street Annex
Pleasant View (8:35 – 2:20)
Robert F. Kennedy
Carnevale
West Broadway
William D'Abate
Fortes/Lima Annex (8:05 - 1:50)

**Middle Schools - 8:05 a.m. to 2:25 p.m.**

| | |
|---|---|
| Esek Hopkins | Oliver Hazard Perry |
| Roger Williams | Samuel W. Bridgham |
| Springfield I and II | Gilbert Stuart |
| Times[2] | Nathan Bishop |
| Nathanael Greene | DelSesto |

**Senior High Schools – 8:20 a.m. - 2:40 p.m.**

| | |
|---|---|
| Mt. Pleasant | Central/Hanley |
| Classical | Hope |
| Feinstein | Occupational Ed. Program |
| Birch Vocational Program | Providence Mall Academy |
| Chamber | ALP |
| PAIS | |
| Health & Science Technology Academy | |

8-5.3 The School calendars are set forth in Appendix D and made a part of this Agreement.

**8-6 Hiring of Teachers**

The Board agrees that it shall employ only those applicants who have earned a minimum of a Bachelor's Degree and have met certification requirements for at least a Provisional Certificate to the extent available and possible. The School Department shall furnish to the Union the names of all personnel holding an emergency certificate and this listing shall remain current.

8-6.1 The Board shall employ long-term substitutes in-pool in such numbers as are needed based upon the average number of absences requiring substitute coverage during the previous academic year.

The Board shall provide long-term substitutes in-pool with the following provisions of the Collective Bargaining Agreement:

| | |
|---|---|
| Article 1 | Union Recognition and Jurisdiction (Long-term substitutes in-pool shall be considered as members of the bargaining unit) |
| Article 2 | Definitions |
| Article 3 | Salary and Rates of Pay |
| Article 6 | Job Connected Injury and Assault and/or Battery |
| Article 8 | Working Conditions except for 8-4.5 |
| Article 9 | Discipline Code |
| Article 10 | Teacher Facilities |
| Article 14 | Teacher Meetings |
| Article 15 | Grievance Procedure |
| Article 16 | Union Privileges, Responsibilities, and Activities |
| Article 17 | Savings Clause |
| Article 18 | Management Rights |
| Article 19 | Past Practice |
| Article 20 | Duration |

Appendix A, Sections:

| | |
|---|---|
| A-1 | Teachers Basic Salary Schedule |
| A-2 | Professional Advancement Schedule |
| A-3 | Longevity Schedule |

Appendix B, Sections:

| | |
|---|---|
| B-1 | Travel Allowance |
| B-4 | Additional Days Worked |
| B-5 | School Psychologists |

Page 26

during classes. There were times when people using the copier were interrupting me in the middle of class. So there were lots of ups and downs about copier use, and I really generally over the years tended to go on the side of letting them -- being lenient and letting people come in and use the copier unless there was a real disruption, and that's the case now. I have classes. Technically they are not supposed to come in during class time but teachers do. In a couple of instances I have asked people to leave because they really have been disruptive to my class teaching using the copier, interrupting me, but aside from that, I generally have let people over the years use the copier at their discretion, not mine.
Q. Let me ask you this, are you aware of any other problems that Simonne Tassone had with Mr. Lee or Mr. DiRuzzo?
A. Yes, I am.
Q. And can you articulate those problems, and then we'll go back and talk about each one in greater detail.
A. Well, the ones I recall, first and foremost I recall the early dismissal question. I saw a

Page 27

contrast between Simonne's results in asking for permission to leave early on a given occasion and my results when asking for permission to leave school early for a special reason. Now, with Simonne's case, I only have her own word that she was refused permission to leave early. If it was bad weather and she was going to be threatened, if she was threatened by the weather conditions, such as snow falling early before dismissal time, and needing to get out, and whether it was a health issue and a doctor's appointment, my understanding through her was that it was very consistent that she was not given permission to leave early. The school rule is the school rule, and she could not leave early, period.
Q. Did she tell you who was denying her permission to leave?
A. I believe it was Mr. Lee primarily. In the absence of the principal she would have gone to the vice president. So speculating it was mostly Mr. Lee and on some occasions probably Mr. DiRuzzo.
Q. You're speculating about the Mr. DiRuzzo part, not the Mr. Lee part?
A. That's correct. I understood that she did go

Page 28

to Mr. Lee.
Q. And Simonne Tassone told you this?
A. Yes, she did.
Q. And she said that -- do you remember her saying that she had asked permission of Mr. Lee to leave early on, you know, snowy days, and he said no?
A. Yes. I don't know how frequently on snowy days, but on some snowy days, yes.
Q. And on how many occasions did she come to you and talk to you about times when she asked for permission to leave early and got a negative response?
A. Do we have a time frame here?
Q. I will ask you that, do you recall the time frame?
A. I cannot cut off this '95 to '97 period and concentrate and say from my memory this is what did or did not happen regarding her early dismissal requests. I would tend to see it more from the time of '93 up to the present.
Q. So your best recollection is, with this issue about her request to get out, your best recollection -- get out early, your best recollection is it took place from '93 to the present time?
A. With some exception, some marked exception.

Page 29

Q. And what do you mean by marked exception?
A. During the tenure of Robert Perkins as vice principal in our school, which I believe was a two-year period from maybe 2001 to 2002, like the 2000/2001 school year, 2001/2002 school year, I'm aware from Simonne's testimony or I have heard from Simonne that Mr. Perkins did indeed allow her to leave early on any number of occasions when she requested it of him when she felt it was serious that she needed to leave.
Q. And Simonne told you that?
A. Yes.
Q. And other than what you would call that marked exception, Simonne told you that she was not allowed to leave early?
A. That's right.
Q. Now, you say that this was different than your own experience in leaving early?
A. My own experience in my requests to leave early.
Q. Can you tell me what your experience was?
A. Yes. I was very cautious not to abuse that request to leave early. I felt that it was on important and justifiable occasions that I did raise it. It wasn't frequent, and it wasn't

abused, but on those occasions when, for example, my wife called me from her Warwick school job and said our kids in private school were not picked up, they're still at school, can you leave school and pick them up, they don't have a ride. So I went to Mr. Perkins on one occasion and asked for permission to leave early. He said you don't have a class now or the discussion went on, I told him I don't have a class right now. It's the last period of the day; it's basically an open library period and nobody is in there. He said, fine, just go. And that happened to me a number of times with Mr. Lee before this example with Perkins, where Mr. Lee gave me permission to leave early. I had many doctors' appointments which included psychiatric appointments, dental appointments, diabetes appointments, general primary care physician appointments over the years which I did my best to schedule later in the day or at other times in the school day, but there were occasions when my appointments ended up being early enough in the school day that I would have to leave school early in order to get to the appointment. I was never refused by any administrator from doing that. Now, how often did



it happen? I would say twice a year, three times a year at the most. Twice a year, three times a year at the most on the average over the years.

Q. And you recall that that happened under the tenure of Lee and Perkins?

A. Yes, I do.

Q. And how about Cochran?

A. Would you repeat your question.

Q. Did that happen under the tenure of Principal Cochran as well where you asked for permission and were granted it?

A. With some degree of confidence I say yes.

Q. We were talking about other problems that you were aware of, and we started listing them, and the first one was Simonne Tassone came to you and told you about instances in which she had asked to leave early and was refused by Mr. Lee. Are you aware of any other problems that she had?

A. Yes. I would cite, for example, Mrs. Tassone had a fall early in the morning in the parking lot when she came to school early, which has always been her habit to come to school very early. I mean 7:00, maybe earlier sometimes. As soon as the custodians get there she will be there quite often. On this particular morning during the



winter probably two years ago, could be last year but I think it's two years ago, she fell. She slipped out of the car and fell on the ground and had to wait 15 minutes for somebody to show up in the school parking lot, one of the custodians. And Mrs. Tassone told me that part of the problem when she fell and broke her wrist on this occasion, part of the problem was that Mr. Lee and subsequent principals had not agreed to have the custodians clean a special lane for her. The custodians had a very limited policy that they were under on cleaning the parking lot, and they basically [illegible] one path from the [illegible] doors, which are three doors going in the school, the main doors of the school, one path out to the edge of the sidewalk where the parking lot begins. Mrs. Tassone's car could be in any number of spots. Being early she often parked where she could get closest to the door, but at any rate any attempts that she made with the principal to have more than just that narrow path shoveled out to the sidewalk or however wide they made it were futile. Any attempts were futile in getting him to get the custodians to shovel any more area for her, and this included times when it was very



treacherous walking for anybody. According to Mrs. Tassone there was no cooperation from the office administrators to have any accommodation made for her in getting the walks in better condition for walking for her.

Q. Did you observe as well this single path?

A. Yes.

Q. So it's not something that you didn't see but Mrs. Tassone described to you?

A. That's correct.

Q. So there was this single path, and when you looked at it yourself, are you saying that at times it was treacherous for you and you were not on crutches?

A. Yes, particularly because you had the twofold problem of the parking lot itself not being plowed very well. So there's a risk of going from your car to the edge of the curb for the sidewalk going into the school. So that could be a mess a lot of times. That was a mess a lot of times and treacherous, and then the actual cleared area going from the sidewalk to the door, the triple doors, was always in various degrees of done. It wasn't a neat, clean job every time. It was a sloppy job many times, and many times it was

A. She thought it was -- she didn't have a problem with it. She said okay.
Q. So did she move the spot?
A. No.
Q. Do you know why?
A. No.
Q. So did she always park outside of the handicap spot? Was there ever a time when she parked in the handicap spot that you're aware of?
A. She may have on occasion.
Q. Do you remember ever hearing that she complained to Mr. Lee about the location of the handicapped spot?
A. No.
Q. Or complained to anybody else? Did you hear her about the handicap spot?
(WITNESS GESTURES)
Q. Do you remember any of the teachers who complained about the handicapped spot?
A. No.
Q. Okay. Do you remember having a conversation with Fran Gonella about the handicapped spot?
A. No.
Q. How many times do you think teachers were talking about the handicapped spot?
A. I don't know.



Q. Can you guess? What is it more than once?
A. Maybe. It wasn't a big issue.
Q. No?
A. No.
Q. Was it more than five times somebody talked about the handicap spot?
MS. RAPPORT: Objection as to form. Over what time period are we talking?
Q. Well --
MS. RAPPORT: 1982 to the present?
Q. Can you remember how long of a time period people were complaining about the handicapped spot?
A. No.
Q. What is corridor duty?
THE WITNESS: What is what?
MS. IAFRATE: Corridor duty.
A. Corridor duty occurs in the morning for the same amount of time as the homeroom period, and in between classes teachers are required to supervise students as they move from one class to the next.
Q. Okay. So what do you physically do when you're on corridor duty?
A. Stand in the corridor.
Q. Okay. And is there any sort of setup as to where you're supposed to stand?



A. Yes.
Q. Okay. Where are you supposed to stand?
A. Relatively close to your classroom.
Q. Okay. How many people have corridor duty at the same time?
A. Everybody.
Q. Okay. So all teachers do corridor duty during these periods of time that you just referenced?
A. In between classes, yes.
Q. Okay. And can you stand in your doorway or you have to be in the corridor?
A. You can stand in your doorway.
Q. Okay. What is the purpose of corridor duty? What are you trying to do while you're out there?
A. Supervise students.
Q. Okay. So is it a mandatory thing that all teachers were to do the corridor duty?
A. Yes.
Q. Are there ever any times where a teacher didn't do corridor duty?
A. Yes.
Q. Okay. Can you think of any reason why a teacher wouldn't do corridor duty?
A. On any given day, sure. Yes.
Q. Okay. What would be a reason not to do corridor duty?



A. A student may come up to me as a teacher at the end of class, ask me to fill out a form for them, ask me a question about material that was covered that the student may or may not have understood. The student might be shy, not want to ask a question in class. Student might indicate to me that they wanted to speak to me privately. Any number of things could happen. The phone could ring. Could be the office trying to get me a message.
Q. Okay. So in those situations you wouldn't do corridor duty, you would take care of the student?
A. Correct.
Q. And would you be concerned that you weren't out in the corridor? Would you have to tell somebody that you were not going to be out in the corridor?
A. No.
Q. Okay. Did the administrator check to see who was in the corridor and who was not?
A. On occasion.
Q. Okay. And could you get in trouble for not being in the corridor under that situation you described?
THE WITNESS: You're talking about in between classes, correct?
MS. IAFRATE: Yes.
A. You could be questioned as to why you weren't

there.
Q. And if you explained a circumstance like you just explained to me, would it be a problem?
A. No.
Q. Were there ever any meetings that you can remember about having to do corridor duty or reminders that it's got to be done, anything like that?
A. Yes.
Q. Okay. Was it an issue that certain people weren't doing corridor duty at any time that you can remember?
A. Yes.
Q. Okay. Who do you remember was not doing corridor duty?
A. That's not the recollection I have.
Q. Okay. What is your recollection?
A. That on various occasions a memo would come out addressed to teachers reminding them of everyone's responsibility to be in the corridors especially in between the changes of classes.
Q. Okay. Was it a hectic situation? How many students are you talking about passing?
A. Depends on where you are.
Q. Okay. So say -- where were you in the building?
A. Second floor.
Q. Okay. And at some point in time was Simonne Tassone



on the second floor?
A. Yes.
Q. Okay. And so during a time where you and Simonne were on the second floor, how busy was it when kids were in the corridor?
A. You would have 400 students changing classes.
Q. Okay. That's just what I'm trying to get an idea. So it's quite a bit of students?
A. Yes.
Q. Okay. And was part of the purpose of being in the corridor to prevent students from, you know, pushing and shoving each other or getting into any kind of physical contact?
A. Yes.
Q. Okay. Did you ever get pushed or bumped into in the corridor when you were on corridor duty?
A. Oh, yes.
Q. So that is something that happened frequently?
A. It happened on occasion.
Q. Did you ever remember Simonne getting pushed or falling during corridor duty?
A. Not that I witnessed, no.
(MS. ANDREWS ENTERS THE ROOM)
Q. Okay. How long of a time period is that?
THE WITNESS: Is what?



Q. Is the passing?
A. It changed to -- it changed.
Q. Okay. When you say it changed, can you explain to me what it was and then what it changed to?
A. It used to be that first period ended at 9:13 and second period began at 9:13, so there was very little time for the students and teachers to change classes. It was designed that way. Recently within the last three or five years of my teaching career, the schedule changed to identify passing time. So as an example, first period may have ended at 9:11 and second period began at 9:13 to allow two minutes for passing. During the lunchtime that period of time could be a little bit more.
Q. So if someone was -- would not do corridor duty, what would be the problem with that?
A. It would depend on the time of day and where the person was located.
Q. Well, what are you saying? If the person -- well, why would it matter where the person was located?
A. If I'm on the second floor and my students are going to lunch, I am supposed to escort them to lunch, so I can't do corridor duty because I'm supposed to escort the students to lunch. So I can't do corridor duty on the second floor when I'm escorting them to



lunch basically.
Q. I understand that, but I'm saying if it was a normal passing time like you described a couple of minutes ago and you were in with your student, what would be the problem? What would be the impact on corridor duty?
THE WITNESS: You mean if I were delayed with a student?
MS. IAFRATE: Yes.
A. It may have little or no impact, or it may have a big impact.
Q. Okay. Why would it have a big impact?
A. If it were a period of the day when all of the 7th and 8th grade and even 6th grade students who were assigned to the second floor were passing, that would mean in excess of 400 students moving at one time. It could have -- could have an impact, depending on student behavior.
Q. Right. But what kind of impact are you talking about?
A. There could be a fight.
Q. Okay. And if there's -- how many other teachers are already out there?
A. It depends.
Q. Well, how many teachers were on the second floor?
A. 27 at a maximum.

Q. So are you saying that at any given time all 27 teachers could be out at corridor duty?
A. Yes.
Q. Okay. So if one of the 27 teachers isn't out, isn't out there, what would be the problem with that?
A. It would depend on student behavior.
Q. So even if there was a fight and one teacher wasn't out at corridor duty, what would be the problem?
A. It would depend on the situation. I'm not trying to evade your answer. One person can make all the difference in the world or it might not have any impact at all even if there were a fight.
Q. Okay. So if there were a fight and there's 27 teachers out there and Simonne Tassone is not out there at corridor duty, what impact would there be?
MS. RAPPORT: Objection. Form. Asked and answered.
A. There might be an impact. There might not.
Q. Okay. But can you think of any -- that's what I'm trying to get at. Can you think of any impact that there would be if Simonne Tassone was not in the corridor when there was a fight and there were 27 other teachers there?
MS. RAPPORT: Objection, form. Asked and answered.



A. If there were a fight, it quickly escalated in a matter of seconds and turned into a riotous situation with four to 600 students converging on one area, a battalion of Marines would be needed.
Q. Well, has that ever happened?
A. Yes.
Q. With a battalion of Marines?
A. No.
Q. But all 400 to 600 students getting into one fight?
A. Yes.
Q. When did that happen?
A. It happens on occasion. I can't recall the specific date, year, but it happens.
Q. You're saying that there have been occasions where all 400 to 600 students have been in a fight?
A. No. I'm saying attracted to.
Q. Okay. You're saying 400 to 600 students watching the fight?
A. Yes.
Q. So what are the teachers supposed to do if there's a fight during corridor duty? What is your job?
A. To the best of our ability defuse it before it happens. If it happens, to the best of our ability to stop it as quickly and as safely as we can.
Q. So what exactly do you have to do physically? Let's



take the defuse first. To defuse the fight, what exactly do you have to do?
A. If it were happening near me, to physically get as close to those students who were involved in what usually starts as a verbal conversation of some kind, to get as physically close to them as I can and to do my best to calm them if I perceive them getting excited or agitated with one another.
Q. Would you do that by yourself?
A. I may.
Q. Okay. Would there be situations where you would call another teacher to help you?
A. Sure.
Q. Okay. What kind of a situation would you handle by yourself?
A. One where I just heard two students whose voices were getting a little too loud.
Q. Okay. And so you think that you would be able to defuse that situation by yourself?
A. Yes.
Q. So what kind of a situation would you call another teacher to help you?
A. If there were more than two students involved.
Q. Still just verbally having some sort of a dispute?
A. Yes.



Q. But if it was more than two students having some kind of verbal encounter, you would call another teacher?
A. Yes.
Q. Okay. What would that other teacher do for you or with you?
A. Assist me in attempting to defuse the situation before it escalated any further.
Q. Okay. And what would they be doing physically? Would they be doing anything physically to help you defuse that situation?
A. They would get as close to the students as they could to try to talk to them, to calm them.
Q. Okay. But they wouldn't touch them?
A. No.
Q. Okay. So if the students were already in a fight, if you hadn't defused it, what would you do to stop that fight from occurring or continuing?
A. Wow. Go to the area where the students are fighting, because fights can happen instantaneously, get as close as is safe to the students, try with my voice to get the students' attention, immediately tell them to stop fighting, do my best.
MS. RAPPORT: Okay. I'm going to just interrupt you just for a minute now. It's 1:05. I need to take a lunch break. I can do a half hour and

limit it to half an hour and then reconvene. It would be good if we could do it now. Is that comfortable for you or do you have a point where you are going to stop soon?

MS. IAFRATE: I'd rather just -- can I just finish this or not?

MS. RAPPORT: This line of questioning?

MS. IAFRATE: That part.

MS. RAPPORT: How many more minutes do you think you'll be?

MS. IAFRATE: Five.

MS. RAPPORT: Okay. Five more minutes. So it's 1:05. We will stop a little after ten after, and then we'll break at that point. Is that comfortable to take a lunch break at that point?

MS. IAFRATE: Right. Unless -- I'm going to try to finish in five minutes, but if I keep going for another minute, I'm not going to --

MS. RAPPORT: I also need to use the bathroom. If you're going to be more than five minutes, it's going to be a problem.

MS. IAFRATE: Why don't you use the bathroom right now? We'll come back and finish this little part.



MS. RAPPORT: And then we will take a lunch break.

(A RECESS WAS TAKEN)

(LAST QUESTION AND ANSWER READ BACK)

Q. So if you couldn't get their attention or get them to stop with your voice, what would you do?

A. Hope that other students would assist me in getting other teachers or physically separating the two or more students who may be involved in a fight. Students tend to not want to see their teachers hurt, not want to see one another hurt, and frequently will quickly come to the assistance of a situation like that.

Q. Okay. So are you saying that you wouldn't ask the other teacher to come but you would depend on the students to go get the teacher?

A. No.

Q. You're not saying that?

A. No.

Q. Would you call other teachers to help you?

MS. RAPPORT: Objection. Asked and answered.

A. They probably already would be there.

Q. Okay. So they're not -- how far away are the other teachers?



A. Varying distances.

Q. Approximately how far away is the closest teacher?

A. Could be a matter of three feet.

Q. Okay. Would you ever be talking to another teacher while you are in corridor duty? Could be you standing right next to another teacher?

A. Sure.

Q. Are you expected to physically separate the kids?

A. To a limited degree, yes.

Q. Okay. What do you mean by that?

A. It's a very quick, split second decision that you're being asked to make. You don't want -- necessarily want to put yourself in harm's way, but you also don't want anyone harmed, so a lot of it is just split second. It, you know, sometimes, many times, students will just respond to an adult voice that they recognize in a loud fashion, a screaming adult, and that's enough to make them stop for a split second so that someone, perhaps a teacher, perhaps a fellow student, can get them by the hand and push it away so they don't punch you in the face.

Q. Were you required to physically stop a fight?

MS. RAPPORT: Objection. Asked and answered.

A. To the best of your ability.



Q. So if you didn't have the ability to do it, you wouldn't be required to do it?

A. I don't know how to answer that.

Q. Well, were there any teachers that didn't have the ability to stop a fight physically?

A. Yes.

Q. Okay. Who?

A. At one time there was an older teacher who was in the building whom no one really expected her to get in the middle of a fight.

Q. Was that a problem?

A. No.

Q. Okay. So did any of the other teachers complain about this woman not being able to stop a fight physically?

A. No.

Q. Okay. Did you ever hear administrators complain or hear any administrator talking about the fact that this teacher could not stop a fight physically?

A. No.

Q. So if Simonne Tassone did not want to do corridor duty, what would be the problem with that?

A. Teachers usually do corridor duty very close to their classroom so that they know the students who are walking by them and can call them by first name, whether it's Kathy or Sara or whomever. So that's a

tremendous help. May or may not have -- there may never be a fight in that area.

Q. So are you saying because other teachers may not know her students' names, it would be a problem for her not to do corridor duty because of her disability?

MS. RAPPORT: Objection as to form.

A. I don't think it's a question of her disability at all. I think it's that I know my students. I don't -- by name. I don't necessarily know students in another grade by name, whether it's 7th grade, 6th grade, special needs, but I do know mine, and my students are going to be the ones that are closest to the area that I'm being asked to supervise.

Q. Okay. But if -- I'm saying that if it was because of her disability. I know you're saying that you don't think that is a factor, but I'm saying if that was the reason why she didn't want to do the corridor duty, are you saying that the reason it would be a problem is because other teachers may not know her students' names?

THE WITNESS: Are you asking because of her disability would other teachers have a problem with her not doing corridor duty?

Q. I'm saying if that's the reason why she couldn't do it.



THE WITNESS: Because of her physical disability?

Q. Exactly.

A. Okay.

Q. Would other teachers have a problem with it?

A. I don't think so.

Q. Okay. So would you personally -- can you think of any reason why it would be a problem if that was the reason why she couldn't do it?

A. No.

MS. IAFRATE: Okay. Want to take a break?

MS. ANDREWS: Yes.

MS. RAPPORT: All right. So we'll resume at quarter of. It's 1:15 now.

MS. IAFRATE: Okay. Quarter of two.

(A RECESS WAS TAKEN)

MS. RAPPORT: Back on the record. So it's later than I said. It's five of two. We took a 40-minute break, not a half hour.

Q. We talked a little bit about Simonne having a problem getting to the second floor with the ramp earlier. Do you remember that?

A. Yes.

Q. Okay. Just so I'm clear, because I had some other



questions, but I think what you said may obviate the need for me to ask them. Are you saying that you don't remember that being a problem that existed for any period, any long period of time?

A. Correct.

Q. Okay. And so you believe that she complained about it to you and then it was resolved?

A. Correct. With the administrators, yes.

Q. Do you ever remember after that her having any further problems with the ramp?

MS. RAPPORT: Objection as to form.

A. No.

Q. When I say after that, I mean after it was resolved that you know of where she got what you call the garage door opener thing. Do you remember her ever having any further problems with the ramp?

A. No, I don't.

Q. Okay. Do you ever remember hearing that she had lost the garage door opener or that it was stolen?

A. I don't recall.

Q. Okay. Did you ever hear of a situation where she got hurt on the ramp?

A. No.

Q. Did you ever hear about her falling off her scooter while she was on the ramp?



A. Not that I recall.

Q. Or falling off her scooter anywhere near the ramp?

A. I don't have any clear memory of it.

Q. Does it sound familiar to you? Is that why you're saying no clear memory?

A. It seems to me that in the course of our career at Bridgham when we were there in the same time frame that I did hear of Simonne being injured on the job. Not having any details of specifically what happened, I would assume that she was in her chair.

Q. Okay. So when you say you believe you heard that she was injured on the job at some point, can you remember what the injury is or was?

A. No. No.

Q. Okay. Can you remember who told you that she was injured on the job?

A. No.

Q. Can you remember when that was?

A. No. I believe there was more than one incident where Simonne was injured on the job.

Q. Okay. And for any of those situations, can you remember what the injury was?

A. I believe that one of her injuries involved her either right wrist or right arm.

Q. What do you remember about her right wrist or right

Q. And what was your reaction to the noise level?
A. I know she had a special-ed class and those kids needed special needs. It is not the easiest class to teach.
Q. Was her noise level any different than the noise level of other teachers who had special-ed?
A. At times it was loud.
Q. It was louder?
A. Louder, I would say.
Q. But you are saying that other special-ed teachers had loud classrooms at times as well?
A. I would say that special-ed rooms in particular have loud atmospheres.
Q. You felt that maybe hers was louder?
A. You know, occasionally I would. The noise level would be a little bit louder.
Q. And you never talked to her about that?
A. No, I never did.
Q. So can you tell me other than that anything about her strengths and weaknesses, in your opinion?
A. As you know, I did not evaluate her so



I can't tell you that much.
Q. Can you tell me anything else?
A. No.
Q. Did you ever hear that she had problems controlling students?
A. No.
Q. Did you ever think that she had problems controlling students?
A. No.
Q. Did you ever hear that Simonne Tassone had been injured while at school?
A. I am just hearing about it from you right now for the first time.
Q. You never heard that she fell off her scooter?
A. No.
Q. You never heard that she was injured by a [redacted]tudent?
[redacted]. No.
Q. [redacted]id you ever know that she was out for [redacted]eriods of time because of an injury or [redacted]ness?
[redacted]. Illness, yes.
Q. [redacted]hat did you know?
[redacted] ill. The



prognosis of the illness, I didn't know.
Q. How did you know that she was ill?
A. I assumed. She was out for quite awhile there for one stretch. There was a sub coming in every day and I assumed that she was ill. I just assumed that.
Q. You never talked to anyone about that?
A. No.
Q. And were there, when a sub comes in to take over for a teacher, is there a rise in the disciplinary problems in that class?
A. Yes. That happens with any class.
Q. So when there is a sub, that makes your job a little bit more difficult?
A. Yes, it does.
Q. Do you know, sir, whether corridor duty was something that all teachers had to do?
A. Once again, that was the principal's responsibility.
Q. But you were the vice principal. In your capacity as vice principal, did you ever act as principal when he was out?
A. Occasionally.
Q. Do you know either in your capacity as acting principal or in your capacity as



assistant principal, whether corridor duty was something that teachers had to do?
A. Yes. There were certain responsibilities that certain teachers had to be out in the corridors and maintain proper discipline in the corridors with kids.
Q. Were there any exceptions to that, do you know?
A. Not that I know of. I can't remember.
Q. What if a teacher had a broken leg?
A. I assume Mr. Lee would excuse that teacher from corridor duty if that teacher had corridor duty.
Q. If that situation had presented itself to you while you were acting principal, what would you have done?
MS. RAPPORT: Objection. Foundation.
A. I probably would have excused that teacher.
Q. And you would not have had to check with anyone, correct?
A. I don't think so.
Q. Did Simonne Tassone ever talk to you about

A. Various teachers.
Q. Can you tell me, are you aware of any teachers who did not do the kind of corridor duty that you've described in Number 1?
THE WITNESS: That just didn't drop what they were doing and went to the hallway?
MS. ANDREWS: Yes.
A. We have that problem in the building that I'm in right now. There was quite a few people who didn't just drop what they were doing unless you walk into their classroom and ask them to come out.
Q. Did you ever have occasion to go in and ask someone?
A. Yes.
Q. Can you tell me who that was?
A. I have asked Mr. Wright to go out. I have asked Mr. Polak to go out. I have asked Ms. Shugrue to go out. I've asked -- I can't think of these two teachers -- there was a couple, a husband and wife. They taught English.
MS. TASSONE: Fuller.
MS. RAPPORT: I'm going to object to the Plaintiff participating in the deposition.



Q. Anyone else that you've asked?
A. Anybody who was not out at their door when the bell rang, because I usually drop everything that I'm doing and I walk the corridor. Anyone who was not out, I had the tendency to go in and ask them to come out.
Q. And when you, for example, talk to these individuals about coming out, did they tell you why they weren't out there?
A. A lot of people have explanations, but those explanations wasn't good enough for me as far as I'm concerned; I was signing a progress report, I needed to pull some material for my next class. On occasion you wouldn't even see the person in the room. The person might say, I had to go to the bathroom. So people had an explanation for their lack of taking on that responsibility if they were called.
Q. Now, were they supposed to stand out in this corridor, as well, or just at their doors?
A. Stand out in the corridors. You drop what you're doing and basically what you do is that. This is your door, you open your door, and you go right outside of the door. You stand outside



of the door, you know, you're in the hallway, but you're closer to your door because you want to be visible. You don't just stand in your door.
Q. What is the purpose of that corridor duty?
A. Basically to encourage the movement of students and to be observant of any inappropriate behavior or to prevent certain things from occurring during the changes of classes.
Q. Was this expected, or was this mandatory?
A. It was mandatory. Well, mandatory and expected. I'm trying to look at the two of them. Even in the building that I'm in right now, it is required that when the bell rings, that you drop everything that you are doing and you go to the door. So I guess it's both. It's expected, and it's mandatory.
Q. Are you aware of when you went to these teachers and told them that they had to come outside, would you subsequently, at a later time, see them back in their rooms not doing corridor duty?
A. Yes.
Q. Did you ever report that to Mr. Cochran?



A. Yes.
Q. And what did Mr. Cochran say?
A. He might say something like -- Mr. Cochran didn't know how to approach people. He would say something like, Why don't you place it back in the bulletin again, reminding teachers. Something like that. And it may be placed in the bulletin again.
Q. Did he indicate that he was aware that teachers didn't do corridor duty on occasion?
MS. RAPPORT: Objection.
Q. Strike that. Did he indicate whether or not that he knew about what you were talking to him about?
A. Yes. He knew what I was talking to him about.
MS. RAPPORT: Objection. Move to strike.
Q. Did he say that he had observed teachers not doing corridor duty?
A. Yes.
Q. Did you ever talk to him about whether this was something that was only expected or whether it was mandatory?
A. I can't.

A. I just can't tell you.
Q. Is that because you don't know that it is, or?
THE WITNESS: Well, would you ask the question again, because I'm not sure?
Q. Sure. Is it an essential function of her job to deal with students who have made threats against her in the classroom?
MS. RAPPORT: Objection.
Q. Do you know whether that's an essential function?
MS. RAPPORT: Asked and answered; foundation and form.
A. I believe teachers still have to teach kids, and that there's a good number of teachers that get threatened at varying levels of threats. Other than that, my history as being a classroom teacher, we have all kinds of students and we teach them all.
Q. I'm just trying to find out whether that's an -- do you know whether that's an essential function of Simmone Tassone's job?
[redacted]
Q. Do you know whether or not corridor duty was an essential function of her job?
THE WITNESS: Of hers in particular?



MS. ANDREWS: Yes.
A. I know that teachers can be assigned corridor duty, yes.
Q. [redacted]
Q. Of her job?
[redacted]
Q. Do you know whether any persons have ever been exempted from corridor duty?
A. I can remember that there were requests, but I don't know that we've actually made that accommodation, so I can't say for sure.
Q. But you are aware that there were requests?
A. There have been requests for teachers not to do cafeteria duty, not to do corridor duty.
Q. Do you remember how many requests there were?
A. Very few. Maybe two.
Q. I take it that these requests were based on disability, or alleged disability?
A. Exactly.
Q. And this was during your tenure?
A. Yes.
Q. And sitting here today, you can't remember what the committee decided?
A. No, I can't.



Q. Now, when you say corridor duty was an essential function of Simmone Tassone's job, is that something that you're assuming, or do you know that to be fact?
A. I know that principals are given the opportunity to assign teachers to what I believe is called the administrative period, where they have to give time to some sort of supervisor be it the cafeteria, the playground, where the buses are, and principals have to have teachers covering those areas.
Q. [redacted]
Q. So, is your answer no, that you can't remember doing that?
A. That's correct.
Q. Do you ever remember any issues about a remote



control with Simmone Tassone?
A. Yes.
Q. Can you tell me what you recall?
A. I believe that Simmone indicated that she had misplaced hers, and she needed it to be replaced, and that a replacement was found and given to her.
Q. Do you know how long it took for a replacement to be found?
A. No.
Q. And how do you know this, did you talk to Simmone about this?
A. I can't remember if I read it in one of her notes, or that it was just part of a conversation that we were attempting to locate a remote. I don't remember, specifically.
Q. Do you ever remember learning that she fell off her scooter?
A. Yes.
Q. And how did you find that out?
A. There was a document that I read.
Q. And when did you read that?
A. Specifically, I don't know. It was a while ago and then I remember -- I think she submitted a document as part of her 504 requests.
Q. So, did she submit a request for a replacement

Page 134

leave, so why don't I do it by motion.
THE CLERK: Okay.
MS. ANDREWS: All right.
THE CLERK: Yes.
MS. ANDREWS: Thank you. Bye. Which obviously means you're going to have to come back.
MS. RAPPORT: If your motion is granted.
MS. ANDREWS: Right.
A. Let me finish this. The fact that we didn't get together on the evaluation is because of a salt visit we were having at the school. It was a very complicated visit that the school was going through, an evaluation so to speak, and we work with -- matter of fact, including Miss Tassone, when she was available, did work a little bit on this and did things for the salt visit as did many different groups of teachers. But my commitment was, first of all, to get that done and was going to come back later with the evaluation. That's why it didn't happen at that time. When Mr. Diruzzo called her and said that I was already gone when that happened. In between after I had retired, I was informed that

Page 135

I couldn't do my evaluations because I was no longer officially the full-time principal. It would have to be a regular staff member, assistant vice principal that was a regular employee would have to do the evaluations, and I was not going to be allowed to do them. I didn't know that until I came back.
MS. ANDREWS: Okay. I still have some questions, and you're taking the position that he has to leave and he has to leave anyway on his own?
MS. RAPPORT: We're finishing now. The deposition is closing.
THE WITNESS: If you can get a few questions that you want answered, I'd gladly do a few. But this is ridiculous.
MS. ANDREWS: You're going to allow me to do some more questions?
MS. RAPPORT: I'm going to allow you to finish the question on this topic, and then I'm closing the deposition and you can move to reopen it by written objection.
MS. ANDREWS: I close the deposition. You can object. This is my deposition. I close it, and I leave it open. You can object to it.

Page 136

MS. RAPPORT: Okay. Then that's fine. But we're going to be leaving in five minutes, so ask the questions to clarify.
THE WITNESS: I want to finish this because --
Q. Let me just ask you a question, sir. Okay? There's no question pending. It states here, "Mr. Diruzzo was assigned as my evaluator, and as soon as I found out, I went to Mr. Robert Lee and requested another evaluator due to prior conflicts." Did Simonne Tassone ever talk to you about any conflicts with Mr. Diruzzo?
A. No. What I recall happening, she came to me, I assume that he must have been assigned from downtown, I don't know for sure, I don't remember, and she asked me to do the evaluation. I said, no problem, I'd be glad to. I had done her before, I would gladly do it again. She had a nice portfolio last time I did, and I was really impressed with it. So I agreed. I don't recall any conflicts that she said she was having. I thought she wanted me to do it because she felt that she liked me to do her evaluations.
Q. Did you ask her why it was that she didn't want Mr. Diruzzo to do it?

Page 137

A. No. I don't recall -- I recall her saying, would you do it. I recall the music teacher that just passed away asked me the same thing, and another teacher asked me the same thing. Because I had been involved with them at some other period, and I had done evaluations. And it wasn't only in answer to her. I wanted to do a few others that had requested me to do it. And I told them if I could I would. My thinking is when I came back after my retirement that I would still be able to do the evaluations, and I didn't find out until I came back in January that I wouldn't be allowed to. So I wasn't aware of it until then.
MS. ANDREWS: I'm leaving it open.
MS. RAPPORT: The deposition is -- we're objecting, and we're closing it.
MS. ANDREWS: You're not closing it. You're objecting.
MS. RAPPORT: You understand the terminology.
MS. ANDREWS: No, I don't understand it. You're the first one to ever use it.
THE REPORTER: Ms. Rapport, would you like a copy of the transcript?

NCENT A. CIANCI, JR.
ayor

ANA LAM
perintendent

OBERT A. DEROBBIO, PH.D.
uman Resources Administrator

Providence
Schools
OUR SCHOOLS. OUR FUTURE.

HUMAN RESOURCES

June 7, 2001

Ms. Simonne Tassone
C/o Samuel Bridgham Middle School
Providence, RI

Dear Ms. Tassone:

I am in receipt of your letter dated June 6, 2001 requesting a variance from the evaluation process for your 8th year evaluation. Please be advised that I am granting the variance and will so inform the building administrator.

Sincerely,

Robert A. DeRobbio, Ph.D.
Director/Human Resources

CC: Mr. DiRuzzo
Mr. Almagno
File

797 Westminster Street • Providence • Rhode Island • 02903-4045 • (401) 456-9205/456-9208

he Providence School Department does not discriminate on the basis of age, sex, sexual orientation, religion, national origin, color or disability in accordance with applicable laws and regulations.
MISSION: Students of all ages in the diverse cultural mosaic of the Providence community will be enthusiastic, life-long learners, workers, and citizens, each with marketable skills achieved relative to his or her ability. These outcomes will manifest themselves in a nurturing environment driven by excellence in educational opportunity.

is that what you are talking about?
A. Yes.
Q. The time factor being how quickly they got out?
A. Yes.
Q. Turning to Page 7, Paragraph 6, you say there were times when my students told me that Mr. DiRuzzo had questioned them about me; do you see that?
A. Yes.
Q. Do you have a recollection of the names of the students who reported that to you?
A. Not right now, I can't think of the names.
Q. Do you have a memory of particular students when you make that statement?
A. Not now, I can't think of anybody right now.
Q. Turning to Paragraph 10, '97 through '98, my personal assistant complained to Mr. DiRuzzo I was going to the bathroom frequently.
A. That should have been classroom assistant.
Q. That wasn't your personal assistant?



A. No.
Q. This is the TA who is assigned to work with your kids?
A. Yes.
Q. Who was that?
A. In 1997 and 1998, that's tough.
Q. That is the person who complained to Mr. DiRuzzo, do you remember who that was?
A. I think it might have been Esther Mabry or Mrs. Brown. I kept getting different TAs almost every year. It is confusing after awhile as to who was there and when.
Q. You say here on Page 7 through 8, on a number of occasions I could not use my remote because someone was playing with the switch?
A. Yes.
Q. What does that mean? When was that? What was that? First of all, what are you talking about?
A. Above the ramp doors there is a box about two feet long and maybe eight inches deep that had the mechanism in it that would recognize when I pressed on the remote.



Q. It was like the electrical receiver for the signal?
A. Yes. From this device, two bars came down and pushed the doors open.
Q. It received the signal that then moved the doors for you?
A. Yes. On the side of the box was a switch, just an ordinary, up and down kind of switch. And somebody found out that if they changed the position of the switch, it shut the mechanism down so I could be there pressing like crazy and the doors would not open.
Q. And this was a continuous problem for about ten months?
A. Yes.
Q. So it did not work for ten months?
A. No. The janitor tried to put tape over it, but somehow they could still, I never saw who did it.
Q. My question is, when the switch was moved in this fashion to shut down the system, what did you have to do to reactivate it?
A. Find a teacher tall enough or someone tall enough to push it back on.



Q. Because it was above your reach?
A. Way above. It was on top of the door.
Q. A teacher or did you go to the janitor?
A. Sometimes a janitor and sometimes a teacher and sometimes a tall student.
Q. In order to deactivate, some student or person had to climb up similarly?
MS. ANDREWS: Objection as to the form.
A. They had to be able to reach it somehow, either by jumping or being tall enough.
Q. So how many times in this ten-month period did you have to call upon somebody to reactivate the switch?
A. Anywhere from three to five times a week.
Q. And how did it eventually resolve so that it didn't happen?
A. Someone came from, some janitors came from downtown and removed the switch, like, there was no switch there, just a hole.
Q. So there was no way of deactivating it?
A. Yes.
Q. But it still worked? If you pressed the

button on your remote, it would move the signal?
A. Yes.
Q. Did you ever fill out any paperwork to make a request to resolve this problem? Strike that. Did you ever put in writing or memorialize in any way this problem you were having with the switch?
MS. ANDREWS: Objection as to the form.
A. I don't remember putting it in writing. I know I spoke to Mr. Lee and Mr. DiRuzzo. I spoke to Peter, I don't know his last name. He works for the school department. He was the janitor. I spoke to him about it. He tried using the tape. I am not sure if it was Mr. Lee or Mr. DiRuzzo who said they would put in a work order.
Q. And at some point it got removed, the switch did?
A. Yes.
Q. Turning to Page 8 where you are talking about the remote and the loss of the remote, you say, I eventually learned the janitor in my school had the remote all



along; do you see that sentence?
A. Yes.
Q. Is it your understanding that remote the janitor had was the one that had gone missing in December of 1998 or an extra one?
A. An extra one.
Q. Did you physically get the remote from the janitor?
A. Yes, I did.
Q. He handed it to you or gave it to you?
A. I am not sure if he gave it to Mr. Lee and Mr. Lee gave it to me, but he did speak to me about it.
Q. Who is the he?
A. Peter.
Q. This is the same Peter who put tape up?
A. Yes.
Q. He is the one who said, it is my remote that you now have, or my copy of it?
A. Yes.
Q. Is he the one who said, don't lose it?
A. Yes.
Q. Because we don't have any others?
A. Yes.



Q. Did you get along with Peter?
A. Yes.
Q. Do you know his last name?
A. I know his wife works at the school. I don't know his last name offhand right now. I always called him Peter.
Q. You say on Page 9 that students could not go on trips because I could not get on the bus?
A. Yes.
Q. You are saying this happened from 1998 to about 2001?
A. Yes.
Q. How many times in that time period did that happen?
A. Sometimes once a year.
Q. We are talking about three years here, '98 to '99, '99 to 2000 and 2000 to 2001?
MS. ANDREWS: Why don't you read your answer before you, when she asks a question, read it and take your time and then answer it.
A. It happened three times or once a year for the three years.
Q. Your memory is that in each of the three



years from 1998 to 2001 your kids did not go on any field trips at all because of your inability to use the bus?
A. Yes, because I was told that it cost extra money to get a handicap because for a scooter. If they went to a museum or a place that did a lot of walking and that because of that a lot of field trips had to be cancelled.
Q. Did other people go on field trips those years?
A. Yes.
Q. Who told you that your kids could not go on a field trip because they could not get a handicap bus?
A. It was members of the special-ed team, I believe.
Q. Who? Glenda Guglielmo?
A. I am talking about teachers.
Q. Did Mr. Lee tell you that?
A. No.
Q. Did Mr. DiRuzzo tell you that?
A. No.
Q. Don't you put in a request for a bus through your principal?

A. Because the question in and of itself is a bit abstract for me. I have to say out loud the basis of my belief, which I believe is in regard to why Mr. DiRuzzo was treating Mrs. Tassone the way I was perceiving him to be treating her, in other words, if not abusive at least with a harassment and intensity for repetition, which I speculated, and that's all I can do is speculate, it might be from the fact that he found her personality different, difficult for him to interact with, and that he didn't like dealing with her requests or exceptions of treatment.

Q. What is the basis for your belief that he didn't like dealing with her requests for exceptions?

MS. ANDREWS: Objection as to form and asked and answered.

Q. You may still answer if you understand the question? Do you need it read back?

A. Once again, please.

(QUESTION READ BACK)

A. I'm uncomfortable with all of this now. It's too much in the realm of speculation, and my speculation, and I'm going to have a hard time grounding it in any fact, so I would rather, if I have the choice, move on to another topic.



Q. That's fine. I just want to know is your answer that you can't answer that because you have a hard time grounding that in any fact; is that your answer?

MS. ANDREWS: Objection as to form.

A. No, I think what I'm saying is that it becomes highly speculative when I look at consistent behavior, as tempting as it may be to reach a conclusion, it still becomes a speculative matter for me as a third party to comprehend everything that's going on between them, and I have my own opinions about it, but I can't say. It's subjective.

Q. Let me ask you this, what makes you think that they were like oil and water? What did you observe? Let me rephrase the question, strike that. What did you observe that makes you believe or leads you to believe that they were like oil and water?

A. I will start by mentioning time. He was abrupt. She was ready to go on at length about the situation she wanted to discuss with him or she wanted to discuss with her. She favored painting a whole picture. He favored zeroing in on one point and sticking to it. She looked for



flexibility based on the particular incident. He wanted to call on the law, the procedure, the policy.

Q. Would it be fair to say that he was more taciturn and she was more talkative?

MS. ANDREWS: Objection as to form -- withdrawn.

A. I can't characterize him as taciturn because that word covers a lot of neutral territory for a lot of people who are taciturn. In incidents that we're talking about with him that I observed, I don't think taciturnity was any part of it, a natural tendency to be quiet or short worded. I don't think that is what we had going on with him.

Q. Well, in his interactions with you, was he talkative?

A. More talkative, but again relative to the groups, being in the middle group, a little more talkative to me, but I was always conscious of how he drew the line with me. There was a certain point at which we wouldn't go beyond.

Q. So it would be fair to say that he was more taciturn with Simonne and less taciturn with those whom he felt more comfortable with in that other group?



MS. ANDREWS: Objection.

A. No, I think he was more abrupt with Simonne and to the point, unvarnished, to the point with Simonne than he was with people in the other groups.

Q. With the people in the other groups would he talk more?

A. I find that question, not to be disrespectful, but somewhat meaningless because of -- it's impossible for me to say in any reliable way, you know, how much taciturn conversation we had as opposed to untacitumed conversation. It's too vague for me.

Q. What makes you think that he was warmer to people whom you somewhat jokingly characterized as of Italian dissent?

A. Well, I will give you a few concrete examples. He would talk in Italian with them. He would greet them in Italian. They would greet him in Italian. He liked to lapse into Italian fairly frequently with those kinds of people.

Q. And you heard --

A. I heard that all the time I was there. I saw that all the time I was there.

Q. So with certain employees who were Italian, he

Q. What makes you think that? What's the basis for that belief?
A. Because there were times and many times when Simonne appears to have gone to him and asked for something and been refused, found him inflexible.
Q. Okay, I'm going to ask --
MS. ANDREWS: Would you let him finish.
A. Found him inflexible.
MS. RAPPORT: Excuse me, the tone is inappropriate. This is my witness now. If you want to object, you may object.
MS. ANDREWS: My tone was fine, and I just want to make sure that the witness has an opportunity to finish his answer.
MS. RAPPORT: I will let him finish.
MS. ANDREWS: I didn't think you were.
MS. RAPPORT: Lose the tone.
MS. ANDREWS: Don't tell me to lose the tone, please.
MS. RAPPORT: That tone is not necessary.
MS. ANDREWS: Don't order me around.
MS. RAPPORT: Don't interrupt my



questioning.
MS. ANDREWS: I will if you're not letting the witness finish the answer.
MS. RAPPORT: Then make an objection.
MS. ANDREWS: Well, how can I do that without interrupting you?
MS. RAPPORT: The word is objection.
MS. ANDREWS: That's my objection.
[illegible] going to ask you, as I did yesterday --
MS. ANDREWS: Have you finished your [illegible]wer?
THE WITNESS: I've lost track of what [illegible] saying.
MS. ANDREWS: I would put on the [illegible]
THE WITNESS: I don't think I was [illegible]
MS. ANDREWS: Are you going to let [illegible]ness finish?
MS. RAPPORT: I would like you to [illegible]
MS. ANDREWS: Do you want it read [illegible]
MS. RAPPORT: Excuse me, I'm [illegible] this questioning, not you.



MS. ANDREWS: I think you ought to ask him in fairness whether he would like it read back. He said he is losing track.
Q. Would you like the question read back, sir?
A. Yes, please.
(QUESTION PAGE 126, LINES 1-2 READ BACK)
MS. ANDREWS: I think it's what he said before that.
MS. RAPPORT: This is my question. I asked would you read the question back. The witness asked would you read the question back. You're not allowed to do anything other than object at this point. This is my question.
MS. ANDREWS: Objection. I thought that he wanted more than the question read back. I thought --
MS. RAPPORT: And if you --
MS. ANDREWS: You're interrupt me now. You tell me to object and now you're interrupting me.
MS. RAPPORT: You need a one word objection, basis for your objection.
MS. ANDREWS: Why? You didn't have one word.
MS. RAPPORT: Well, that wasn't



right. You threatened to bring me to court, so now we're going to play it the same way.
MS. ANDREWS: My point is that I thought the witness asked that his answer be read back, so I am interposing that objection.
MS. RAPPORT: Based on what? What's the basis for your objection?
MS. ANDREWS: Objection as to form and objection that you're not being fair.
MS. RAPPORT: Objection as to form. You may answer. Read the question back, please, ma'am. Now, Miss Andrews, I ask you politely to please restrain yourself. Would you please read the question back.
(QUESTION PAGE 126, LINES 1-2 READ BACK)
Q. Do you need more than that or would you like your partial answer repeated?
A. What I would prefer to do is state to you my understanding of what that question was implying so that I can get back to the context in which I was answering.
Q. You may answer however you like. The question is what is the basis for that belief, and if you need more time and ability to clarify, you're free to make it.

STATE OF RHODE ISLAND
# COMMISSION FOR HUMAN RIGHTS

July 3, 2003

*Chair*
Dr. John B. Susa

*Commissioners*

Joaquin F. Gomes
Richard R. Ferland
Iraida Willaims
Randolph Lowman
Camille Vella Wilkinson
Jean Stover

*Chair Emeritus*
Marguerite A. Beaubien

*Executive Director*
Michael D. Evora

Ms. Melody Johnson, Superintendent
Providence school Committee Jointly
And Severally
Providence School Department
797 Westminster Street
Providence, RI 02903

RECEIVED
JUL 7 - 2003
By

RE: RICHR NO. 03 ERA 026-06/06 EEOC NO. 16JA200199
Robert Perkins vs. Providence School Committee, Jointly and Severally
and Alex Prignano, Finance Director

Dear Ms. Johnson:

On **June 17, 2003,** a determination of **no probable cause** was made by a Preliminary investigating Commissioner in the charge of discrimination cited above. This determination concludes the State Commission's Processing of the subject matter. **Any hearing scheduled in this matter is hereby cancelled.**

As the complainant's charge was co-filed with the U. S. Equal Employment Opportunity Commission (EEOC) under Title VII of the Civil Rights Act of 1964, as amended, which is enforced by EEOC, you have the right to request review of this action.

In order to secure a review, the complainant must request it in writing, within 15 days of the receipt of notification of the ruling to the Equal Employment Opportunity Commission, JFK Federal Building, Room 475, Boston, Massachusetts 02203. Otherwise, EEOC will generally adopt our action in the case.

Should the charging party wish to pursue this matter further, the party may do so by filing a private action in Federal District Court within ninety (90) days of the receipt of the EEOC's Letter of Determination.

Thank you for your past cooperation.

Sincerely,

Michael D. Evora
Executive Director

MDE/nf

CC: Emily R. Davis, Esq.
Providence School Committee Members

Fax (401) 222-2616 180 Westminster Street, Providence, RI 02903 TDD# (401) 222-2664
(401) 222-2661
http://richr.ri.gov

happened specifically that Simonne saw or heard it.
Q. Let me stop you there then. Is Jane Shugrue mentioned in here?
A. Yes. It says, "I saw Jane lift her pant leg up and say that she should put on her brace so she can get a 504 plan and get out of doing coverage."
Q. The reference to Jane, you learned it was Jane Shugrue?
A. Yes.
Q. Let me just ask you, when you received this document, what was your reaction?
A. I was upset.
Q. Why were you upset?
A. For moral issues and comments, colleague-to-colleague that I believe were taken out of context and that I didn't believe that people had accurate information. They were making assumptions about things that they really didn't have knowledge, correct or full knowledge about.
Q. Anything else?
A. You know, concern for Simonne feeling, you know, isolated or ostracized or picked on.
Q. Did she tell you that she felt ostracized and picked on?
A. Yes.



Q. Did she say that -- strike that. So that you believe this was a form of harassment based on her disability?
A. I believe it presented a possibility that it could be. As I said before, when I talked to her I tried to determine if it was, you know, ongoing, isolated, what she wanted to do about it, how we would proceed.
Q. Did she tell you whether this was isolated or whether this was something that was --
A. Well, as I said, I believe, I'm quite sure [illegible] initial reaction was that she wanted to try [illegible] it would sort of blow over. That she was [illegible] with kind of a typical dilemma of, you know, do [illegible] it will go away or do you make an issue and [illegible] possibility that, you know, you irritate [illegible] more? That is obviously a difficult position [illegible]
Q. [illegible] your position is -- strike that. What do you [illegible] her saying?
A. [illegible] The only part I remember her saying was that [illegible] wanted to, you know, think it over or hold [illegible] to see if, in fact, you know, it would [illegible]. This is my terminology. I don't remember [illegible] said. As I said, it was a very stressful



time because of the shortages of substitute teachers. We were doing a lot of coverages. That meant people were going straight through the day with no break.
Q. Did she ever come back to you?
A. I don't remember that she came back to me. I believe that the handwriting, the handwriting in the left-hand corner looks like my handwriting, the cc for Don Zimmerman. As I said, Don and HR were already informed of the situation back to the point when the coverages, you know, the question I had was I had never seen the 504 or I didn't have anything that, you know, I knew. I don't disbelieve Simonne. I certainly felt that this could become an issue and that I needed some documentation, direction from HR, and in the interim I would not assign her the coverages. You know, when this came up, Don Zimmerman would already have been aware that there was an issue there.
Q. Okay. Why did you send it to Don Zimmerman?
A. Because it was related, first of all, it was related to the issue that I had raised which was, you know, where are we with this? I'm honoring this based on good faith and Simmone's word at the moment, but I need some direction. You know, to let him know that this was an issue. We knew now, knew it had become an



issue, to keep him in the loop. More than keeping him in the loop, kind of looking for some direction from HR and their involvement.
Q. But to resolve not only the issue of the coverage but the issue of what's contained in Plaintiff'S Exhibit 5, in this document?
A. Right, right.
Q. Did you ever hear back from Don from human resources?
A. I know I did. Like I said, it's strange because as much as I clearly remember this incident, like I said, when I spoke to Attorney Quigley it was the first thing that came to my mind. I remember everything leading up to it. I don't remember the resolution of it. I don't remember whether, you know, she continued to be excluded. I don't know whether it was resolved while I was still there. I don't remember whether I was directed to put her back on the list. I draw a blank on that.
Q. Do you remember any other documents relating to this issue?
A. I believe I probably sent e-mails related to this.
Q. Related to Plaintiff's Exhibit 5?
A. I don't know about this exhibit. I

certainly, you know, the issue that she was being exempted from the coverage, but I don't remember specific e-mails or what I specifically said.

Q. Sitting here today do you know whether Simonne Tassone continued to have problems with teachers?

A. I don't. I believe that, I know I had several conversations with Jane Shugrue. My position was that, you know, if, and assuming until I knew otherwise, that this was something that was agreed upon, I was proceeding on an assumption that there was a likelihood that there was an agreed-upon document or agreement between Simonne and the school department that provided certain conditions. To me, those would be honored unless I was told not to honor them. That put in a position where if the union felt that was unfair, then we were looking at, you know, the union contract versus 504, American Disabilities Act. I didn't feel that this was something that I was going to be able to determine.

Q. I take it that the coverage issue first arose at the beginning of the school year, correct?

A. No. It really, I don't know whether, I think that because of budgetary constraints, you know, the school department realizing that money was going to be tight, I don't think it started at the beginning of



the school year for two reasons. One is you haven't entered cold and flu season, that kind of stuff. Attendance for everybody is going to be the best at the beginning of the school year. My other memory, recollection in general was that it wasn't an issue until the school department needed to tighten its belt in certain areas. I think what they did was they determined that they would have a set number of substitutes in their pool. That would be it. On days that those people could handle all of the things would be fine. On those days where it went beyond that, we would just have to do teacher coverages.

Q. Approximately when in the school year did the issue come up?

A. I don't know exactly. I do remember, you know, I don't remember it as being an issue right from the start of the school year.

Q. Would it have been in that first semester?

A. If it had been, it would have been late in it. My recollection of it was that it was, you know, late fall/early winter at the earliest when it started to become an issue. It was an issue I related to strongly. I was the one who had to sit there every morning, say, "Okay, first period I have to cover science class. Who is next on the list," and go



through and implement all of that. It wasn't easy.

Q. Did you ever speak to Jane Shugrue about her lifting her pant leg up?

A. I believe I did.

Q. You did?

A. I believe I did.

Q. When in relation to your receiving this February 4, 2003 document did you do that?

A. I don't remember specifically. I believe I spoke to Jane Shugrue and indicated that I felt that that was an inappropriate comment. I think that led to a longer conversation, one of several that I had with her about the issue of the coverage.

Q. Did she deny that she did it?

A. I don't believe she did. I don't remember the specifics.

Q. If she didn't deny that she did it, did you ever think that discipline was appropriate for her raising her pant leg and saying that she should put a brace on her leg, too?

A. Discipline as in? I mean, being spoken to by the principal and being told that something is inappropriate and not acceptable, I think is, you know, certainly a first step in drawing boundaries and a first step in a disciplinary type of action.



Q. But that wasn't discipline?

A. Well, in my experience dealing with, you know, teachers and having to discipline them, that would be the first step that I would do.

Q. Would you say that this was an oral warning?

A. I would put it in that category.

Q. A formal oral warning?

A. No. Let me say how, you know, I would proceed on things. I don't remember needing to go beyond that with Jane on it. I would warn people about things that are inappropriate. If people continued, I would write them a memo, documenting that I spoke to you about this and now I'm putting it in writing, et cetera, proceeding step-by-step.

Q. Do you remember Simonne Tassone coming to you after this document was received by you and saying she was continuing to have problems?

A. I don't remember.

Q. One way or the other?

A. No. I don't remember any specifics. I certainly believe there was a chilled relationship, but I don't remember any, you know, documentable-type of incident that comes to mind.

Q. What about the teachers who laughed; did you ever seek to find out who they were?

A. I don't believe I did.
Q. Why didn't you do that?
A. I chose to focus on the person who made the documented discernible. It's very hard in my experience dealing for over 20 years with students and teachers to try and determine why somebody laughed or if their laughter was related to the comment or wasn't related to the comment. I chose to focus on the person and the comment that was at the center. Without that comment, I don't think Simonne would have felt the way she says she clearly felt.
Q. She didn't tell you that, though?
A. Well, I think her documents say that that comment started, you know, a series of events that led to her feeling that way.
Q. Here it says, "Again, later in the day I overheard other teachers say the same things. I felt like I was on trial." Did you speak to any other teachers?
A. I did speak to, I believe, at least one other teacher. It probably was one other teacher.
Q. Who was that?
A. You know, I don't remember if it was, I'm cautious to say this because I could be remembering the wrong person. I don't remember whether it was Ted



Pollack. I don't remember if it was perhaps Chris Kite. I don't know whether I'm thinking of them because they each were the union rep in a given year. I did speak to, I'm quite sure I spoke to, once I determined who the other person was who was talking to her -- now there was one other person, I don't remember the other, specifically the other teachers. I did attempt to deal with those things that I could see as specific. People needed to either know things or they had misinformation or, you know --
Q. Well, sitting here today do you recall any other persons, other than Jane, who you spoke with after you received this document?
A. I know that I had a conversation with Pearl Holloway. Pearl who is a very, I would have to say a very concerned and conscientious person, had worked with Simonne as one of the people on the leadership team. I don't remember whether I was talking to her in a general sense or whether she had anything to do with any of the comments. I remember having a conversation with Pearl.
Q. Do you remember conducting any kind of an investigation after you received this?
[illegible]
[illegible]dn't do it?



A. I don't believe there was, no.
Q. Tell me, do you know Ms. Johnson, the teacher who worked --
THE WITNESS: Can you give me a first name?
MS. ANDREWS: I can't, but I think she was on Simonne's team.
A. It's not clicking with me. I don't know. If you give me a first name.
Q. Okay.
A. I think we had several Johnsons either as assistants or substitutes or whatever. It's not coming back to me.
Q. Do you ever remember Simonne Tassone going to you about leaving early because of the snow and your telling her that she could not leave early because several gym teachers had been leaving early and sometimes they left the kids alone. Do you remember anything at all about that?
A. An incident with some gym teachers being spoken to about leaving when they should not, that rings a bell with me. I don't know whether, I don't remember it being connected with Simonne.
Q. Do you ever remember telling her that she could not leave early because that would be a problem with



some gym teachers?
A. I don't remember that specifically, no.
Q. Do you deny that?
A. I don't deny it, and I don't remember it.
Q. Do you recall Simonne Tassone having an injury with her, on her thumb and her speaking to you about getting someone who could write for her?
A. I remember, I don't remember how it happened, like I said. I do remember that Simonne had made a request, I believe, through special ed or the school department to receive assistance. I believe it was related to getting her IEP plans written which required a great deal of writing within a short period of time.
Q. Do you remember whether or not that was granted?
A. I don't.
Q. Do you remember a personal assistant, Marabelle, first name Marabelle?
A. I do remember, yes, I do remember her.
Q. Do you ever remember using Marabelle for purposes other than those related to Simonne Tassone? Do you understand my question?
A. Right. I don't have enough of a specific recollection, no.
Q. Do you remember Simonne Tassone applying for a

to be very frequent as her vice principal.
Q. You said there was another library incident, if you will, that you remembered. Can you tell me when that one took place in relation to the one you just talked about?
A. No, I can't.
Q. Was it before or after?
A. I would only be guessing that it was after.
Q. But that's your best guess that it was after?
A. Best guess that it was after.
Q. All right, can you tell us about that?
A. Yes. Mr. Lee had arranged that I had a copier machine -- in fact, I had two -- in the library at that time, and teachers were allowed to use that machine, although it was understood it was primarily mine for library purposes. By the time that this incident occurred, lots of teachers used my copier with my consent. It was Mrs. Tassone's intent, that was expressed to me, that she would come down on some days to do her own copying for schoolwork during period five which was after lunch at that time on a fixed schedule. The fixed schedule, it was always period five after lunch, 12:30. During that period that would be her target period to do copying, and that she would



like to know if she could use the library copier because the copier in the teachers' lounge, which was the primary copier for teachers to be using, was across the room called the cafeteria, and fifth period happened to be the time that the custodians would clean the room and wash the floor. So they had signs up, yellow signs up and barriers up warning people that the floors were wet. And because those floors were not manageable, maneuverable for her, she was looking for an exception to come in and use the library. I had no objection for her to do that, but I found out subsequently to her request -- subsequent to her request that she had been refused, according to her words, by the principal and simply was forbidden to come into the library fifth period to use the copier on a frequent basis or on any basis, I think, during a free period.
Q. And the principal, did she identify the principal?
A. This was Robert E. Lee.
Q. Did you ever have any discussions with any person other than Simonne Tassone about that issue?
A. Not to my recollection. Including with the principal, I do not ever remember discussing it with him.



Q. So I take it that at some point Simonne Tassone went to you and said that she wanted to use the copier in the library during her fifth period, which was the free period, correct?
A. Yes.
Q. And she explained to you that she needed to use that because she could not maneuver her way through the cafeteria?
A. Yes.
Q. Because it was closed or because there were signs up?
A. It really was closed.
Q. Did she explain to you why she couldn't use the copier in the teachers' room?
A. Yes. It was a hazard, a safety hazard for her.
Q. And did she explain how?
A. Well, she didn't have to explain very much. Because of her crutches and her mobile cart, I could understand that that would not be a feasible option for her.
Q. So you gave her permission to use it?
A. That's correct.
Q. And she subsequently told you that Mr. Lee told her that she could not do that?
A. That is correct.



Q. Did you ever see Simonne Tassone using the copier in the library during that period after that?
A. No, I didn't. If I may, I would like to state for the record that I never had any agreement with Mr. Lee. It was not talked about. I never had any conversations with him private or public in which I agreed to his strategy or his policy of not letting her come in and use the library. I really left it between Simonne and him. She never asked me to go and talk to him that I recall, and I didn't.
Q. Now, you said that other teachers used the copier in the library. Was that before and after Simonne told you that Mr. Lee told her that she could not?
A. Yes, it was.
Q. And did that strike you in any way that Simonne had told you that she couldn't use it and was not and yet other teachers were able to?
A. It struck me as enigmatic. It struck me as enigmatic. May I add for the record?
MS. ANDREWS: Yes.
A. That the environment at the school on the copier issues was such that there were a complex of issues about the use of the library copier. There were violations when people would come in

during classes. There were times when people using the copier were interrupting me in the middle of class. So there were lots of ups and downs about copier use, and I really generally over the years tended to go on the side of letting them -- being lenient and letting people come in and use the copier unless there was a real disruption, and that's the case now. I have classes. Technically they are not supposed to come in during class time but teachers do. In a couple of instances I have asked people to leave because they really have been disruptive to my class teaching using the copier, [illegible] but aside from that, I generally have let people over the years use the copier at their discretion, not mine.

Q. Let me ask you this, are you aware of any other problems that Simonne Tassone had with Mr. Lee or Mr. DiRuzzo?

A. Yes, I am.

Q. And can you articulate those problems, and then we'll go back and talk about each one in greater detail.

A. Well, the ones I recall, first and foremost I recall the early dismissal question. I saw a



contrast between Simonne's results in asking for permission to leave early on a given occasion and my results when asking for permission to leave school early for a special reason. Now, with Simonne's case, I only have her own word that she was refused permission to leave early. If it was bad weather and she was going to be threatened, if she was threatened by the weather conditions, such as snow falling early before dismissal time, and needing to get out, and whether it was a health issue and a doctor's appointment, my understanding through her was that it was very consistent that she was not given permission to leave early. The school rule is the school rule, and she could not leave early, period.

Q. Did she tell you who was denying her permission to leave?

A. I believe it was Mr. Lee primarily. In the absence of the principal she would have gone to the vice president. So speculating it was mostly Mr. Lee and on some occasions probably Mr. DiRuzzo.

Q. You're speculating about the Mr. DiRuzzo part, not the Mr. Lee part?

A. That's correct. I understood that she did go



to Mr. Lee.

Q. And Simonne Tassone told you this?

A. Yes, she did.

Q. And she said that -- do you remember her saying that she had asked permission of Mr. Lee to leave early on, you know, snowy days, and he said no?

A. Yes. I don't know how frequently on snowy days, but on some snowy days, yes.

Q. And on how many occasions did she come to you and talk to you about times when she asked for permission to leave early and got a negative response?

A. [illegible] a time frame here?

Q. I will ask you that, do you recall the time frame?

A. I cannot cut off this '95 to '97 period and concentrate and say from my memory this is what did or did not happen regarding her early dismissal requests. I would tend to see it more from the time of '93 up to the present.

Q. So your best recollection is, with this issue about her request to get out, your best recollection -- get out early, your best recollection is it took place from '93 to the present time?

A. With some exception, some marked exception.



Q. And what do you mean by marked exception?

A. During the tenure of Robert Perkins as vice principal in our school, which I believe was a two-year period from maybe 2001 to 2002, like the 2000/2001 school year, 2001/2002 school year, I'm aware from Simonne's testimony or I have heard from Simonne that Mr. Perkins did indeed allow her to leave early on any number of occasions when she requested it of him when she felt it was serious that she needed to leave.

Q. And Simonne told you that?

A. Yes.

Q. And other than what you would call that marked exception, Simonne told you that she was not allowed to leave early?

A. That's right.

Q. Now, you say that this was different than your own experience in leaving early?

A. My own experience in my requests to leave early.

Q. Can you tell me what your experience was?

A. Yes. I was very cautious not to abuse that request to leave early. I felt that it was on important and justifiable occasions that I did raise it. It wasn't frequent, and it wasn't

button on your remote, it would move the signal?
A. Yes.
Q. Did you ever fill out any paperwork to make a request to resolve this problem? Strike that. Did you ever put in writing or memorialize in any way this problem you were having with the switch?
MS. ANDREWS: Objection as to the form.
A. I don't remember putting it in writing. I know I spoke to Mr. Lee and Mr. DiRuzzo. I spoke to Peter, I don't know his last name. He works for the school department. He was the janitor. I spoke to him about it. He tried using the tape. I am not sure if it was Mr. Lee or Mr. DiRuzzo who said they would put in a work order.
Q. And at some point it got removed, the switch did?
A. Yes.
Q. Turning to Page 8 where you are talking about the remote and the loss of the remote, you say, I eventually learned the janitor in my school had the remote all



along; do you see that sentence?
A. Yes.
Q. Is it your understanding that remote the janitor had was the one that had gone missing in December of 1998 or an extra one?
A. An extra one.
Q. Did you physically get the remote from the janitor?
A. Yes, I did.
Q. He handed it to you or gave it to you?
A. I am not sure if he gave it to Mr. Lee and Mr. Lee gave it to me, but he did speak to me about it.
Q. Who is the he?
A. Peter.
Q. This is the same Peter who put tape up?
A. Yes.
Q. He is the one who said, it is my remote that you now have, or my copy of it?
A. Yes.
Q. Is he the one who said, don't lose it?
A. Yes.
Q. Because we don't have any others?
A. Yes.



Q. Did you get along with Peter?
A. Yes.
Q. Do you know his last name?
A. I know his wife works at the school. I don't know his last name offhand right now. I always called him Peter.
Q. You say on Page 9 that students could not go on trips because I could not get on the bus?
A. Yes.
Q. You are saying this happened from 1998 to about 2001?
A. Yes.
Q. How many times in that time period did that happen?
A. Sometimes once a year.
Q. We are talking about three years here, '98 to '99, '99 to 2000 and 2000 to 2001?
MS. ANDREWS: Why don't you read your answer before you, when she asks a question, read it and take your time and then answer it.
A. It happened three times or once a year for the three years.
Q. Your memory is that in each of the three



years from 1998 to 2001 your kids did not go on any field trips at all because of your inability to use the bus?
A. Yes, because I was told that it cost extra money to get a handicap because for a scooter. If they went to a museum or a place that did a lot of walking and that because of that a lot of field trips had to be cancelled.
Q. Did other people go on field trips those years?
A. Yes.
Q. Who told you that your kids could not go on a field trip because they could not get a handicap bus?
A. It was members of the special-ed team, I believe.
Q. Who? Glenda Guglielmo?
A. I am talking about teachers.
Q. Did Mr. Lee tell you that?
A. No.
Q. Did Mr. DiRuzzo tell you that?
A. No.
Q. Don't you put in a request for a bus through your principal?

A. Yes.
Q. When you say on Page 9, in about April or May of 2000 I left during an actual fire, take a look at that paragraph.
MS. ANDREWS: Objection as to the form. That is no not what it says.
Q. Look at the paragraph that begins, in or about April or May of 2000, just take a look at that paragraph.
(WITNESS PERUSES DOCUMENT)
A. Okay.
Q. Which fire door had shut automatically and prevented you from getting out, if you can describe it for me?
A. When you get off the ramp.
Q. On the second floor?
A. When you come down the ramp and go to the first floor, because I was stuck on the second floor and I figured, I thought I could get down the ramp and scoot out the main entrance to get out of the building because I was by myself. I didn't realize that once you got off the ramp and made a left turn there were two fire doors there that automatically shut. I could not get



them open. I got scared because that area was filling in with smoke.
Q. These were the doors on the first flor to the left as you come off the ramp?
A. Yes.
Q. And you say, I began telling everyone what happened and I remember some teachers laughing. Do you remember who?
A. I think Maria was one of them, the secretary.
Q. She is not a teacher?
A. Right. There were a lot of teachers out there. I remember Maria being out there and laughing.
Q. You write here, I remember teachers laughing?
A. Yes.
Q. What teachers were laughing?
A. Right now all I can think of is Maria the secretary. I can't remember the other teachers' names. I don't recall who was out there at that time.
Q. You are not saying that every teacher who was out there was laughing?
A. No, just a few, like, three of them.



Q. Three teachers?
A. Yes. It was a small group. They thought it was kind of funny that the fireman found me.
Q. Did you think it was funny?
A. No.
Q. Did there come a time in which it was your understanding Ms. Kobonick was in charge of special-ed kids?
MS. ANDREWS: Asked and answered ad nauseam in the second deposition by you.
A. Yes.
Q. When was that?
MS. ANDREWS: Asked and answered.
A. 1999-2000 school year.
Q. 1999-2000 school year is your memory of when she took over?
A. As vice principal for just one year.
Q. And not before?
A. No. She was only vice principal for one year, I believe.
Q. When you were suffering this finger injury, you were out from September 11, you just



testified you think you came back after the February vacation?
A. No, not for my finger injury.
Q. When did you come back?
A. For my finger injury, we thought it was just a sprain at first. The doctor decided to try therapy and the physical therapist made me this big plastic thing so I could walk with the crutches.
Q. Page 10 at the top, it says, after I was injured by Nelson Garcia, I was out of school because of the injury. When were you out of school?
A. From February 5, I believe the day of the surgery, until September of that year.
Q. So February 5 of 2002 until September of that same calendar year?
A. Yes.
Q. You describe a voice-activated program that did not work. Are you seeing that in that paragraph?
MS. ANDREWS: Read the whole thing slowly, you don't have to speed read.
(WITNESS PERUSES DOCUMENT)
A. Okay.